JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| **(b)** County of Residence of First Listed Plaintiff _____ <br> *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant _____ <br> *(IN U.S. PLAINTIFF CASES ONLY)* <br> NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF <br> THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
      Plaintiff

☐ 2  U.S. Government
      Defendant

☐ 3  Federal Question
      *(U.S. Government Not a Party)*

☐ 4  Diversity
      *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                          *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place <br> of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place <br> of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a <br> Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment <br> & Enforcement of Judgment <br> ☐ 151 Medicare Act <br> ☐ 152 Recovery of Defaulted <br> Student Loans <br> (Excludes Veterans) <br> ☐ 153 Recovery of Overpayment <br> of Veteran's Benefits <br> ☐ 160 Stockholders' Suits <br> ☐ 190 Other Contract <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | **PERSONAL INJURY** <br> ☐ 310 Airplane <br> ☐ 315 Airplane Product <br> Liability <br> ☐ 320 Assault, Libel & <br> Slander <br> ☐ 330 Federal Employers' <br> Liability <br> ☐ 340 Marine <br> ☐ 345 Marine Product <br> Liability <br> ☐ 350 Motor Vehicle <br> ☐ 355 Motor Vehicle <br> Product Liability <br> ☐ 360 Other Personal <br> Injury <br> ☐ 362 Personal Injury - <br> Medical Malpractice | **PERSONAL INJURY** <br> ☐ 365 Personal Injury - <br> Product Liability <br> ☐ 367 Health Care/ <br> Pharmaceutical <br> Personal Injury <br> Product Liability <br> ☐ 368 Asbestos Personal <br> Injury Product <br> Liability <br> **PERSONAL PROPERTY** <br> ☐ 370 Other Fraud <br> ☐ 371 Truth in Lending <br> ☐ 380 Other Personal <br> Property Damage <br> ☐ 385 Property Damage <br> Product Liability | ☐ 625 Drug Related Seizure <br> of Property 21 USC 881 <br> ☐ 690 Other | ☐ 422 Appeal 28 USC 158 <br> ☐ 423 Withdrawal <br> 28 USC 157 <br> **PROPERTY RIGHTS** <br> ☐ 820 Copyrights <br> ☐ 830 Patent <br> ☐ 835 Patent - Abbreviated <br> New Drug Application <br> ☐ 840 Trademark <br> ☐ 880 Defend Trade Secrets <br> Act of 2016 | ☐ 375 False Claims Act <br> ☐ 376 Qui Tam (31 USC <br> 3729(a)) <br> ☐ 400 State Reapportionment <br> ☐ 410 Antitrust <br> ☐ 430 Banks and Banking <br> ☐ 450 Commerce <br> ☐ 460 Deportation <br> ☐ 470 Racketeer Influenced and <br> Corrupt Organizations <br> ☐ 480 Consumer Credit <br> (15 USC 1681 or 1692) <br> ☐ 485 Telephone Consumer <br> Protection Act <br> ☐ 490 Cable/Sat TV <br> ☐ 850 Securities/Commodities/ <br> Exchange |
| **REAL PROPERTY** <br> ☐ 210 Land Condemnation <br> ☐ 220 Foreclosure <br> ☐ 230 Rent Lease & Ejectment <br> ☐ 240 Torts to Land <br> ☐ 245 Tort Product Liability <br> ☐ 290 All Other Real Property | **CIVIL RIGHTS** <br> ☐ 440 Other Civil Rights <br> ☐ 441 Voting <br> ☐ 442 Employment <br> ☐ 443 Housing/ <br> Accommodations <br> ☐ 445 Amer. w/Disabilities - <br> Employment <br> ☐ 446 Amer. w/Disabilities - <br> Other <br> ☐ 448 Education | **PRISONER PETITIONS** <br> **Habeas Corpus:** <br> ☐ 463 Alien Detainee <br> ☐ 510 Motions to Vacate <br> Sentence <br> ☐ 530 General <br> ☐ 535 Death Penalty <br> **Other:** <br> ☐ 540 Mandamus & Other <br> ☐ 550 Civil Rights <br> ☐ 555 Prison Condition <br> ☐ 560 Civil Detainee - <br> Conditions of <br> Confinement | **LABOR** <br> ☐ 710 Fair Labor Standards <br> Act <br> ☐ 720 Labor/Management <br> Relations <br> ☐ 740 Railway Labor Act <br> ☐ 751 Family and Medical <br> Leave Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Employee Retirement <br> Income Security Act <br><br> **IMMIGRATION** <br> ☐ 462 Naturalization Application <br> ☐ 465 Other Immigration <br> Actions | **SOCIAL SECURITY** <br> ☐ 861 HIA (1395ff) <br> ☐ 862 Black Lung (923) <br> ☐ 863 DIWC/DIWW (405(g)) <br> ☐ 864 SSID Title XVI <br> ☐ 865 RSI (405(g)) <br> **FEDERAL TAX SUITS** <br> ☐ 870 Taxes (U.S. Plaintiff <br> or Defendant) <br> ☐ 871 IRS—Third Party <br> 26 USC 7609 | ☐ 890 Other Statutory Actions <br> ☐ 891 Agricultural Acts <br> ☐ 893 Environmental Matters <br> ☐ 895 Freedom of Information <br> Act <br> ☐ 896 Arbitration <br> ☐ 899 Administrative Procedure <br> Act/Review or Appeal of <br> Agency Decision <br> ☐ 950 Constitutionality of <br> State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original
     Proceeding

☐ 2 Removed from
     State Court

☐ 3 Remanded from
     Appellate Court

☐ 4 Reinstated or
     Reopened

☐ 5 Transferred from
     Another District
     *(specify)*

☐ 6 Multidistrict
     Litigation -
     Transfer

☐ 8 Multidistrict
     Litigation -
     Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
   UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____

Address of Defendant: _____

Place of Accident, Incident or Transaction: _____

---

*RELATED CASE, IF ANY:*

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?     Yes ☐     No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?     Yes ☐     No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?     Yes ☐     No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?     Yes ☐     No ☐

I certify that, to my knowledge, the within case ☐ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____     _____     _____
                                  *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

*A.*     *Federal Question Cases:*

☐ 1.   Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2.   FELA
☐ 3.   Jones Act-Personal Injury
☐ 4.   Antitrust
☐ 5.   Patent
☐ 6.   Labor-Management Relations
☐ 7.   Civil Rights
☐ 8.   Habeas Corpus
☐ 9.   Securities Act(s) Cases
☐ 10.  Social Security Review Cases
☐ 11.  All other Federal Question Cases
        *(Please specify): _____*

*B.*     *Diversity Jurisdiction Cases:*

☐ 1.   Insurance Contract and Other Contracts
☐ 2.   Airplane Personal Injury
☐ 3.   Assault, Defamation
☐ 4.   Marine Personal Injury
☐ 5.   Motor Vehicle Personal Injury
☐ 6.   Other Personal Injury *(Please specify): _____*
☐ 7.   Products Liability
☐ 8.   Products Liability – Asbestos
☐ 9.   All other Diversity Cases
        *(Please specify): _____*

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____, counsel of record *or* pro se plaintiff, do hereby certify:

☐   Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐   Relief other than monetary damages is sought.

DATE: _____     _____     _____
                                  *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

<u>**UNITED STATES DISTRICT COURT**</u>
<u>**EASTERN DISTRICT OF PENNSYLVANIA\**</u>

| | | |
|---|---|---|
| **IGNATUS PAPPAGALLO,** | * | |
| **EXECUTOR OF THE ESTATE OF** | * | |
| **RALPH PAPPAGALLO a/k/a** | * | |
| **RAFFAELE PAPPAGALLO and** | * | |
| **ANNA PAPPAGALLO, in her own right** | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| | * | |
| | * | |
| v. | * | CIVIL ACTION No. _____ |
| REDCO CORP., f/k/a CRANE COMPANY | * | |
| 3M COMPANY | * | |
| AMDURA LLC F/K/A AMDURA | * | |
| CORPORATION INDIVIDUALLY AND AS | *, | |
| SUCCESSOR TO AMERICAN HOIST & | * | |
| DERRICK COMPANY | * | |
| ANCHOR DARLING VALVE COMPANY | * | |
| AIR LIQUID SYSTEMS CORP., | * | |
| AS SUCCESSOR BY MERGER TO | * | |
| BUFFALO PUMPS, INC. | * | |
| CARRIER CORPORATION | * | |
| CLEAVER BROOKS, INC. | * | |
| DAP, INC. K/N/A LA MIRADA PRODUCTS | * | |
| CO. | * | |
| DREVER COMPANY | * | |
| FLOWSERVE AS SUCCESSOR TO | * | |
| BYRON JACKSON PUMP COMPANY | * | |
| FLOWSERVE AS SUCCESSOR TO | * | |
| DURCO PUMPS | * | |
| FLOWSERVE AS SUCCESSOR TO | * | |
| DURIRON | * | |
| FLOWSERVE US INC., SOLELY AS | * | |
| SUCCESSOR TO EDWARD VOGT VALVE | * | |
| COMPANY VOGT VALVE COMPANY | * | |
| FLOWSERVE CORPORATION | * | |
| INDIVIDUALLY AND AS SUCCESSOR | * | |
| TO IDP PUMPS F/K/A INGERSOLL | * | |
| DRESSER PUMPS | | |

FLOWSERVE US INC., SOLELY AS          *
SUCCESSOR TO NORDSTROM                *
VALVES, INC.                          *
FMC CORPORATION                       *
FOSECO, INC.                          *
FOSTER WHEELER LLC                    *
GENERAL ELECTRIC CO.                  *
GENUINE PARTS CO.                     *
ITT LLC, AS SUCCESSOR TO GODWIN       *
PUMPS OF AMERICA, INC.                *
GOULDS PUMPS INC., N/K/A GOULDS       *
PUMPS LLC                             *
GREENE, TWEED NC, LLC                 *
GRINNELL, LLC, F/K/A GRINNELL         *
CORPORATION                          *
HAJOCA CORPORATION                    *
HONEYWELL INTERNATIONAL, INC.         *
AS SUCCESSOR IN INTEREST TO           *
ALIAS TO BENDIX CORPORATION           *
IMO INDUSTRIES, INC., INDIVIDUALLY,   *
AND AS SUCCESSOR TO DELAVAL           *
STEAM TURBINE COMPANY                 *
ITT CORPORATION                       *
ITT LLC F/KA/ ITT CORPORATION AND     *
BELL & GOSSETT COMPANY                *
J.A. SEXAUER MANUFACTURING            *
COMPANY                              *
J. H. FRANCE REFRACTORIES             *
JOHN CRANE, INC., F/K/A CRANE         *
PACKING COMPANY                       *
KEELER/DORR-OLIVER BOILER CO.         *
GROVE U.S. LLC, AS SURVIVOR OF        *
THE MERGER WITH MANITOWOC             *
CRANES, LLC CORPORATION SERVICE       *
COMPANY                              *
METROPOLITAN LIFE INSURANCE CO.       *
MILWAUKEE VALVE COMPANY               *
JOY GLOBAL SURFACE MINING, INC.,      *
F/K/A P & H MINING EQUIPMENT, INC.    *
P&H MINING EQUIPMENT, INC., F/K/A     *
ALIAS: HARNISCHFEGER CORPORATION      *
PARKER HANNIFIN CORPORATION           *
STERLING FLUID SYSTEMS (USA)          *
SUNOCO, INC.                          *

2

UNION CARBIDE CORPORATION      *
WARREN PUMPS LLC      *
THE MARLEY-WYLAIN COMPANY F/K/A      *
WEIL MCLAIN COMPANY      *
VIACOMCBS INC. F/K/A CBS      *
CORPORATION , A DELAWARE      *
CORPORATION  F/K/A VIACOM INC.      *
SUCCESSOR BY MERGER TO CBS      *
CORPORATION, A PENNSYLVANIA      *
CORPORATION F/K/A      *
WESTINGHOUSE ELECTRIC      *
CORPORATION      *
ZURN INDUSTRIES INC.      *

           Defendants,

## DEFENDANT JOHN CRANE INC.'S
## NOTICE OF REMOVAL OF ACTION

Pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, Defendant John Crane Inc. ("JCI")[1] hereby removes this action from the Philadelphia County Court of Common Pleas (the "Common Pleas Court") to the United States District Court for the Eastern District of Pennsylvania. JCI provides the following short and plain statement of the grounds for removal:

## I. BACKGROUND FACTS

JCI was served with a Summons and Complaint on April 28, 2023, in connection with the civil action pending before the Common Pleas Court, Case Number 230402099. (Summons and Complaint attached collectively as **Exhibit A**.)

The "Short Form Complaint"—an initial pleading which does not comply with Federal Rule of Civil Procedure 8—alleges that the decedent Raffaele "Ralph" Pappagallo (hereafter "Mr.

---

[1] In the style of her Complaint, Plaintiff mistakenly identifies JCI with a comma in its name.

3

Pappagallo" or "Decedent") developed mesothelioma caused in part by his work with and around a wide variety of asbestos-containing products, including JCI gasket and packing products, while working (among other places) at Bethlehem Steel as a mechanic from 1961-1987. (*Id.* ¶3.) The Complaint sets forth no further details regarding the nature of Mr. Pappagallo's work at Bethlehem Steel. In discovery responses dated February 12, 2025, Plaintiffs again disclosed those same limited facts about Mr. Pappagallo's work history at Bethlehem Steel. (2/12/25 Resps. to Master Disc. at Exs. 2&5 thereto, attached as **Exhibit B**.)

Discovery revealed no further facts regarding the nature of Mr. Pappagallo's work for Bethlehem Steel until the March 12, 2025 deposition of a co-worker witness, Antonio Albanese. Because Mr. Pappagallo passed away before he could be deposed, Mr. Albanese was offered as a fact witness regarding Mr. Pappagallo's work for Bethlehem Steel. Mr. Albanese recounted how he and Mr. Pappagallo (in addition to having each worked different jobs there) labored together for three years repairing vessels at Bethlehem Steel's shipyard in Hoboken, New Jersey (hereafter the "Hoboken Shipyard"). (3/12/25 Disc. Dep. of A. Albanese at 11:13-15; 29:14-30:21, attached as **Exhibit C**.) Among the products Mr. Albanese recalled he and Mr. Pappagallo "regularly" worked with aboard vessels at the Hoboken Shipyard were JCI brand gaskets and packing. (3/12/25 Trial Pres. Dep. at 41:9-42:15; 43:11-17; 45:2-9; 63:22-64:23, attached as **Exhibit D**.)

In addition to other types of vessels, Mr. Albanese chronicled how Hoboken Shipyard laborers worked on both Navy and U.S. Coast Guard Ships, (Ex. C at 37:12-38:6), explaining "we worked on quite a few of the Navy ships." (*Id.* at 45:14-21.) While Mr. Albanese could not "specifically" recall the "particular" Navy ships on which Mr. Pappagallo worked, (*id.* at 197:24-198:3), Mr. Albanese testified—repeatedly, in fact—that Mr. Pappagallo worked aboard Navy and

Coast Guard vessels using the same brands of gaskets and packing as Mr. Albanese used. (*Id.* at 39:6-10; 195:7-19; 196:3-18.)

While the Short Form Complaint sets forth no theories of recovery, it incorporates by reference a 100-page "Master Long Form Complaint" filed in the Common Pleas Court in 1986. (Ex. A at pdf p. 11.)  The Original Master Complaint, a copy of which is attached as **Exhibit E**, sounds in negligence and strict liability and alleges causes of action for defective design, failure to warn, and failure to test.  (Ex. E at 83-86.)

## II. GOVERNMENT SPECIFICATIONS GOVERNING GASKETS AND PACKING

At all times relevant to Plaintiffs' claims, the U.S. Navy and U.S. Coast Guard observed a very particular process that had to be followed by product suppliers and manufacturers, like JCI, in order to sell products to the U.S. Navy and U.S. Coast Guard. Each required that any product it purchased be qualified and approved before the purchase. Accordingly, to sell a product to either the U.S. Navy or the U.S. Coast Guard, JCI would have had to go through certain steps to have the product placed on the Federal government's Qualified Products List ("QPL"), a list designating products as eligible for bidding on naval contracts.

At all times relevant to Plaintiffs' claims, to place a bid to sell a product to the U.S. Navy or U.S. Coast Guard, JCI would first obtain the Navy's applicable Military Specification ("Mil-Spec"). Then, JCI would inform the Navy or Coast Guard of its intention to bid on that specification. Once JCI had developed a product that conformed to the Navy's or Federal specifications, the specification required JCI to test the product using an independent laboratory and submit those test results to the Navy or designated agency.

The Navy's and Federal specifications—again governing both Navy and Coast Guard ships—also required that the product be submitted to the Navy or designated Federal agency for

the government's own testing. Only after the product had satisfied the required testing could it be placed on the Federal government's QPL. Once a product was placed on the QPL, it could then be sold to the Navy or Coast Guard.

### A.    Specifications Regarding Gaskets

At all times relevant to Plaintiffs' claims, any JCI compressed asbestos-containing sheet gasket material sold to the U.S. Navy or Coast Guard would have conformed with reasonably precise military specifications covering every aspect of the composition, marking and labeling of the product, appearance, technical performance, and testing requirements.[2]

During much of the time relevant to Plaintiffs' claims, compressed asbestos-containing sheet gasket material was governed by Military Specification MIL-A-17472B, attached as **Exhibit F**. This specification expressly required—based on decades of research by the Navy itself dating back to the first score of the twentieth century—the asbestos sheet to contain a minimum amount ("not less than 70 percent") of chrysotile asbestos.  (*Id.* ¶¶ 3.2.1, 3.4.)

Included in this Mil-Spec was a requirement for all writings and markings to appear on the face of the product. Specifically, Paragraph 3.11, entitled "Branding," in MIL-A-17472B provided that the face of the gasket was to be "plainly marked" with the "manufacturer's name, brand identification, and symbol 2150."  (*Id.* ¶ 3.11.) No other writings or markings—including warnings of any kind—were permitted.

In 1974, MIL-A-17472B was replaced by Federal Specification HH-P-46D. It also contained requirements as to the type and amount of asbestos to be included in the product.

---

[2] The only JCI sheet gasket material ever appearing on the Navy's QPL—although not during many of the years at issue here—was style 2150.

(7/27/73 HH-P-46D ¶¶3.2.1, 3.4, attached as **Exhibit G**.) It also set forth what could appear on the face of the gasket material, to the exclusion of all other things. HH-P-46D categorized as a "major" defect any gasket whose "[m]arking is not as specified." (*Id.* at Table II.)[3]

Likewise, Paragraph 5.3 of MIL-A-17472B (and Paragraph 5.3.2 of HH-P-46) set forth requirements for all writings and markings that were permitted on shipping containers for gasket material. The documents incorporated by reference into Paragraph 5.2 did not—prior to July 1, 1980—include warnings for asbestos-containing products. Because the Navy assumed responsibility for promulgation of all warnings, and because one of the Navy's objectives was ensuring uniformity in labeling across the same products, the absence of any warning for asbestos incorporated into these paragraphs meant that such a warning was not permitted on the shipping containers for compressed asbestos sheet gasket material. As of July 1, 1980, the Federal government specified in detail (and JCI began providing) the asbestos warning required to accompany all shipments of gaskets. (7/1/80 MIL-STD-129H at 90 ¶5.4.35.1, attached as **Exhibit I**.)

Mil-Spec MIL-A-17472B likewise defined and delimited mandatory detailed and comprehensive testing procedures in Section 4.5. (Ex. F ¶ 4.5.) The Navy's qualification process for inclusion of asbestos-containing gaskets on the applicable QPL, which included these mandatory testing procedures, is reflected in paragraphs 3.1 and 4.2 of Mil-Spec MIL-A-17472B (and paragraphs 3.1 and 4.4 in HH-P-46). The gaskets JCI sold to the Navy and Coast Guard were

---

[3] HH-P-46D was superseded by HH-P-46E in 1975. Its provisions were substantially similar to those of revision D. (3/3/75 HH-P-46E, attached as **Exhibit H**.)

required to—and did—conform to all the applicable specifications for compressed asbestos sheet gasket material during the years at issue.

### B.    Specifications Regarding Packing

The level of oversight, control, testing, and detailed specifications described above for gasket material applied with equal force to the packing products sold by JCI to the Navy and Coast Guard. Indeed, Mil-Specs for packing during the period relevant to Plaintiffs' claim contained precise language covering every aspect of the composition (expressly including asbestos), construction, size, performance testing, temperature rating, pressure rating, packaging, marking, and other characteristics of the particular style of packing at issue. (*See* MIL-P-17303C, attached as **Exhibit J**).

For example, MIL-P-17303 strictly governed the composition of the packing supplied to the Navy and Coast Guard. Paragraph 3.2 provided that the "composition" of the packing "shall conform to that of the sample submitted for qualification." (*Id.* ¶ 3.2.) When it was promulgated by the Navy in 1952, MIL-P-17303 replaced what had been Mil-Spec MIL-P-15385, which had been in place since August 15, 1951, which in turn had superseded Navy Department Specification ("ND-SPEC") 33-P-25c, which had been in place since 1943.[4]  The replacement of ND-SPECs with Mil-Specs was a function of a post-war movement away from branch-specific specifications to specifications that could be used across the various military branches.

Both MIL-P-15385 and ND-SPEC 33-P-25 expressly required that all packing contain asbestos.  (Aug. 15, 1951 MIL-P-15385, attached as **Exhibit K**, at ¶3.5; Jan. 2, 1943, ND-SPEC

---

[4] Between 1952 and October 14, 1955 (the date of Exhibit J), MIL-P-17303 was amended in ways not relevant here.

33-P-25c, attached as **Exhibit L**, at §D.)  As such, the packing supplied by JCI that was approved for use by the Navy and Coast Guard under MIL-P-15385 and ND-SPEC 33-P-25 was required to contain asbestos.

When MIL-P-17303C was promulgated, the products that had previously been approved by the Navy under MIL-P-15385 and ND-SPEC 33-P-25c were carried forward as the "approved" products under MIL-P-17303C.  This is reflected in the QPL for MIL-P-17303C during the time of Mr. Pappagallo's work at the Hoboken Shipyard, reflecting dates of approved product testing (in the 1930s) that tied back to ND-SPEC 33-P-25. (*See*, *e.g.*, Mar. 19, 1969, QPL-17303-25, attached as **Exhibit M**, at 1, identifying "EES"—the Navy's Engineering Experiment Station—test results from the 1930s.)

Thus, in promulgating MIL-P-17303C, the Navy required the continued use of the same asbestos-containing packings that had been required for decades under MIL-P-15385 and ND-SPEC 33-P-25. All of the various brands of packing on the QPL for MIL-P-17303C over the years in question, regardless of manufacturer, contained asbestos and JCI was not free to use non-asbestos packing under MIL-P-17303C.

Before such a product could be used, it would have to be subjected to the testing required in the Mil-Spec. Only after such testing would the Navy then have decided whether to approve use of the product, a decision that was completely within the Navy's discretion. During the course of Mr. Pappagallo's work, the Navy tested for non-asbestos alternatives and determined that asbestos was still required to be used in packings supplied under MIL-P-17303C.

Further, MIL-P-17303C included requirements for all writings and markings (which were only permitted on containers and not on the spools themselves) that were to appear on the product. (Ex. J ¶ 5.3.)  No other writings or markings (including warnings of any kind) were permitted.  Up

9

until July 1, 1980, these writings and markings never included an asbestos warning. For the same reasons described above for gaskets, warnings on packing containers were strictly controlled by the Navy and did not allow for an asbestos warning.  As discussed above, JCI began providing the asbestos warning required by the Federal government on July 1, 1980.

Like MIL-A-17472 and HH-P-46 for gaskets, MIL-P-17303C set forth mandatory detailed and comprehensive testing procedures for packing in the paragraph entitled "4.4 Inspection and tests." (Ex. J ¶ 4.4.)

At all times relevant to Plaintiffs' claims, JCI complied with all reasonably precise specifications, including product composition, labeling requirements, and testing protocols, set forth in the specifications applicable to the gasket and packing products it sold to the U.S. Navy and Coast Guard.

 The U.S. Navy inspected goods supplied by JCI both at JCI's facilities and at the point of receipt by the Navy and Coast Guard. These inspections specifically included review for compliance with marking and labeling requirements. The Navy never rejected or returned any shipment of products from JCI for failure to include an asbestos warning label. JCI never received any correspondence or other communication from the Navy instructing that JCI's shipments of products were required to include such warnings. There was never a cessation of the business relationship between the Navy or the Coast Guard and JCI over failure to include asbestos warnings on products.

At all times relevant to Plaintiffs' claims in this lawsuit, the United States Government, including the U.S. Navy—as one of the world's largest consumers of asbestos containing products—possessed knowledge regarding the dangers of asbestos that was superior to that of its equipment and product suppliers, including JCI.  In fact, the Navy's knowledge of asbestos hazards

dates back to the early 1920s, before JCI was even approved to sell products to the Navy and Coast Guard.

### III. <u>FEDERAL OFFICER REMOVAL (28 U.S.C. § 1442(a)(1))</u>

As an initial matter, when a case such as this one is not removable based on the initial pleadings, the deadline to remove runs 30 days from the defendant's receipt of an "amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. §1446(b)(3). The Third Circuit has recognized that answers to deposition questions constitute "other paper" for purposes of triggering the time for removal under Section 1446. *See Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 816 n. 10 (3rd Cir. 2016). Thus, this removal by JCI is timely.

Removal is proper under 28 U.S.C. § 1442(a)(1) when facts are disclosed establishing that: (1) the removing defendant is a person within the meaning of the statute; (2) it performed the complained of action at the direction of a federal officer and under color of federal office; (3) there is a causal nexus between the defendant's actions and the Plaintiff's claims; and (4) the defendant asserts a "colorable federal defense." *Mesa v. California*, 489 U.S. 121, 123-135 (1989); *Papp*, 842 F.3d at 812; *see also Gay v. A.O. Smith*, 2024 U.S. App. LEXIS 12536 at *5-7 (3d Cir. May 24, 2024); *accord Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022); *Leite v. Crane Co.*, 749 F.3d 1117, 1120 (9th Cir. 2014); *Getz v. Boeing Co.*, 654 F.3d 852, 861 (9th Cir. 2011); 28 U.S.C. § 1442(a)(1). JCI meets all four elements and is therefore entitled to remove this action pursuant to the federal officer removal statute.

First, as a corporation, JCI is a "person" for purposes of 28 U.S.C. § 1442(a)(1). *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 136 (2d Cir. 2008); *accord Moore*, 25 F.4th at 34; *Papp*, 824 F.3d at 812. Second, to the extent JCI supplied asbestos-containing gasket and packing material,

it was at the direction of a federal officer, the United States Government, and under color of federal office.

The materials at issue were supplied pursuant to military procurement contracts with the United States Government and in compliance with detailed design, testing, and labeling specifications issued and approved by the Government. These specifications dictated the performance testing and material composition of the materials, including the requirement that such material contain asbestos fibers. (Ex. F (MIL-A-17472) ¶¶ 3.1-3.4 and Ex. G (HH-P-46D) ¶¶ 3.1-3.4 (gaskets); Ex. J (MIL-P-17303C) ¶¶ 3.1, 3.9.2 (packing).)

These specifications dictated the writings and markings required and allowed to be placed on the materials. (Ex. F (MIL-A-17472B) ¶¶ 3.11, 5.2 and Ex. G (HH-P-46D) ¶¶ 3.11, 5.3.2, Table II thereto (gaskets); Ex. M (MIL-P-17303C) ¶ 5.3 (packing).)  The design, manufacture, testing, labeling, and shipment of such materials were subject to close, detailed, and ongoing supervision and control of the United States Government and its officers. The Government exercised discretion and approval authority over the products supplied by JCI. JCI complied with all of the United States Government's specifications. And, to the extent of any alleged hazards associated with gasket and packing materials, there were no dangers known to JCI that were not known to the United States.  *Papp*, 842 F.3d at 814; *see also Moore*, 25 F. 4th at 37*; Leite*, 749 F.3d at 1120; *Ruppel v. CBS* Corp, 701 F.3d 1176, 1186 (7th Cir. 2012); *Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 438 (5th Cir. 2000); *accord Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 666 (2016) (derivative sovereign immunity defense applies so long as the contractor can demonstrate that it complied with the Government's specifications regardless of the subject matter of the contract).

JCI's supply of gasket and packing materials under the control, direction, specification, and supervision of the Government thus satisfies the "acting under" requirement, which, like

federal officer removal generally, "is 'broad' and is to be 'liberally construe[d]' in favor of the entity seeking removal.'" *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007); *Isaacson*, 517 F.3d at 136. "[U]nder that broad scope, the general rules guiding removal—including that a defendant may remove a case from state to federal court only if the federal court had original jurisdiction to hear the case … are inapplicable … Similarly, the ordinary presumption against removal does not apply to federal officer removal … General removal principles are, in other words, inverted when §1442(a)(1) is at issue." *Maryland v. 3M Co.*, __F.4th__, 2025 U.S. App. LEXIS 5368 at *10 (4th Cir. Mar. 7, 2025).

For purposes of federal officer removal, federal appellate case law is clear that military contractors were "acting under a federal officer" in relation to the design, manufacture, and supply of equipment to the United States Government. *See, e.g., Leite*, 749 F.3d at 1120; *Moore,* 25 F.4th at 34-35; *Papp*, 842 F.3d at 812 (*citing Ruppel,* 701 F.3d at 1184-1186). Indeed, JCI could not change the design or provide additional language—including warning labels—on the gaskets and packing without prior Government authorization. Moreover, not only did JCI's acquisition of Government approval for any design change require strict compliance with the Government's formal and detailed change process procedures, but the Government retained absolute authority at all times to accept, reject, or modify any aspect of a military government contractor's requested change proposal. Similarly, JCI could not change the testing protocol that the gasket and packing material was subjected to because, pursuant to the clear language of the specifications, the testing was to be conducted in facilities approved by the Government and done in accordance with the Government's protocol.

Third, there is a causal nexus between JCI's alleged actions in supplying the gaskets and packing and Plaintiff's claim that his mesothelioma was caused by the asbestos-containing gaskets

13

and packing JCI supplied to the U.S. Navy and Coast Guard pursuant to and in strict adherence to applicable government specifications. In assessing whether a causal nexus exists, the Court credits the defendant's theory of the case, *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999); *Leite,* 749 F.3d at 1124, as to "whether the conduct with which it has been charged is related to its federal work." *Maryland*, 2025 U.S. App. LEXIS 5368 at *13.

Under this standard, courts must ask "if, under [the defendant's] theory of the case"—and "giving it the benefit of all reasonable inferences from the facts alleged"—the defendant "plausibly alleged that its charged conduct was related to its federal work." *Id.* at *16, 19. It is "enough for present purposes of removal that at least some of" the exposures "arose from the federal acts." *See Baker v. Atl. Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020). Thus, "to remove, the defense need not be a lawsuit's defining feature; if it is a single 'ingredient in the mass,' then it is 'decisive upon the subject of jurisdiction.'" *Gov't of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 186 (1st Cir. 2024).

Furthermore, the federal officer removal has been broadened to include not only causally connected actions under color of federal officer, but also to include *connected* or *associated* acts. *Moore,* 25 F.4th at 35 n.4; *Papp*, 842 F.3d at 813. Here, a nexus exists because the very acts that form the basis of Plaintiff's claims—JCI's supply of asbestos-containing products to the U.S. Navy for use on Navy ships and its alleged failure to warn about asbestos hazards—are acts that JCI performed in accordance and compliance with directions from the Navy. *Moore*, 25 F.4th at 37-38; *Ruppel,* 701 F.3d at 1184-1186; *Winters v. Diamond Shamrock Chem. Co*., 149 F.3d 387, 396-397 (5th Cir. 1998) (government contractor who supplied dangerous herbicide Government used to conduct war could remove product liability actions pursuant to federal officer removal statute).

Fourth—and applying the principles set forth above—JCI asserts a colorable federal defense, namely the "government contractor" defense set forth in *Boyle v. United Technologies, Inc.*, 487 U.S. 500 (1988) and its progeny. The government contractor defense applies to Plaintiff's failure-to-warn claims, failure to test, and any design defect claims in that: (1) the Government approved specifications for the design and labeling of gaskets and packing; (2) JCI complied with these specifications, and (3) there were no health hazards associated with asbestos generally, or asbestos-containing gaskets and packing material specifically, of which JCI was aware and the Government was not. *See Boyle*, 487 U.S. at 512-513; *Leite*, 749 F.3d at 1120; *accord Moore*, 25 F.4th at 36-38; *Jowers v. Lincoln Elec. Co.*, 617 F.3d 346, 352 (5th Cir. 2010); *Miller*, 275 F.3d at 423; *Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 438-39 (5th Cir. 2000); *see also Sawyer*, 860 F.3d at 259; *Ruppel*, 701 F.3d at 1188; *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1003-04 (7th Cir. 1996); *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995).

JCI also is entitled to federal officer removal under 28 U.S.C. § 1442(a)(1) based on the separate defense of derivative sovereign immunity set forth in *Yearsley v. W. A. Ross Constr. Co.*, 309 U.S. 18, 20-21 (1940), clarified most recently by *Campbell-Ewald Co.*, *supra*. In *Yearsley*, the Court established that a government contractor acting at the direction and authorization of a government officer is immune from suit based on performance of the government contract. Thus, to establish that defense, JCI ultimately will have to prove that it supplied its asbestos-containing products to the Navy as authorized and directed by the Government. *Campbell-Ewald Co.*, 136 S. Ct. at 666; *Yearsley*, 309 U.S. at 20-21. *Yearsley* is satisfied here because—for the same reasons discussed above and applying the same factors as under *Boyle*—the acts complained of were performed at the direction of government officers acting under government authorization, and if the Government had performed those acts directly, it would be immune from suit. *See Gay v. A.O.*

15

*Smith Corp.*, 2024 U.S. App. LEXIS 12536 at *4-5 (3d Cir. May 24, 2024) (affirming summary judgment to asbestos defendant under derivative sovereign immunity defense).

As articulated above, to assert a colorable defense, a defendant is required only to identify facts which, viewed in the light most favorable to the defendant, would establish a defense under *Boyle*, *Moore*, *Ruppel*, or *Yearsley/Campbell-Ewald* at trial, and "need not win his case before he can have it removed." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). "Just as requiring a clearly sustainable defense rather than a colorable defense would defeat the purpose of the removal statute, so would demanding an airtight case on the merits in order to show the required causal connection." *Jefferson County v. Acker*, 527 U.S. 423, 432 (1999). To be "colorable," the defense need not be "clearly sustainable," as the purpose of the statute is to secure that the validity of the defense will be tried in federal court. *Willingham*, 395 U.S. at 407. Under identified facts similar to those here, federal courts—including this one—consistently have denied motions to remand state law claims removed under the government contractor defense. *See Papp*, 842 F.3d at 809; *accord Moore*, 25 F.4th at 32; *Ruppel*, 701 F.3d at 1178; *Leite*, 749 F.3d at 1120.

## IV. <u>JURISDICTION</u>

Removal of this action is proper under 28 U.S.C. § 1442. Consistent with the short and plain statement of the law and facts set forth above, the federal district courts have original jurisdiction over the subject matter of this suit under 28 U.S.C. § 1442(a)(1) because JCI was acting under an officer or agency of the United States Government in relation to any claims asserted against JCI and JCI can state at least a colorable defense under federal law to any such claims. *See Moore*, 25 F.4th at 36-38; *Papp*, 842 F.3d at 809.

Section 1442(a)(1) authorizes removal of the entire case even if only one of the controversies it raises involves a federal officer or agency.

The Common Pleas Court is located within the judicial district overseen by the United States District Court for the Eastern District of Pennsylvania, making venue proper. *See* 28 U.S.C. §§ 1332(a)(3) and 1441(a).

## V. **PROCEDURAL COMPLIANCE**

JCI is not required to obtain the consent of any other defendants to remove this action in its entirety under section 1442(a)(1).  *Huntingdon Valley Club Condo. Ass'n v. Pa. Hous. Fin Agency*, 2005 U.S. Dist. LEXIS 234,*6, 2005 WL 44524 (E.D. Pa. 2005) (*citing Akin v. Ashland Chem. Co.*, 156 F.3d 1030,1034 (10th Cir. 1998); *Doe v. Kerwood*, 969 F.2d 165, 168 (5th Cir. 1992); *Ely Valley Mines, Inc. v. Hartford Accident and Indem. Co.*, 644 F.2d 1310, 1314-15 (9th Cir. 1981); *Bradford v. Harding*, 284 F.2d 307, 310 (2d Cir. 1960); *see also* 14C Wright, Miller & Cooper, Federal Practice and Procedure § 3727, at 166-68 (3d ed. 1998)).

As required by 28 U.S.C. § 1446(a), true and correct copies of all process, pleadings, and orders served upon JCI are being filed and are attached here as **Exhibit N**.

Pursuant to 28 U.S.C. § 1446(d), JCI is filing written notice of this Notice of Removal with the Philadelphia Court of Common Pleas concurrently with the filing of this Notice of Removal and will serve the same on counsel of record.  A copy of the Notice of Filing Notice of Removal (without exhibits) is attached as **Exhibit O**.

A court cannot remand a properly removed case for discretionary or policy reasons, such as allegedly related state court cases or a contention that judicial economy compels remand.  28 U.S.C. § 1447(c); *Thermitron Prods., Inc. v. Hermansdorfer,* 423 U.S. 336(1976).  The federal officer removal statute, 28 U.S.C. § 1442(a)(1), is not narrow nor limited, and it should not be frustrated by a narrow or grudging interpretation.  *Willingham v. Morgan*, 395 U.S. 402, 405 (1969).

17

If Plaintiffs file a motion to remand this action, JCI respectfully requests an opportunity to respond more fully in writing, including submission of additional affidavits and authority.

JCI reserves all of its defenses.

**WHEREFORE**, Defendant JCI requests that this Court assume jurisdiction over this matter on removal from the Philadelphia Court of Common Pleas.

Dated: April 10, 2025

Respectfully Submitted,

**JOHN CRANE INC.**

By:    TFT2354

Attorneys for Defendant

**John Crane Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 10, 2025, I electronically filed the foregoing Notice of

Removal with the Clerk of Court using the CM/ECF system.


<u>TFT 2354</u>
Tiffany F. Turner, Esquire
Attorney for Defendant, John Crane, Inc.

19

# EXHIBIT A

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

**For Prothonotary Use Only (Docket Number)**

## APRIL 2023

E-Filing Number: 2304041712

**02099**

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| IGNATIUS PAPPAGALLO, ALIAS: RAFFAELE PAPPAGALLO | REDCO CORP., F/K/A CRANE COMPANY |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 5 INDEPENDENCE WAY HAZLET NJ 07730 | THE CORPORATION TRUST COMPANY CORPORATION TRUST CENTER 1209 ORANGE STREET WILMINGTON DE 19801 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| ANNA PAGGAGALLO | 3M COMPANY |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 5 INDEPENDENCE WAY HAZLET NJ 07730 | 3M CORPORATE HEADQUARTERS 3M CENTER ST. PAUL MN 55144 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | AMDURA LLC, F/K/A AMDURA CORPORATION, INDIVIDUALLY AND AS, ALIAS: SUCCESSOR TO AMERIC |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | C/O C.T. CORPORATION 1209 ORANGE STREET WILMINGTON DE 19801 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 2 | 46 | [X] Complaint  ☐ Petition Action  ☐ Notice of Appeal<br>☐ Writ of Summons  ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| ☐ $50,000.00 or less<br>[X] More than $50,000.00 | ☐ Arbitration<br>☐ Jury<br>☐ Non-Jury<br>☐ Other: | [X] Mass Tort<br>☐ Savings Action<br>☐ Petition | ☐ Commerce<br>☐ Minor Court Appeal<br>☐ Statutory Appeals | ☐ Settlement<br>☐ Minors<br>☐ W/D/Survival |

**CASE TYPE AND CODE**

T1 - MASS TORT - ASBESTOS

**STATUTORY BASIS FOR CAUSE OF ACTION**

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | **FILED PRO PROTHY** | IS CASE SUBJECT TO COORDINATION ORDER? |
|---|---|---|
| | APR **21** 2023<br><br>**G. IMPERATO** | YES        NO |

**TO THE PROTHONOTARY:**

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: IGNATIUS PAPPAGALLO , ANNA PAGGAGAL

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| CASEY R. COBURN | TWO PENN CENTER 1500 JFK BLVD. SUITE 404 |

| PHONE NUMBER | FAX NUMBER | |
|---|---|---|
| (215)546-8200 | (215)545-1591 | |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 201624 | ccoburn@nasscancelliere.com |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| CASEY COBURN | Friday, April 21, 2023, 09:30 am |

FINAL COPY (Approved by the Prothonotary Clerk)

**COMPLETE LIST OF DEFENDANTS:**

1. REDCO CORP., F/K/A CRANE COMPANY
   THE CORPORATION TRUST COMPANY CORPORATION TRUST CENTER 1209 ORANGE STREET
   WILMINGTON DE 19801
2. 3M COMPANY
   3M CORPORATE HEADQUARTERS 3M CENTER
   ST. PAUL MN 55144
3. AMDURA LLC, F/K/A AMDURA CORPORATION, INDIVIDUALLY AND AS
   ALIAS: SUCCESSOR TO AMERICAN HOIST & DERRICK COMPANY
   C/O C.T. CORPORATION 1209 ORANGE STREET
   WILMINGTON DE 19801
4. ANCHOR DARLING VALVE COMPANY
   C/O TROY CHUTE 34407 DUPONT BLVD., SUITE 6
   FRANKFORD DE 19945
5. AIR AND LIQUID SYSTEMS CORP., AS SUCCESSOR BY MERGER TO
   ALIAS: BUFFALO PUMPS, INC.
   C/O CORPORATION SERVICE CO. 2595 INTERSTATE DRIVE, #103
   HARRISBURG PA 17110
6. CARRIER CORPORATION
   CORPORATE CREATIONS NETWORK 1001 STATE STREET, #1400
   ERIE PA 16501
7. CLEAVER BROOKS, INC.
   11270 W. PARK PLACE, 4TH FLOOR
   MILWAUKEE WI 53224
8. DAP, INC. K/N/A LA MIRADA PRODUCTS CO.
   2400 BOSTON STREET, SUITE 200
   BALTIMORE MD 21224
9. DREVER COMPANY
   C/O CT CORPORATION SYSTEMS 600 N. 2ND STREET, SUITE 401
   HARRISBURG PA 17101
10. FLOWSERVE, AS SUCCESSOR TO BYRON JACKSON PUMP COMPANY
    5215 N. O'CONNOR BOULEVARD SUITE 2300
    IRVING TX 75039
11. FLOWSERVE AS SUCCESSOR TO DURCO PUMPS
    5215 N. O'CONNOR BOULEVARD SUITE 2300
    IRVING TX 75039
12. FLOWSERVE, AS SUCCESSOR TO DURIRON
    5215 N. O'CONNOR BOULEVARD SUITE 2300
    IRVING TX 75039
13. FLOWSERVE US, INC., SOLELY AS SUCCESSOR TO EDWARD VOGT
    ALIAS: VOGT VALVE COMPANY
    5215 N. O'CONNOR BOULEVARD SUITE 2300
    IRVNG TX 75039
14. FLOWSERVE CORPORATION, INDIVIDUALLY AND AS SUCCESSOR TO
    ALIAS: IDP PUMPS F/K/A INGERSOLL DRESSER PUMPS
    CT CORP. 1999 BRYAN STREET, SUITE 900
    DALLAS TX 75201
15. FLOWSERVE US INC., SOLELY AS SUCCESSOR TO
    ALIAS: NORDSTROM VALVES, INC.
    5215 N. O'CONNOR BOULEVARD SUITE 2300
    IRVING TX 75039
16. FMC CORPORATION
    CT CORPORATION SYSTEM 600 N. 2ND STREET, SUITE 401
    HARRISBURG PA 17101

17. FOSECO, INC.
    CT CORPORATION SYSTEM 600 N. 2ND STREET, SUITE 401
    HARRISBURG PA 17101
18. FOSTER WHEELER, LLC
    UNITED AGENT GROUP, INC. 3411 SILVERSIDE ROAD TATNALL BUILDING, #104
    WILMINGTON DE 19810
19. GENERAL ELECTRIC CO.
    C/O C.T. CORPORATION SYSTEMS 600 N. 2ND STREET, SUITE 401
    HARRISBURG PA 17101
20. GENUINE PARTS CO.
    C/O CT CORPORATION SYSTEMS 600 N. 2ND STREET, SUITE 401
    HARRISBURG PA 17101
21. ITT, LLC, AS SUCCESSOR TO GODWIN PUMPS OF AMERICA, INC.
    C/O C.T. CORPORATION SYSTEMS 600 N. 2ND STREET, SUITE 401
    HARRISBURG PA 17101
22. GOULDS PUMPS, INC. N/K/A GOULDS PUMPS LLC
    C/O C.T. CORPORATION SYSTEMS 600 N. 2ND STREET, SUITE 401
    HARRISBURG PA 17101
23. GREENE, TWEED NC, LLC
    201 S TYRON, SUITE 950
    CHARLOTTE NC 28202
24. GRINNELL, LLC F/K/A GRINNELL CORPORATION
    C/O C.T. CORPORATION SYSTEMS 600 N. 2ND STREET, SUITE 401
    HARRISBURG PA 17101
25. HAJOCA CORPORATION
    CORPORATION SERVICE COMPANY 2595 INTERSTATE DRIVE, #103
    HARRISBURG PA 17110
26. HONEYWELL INTERNATIONAL, INC., AS SUCCESSOR IN INTEREST TO
    ALIAS: TO BENDIX CORPORATION
    CORPORATION SERVICE COMPANY 2595 INTERSTATE DRIVE, #103
    HARRISBURG PA 17110
27. IMO INDUSTRIES, INC. INDIVIDUALLY, AND AS SUCCESSOR TO
    ALIAS: DELAVAL STEAM TURBINE COMPANY
    C/O CORPORATION SYSTEMS 600 N. 2ND STREET, SUITE 401
    HARRISBURG PA 17101
28. ITT CORPORATION
    C/O CT CORPORATION SYSTEM 600 N. 2ND STREET, SUITE 401
    HARRISBURG PA 17101
29. ITT, LLC F/K/A ITT CORPORATION AND BELL & GOSSETT COMPANY
    C/O CT CORPORATION SYSTEMS 600 N. 2ND STREET, SUITE 401
    HARRISBURG PA 17101
30. J.A. SEXAUER MANUFACTURING COMPANY
    C/O CSC 251 LITTLE FALLS DRIVE
    WILMINGTON DE 19808
31. J.H. FRANCE REFRACTORIES
    C/O THE CORPORATION TRUST CO CORPORATION TRUST CENTER 1209 ORANGE STREET
    WILMINGTON DE 19801
32. JOHN CRANE, INC. F/K/A CRANE PACKING COMPANY
    CT CORPORATION 600 N. 2ND STREET, SUITE 401
    HARRISBURG PA 17101
33. KEELER/DORR-OLIVER BOILER CO.
    C/O JOHN G. GAUL, ESQUIRE THREE LOGAN SQUARE 1717 ARCH STREET, SUITE 3710
    PHILADELPHIA PA 19103
34. GROVE U.S. LLC, AS SURVIVOR OF THE MERGER WITH MANITOWOC

```
       ALIAS: CRANES, LLC
       CORPORATION SERVICE COMPANY 2704 COMMERCE DRIVE, SUITE B
       HARRISBURG PA 17110
35. METROPOLITAN LIFE INSURANCE CO.
       200 PARK AVENUE
       NEW YORK NY 10166
36. MILWAUKEE VALVE COMPANY
       16550 WEST STRATTON DRIVE
       NEW BERLIN WI 53151
37. JOY GLOBAL SURFACE MINING, INC. F/K/A
       ALIAS: P & H MINING EQUIPMENT, INC.
       THE CORPORATION TRUST COMPANY CORPORATION TRUST CENTER 1209 ORANGE STREET
       WILMINGTON DE 19801
38. P&H MINING EQUIPMENT, INC. F/K/A
       ALIAS: HARNISCHFEGER CORPORATION
       THE CORPORATION TRUST COMPANY 1209 ORANGE STREET
       WILMINGTON DE 19801
39. PARKER HANNIFIN CORPORATION
       THE CORPORATION TRUST COMPANY 1209 ORANGE STREET
       WILMINGTON DE 19801
40. STERLING FLUID SYSTEMS (USA)
       2005 DR. MARTIN LUTHER KING ST
       INDIANAPOLIS PA 46202
41. SUNOCO, INC.
       3801 WEST CHESTER PIKE
       NEWTOWN SQUARE PA 19073
42. UNION CARBIDE CORPORATION
       C/O C.T. CORPORATION SYSTEMS 600 N. 2ND STREET, SUITE 401
       HARRISBURG PA 17101
43. WARREN PUMPS LLC
       CT CORPORATION 1209 ORANGE STREET
       WILMINGTON DE 19801
44. THE MARLEY-WYLAIN COMPANY F/K/A WEIL MCLAIN COMPANY
       500 BLAINE STREET
       MICHIGAN CITY IN 46360
45. VIACOMCBS, INC. F/K/A CBS CORPORATION,
       ALIAS: PA CORP. F/K/A WESTINGHOUSE ELECTRIC CORPORATION
       20 STANWIX STREET
       PHILADELPHIA PA 15222
46. ZURN INDUSTRIES, INC.
       1801 PITTSBURGH AVENUE
       ERIE PA 16502
```



Filed and Attested by the
Office of Judicial Records
21 APR 2023 09:30 am
E. IMPERATO

NASS CANCELLIERE
By:  Casey R. Coburn, Esquire
Email:  ccoburn@nasscancelliere.com
Identification No. 201624
Two Penn Center
1500 JFK Blvd., Suite 404
Philadelphia, PA  19102
(215) 546-8200

Attorneys for Plaintiffs

ASSESSMENT OF DAMAGES HEARING
IS REQUIRED
NON-JURY

| | |
|---|---|
| IGNATIUS PAPPAGALLO, Executor of the Estate of RALPH PAPPAGALLO a/k/a RAFFAELE PAPPAGALLO and ANNA PAPPAGALLO, in her own right<br>5 Independence Way<br>Hazlet, NJ 07730<br><br>v.<br><br>ReDco CORP., f/k/a/ CRANE COMPANY<br>The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, DE  19801, et al. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br><br>TERM, 2023<br><br><br>NO. |

CIVIL ACTION - COMPLAINT
(Personal Injury - 2090 Asbestos)
NOTICE TO DEFEND

NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

*You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*

Philadelphia Bar Association
Lawyer Referral and Information Service
One Reading Center
Philadelphia, Pennsylvania 19107
(215) 238-6333

AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo el partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perer dinero o sus propiedades u otros derechos importantes para usted.

*Lleva esta demanda a un abogado inmediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagartal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.*

Asociacion de Licenciadosde Filadelfia
Servicio de Referencia e Informacion Legal
One Reading Center
Filadelfia, Pennsylvania 19107

3M Company
3M Corporate Headquarters
3M Center
St. Paul, MN  55144-1000

AMDURA LLC f/k/a Amdura Corporation,
individually and as successor to American
Hoist & Derrick Company
c/o C.T. Corporation
1209 Orange Street
Wilmington, DE  19801

Anchor Darling Valve
c/o Troy Chute
34407 DuPont Blvd., Suite 6
Frankford, DE 19945

Air and Liquid Systems Corp, as successor
by merger to Buffalo Pumps, Inc.
c/o Corporation Service Co.
2595 Interstate Drive, Suite 103
Harrisburg, PA  17110

Carrier Corporation
Corporate Creations Network
1001 State Road, #1400
Erie, PA  16501

Cleaver Brooks, Inc.
11270 West Park Place, 4th Floor
Milwaukee, WI 53224

DAP, Inc. k/n/a La Mirada Products Co.
2400 Boston Street, Suite 200
Baltimore, MD  21224

Drever Company
c/o CT Corporation System
600 N. 2nd Street, Suite 401
Harrisburg, PA  17101

Flowserve, as successor to
Byron Jackson Pump Company
5215 N. O'Connor Boulevard
Suite 2300
Irving, DE  75039

Flowserve, as successor to
Durco Pumps
5215 N. O'Connor Boulevard
Suite 2300
Irving, TX  75039

Flowserve, as successor to
Duriron
5215 N. O'Connor Boulevard
Suite 2300
Irving, TX  75039

Flowserve US Inc., solely as successor to
Edward Vogt Valve Company Vogt Valve
Company
5215 N. O'Connor Boulevard, Suite 2300
Irving, TX  75039

Flowserve Corporation, individually and as
successor to IDP Pumps f/k/a Ingersoll
Dresser Pumps
CT Corp.
1999 Bryan Street, Suite 900
Dallas, TX 75201

Flowserve US Inc., Solely as Successor to
Nordstrom Valves, Inc.
5215 N. O'Connor Boulevard, Suite 2300
Irving, TX  75039

FMC CORPORATION
CT Corporation System
600 North 2nd Street
Suite 401
Harrisburg, PA  17101

Foseco, Inc.
CT Corporation
600 N. 2nd Street, Suite 401
Harrisburg, PA  17101

Foster Wheeler LLC
United Agent Group, Inc.
3411 Silverside Road
Tatnall Building #104
Wilmington, DE  19810

Case ID: 230402099

General Electric Co.
c/o C.T. Corporation Systems
600 N. 2nd Street, Suite 401
Harrisburg, PA 17101

Genuine Parts Co.
c/o C.T. Corporation Systems
600 N. 2nd Street, Suite 401
Harrisburg, PA 17101

ITT LLC, as successor to Godwin Pumps of
America, Inc.
c/o CT Corporation System
28 Liberty Street
New York, New York 10005

Goulds Pumps Inc., n/k/a Goulds Pumps LLC
c/o CT Corporation System
28 Liberty Street, 42nd Floor
New York, New York 10005

Greene, Tweed NC, LLC
201 S. Tyron, Suite 950
Charlotte, NC 28202

Grinnell, LLC, f/k/a Grinnell Corporation
c/o C.T. Corporation
600 N. 2nd Street, Suite 401
Harrisburg, PA 17101

Hajoca Corporation
Corporation Service Company
2595 Interstate Drive, Suite 103
Harrisburg, PA 17110

Honeywell International, Inc.
as successor in interest to Allied Signal, Inc.,
as successor in interest to Bendix Corporation
Corporation Service Co.
2595 Interstate Drive, Suite 103
Harrisburg, PA 17110

IMO Industries, Inc., individually, and as
successor to DeLaval Steam Turbine
Company
c/o Corporation Systems
600 N. 2nd Street, Suite 401
Harrisburg, PA 17101

ITT Corporation
c/o CT Corporation System
28 Liberty Street
New York, New York 10005

ITT LLC (f/k/a ITT Corporation and Bell &
Gossett Company)
c/o CT Corporation System
28 Liberty Street
New York, New York 10005

J.A. Sexauer Manufacturing Company
4829 Jennings Lane
Louisville, KY 40218

J.H. France Refractories
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

John Crane, Inc., f/k/a Crane Packing
Company
CT Corporation
600 N. 2nd Street, Suite 401
Harrisburg, PA 17101

Keeler/Dorr-Oliver Boiler Co.
c/o John G. Gaul, Esquire
Three Logan Square
1717 Arch Street, Suite 3710
Philadelphia, PA 19103-2832

Grove U.S. L.L.C., as survivor of the merger
with Manitowoc Cranes, LLC
Corporation Service Company
2704 Commerce Drive, Suite B
Harrisburg, PA 17110

Case ID: 230402099

Metropolitan Life Insurance Co.
200 Park Avenue
New York, NY 10166

Milwaukee Valve Company
16550 West Stratton Drive
New Berlin, WI 53151-7301

Joy Global Surface Mining, Inc., f/k/a P & H
Mining Equipment, Inc.
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

P&H Mining Equipment, Inc., f/k/a
Harnischfeger Corporation
The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

Parker Hannifin Corporation
The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

Sterling Fluid Systems (USA)
2005 Dr. Martin Luther King, Jr. Street
Indianapolis, IN 46202

Sunoco, Inc.
3801 West Chester Pike
Newtown Square, PA 19073

Union Carbide Corporation
c/o C.T. Corporation Systems
600 N. 2nd Street, Suite 401
Harrisburg, PA 17101

Warren Pumps LLC
CT Corporation
1209 Orange Street
Wilmington, DE 19801

The Marley-Wylain Company (f/k/a Weil
McLain Company)
Blaine Street
Michigan City, IN 46360

ViacomCBS Inc. f/k/a CBS Corporation, a
Delaware corporation, f/k/a Viacom Inc.,
successor by merger to CBS Corporation, a
Pennsylvania corporation, f/k/a
Westinghouse Electric Corporation
20 Stanwix Street
Pittsburgh, PA 15222

Zurn Industries Inc.
1801 Pittsburgh Avenue
Erie, PA 16502

NASS CANCELLIERE
By:    Casey R. Coburn
E-mail: ccoburn@nasscancelliere.com
Identification No. 201624
Two Penn Center
1500 JFK Blvd., Suite 404
Philadelphia, PA  19102
(215) 546-8200

**Attorneys for Plaintiff**

**ASSESSMENT OF DAMAGES
HEARING IS REQUIRED
NON-JURY**

---

IGNATIUS PAPPAGALLO, Executor of  :
the Estate of RALPH PAPPAGALLO a/k/a  :
RAFFAELE PAPPAGALLO and ANNA  :
PAPPAGALLO, in her own right  :
5 Independence Way  :
Hazlet, NJ 07730  :
  :
  :
         v.  :
  :
ReDco CORP., f/k/a/ CRANE COMPANY  :
The Corporation Trust Company  :
Corporation Trust Center  :
1209 Orange Street  :
Wilmington, DE  19801, et al.  :

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY


           TERM, 2023


NO.

---

## SHORT FORM COMPLAINT

      Plaintiff incorporates by reference Plaintiff's Master Long Form Complaint In Re:

Asbestos Litigation in Philadelphia Court of Common Pleas, filed as of October Term,

1986, No. 8610-0001.  Pursuant to an Order dated July 30, 1986 and signed by the

Honorable Richard B. Klein and the Honorable Edward J. Blake the following Short Form

Complaint is utilized in this asbestos action.

1.      This Complaint involves the claims of the following plaintiffs

    (a)      For Plaintiff-Decedent, Ignatius Pappagallo, Executor of the Estate of

Raffaele Pappagallo, deceased.

Address:      5 Independence Way
             Hazlet, NJ 07730

Decedent's Social Security Number:    xxx-xx-6492

Decedent's Date of Birth:        3/18/1937

Decedent's Date of Death:        12/12/2022

    (b) Plaintiff-Spouse:   Anna Pappagallo

2.      The Defendants are those companies identified in the caption of this Complaint.

3.      The decedent employment history is as follows:

        Employer:      Bethlehem Steel
        Years:          1961 - 1987
        Job Title:      Mechanic

        Employer:      Kearny Marine
        Years:          1987 - 2002
        Job Title:      Foreman

4.      Plaintiff was exposed to asbestos during portions of his employment for Bethlehem Steel and Kearny Marine.  Plaintiff was also exposed to asbestos performing home improvement work.  Discovery and investigation is continuing as to whether the plaintiff was exposed to asbestos in any other occupational settings or non-occupational settings.

5.      Plaintiff was diagnosed on or about November 1, 2022, as suffering from Lung cancer.  Plaintiff's exposure to asbestos was a factual cause of his lung cancer, which injuries and illness caused or contributed to his death on December 12, 2022.

6.      A claim for lost wages is not being asserted at this time.

7.      All averments in the Long Form Complaint setting forth plaintiff's survival action and the damages related thereto are incorporated herein by reference with the following amendment and/or addition:  Plaintiff, Ignatius Pappagallo, as Executor of the Estate of  Raffaele a/k/a Ralph Pappagallo, brings this suit on behalf of the decedent's estate pursuant to 42 Pa. C.S.A. 8302.

8.      All averments in the Long Form Complaint setting forth plaintiff's wrongful death

action and the damages related thereto are incorporated herein by reference with the following amendment and/or addition: Plaintiff, Anna Pappagallo, brings this suit in her own right, as wife of the decedent, pursuant to 42 Pa. C.S.A. 8301, and on behalf of any and all of decedent's wrongful death beneficiaries, and claims all damages to which they are entitled for decedent's wrongful death, including but not limited to, suffering a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder; loss of guidance, counseling, companionship and loss of society; pecuniary benefits, including net earnings they would have received from the decedent in support of them and/or the family for shelter, food, clothing, medical care, education and recreation; damages for reasonable hospital, nursing, and medical care; and funeral expenses and expenses of administration necessitated by reason of the decedent's death.

NASS CANCELLIERE

BY: _____
CASEY R. COBURN
Attorneys for Plaintiff

## VERIFICATION

The undersigned is the Plaintiff in this action and verifies that the facts contained in the foregoing document are true and correct to the best of my knowledge, information, and belief. To the extent that the contents of the said document are based on information gathered by my counsel, the undersigned has relied upon counsel in executing this verification. The language of this verification is that of counsel and not of the signer. I understand that the statements contained in said document are made subject to the penalties of 18 Pa.C.S. section 4904 relating to unsworn falsification to authorities.

DATE: __4/20/23__          By: _____

# EXHIBIT B

**NASS CANCELLIERE**
**By: Richard P. Hackman**                                    **Attorneys for Plaintiff(s)**
**E-mail: rphackman@nasscancelliere.con**
**Identification No. 22476**
**1500 JFK Blvd., Suite 404**
**Philadelphia, PA 19102**
**(215) 546-8200**

| | | |
|---|---|---|
| ESTATE OF RAFFAELE PAPPAGALLO, et al. | : | COURT OF COMMON PLEAS |
| | : | PHILADELPHIA COUNTY |
| | : | |
| vs. | : | APRIL TERM, 2023 |
| | : | NO. 2099 |
| | : | |
| REDCO CORP., et al. | : | |

### PLAINTIFF'S ANSWERS TO DEFENDANTS'
### MASTER INTERROGATORIES

    1.    Please state your full name, including aliases or nicknames; date of birth; social security number and current address.

        Full name:    **Raffaele Pappagallo**
        SSN:          **xxx-xx-6492**
        Nicknames:   **Ralph**
        Address:     **5 Independence Way, Hazlet, NJ 07730**
        Date of Birth: **3/18/1937**

    2.    If the person answering these interrogatories is the representative of a deceased claimant, set forth the name of the person responding to these interrogatories; the legal capacity in which that person is responding; the date and place of the decedent's death; the decedent's cause of death; and, whether or not you contend that the decedent's death was related to asbestos exposure.

        **Ignatius Pappagallo, son of Plaintiff Decedent.**

    3.    Have you or your attorneys filed on behalf of any of the plaintiffs named herein, any related or companion lawsuits or legal actions in any court based upon any alleged asbestos-related condition?  If so, please list the caption and identifying number of any such suits.

        **No.**

4.      Please provide a chronological list of all addresses at which you have resided.  Please also provide the dates of residence at these addresses.

**See Exhibit 1**

5.      State the names and dates of birth of your spouse and children, as applicable.

Spouse:          **Anna Pappagallo – 2/13/1940**
Children:        **Ignatius Pappagallo- 7/7/62 asb**
                 **Vincent Pappagallo – 1/12/71**
                 **Joann Smith – 7/1/65**

6.      If any person, including those listed in No. 5 above, is partially or totally financially dependent upon you, state his or her name, date of birth, current address, relationship to you, and the amount of support given during the last five (5) years.

7.      Set forth your current occupation and employer.

Position:        **N/A**
Employer:

8.      Please provide a complete chronological history of work experience, to include: the name and address of each employer and work site; your job title and the dates of employment; and, whether you were exposed to asbestos at the job or work site listed, and the period of time for each exposure alleged.

**See Exhibit 2.**

9.      If this lawsuit is based upon any asbestos exposure other than that described in the preceding interrogatory, then set forth the nature, location and dates of said exposure.

**Discovery is continuing.**

10.     If you are retired, please state the date of retirement, type of retirement, the employment retired from and the reason for your retirement.

**Plaintiff Decedent retired in 2002.**

11.     During your last year of full-time employment, what was your gross income?

**Unknown to Answering Plaintiff.**

12.     What are the injuries for which you are claiming compensation in this lawsuit?

**See Plaintiff's Complaint as well as Plaintiff's medical records for further details.**

13.     What is the name and address of the doctor who diagnosed these injuries, and what was the date of diagnosis?

Doctor:            **Dr. Denis Fitzgerald**

Diagnosis Date:    **11/1/22**

14.     Please provide a complete list of the hospitals, institutions or other health-related facilities in which you have been confined, or in which you have received out-patient treatment, including: the name and address of the hospital, institution, or other health-related facility; the date of admission; the date of discharge; medical condition, illness or symptoms which were the basis for each hospitalization, institutionalization, or other treatment; diagnosis at discharge; and, the full name and address of admitting physician or principal treating physician.

**See Exhibit 3.**

15.     Please provide a complete list of medical practitioners, including, but not limited to, physicians and therapists, excluding those listed in No. 14 above, who have rendered services to you, and as to each, state: full name and present or last known address; the date(s) of examination, treatment, or other care; and, the medical condition, illness or symptoms which were the basis for each examination, treatment or consultation.

**See Exhibit 4.**

16.     If you have ever used tobacco products, state: the type(s) of tobacco product you have used; the dates during which you have used each type of tobacco product; and, the daily frequency with which you have used each tobacco product (i.e., two packages of cigarettes daily, three cigars daily, two pipefuls daily, etc.).

**Plaintiff Decedent smoked approximately one pack of cigarettes per day.**

17.    State whether you have ever sought, filed for, or received any of the following: Workmen's Compensation benefits; sickness, accident or disability benefits provided by or through an employer for non-employment related conditions; Social Security disability benefits; Veterans medical or disability benefits; Union disability benefits; and, any other disability benefits.

**Answering Plaintiff advised no.**

18.    For each affirmative response to Interrogatory No. 17, please provide the following: a description of the benefits sought, filed for, or received; the identity of each person, firm, corporation or entity (including insurance companies or union) from which benefits were sought, filed for or received; claim number, account number or other identifying information; the date of request or claim for benefits; and, the date on which benefits were first received or denied.

19.    Describe your educational background, including:

    (a)    the names and addresses of all schools attended;

    (b)    dates of attendance;

    (c)    dates of graduation;

    (d)    diplomas or degrees received

**Plaintiff Decedent graduated high school in Italy**

20.    Have you ever served in the Armed Forces of the United States?  If so, state:

**Answering Plaintiff advised no.**
    (a)    the branch of the service;

    (b)    your serial number, initial rank, rank at discharge, and highest rank held;
        Serial Number:
        Initial Rank:

Discharge Rank:

(c)      the dates of your service;

(d)      the type of discharge you received;

(e)      whether you were given any physical examination  which included x-rays;

(f)      whether you were injured while in the service and the nature of your injury or injuries;

(g)      whether you incurred any illness requiring hospitalization while in the service and the nature of that illness?

(h)      whether you claimed any disability for any injury, physical condition, or illness arising out of your military service; and if so, state the details of the claim, including the nature of the claim, the date the claim was made, when the claim was adjudicated, and the compensation, if any, which was awarded.

21.   What is your present marital status?

      **Plaintiff Decedent was married at the time of his death.**

22.   Have you ever been married to anyone other than your present spouse?  If so, state:

      **Answering Plaintiff advised no.**

      (a)      Your former spouse's name and present address;

(b)     the date of the marriage;

(c)     how and when the marriage ended;

(d)     whether you provide any support for the former spouse;

(e)     whether the former spouse provides any support for you.

23.     Have you or your spouse ever lived apart from one another either under a legal separation agreement or under an informal arrangement?  If so,

**Answering Plaintiff advised no.**

(a)     when?

(b)     for how long?

(c)     what was your address and your spouse's address during the separation?

24.     Has your spouse ever been employed?  If so, state:

**Answering Plaintiff advised yes.**

(a)     the name and address of each employer;

**Answering Plaintiff advised she worked various odd jobs off and on**

(b)      the dates of each employment;

(c)      whether employment was or is full-time or part-time;

**Part time**

(d)      the job title(s) and description(s);

**Seamstress**

(e)      the amount of the spouse's average weekly or monthly salary.

**Answering Plaintiff does not know.**

25.      Have you engaged in any part-time employment within the past five years in addition to your regular occupation?  If so, state:

**N/A.**

(a)      each employer for whom you worked part-time;

(b)      the type of work performed;

(c)      the rate of pay;

(d)      the number of hours or days you were employed; and

(e)      whether you are currently employed.

26.    Describe any pain or suffering for which you are claiming compensation in this lawsuit.

**Prior to his death, Plaintiff suffered from shortness of breath, exertional intolerance, weakness, fatigue, general malaise, and mental anguish arising from having his disease as well as from the fear of his disease progressing.**

**See plaintiff's complaint and medical records for additional details.**

27.    Describe the nature of any disability for which you are claiming compensation in the lawsuit.

**Because of the aforesaid physical symptoms, plaintiff was generally unable to exert himself as he did before the onset of his symptoms.  He had difficulty walking, climbing steps, and exercising because of his shortness of breath and exertional intolerance.  These physical symptoms along with his mental anguish, affected his ability to perform his customary day to day activities, as a result of which he suffered a loss of life's pleasures and enjoyment.**

**See plaintiff's complaint and medical records for additional details.**

28.    If you have had chest x-rays taken, including x-rays taken at the request of your employer, state:

(a)    the names and addresses of the persons who took the x-rays;

**See plaintiff's medical records in the possession of RecordTrak.**

(b)    the dates on which the x-rays were taken;

(c)    the charges you incurred for the x-rays and evaluations; and

(d)    if and when you were informed of the results of those x-rays.

29.    Has any physician or other person conducted pulmonary function tests on you, including pulmonary function tests done at the request of your employer?  If so, who conducted the tests and when and where were they conducted?  Please list any costs you incurred for the tests.

**See plaintiff's medical records in the possession of RecordTrak.**

30.    Are you still under a physician's care for the injuries which are the subject of this lawsuit?  If so, state:

**N/A.**

(a)    name(s) and address(es) of the treating physicians.

(b)    the frequency of treatment; and

(c)    the date you were last treated.

31.    Have you ever been confined to a bed or confined to your house because of the condition for which you instituted this lawsuit?  If so, state the period of that confinement.

**Answering Plaintiff advised Plaintiff Decedent was confined to home for 6-8 weeks before his death.**

32.    Did you have annual or other regular physical examinations?  If so, state the names and addresses of the examining physicians, when and where they took place, whether you or your employer requested these examinations, and whether you were advised of the results.

**Yes.  Answering Plaintiff advises that Plaintiff Decedent had regular physical examinations.**

33.    If you have not fully recovered from the injuries for which you are suing, state in what ways you have not fully recovered.

**Plaintiff continued to suffer the symptoms set forth in Interrogatory #26 until his death.**

34.    Do you claim that exposure to asbestos has aggravated a pre-existing condition?

**No.**

(a)    If so, had you recovered from the pre-existing condition at the time of the exposure to the asbestos materials?

(b)    If you had recovered, what was the date of recovery?

35.    When were you first aware of any symptoms which you now believe to be related to the injuries for which you are suing?  What were those symptoms?

**10/1/22.**

36.    If you believe you were exposed to asbestos materials aboard specific ships or in certain buildings, identify the ships or buildings.

**See Exhibit 5.**

37.    Set forth in detail the exact nature of your work that involved exposure to asbestos materials, including:

      (a)    the frequency of contact with asbestos materials;

      **Daily at times**

      (b)    the frequency with which you worked near other persons who worked with asbestos materials; and

      **Daily at times**

      (c)    the manner in which you performed your work.

      **Plaintiff performed the typical duties of a mechanic**

38.    List, by type, brand or trade name, and manufacturer, every asbestos-containing product to which you believe you were exposed.

      **To be supplied by the plaintiff at his discovery deposition, and/or by plaintiff's product identification witnesses.**

39.    For each asbestos-containing product identified in the answer to the preceding interrogatory, set forth the places, circumstances, and dates of exposure.

      **See Interrogatory 38.**

40.    For each separate defendant to whose asbestos products you claim exposure, state the names, home addresses and business addresses of all individuals who have knowledge of that particular exposure.

**To be supplied by the plaintiff's product identification witnesses, the list of whom are being provided separately as required by the local rules applicable to asbestos actions.**

41.    State whether each asbestos-containing product you have identified had any caution or warning, and if so, set forth the nature and text of each such warning or caution and when you first became aware of such warning or caution.

**No.**

42.    Did you ever work with, or around, asbestos-containing materials, which were manufactured, sold, prepared, or distributed, installed or removed by any person or company not named as a defendant in this lawsuit?

**To be supplied.  Discovery and investigation is continuing.**

43.    If your answer to the previous interrogatory is in the affirmative, identify each such person or company, and state:

**Not applicable.**

(a)    the type of product;

(b)    when and where the exposure occurred;

(c)    the type of work you were doing during this exposure;

(d)    how the exposure occurred; and

(e)    your employer at the time.

44.    What are the names and addresses of each of your supervisors during the period in which you claim you were exposed to asbestos materials?

**See Exhibit 6.**

45.    What are the names and addresses of each of your co-workers when you were allegedly exposed to asbestos?

**See Exhibit 6.**

46.    Have you or your attorneys, representatives, or experts performed any tests upon any asbestos-containing products, to which you claim you were exposed, to determine their composition?

**No**

47.    If so, state the name, address, job classification, and employer of the person who conducted each test, and;

**N/A**

(a)    the date of each test;

(b)    state the tools used in each test;

(c)    state where each test was conducted?

(d)    set forth a summary of the findings or results of each test;

(e)    state the nature of the test performed on each product;

(f)    state the names, addresses, and occupations of all persons present during any of the tests;

(g)    state the specific products on which the tests were conducted; identifying the products by manufacturer, brand or trade name, and type of product;

(h)    state whether any reports, notes, memoranda, or other type of record was made for any such test, and if so, by whom?

48.    State the present location of the record referred to in the preceding interrogatory, including the name, address, and occupation of the person who has possession of such record.

**N/A**

49.    Do you, your attorneys, your representatives or experts have possession of any samples of any asbestos or asbestos-containing products referred to in the Complaint and, if so, state:

**To be made available for inspection if the plaintiff intends on using them at trial.**

(a)    the name, address, and job classification of the person having custody;

      (b)     the manufacturer's name, brand or trade name, distributor's name, and type of product for each sample;

      (c)     when, where, and from whom each sample was obtained;

      (d)     whether the samples were altered or changed in any way from the state in which they were manufactured and originally distributed;

      (e)     whether you have viewed any such sample; and if so, when?

50.    State whether you or any other person known to you has, or knows of, photographs of insulating repair or insulation work done by, or near you; and if so, state:

**No.**

      (a)     when each photograph was taken;

      (b)     the name, address, and occupation of the person who took each photograph;

      (c)     where each photograph was taken;

      (d)     the present location and the name, address, and occupation of the custodian of each such photograph;

      (e)     what each photograph depicts;

      (f)     whether you personally have seen any such photographs; and if so, when?

51.    Do you, or any person known to you, have, or know of, the existence of any asbestos product information or data sheets with information about the characteristics and uses of any asbestos product to which you were exposed.  If so, state:

**To be supplied if the plaintiff intends to use them as evidence.**

      (a)     the manufacturer or seller, brand or trade name, and type of product of each sample;

      (b)     when and from whom each sample was obtained;

      (c)     whether you have seen any of these product information or data sheets and, if so, when.

52.    Do you, or any person known to you, have or know of, photographs of any asbestos-containing products made or sold by any defendant or other person or company; and if so, state:

**To be supplied if the plaintiff intends to use them as evidence.**

(a)    when each photograph was taken;

(b)    the name, address, and occupation of the person who took each photograph;

(c)    where each photograph was taken;

(d)    the present location, and the name, address, and occupation of the person who has possession of each such photograph;

(e)    what each photograph depicts;

(f)    whether you personally have seen any such photograph; and if so, when.

53.    Did your employer ever give any instructions or warnings during the course of your employment about any alleged dangers of asbestos?

**Unknown to Answering Plaintiff.**

54.    If the answer to the preceding interrogatory is yes, then, for each instruction or warning, state:

(a)    the date given;

(b)    the person who gave it;

(c)    whether the communication was written or oral;

(d)    if the communication was written, whether you have a copy of it in writing or know of anyone who does have a copy?

(e)    if the communication was written, the author of the communication; and

(f)    a summary of the communication.

55.    Were masks, respirators, or other dust inhalation inhibitors available during any part of your employment, and if so, state:

**Unknown to Answering Plaintiff.**

(a)    whether the devices were provided by your employer;

(b)    the period of time of your employment during which the devices were available to you;

(c)    what instructions were given to you about using the devices;

(d)    the manufacturer of the device;

(e)    whether and when you ever used the devices;

(f)    how often, by a percentage of the time you were exposed to asbestos materials, you in fact used the devices.

56.     Did any of your employers ever recommend or require that you use any device to reduce your possible exposure to, or inhalation of, asbestos fibers?

**Unknown to Answering Plaintiff.**

57.     If your response to the preceding interrogatory was in the affirmative, state:

(a)     the employer's name and address;

(b)     when, where, and the circumstances under which each recommendation or requirement was made;

(c)     the identity of the person who issued the recommendation or requirement to you;

(d)     the identity of each person present when each recommendation or requirement was made to you;

(e)     the identity of each person who received the same or similar recommendation or requirement;

(f)     the exact wording and content of each recommendation or requirement; and whether it was made in writing or orally;

(g)     the type, make, and model of each device referred to in each recommendation, or requirement;

(h)     the nature of the action, if any, you took in response to each recommendation or requirement.

58.     Did you at any time receive any publication, warning, requirement, or recommendation, whether written or oral, which purported to:

(a)     advise you of possible harmful effects of exposure to, or inhalation of asbestos; or

**Unknown to Answering Plaintiff**

(b)     recommend techniques or equipment which would reduce or guard against such potentially harmful exposure?

**Unknown to Answering Plaintiff**

59.     If you answered in the affirmative to any part of the preceding interrogatory, state for each communication:

(a)     the nature and exact wording;

(b)     when, where, and the circumstances under which it was communicated;

(c)     the identity of each source;

(d)     the identity of each witness to your receipt of the communication?

(e)     the identity of each co-worker or similarly situated person who received a similar communication.

60.     Do you, or any person known to you, have, or know of, samples of any asbestos product labels, warnings, packaging markings, or writings, or any other type of symbols or writings identifying or describing such products or warning of hazards of such products; and if so, state:

**To be supplied if the plaintiff intends to use them as evidence.**

(a)     the manufacturer, brand or trade name, and type of product of each such sample;

(b)     when and from whom each sample was obtained;

(c)     whether the samples were altered or changed in any way from when they were originally produced;

(d)     whether you have seen such samples; and if so, when.

61.    Do you, or any person known to you, have, or know of, samples of warning signs, notices, bulletins, pamphlets, memoranda, or other writing posted at your place of employment by your employer, your labor union, by any state governmental agency, or by any federal governmental agency, about asbestos health hazards or work practices and procedures to be followed when working with or near asbestos-containing products; and if so, state:

**No.**

(a)    the type and content of the sample;

(b)    when and from whom the sample was obtained;

(c)    when the writing was issued or posted; and

(d)    the present location, and the name, address, and occupation of the person who has possession, of each such sample.

62.    Were you a member of any labor union at anytime?  If so, state for each membership:

**Yes.**

(a)    the name of the union and its local;

**Local 15
Industrial Union of Marine & Shipbuilding Workers of America**

(b)    the time periods in which you were a member;

**1961-2002**

(c)    the names of your local's officials.

63.    When were you an apprentice?

64.    When were you a journeyman?

65.     What offices have you held, and on what committees have you served for either your local, regional, national or international union?

**Answering Plaintiff advised none.**

66.     Have you ever attended any international, national, regional or local union meetings, seminars, conferences, or conventions, at which the subjects of occupational health and exposure to asbestos were discussed?  If so, state:

**Answering Plaintiff advised Plaintiff Decedent may have attended local union meetings.**

(a)     when and where such meetings took place;

(b)     the names and addresses of any speaker or discussion leader; and

(c)     a summary of the matters under discussion.

67.     Have you ever been informed by any person in your local or international union of any possible hazards associated with exposure to asbestos?  If so, state:

**Unknown to Answering Plaintiff.**

(a)     the name, address, and official capacity of the person;

(b)     when and where you were so informed;

(c)     the information you received;

(d)     what action, if any, you took upon learning this information.

68.     Did you receive any union newspapers, newsletters, or other publication?  If so, state: **Unknown to Answering Plaintiff.**

(a)     the type and nature of each publication received;

(b)     how often you received such publications; and

(c)     whether you read such publications.

69.     Have you ever discussed this lawsuit or the injuries you claim in this lawsuit with any official of your local or international union?  If so, state:

**Answering Plaintiff advised no.**

(a)     the name, address, and official capacity of each person with whom you discussed these matters;

(b)     when, where, and under what circumstances did you discuss these matters;

(c)     the substance of these discussions.

70.     Did you ever participate in any medical screening program or health survey sponsored by, or with, your local or international union?  If so, state:

**Answering Plaintiff advised no.**

    (a)       when and where you so participated;

    (b)       the nature of the program or survey;

    (c)       the name and address of any examining physician or health practitioner;

    (d)       whether any x-rays were taken.

71.    If you are claiming loss of earnings or impairment of earning power because of any asbestos-related condition, disease or injury, then state:

    (a)       when you first became impaired;

    (b)       the name and address of your employer, your job classification, and your monthly or weekly rate of pay at the time you claim to have become impaired or lost earning power;

    (c)       if you had more than one employer during the three-year period prior to the onset of the impairment in earning power, then state the names and addresses of all employers, your job classifications, your weekly or monthly rates of pay, and the dates of employment;

(d)    the dates during which you were unable to work to your expectations because of any asbestos-related injury, and the total amount of pay you lost because of this inability.

72.    State whether you have ever sought, filed for or received any of the following:

(a)    Social Security retirement benefits;

**Yes.**

(b)    Life insurance benefits including, but not limited to, waiver of premium;

**No.**

(c)    Union retirement benefits;

**Pension**

(d)    Any other retirement benefits; and

(e)    Unemployment compensation.

**No.**

73.    When, if ever, did you first become aware that asbestosis was a compensable occupational disease under a state or federal workmen's compensation Act?  State how you became aware of this fact.

**Unknown to Answering Plaintiff.**

74.    For each hospital, or other health-related facility in which you have been confined as the result of any alleged asbestos related condition, disease or injury, itemize by facility the costs you incurred.  State whether or not these expenses have been paid, partially or wholly, and identify the person or other entity who has paid them.

**To be supplied if the plaintiff intends to seek recovery of the same.**

75.    State the total amount of any other expenses, including doctor bills, which you incurred as a result of your alleged asbestos-related condition, disease or injuries.  State whether or

not these expenses have been paid, partially or wholly, and identify the person or other entity who has paid them.

**To be supplied if the plaintiff intends to seek recovery of the same.**

76.     If a claim is made for household help, state the names and addresses of each person employed for household help, the dates of the employment, and the expenses incurred.

**To be supplied if the plaintiff intends to seek recovery of the same.**

77.     Do you now consume, or have you ever consumed, alcoholic beverages?  If so, describe what you drink, and the frequency and quantity of your consumption.

**Answering Plaintiff advised a glass of wine occasionally.**

78.     If you have used cigarettes, cigars, pipes, or any other tobacco product, state:


(a)     the brand names of the tobacco product;

**Parliament**

(b)     whether you were ever advised by any physician, or other person to stop using tobacco products, and if so, identify each person so advising you, and state when the advice was given to you, and whether you followed the advice.


79.     If you ever stopped using tobacco products, please state your reasons for doing so.

**Answering Plaintiff advised health reasons.**

80.     Are you aware of the United States Surgeon General's cautions placed on all cigarette packages and advertisements?  If so, when did you acquire this awareness?

**Unknown to Answering Plaintiff.**

81.     Have you ever read the warnings referred to in the preceding interrogatory?

**Unknown to Answering Plaintiff.**

82.    Have you ever smoked cigarettes after becoming aware of the cautions?

**Unknown to Answering Plaintiff.**

83.    Are you aware that the use of tobacco may cause cancer?  If so, when did you acquire this knowledge?

**Plaintiff was not aware of this when he began smoking and was never aware of the potentially deadly combination of asbestos dust inhalation and cigarette smoking.**

84.    Identify the sources of all information you, your attorneys, or other representatives, obtained in answering the preceding interrogatory, setting forth the names and addresses of all persons providing the information, their employment, and their job positions.

85.    Have you ever given sworn testimony in a criminal or civil proceeding other than this; and, if so, state:

**Answering Plaintiff advised no.**

(a)    when and where you testified;

(b)    who called you as a witness;

(c)    in what court you testified;

(d)    the subject matter of your testimony;

(e)    the parties to the proceedings.

86.    Identify all written statements which you have made which relate to the facts of this lawsuit and the damages claimed.

**None.**

87.    List the names of each person who will testify as a fact witness on behalf of the plaintiffs.

**Plaintiff's product identification and exposure witnesses, and plaintiff's family members.  Plaintiff reserves the right to supplement or amend his fact witness list.**

88.    For each person identified in your answer to interrogatory number 87, state the person's

**To be supplied when plaintiff makes a final determination as to who will be testifying as fact witnesses.**

(a)    age;

(b)    home and business address;

(c)    employer's name;

(d)    occupation;

(e)    previous employment history, including a description of duties for each employer.

89.    For each person identified in your answer to interrogatory number 87, state the subject matter of the witness's proposed testimony and the facts to which the person will testify.

**The facts set forth in plaintiff's Complaint; product identification; plaintiff's job duties and exposure to asbestos; lack of warnings on asbestos-containing products; plaintiff's physical and mental pain and suffering as well as other damages.**

90.    With whom did you consult in preparing your answers to these interrogatories?

**Counsel of record.**

91.    Did you rely on any documents in preparing your answers to these interrogatories?  If so, describe each document fully, and state when, where, and from whom you obtained the document.

**Counsel relied in part on plaintiff's medical records and reports.**

<u>ANSWERS 92-113</u>

The following physician(s) have examined and/or tested the plaintiff, and/or have reviewed the plaintiff's medical records and studies, and may testify in this litigation:

> **Plaintiff's expert medical witnesses and their reports will be supplied in accordance with the applicable procedural rules.**

> **Plaintiff also reserves the right to call as expert and/or fact witnesses, any of plaintiff's treating physicians, or any physician who has rendered any findings, diagnoses or opinions relative to the plaintiff.**

> **For Answers to Interrogatories 92(b)-113, see plaintiff's medical records, plaintiff's expert reports, and the prior qualifications and general medicine testimony given by the plaintiff's medical experts.**

114.    Please list the names and addresses of every person you intend to call at the time of trial to testify as a non-medical expert witness and for each state and identify:

> **To be supplied.**

> (a)    The subject matter of his expected testimony;

> (b)    The substance of the facts and opinions to which he will testify;

> (c)    All materials or other information provided by you to him for the preparation of his testimony in this case;

> (d)    All materials reviewed by him with regard to his testimony in this case;

> (e)    All materials upon which he will rely for his testimony in this case;

(f)      All materials he will utilize during the course of his testimony in this case;

(g)      His employers for the past ten years and his title and job responsibilities for each;

(h)      The caption of every other asbestos case in which he has testified since 1980, the party for whom he testified and the name of the opposing counsel in each;

(i)      All facts upon which you will rely at trial to qualify him as an expert;

(j)      All books, articles, studies or other matters published by the expert;

(k)      The title and subject matter of all unpublished articles, books or studies authored by the expert.

115.    State the name and address of every person who has been retained, consulted or specially employed as an expert in anticipation of litigation or preparation for trial, but who is not expected to be called as a witness at trial.

**Objection. Defendants are not entitled to discovery of this information without a showing of exceptional circumstances for requiring this information under the applicable Rules of Civil Procedure.**

NASS CANCELLIERE

BY:   /s/ ***Richard P. Hackman***
           RICHARD P. HACKMAN
           Attorneys for Plaintiffs

## PLAINTIFF'S RESIDENCES

| DATES | ADDRESSES |
|-------|-----------|
| 1937-1960 | Molfetta, Italy |
| 1960-1966 | Hoboken, NJ |
| 1966-1978 | Jersey City, NJ |
| 1978-2022 | Hazlet, NJ |

EXHIBIT 1

**PLAINTIFF'S WORK HISTORY**

| Dates | Employer | Job Title | Asbestos Exposure |
|---|---|---|---|
| 1961-1987 | Bethlehem Steel | Mechanic | Yes |
| 1987-2002 | Kearney Marine | Foreman | Yes |

EXHIBIT 2

## PLAINTIFF'S HOSPITALIZATIONS

**Dates**                **Hospital**                **Medical Condition**                **Physician**

**SEE PLAINTIFF'S MEDICAL RECORDS AND REPORTS IN THE POSSESSION OF RECORDTRAK.**

EXHIBIT 3

## PLAINTIFF'S PHYSICIANS

| Dates | Physician | Medical Condition(s) |
|---|---|---|

**SEE PLAINTIFF'S MEDICAL RECORDS AND REPORTS IN THE POSSESSION OF RECORDTRAK.**

EXHIBIT 4

## LOCATIONS OF ASBESTOS EXPOSURE

**Employer**                                                    **Location**

Bethlehem Steel

**Kearney Marine**

EXHIBIT 5

## PLAINTIFF'S SUPERVISORS AND CO-WORKERS

**Employer**                              **Supervisors**                              **Co-Workers**

**SEE PLAINTIFF'S PRODUCT IDENTIFICATION WITNESS LIST WHICH WILL BE SUPPLIED IN ACCORDANCE WITH THE APPLICABLE LOCAL RULES OF CIVIL PROCEDURE.**

EXHIBIT 6

## VERIFICATION

The undersigned is the Plaintiff in this action and verifies that the facts contained in the foregoing document are true and correct to the best of my knowledge, information, and belief. To the extent that the contents of the said document are based on information gathered by my counsel, the undersigned has relied upon counsel in executing this verification. The language of this verification is that of counsel and not of the signer. I understand that the statements contained in said document are made subject to the penalties of 18 Pa.C.S. section 4904 relating to unsworn falsification to authorities.

DATE:____2/12/2025_____    By:_____

## <u>CERTIFICATE OF SERVICE – RAFFAELE PAPPAGALLO</u>

The undersigned attorney certifies that the foregoing was electronically served on all law firms of record this 12th day of February 2025.  It is available for viewing and downloading through RecordTrak's E-Service.  It has been served by fax or email for those non-participating law firms.

| ReDco Corp/Crane Co. | G. Daniel Bruch, Jr., Esquire<br>gdbruch@swartzcampbell.com<br>Pamela A. Maginnis, Esquire<br>pmaginnis@swartzcampbell.com<br><br>**SWARTZ CAMPBELL LLC**<br>One Liberty Place<br>1650 Market Street, 38th Floor<br>Philadelphia, PA 19103<br><br>Telephone:   (215) 564-5190<br><br>Erin Magee, Paralegal<br>emagee@swartzcampbell.com |
|---|---|
| 3M Company | Basil A. DiSipio, Esquire<br>bdisipio@lavin-law.com<br><br>**Lavin, Cedrone, Graver, Boyd & DiSipio**<br>190 North Independence Mall West<br>6th and Race Streets, Suite 500<br>Philadelphia, PA  19106<br><br>Telephone:  (215) 627-0303<br>Facsimile:   (215) 627-2551<br><br>Diane Vulpio, Legal Assistant<br>dvulpio@lavin-law.com |
| AMDURA/American Hoist | Mark J. Skinner, Esquire<br>mskinner@maronmarvel.com<br><br>**MARON MARVEL BRADLEY ANDERSON & TARDY LLC**<br>Three Logan Square<br>1717 Arch Street, Suite 3710<br>Philadelphia, PA  19103<br><br>Telephone:  (215) 231-7100 |

| | |
|---|---|
| | Facsimile:        (215) 231-7101<br><br>Michelle Voigt<br>MMV@maronmarvel.com<br>Yalanda M. Darby, Paralegal<br>YDarby@maronmarvel.com |
| Anchor Darling | John McMeekin, II, Esquire<br>jmcmeekin@rawle.com<br>Anisha S. Abraham, Esquire<br>aabraham@rawle.com<br><br>**RAWLE & HENDERSON LLP**<br>The Widener Building<br>1339 Chestnut Street, 16th Floor<br>Philadelphia, PA  19107<br><br>Telephone:  (215) 575-4200<br>Facsimile:    (215) 563-2583<br><br>Hollee Smalley, Paralegal<br>hsmalley@rawle.com<br>Tiffany K. Sanchez, Legal Assistant<br>tsanchez@rawle.com |
| Air and Liquid/Buffalo Pumps | John Howarth, Esquire<br>jsh@wlbdeflaw.com<br>Keith D. Babula, Esquire<br>kdb@wlbdeflaw.com<br><br>**WILBRAHAM, LAWLER & BUBA**<br>1600 Market Street, Suite 2000<br>Philadelphia, PA  19103<br><br>Telephone:  (215) 564-4141<br>Facsimile:        (215) 564-4385<br><br>Robert G. Gaehring, Paralegal<br>rgg@wlbdeflaw.com |
| Carrier Corp. | Hillary C. Rankin, Esquire<br>hillary.rankin@morganlewis.com<br><br>**MORGAN LEWIS & BOCKIUS LLP**<br>One Oxford Centre, 32nd Floor<br>Pittsburgh, PA  15219 |

| | |
|---|---|
| | Telephone:  412-560-3300 |
| | And |
| | Patrick K.A. Elkins, Esquire<br>Patrick.elkins@morganlewis.com |
| | **MORGAN LEWIS & BOCKIUS LLP**<br>101 Park Avenue<br>New York, NY 10178 |
| | Telephone: 212-309-6876 |
| | Tiffany Guzzi , Paralegal<br>tiffany.guzzi@morganlewis.com<br>Yovana Burns, Senior Paralegal<br>Yovana.burns@morganlewis.com<br>asbestosdepositions@morganlewis.com |
| Cleaver Brooks<br><br>ITT/Godwin Pumps<br><br>Goulds Pumps<br><br>Grinnell<br><br>ITT Corp.<br><br>ITT/Bell & Gossett | Brady S. Edwards, Esquire<br>brady.edwards@morganlewis.com<br><br>**MORGAN, LEWIS & BOCKIUS LLP**<br>1000 Louisiana Street, Suite 4000<br>Houston, TX  77002<br>Telephone:  (713) 890-5110<br><br>and<br><br>Hillary C. Rankin, Esquire<br>hillary.rankin@morganlewis.com<br><br>**MORGAN LEWIS & BOCKIUS LLP**<br>One Oxford Centre, 32nd Floor<br>Pittsburgh, PA  15219<br><br>Telephone:  412-560-3300<br><br>Yovana Burns, Senior Paralegal<br>Yovana.burns@morganlewis.com<br>Tiffany Guzzi, Paralegal<br>tiffany.guzzi@morganlewis.com |
| DAP | James F. Tate, Esquire<br>mblock@wlbdeflaw.com |

| | |
|---|---|
| *Milwaukee Valve* | **WILBRAHAM, LAWLER & BUBA**<br>1600 Market Street, Suite 2000<br>Philadelphia, PA 19103<br><br>Telephone: (215) 564-4141<br>Facsimile:        (215) 564-4385<br><br>Natalie Frost, Paralegal<br>nfrost@wlbdeflaw.com<br>Robert G. Gaehring<br>rgg@wlbdeflaw.com<br>Paige Narducci, Paralegal<br>pxm@wlbdeflaw.com<br>Krystina V. Minko, Paralegal<br>kvs@wlbdeflaw.com |
| Drever Co. | Molly C. Reilly, Esquire<br>mreilly@rmh-law.com<br><br>**REILLY, McDEVITT, & HENRICH, P.C.**<br>The Widener Building<br>One South Penn Square, Suite 410<br>Philadelphia, PA 19107<br><br>Telephone: (215) 972-5200<br>Facsimile:   (215) 972-0405<br><br>asbestosmail@rmh-law.com |
| Flowserve/Byron Jackson | Timothy Connor, Esquire<br>tconnor@smsm.com<br><br>**SEGAL McCAMBRIDGE SINGER & MAHONEY**<br>1818 Market Street, Suite 1700<br>Philadelphia, PA 19103<br><br>Telephone: (215) 972-8015<br>Facsimile:   (215) 972-8016<br><br>Patty Hannigan. Paralegal<br>phannigan@smsm.com |
| Flowserve/Durco Pumps | Tracey McDevitt Hagan, Esquire |

| | |
|---|---|
| Flowserve/Duriron | tmcdevitt@rmh-law.com<br>Joseph Reilly, Esquire<br>jreilly@rmh-law.com<br><br>**REILLY, MCDEVITT & HENRICH, P.C.**<br>Widener Building, Suite 410<br>One South Penn Square<br>Philadelphia, PA  19107<br><br>Telephone:  (215) 972-5200 |
| Flowserve/Ed Vogt<br><br>Flowserve/Nordstrom | Bernard L. Levinthal, Esquire<br>blevinthal@goldfeinlaw.com<br><br>**GOLDFEIN & JOSEPH**<br>1880 John F. Kennedy Blvd.  20th Floor<br>Philadelphia, PA  19103<br><br>Telephone:  (215) 979-8200<br>Facsimile:    (215) 979-8201<br><br>Nancy DeBasio, Paralegal<br>NDeBasio@goldfeinlaw.com |
| *Flowserve/IDP Pumps* | |
| FMC Corp.<br><br>Sterling Fluid | W. Matthew Reber, Esquire<br>mreber@kjmsh.com<br><br>**KELLEY JASONS MCGOWN SPINELLI HANNA & REBER, LLP**<br>1818 Market Street, Suite 3205<br>Philadelphia, PA  19103<br><br>Telephone:  (215) 854-0658<br>Facsimile:          (215) 854-8434<br><br>Sandy Coco, Paralegal<br>scoco@kjmsh.com<br>Mike Mulder, Paralegal<br>mmulder@kjmsh.com |
| Foseco | Jennifer A. McGarrity, Esquire<br>JMcGarrity@maronmarvel.com<br>Kimberly Lapworth, Esquire |

| | |
|---|---|
| | KLapworth@maronmarvel.com<br><br>**MARON MARVEL BRADLEY ANDERSON & TARDY LLC**<br>Three Logan Square<br>1717 Arch Street, Suite 3710<br>Philadelphia, PA 19103-2832<br><br>Telephone:  (215) 231-7100<br>Facsimile:        (215) 231-7101 |
| Foster Wheeler | Vincent F. Reilly, Esquire<br>vreilly@rmh-law.com<br>Susan M. Valinis, Esquire<br>svalinis@rmh-law.com<br>asbestosmail@rmh-law.com<br><br>**REILLY, McDEVITT, & HENRICH, P.C.**<br>The Widener Building<br>One South Penn Square, Suite 410<br>Philadelphia, PA  19107<br><br>Telephone:  (215) 972-5200<br>Facsimile:  (215) 972-0405<br><br>Laura J. Mann, Paralegal<br>lmann@rmh-law.com |
| General Electric<br><br>CBS/Westinghouse | John McShea, Esquire<br>jmcshea@mcshealawfirm.com<br><br>**McSHEA LAW FIRM, P.C.**<br>Centre Square, West Tower<br>1500 Market Street, Suite 4000<br>Philadelphia, PA  19102<br><br>Telephone:  (215) 599-0800<br>Facsimile:   (215) 599-0888<br><br>Marie Von Feldt, Paralegal<br>mvonfeldt@mcshealawfirm.com<br>Patricia Ricciardi, Secretary<br>pricciardi@mcshealawfirm.com |
| Genuine Parts | Stephanie A. Fox, Esquire |

| | |
|---|---|
| | saf@maronmarvel.com<br>Natasha L. Dorcus, Esquire<br>Ndorcus@maronmarvel.com<br><br>**MARON MARVEL BRADLEY ANDERSON & TARDY LLC**<br>Three Logan Square<br>1717 Arch Street, Suite 3710<br>Philadelphia, PA 19103-2832<br><br>Telephone:  (215) 231-7100<br>Facsimile:         (215) 231-7101<br><br>Michelle Voigt, Paralegal<br>Mmv@maronmarvel.com<br>Yalanda M. Darby, Paralegal<br>YDarby@maronmarvel.com |
| Greene Tweed | David Weinberg, Esquire<br>dcw@wlbdeflaw.com<br><br>**WILBRAHAM, LAWLER & BUBA**<br>1600 Market Street, Suite 2000<br>Philadelphia, PA  19103<br><br>Telephone:  (215) 564-4141<br>Facsimile:         (215) 564-4385<br><br>Robert G. Gaehring, Senior Paralegal<br>rgg@wlbdeflaw.com |
| Hajoca Corp. | Christina A. Gonzales, Esquire<br>CAGonzales@mdwcg.com<br><br>**MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN**<br>2000 Market Street, Suite 2300<br>Philadelphia, PA  19103<br><br>Telephone:  (215) 575-2820<br>Facsimile:   (215) 575-0856<br><br>Suzie K. McNamara, Paralegal<br>SKMcNamara@mdwcg.com |
| Honeywell/Bendix | Lauren E. Burke, Esquire |

| Marley Wylain | Lauren.burke@huschblackwell.com <br> paservice@huschblackwell.com <br><br> **HUSCH BLACKWELL LLP** <br> 1801 Pennsylvania Avenue, NW, Suite 1000 Washington, D.C. 20006 <br><br> Telephone: (202) 378-2364 <br> Facsimile:  (202) 378-2319 <br><br> Megan Herbert, Paralegal <br> Megan.Herbert@huschblackwell.com |
|---|---|
| IMO Industries/DeLaval Steam | Joseph I. Fontak, Esquire <br> jfontak@leaderberkon.com <br><br> **Leader & Berkon, LLP** <br> 1515 Market Street, Suite 1200 <br> Philadelphia, PA  19102 <br><br> Telephone: (215) 755-0455 <br> Facsimile:       (215) 405-2999 <br><br> Robert Shaw, Senior Paralegal <br> rshaw@leaderberkon.com |
| J.A. Sexauer | Timothy D. Rau, Esquire <br> trau@dmclaw.com <br><br> **DICKIE McCAMEY** <br> 1650 Arch Street, Suite 2110 <br> Philadelphia, PA  19103 <br><br> Telephone:  215-925-2289 <br><br> Pamela Fairey, Paralegal <br> pfairey@dmclaw.com |
| J.H. France Refractories | Vincent F. Reilly, Esquire <br> vreilly@rmh-law.com <br> Damian S. Jackson, Esquire <br> djackson@rmh-law.com <br> asbestosmail@rmh-law.com <br><br> **REILLY, McDEVITT, & HENRICH, P.C.** |

| | |
|---|---|
| | The Widener Building<br>One South Penn Square, Suite 410<br>Philadelphia, PA  19107<br><br>Telephone:  (215) 972-5200<br>Facsimile:   (215) 972-0405<br><br>Laura J. Mann, Paralegal<br>lmann@rmh-law.com |
| John Crane | Tiffany Turner, Esquire<br>tturner@dmclaw.com<br>William R. Adams, Esquire<br>wadams@dmclaw.com<br>William J. Smith, Esquire<br>wsmith@dmclaw.com<br><br>**DICKIE, McCAMEY & CHILCOTE, P.C.**<br>1650 Arch Street, Suite 2110<br>Philadelphia, PA  19103<br><br>Telephone:  (215) 925-2289<br>Facsimile:       (215) 925-0307<br><br>Pam Fairey, Paralegal<br>PFairey@dmclaw.com |
| Keeler/Dorr-Oliver | Jennifer A. McGarrity, Esquire<br>jmcgarrity@maronmarvel.com<br>Kimberly Lapworth, Esquire<br>KLapworth@maronmarvel.com<br>Eric J. Kadish, Esquire<br>ejk@maronmarvel.com<br><br>**MARON MARVEL BRADLEY ANDERSON & TARDY LLC**<br>Three Logan Square<br>1717 Arch Street, Suite 3710<br>Philadelphia, PA 19103-2832<br><br>Telephone:  (215) 231-7100<br>Facsimile:       (215) 231-7101<br><br>Michelle Voigt, Paralegal<br>Mmv@maronmarvel.com |

| | Yalanda M. Darby, Paralegal<br>YDarby@maronmarvel.com |
|---|---|
| Grove US/Manitowoc Cranes | Patrick Brannigan, Esquire<br>pbrannigan@eckertseamans.com<br>Paul Seward, Esquire<br>pseward@eckertsemans.com<br><br>**ECKERT SEAMANS CHERIN &<br>MELLOT, LLC**<br>Two Liberty Place<br>50 S. 16th Street, 22nd Floor<br>Philadelphia, PA 19102<br><br>Telephone:  (215) 851-8400<br>Facsimile:   (215) 851-8383<br><br>Kathy Bleacher, Paralegal<br>kbleacher@eckertseamans.com<br>Molly Williamson, Paralegal<br>mwilliamson@eckertseamans.com |
| Met Life | Stewart Singer, Esquire<br>ssinger@srstlaw.com<br><br>**SALMON RICCHEZZA SINGER<br>TURCHI**<br>1601 Market Street, Suite 2500<br>Philadelphia, PA  19103-2302<br><br>Telephone:  (215) 606-6600<br>Facsimile:   (215) 606-6601 |
| Joy Global/ P&H Mining | Joan P. Depfer, Esquire<br>jpdepfer@mdwcg.com<br><br>**MARSHALL, DENNEHEY, WARNER,<br>COLEMAN & GOGGIN**<br>2000 Market Street, Suite 2300<br>Philadelphia, PA  19103<br><br>Telephone:  (215) 575-4559<br>Facsimile:  (215) 575-0856 |
| Parker Hannifin | Daniel J. Ryan, Jr., Esquire |

| | |
|---|---|
| Zurn Industries | djryan@mdwcg.com<br><br>**MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN**<br>2000 Market Street, Suite 2300<br>Philadelphia, PA  19103<br><br>Telephone: (215) 575-4559<br>Facsimile:  (215) 575-0856<br><br>Suzie McNamara, Paralegal<br>Direct Dial:  (215) 575-2689<br>SKMcNamara@mdwcg.com |
| *Sunoco* | *Pamela A. Maginnis, Esquire*<br>*pmaginnis@swartzcampbell.com*<br><br>*SWARTZ CAMPBELL LLC*<br>*One Liberty Place*<br>*1650 Market Street, 38th Floor*<br>*Philadelphia, PA 19103*<br><br>*Telephone:   (215) 564-5190*<br><br>*Erin Magee, Paralegal*<br>*emagee@swartzcampbell.com* |
| Union Carbide | Catherine N. Jasons, Esquire<br>cjasons@kjmsh.com<br><br>**KELLEY, JASONS, MCGOWAN, SPINELLI HANNA & REBER, LLP**<br>1818 Market Street, Suite 3205<br>Philadelphia, PA  19103<br><br>Telephone.:  (215) 854-0658<br>Facsimile:    (215) 854-8434<br><br>Sandy Coco, Paralegal<br>scoco@kjmsh.com<br>Mike Mulder, Paralegal<br>mmulder@kjmsh.com |
| Warren Pumps | Joshua D. Scheets, Esquire<br>jdscheets@mdwcg.com |

|  | **MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN**<br>2000 Market Street, 23rd Floor<br>Philadelphia, PA 19103<br><br>(215) 575-2751 |
|---|---|

DATE: <u>2/12/25</u>          */s/*    ***Richard P. Hackman*** _____
                               RICHARD P. HACKMAN, ESQUIRE

**EXHIBIT C**

Page 1

1    ESTATE OF RAFFAELE      : COURT OF COMMON
     PAPPAGALLO, et al,     : PLEAS
2       Plaintiffs          : PHILADELPHIA COUNTY
                            :
3            vs.            :
                            :
4    REDCO CORP., et al,    : NO. 2304-2099
         Defendants         : DISCOVERY
5
6
7              WEDNESDAY, MARCH 12, 2025
8
9                  Video Taped Discovery
10   Deposition of ANTONIO ALBANESE, taken pursuant
11   to notice, at 20 Hidden Meadow Drive, Easton,
12   Pennsylvania, on above date, beginning at or
13   about 11:30 a.m., before Jeanne Christian,
14   Professional Reporter and Notary Public and
15   Frankie Matus, Video Technician.
16
17
18
19
20
21
22
23           VERITEXT LEGAL SOLUTIONS
24            MID-ATLANTIC DIVISION

ANTONIO ALBANESE

Page 10

1 A.    Well, the way that I got contact, it is
2 from his name from the -- from speaking with
3 them, with the wife of -- and they would say
4 they were looking for somebody who worked with
5 Ralph, and will I give a deposition, and if it
6 was okay, then for them to call me.  And I
7 said okay.
8 Q.    So Mrs. Pappagallo reached out to you
9 and asked you --
10 A.    If I wanted to --
11 Q.    If you would testify, okay.
12          And do you know when that was,
13 approximately, that you were first contacted?
14 A.    When I was contacted from -- that was, I
15 don't know, four, five months ago.  I don't
16 remember exactly now.
17 Q.    And that's totally fine.  I will just
18 remind you, if you don't know an exact date or
19 time or length, if you are giving us an
20 approximation, that's fine.  Just let us know
21 you are doing that, like you just did.
22 A.    Yeah, I don't know exactly.  I don't
23 know nothing to pinpoint that date, you know.
24 As a matter of fact, she didn't even have my

Page 11

1 phone number, because we lost that, too.  As a
2 matter of fact, it was another guy who worked
3 with us, and then she called me and told me
4 that she was trying to get in contact with me.
5 Q.    And what was that gentleman's name, if
6 you remember?
7 A.    Yes, Mateo DeTulli.
8 Q.    Can you say that again?  I'm sorry.
9 A.    Mateo.
10 Q.    Mateo.
11 A.    DeTulli, D-E-T-U-L-L-I, I think.  I
12 don't know if that's right.
13 Q.    And Mr. DeTulli worked at Hoboken
14 Shipyard with you and Mr. Pappagallo?
15 A.    Yes, yes.
16 Q.    And what was his trade when he was
17 working with you?
18 A.    He was an outside machinist, but he used
19 to work on what they called most of the time
20 on the wheel gang that was outside, the rotor,
21 the propeller, very little, you know, at least
22 there was nothing to do that was working in
23 the engine room.
24 Q.    So he did not work in the engine room

Page 12

1 with you and Mr. Pappagallo?
2 A.    Very rare, unless there was -- he was
3 doing something else.  He was not working in
4 the engine room.
5 Q.    And you still keep in touch with Mr.
6 DeTulli?
7 A.    Yes, I do.
8 Q.    Do you still keep in touch with Mrs.
9 Pappagallo?
10 A.    Like very rare.  Matter of fact, he
11 contact me, and then I talk with her, but
12 other than that, I didn't -- that's the one
13 time, and then she asked for -- for him to
14 call me.
15 Q.    Do you communicate with anybody -- have
16 you communicated with anybody else in Mr.
17 Pappagallo's family, any of his children?
18 A.    No, no.
19 Q.    Other than this conversation with Mrs.
20 Pappagallo approximately four to five months
21 ago or so, do you recall when you might have
22 last spoken with her?
23 A.    It was -- when I spoke with her?  It is
24 just whenever she answer the phone when Mr.

Page 13

1 Pappagallo was still alive.
2 Q.    Okay, okay.  So after you left the
3 shipyard, did you keep in touch with Mr.
4 Pappagallo?
5 A.    Yeah, we talked every once in a while in
6 there; especially, Easter, Christmas.
7 Q.    Okay, holidays?
8 A.    Holidays.
9 Q.    Okay.  Did you attend Mr. Pappagallo's
10 funeral?
11 A.    No, I didn't.
12 Q.    Did you know -- had you known that he
13 had passed away?
14 A.    Yes, I did.
15 Q.    Did you speak with him, you know, within
16 six months of when he passed away, if you
17 recall?
18 A.    I don't remember when he died, but
19 whenever he died, I spoke with him the
20 Christmas before.
21 Q.    Got you.  And when you spoke with him
22 the Christmas before that he passed away, did
23 you talk about your work at the shipyard at
24 all?

4 (Pages 10 - 13)

ANTONIO ALBANESE

Page 26

1  Q.   Got you.
2  A.   Usually, it is a leader, you know, but
3  --
4  Q.   Understood.
5        So, as a snapper, he was still
6  an outside machinist?
7  A.   Yes, he was still in the engine room.
8  Q.   And he was still working or was he more
9  supervising when he was a snapper?
10 A.   More supervising, more directed the
11 work.  But I mean, I know it is hard to
12 explain, but with the crew that we get in the
13 shipyard, some of the time, the people who
14 work, you have to come and do it yourself.
15 Q.   And then -- so he was a snapper in
16 approximately '79 or '80.  When did he become
17 the foreman or supervisor?
18 A.   He probably was a snapper in '76, '77.
19 Q.   Okay.
20 A.   And then, in '79, '80, he became the
21 foreman.
22 Q.   Understood, okay.  I'm sorry, I mixed up
23 the dates.
24 A.   He became foreman on night shift.

Page 27

1  Q.   Foreman on night shift, okay.   All
2  right.
3        So when you started in
4  January 1967, was there different shifts at
5  the shipyard?
6  A.   The day shift and night shift.
7  Q.   And what is the time for day shift, and
8  what is the time for night shift?
9  A.   You mean the start of the working?
10 Q.   Yes.  Is it like 7:00 to 7:00 or --
11 A.   I think it was 7:30 to 4:00 o'clock.
12 Q.   Okay.
13 A.   And 4:00 to 1:00.
14 Q.   And 4:00 to 1:00, okay.  And when you
15 started in January 1967, were you assigned to
16 a specific shift or did you rotate?
17 A.   I took whatever I can.  Whatever the
18 shift they assign you, you go, because,
19 sometimes, they need people on day shift,
20 sometimes, they need people on night shift,
21 and you have to get in there before you build
22 your name.
23 Q.   At some point in time, were you able to
24 select a shift and stay on that shift?

Page 28

1  A.   If you want to, you can select it, but
2  only thing, if there was no work, then
3  somebody that may have less seniority could
4  work on day shift.  Let's say they need people
5  on day shift.  If you don't want to go, people
6  with less seniority, they take your place.
7  Q.   So throughout your time as outside
8  machinist at the shipyard, did you always take
9  whatever was available, in other words?
10 A.   I took whatever was available until '75,
11 and then I became a union representative for
12 the night shift.
13 Q.   So, beginning in 1975, did you always
14 work the night shift?
15 A.   Yes, because then I was the union
16 representative for the outside machinist.
17 Q.   And did that last until you left the
18 shipyard or did it change again at some point?
19 A.   That last until Bethlehem Steel close.
20 Q.   Okay.  And that was in 19 --
21 A.   '82.
22 Q.   '82, okay.  And then, what happened in
23 1982?  Did you go back to picking up whatever
24 shift was available or did you --

Page 29

1  A.   Well, that's when the new company,
2  Braswell was -- what his name, Pappagallo, was
3  made foreman of the day shift or whatever, and
4  me, after a month, then I work still at night
5  shift, and then I went on day shift as his
6  assistant.  I took over -- I was always with
7  the union, not -- you know, as a foreman of
8  night shift, and then, after a month, I went
9  on day shift as his assistant.
10 Q.   Okay, so you remained on the night shift
11 until you went to the day shift to be Mr.
12 Pappagallo's assistant?
13 A.   Correct.
14 Q.   Let me ask you about Mr. Pappagallo.
15 When you started in January 1967, do you know,
16 was he on a regular shift of any type?
17 A.   No, he was like me.
18 Q.   He was like you, picked whatever was --
19 A.   Whatever you can do.
20 Q.   At some point, did his shift assignment
21 change?  Like, you went to the union rep for
22 the night shift.   At some point, did he
23 become on one shift or the other?
24 A.   Like I said, '75 or whatever, '75, '76,

8 (Pages 26 - 29)

ANTONIO ALBANESE

Page 30

1 he became like a snapper, and so he was
2 assigned the day shift.
3 Q.    So when he became a snapper, whatever
4 year that was --
5 A.    Yes.
6 Q.    -- he was assigned the day shift.
7 Okay, you said about 1967.  I got you.  I'm
8 sorry, 1976, sorry about that.
9              And about that time, you were
10 the union rep on the night shift?
11 A.    Yes.
12 Q.    Understood.  And then you both came
13 back together in 1983 or so --
14 A.    No, because he became -- when he became
15 a supervisor foreman from Bethlehem Steel, he
16 became on night shift.
17 Q.    And that was in --
18 A.    Around '83 or something like that.
19 Q.    '83?
20 A.    So we worked together for three years,
21 Bethlehem Steel on night shift.
22 Q.    That was when the new shipyard took over
23 or was that still Bethlehem Steel?
24 A.    No, Bethlehem Steel, Bethlehem Steel.

Page 31

1 Q.    So, for a period, you were the union rep
2 on the night shift, and he was a snapper on
3 the day shift, but then he moved to the night
4 shift?
5 A.    He moved to the night shift.  There was
6 a foreman on the day shift, and he became the
7 foreman of the night shift.
8 Q.    Night shift.  And then did he remain
9 foreman on night shift until he became foreman
10 of the day shift?
11 A.    Yeah, until Bethlehem Steel close.
12 Q.    So he was foreman of the night shift
13 until Bethlehem Steel closed, and then he was
14 foreman of the day shift under the new --
15 A.    He was like a superintendent of
16 machinery at the time with Bethlehem, which
17 included outside machinist and machine shop,
18 okay?  Which was not that before.  Before, it
19 was just outside machinist.  But when
20 Braswell took over, he became that.  And
21 that's when I became -- actually, I was the
22 foreman of machinists.  I was his assistant.
23 But I never took the -- how should I say, the
24 company -- I was still an hourly paid.

Page 32

1 Q.    Understood, understood.
2              And you mentioned the union.
3 What union is it that you all belonged to, if
4 you remember?
5 A.    I think it was Local 15.
6 Q.    I think I saw it somewhere.  Do you
7 remember the name of the union?  I think I saw
8 it somewhere.
9              MR. HACKMAN:  It should be in
10 the Rogs.
11              MS. TURNER:  Yes, I didn't
12 write it down, of course.
13              THE WITNESS:  I remember it
14 was Local 15, I think it was.
15 BY MS. TURNER:
16 Q.    Yes, that's what it says here, that's
17 correct.  I couldn't remember the name of the
18 union.
19              Is that the only union that
20 you were a member of while working at the
21 shipyard?
22 A.    Yeah, definitely, that was the only one.
23 Q.    And did you join the union when you
24 started at the shipyard?

Page 33

1 A.    Yes.  After three months, and then,
2 after three months -- once they give you
3 seniority, then you got to belong to the
4 union.  And at the time -- now, don't make me
5 a liar, that is just some thing that I
6 remember, that in three months, in 90 days,
7 you had to put in 240 hours of work.  If you
8 put in 240 hours a work, and they don't chase
9 you out, then, automatically, they give you
10 seniority, so you have to belong to the union.
11 Q.    Understood.
12              And when you joined the union
13 in early 1967, was Mr. Pappagallo already a
14 member of the union?
15 A.    Oh, yes.  He was there before me.  How
16 long ago before me, I can't recall.
17 Q.    And he remained in -- do you know if he
18 remained in that same union until he --
19 A.    Yes.
20 Q.    -- became the supervisor?
21 A.    Until he became supervisor with
22 Bethlehem Steel.
23 Q.    Understood.
24              You said that you were union

9 (Pages 30 - 33)

ANTONIO ALBANESE

Page 34

1  rep for the night shift in approximately 1975?
2  A.    Yes.
3  Q.    Did you hold any other positions with
4  the union?
5  A.    No.
6  Q.    Did Mr. Pappagallo ever hold any
7  positions with union?
8  A.    No.
9  Q.    Did you attend union meetings?
10  A.    Of course.  I was the representative.  I
11  have to attend meeting.
12  Q.    Well, before you became representative,
13  in the early days?
14  A.    Representative means that what they call
15  shop steward, okay?  Not the rest, you don't
16  have to attend meeting.  If they want to go,
17  they could attend meeting.
18  Q.    When you first joined the union in early
19  1967, did you attend meetings then?
20  A.    If I want to attend meeting.  I attend
21  meeting when I wanted to go for union
22  representative.
23  Q.    Do you know if Mr. Pappagallo attended
24  union meetings?

Page 35

1  A.    I don't recall seeing him.
2  Q.    Did the union send out any publications
3  to your home?
4  A.    About what?
5  Q.    Like newsletters or informational
6  material?  No?  You have to say no.
7  A.    No.
8  Q.    At any meeting you may have attended for
9  the union, did the subject of asbestos ever
10  come up?
11  A.    I tell you, I don't recall.  It may be,
12  but I do not recall.
13  Q.    That's fair enough.  Okay.  Sometimes,
14  I go off on a tangent, and I have just got to
15  figure out where I am.
16        So you had talked about
17  working in the engine rooms of ships that were
18  in the shipyard; correct?
19  A.    Yes.
20  Q.    You and Mr. Pappagallo both did that?
21  A.    Yes.
22  Q.    Can you estimate how much of your time
23  was spent working on ships versus working, if
24  at all, off the ship?  Like in the shipyard

Page 36

1  itself or in the shop or anywhere?
2  A.    At Bethlehem Steel, you know,
3  90 percent, unless something was -- was on the
4  ship.
5  Q.    So the majority of your time was spent
6  on ship?
7  A.    Yes.
8  Q.    And is that the same for Mr. Pappagallo?
9  A.    Yes.
10  Q.    Okay, all right.
11  A.    The time that he was not a supervisor.
12  The time that he was a supervisor, some of the
13  time, he spent in the office.
14  Q.    So up until the late '70s?
15  A.    Yeah, late, I think it was, because he
16  only became night for couple of years, so --
17  Q.    I'm going to ask you some questions
18  about the shop in a minute, but I want to ask
19  you a little bit about the ships.
20        Whose ships are coming in for
21  you all to work on?
22  A.    Well, the one which I wish I
23  remembered -- I am drawing a blank on the
24  name.  At the time, most of the ship was from

Page 37

1  SeaLand.
2  Q.    Most of the ships were from what?
3  A.    SeaLand.
4  Q.    SeaLand?  And what is SeaLand?
5  A.    It does not exist anymore.  Now, it is
6  Maersk, Maersk.  It was one of the biggest
7  container ship, container ship.
8  Q.    So they are commercials ships?
9  A.    Yeah, container.  At the time, they were
10  one of the biggest.  Or at least that is all
11  there was, SeaLand.
12  Q.    Were there any Navy ships that came into
13  the shipyard?
14  A.    Yes, they did.  Now, don't ask me the
15  name of the ship.  The only one that comes to
16  mind, if I am not mistaken, that was diesel,
17  was the DuPont.  But we do work on container
18  ship.
19  Q.    Did you work on other Navy ships, aside
20  from the DuPont, that you can't recall?
21  A.    Yes, I did.  Yes, we did.  Not one.
22  We did a few.  I'm just trying to get a
23  memory of one.
24  Q.    Okay.  And I'm not looking for the

10 (Pages 34 - 37)

ANTONIO ALBANESE

1 names. I'm just kind of looking -- is there
2 a percentage of SeaLand ships versus Navy
3 ships that you worked on?
4 A. SeaLand, the most. SeaLand, the most.
5 Q. Did you work on any Coast Guard ships?
6 A. Yes, we did.
7 Q. Do you remember the names of any of the
8 Coast Guard ships?
9 A. Like I say, I remember SeaLand, because
10 I did so much work with it, and you want me to
11 remember Coast Guard? This was something that
12 happened --
13 Q. No, no worries. And as Mr. Hackman
14 instructed you, if anything comes to you,
15 because we are talking about this --
16 A. Something just comes to me from SeaLand.
17 One of the ships was Chicago.
18 Q. That's a SeaLand ship?
19 A. That was a SeaLand ship.
20 Q. Okay, very good.
21 A. We also did -- we stripped that ship,
22 though, the one that was here in New York.
23 That used to be the Intrepid.
24 Q. And that's a Navy ship?

1 A. It was an aircraft, and now, they made a
2 museum in New York. But the job that we did,
3 we strip it. We make them -- it is in a
4 museum now.
5 Q. Understood, understood.
6         I asked you about your work on
7 these different ships. Did Mr. Pappagallo
8 work on the SeaLand and the Navy and the Coast
9 Guard ships as well?
10 A. Yeah.
11 Q. Did he work any differently than you?
12 In other words, was more of his work on the
13 Navy or the Coast Guard ships, as opposed to
14 the SeaLand ships or --
15 A. No. I could only imagine it being the
16 same, okay?
17 Q. So most of the work was on the SeaLand
18 ships?
19 A. At the time, we had a lot of SeaLand
20 ships; especially, in the years when we didn't
21 know about asbestos.
22 Q. You told me about -- well, we have
23 talked about Mr. Pappagallo a little bit, and
24 you told me about the other gentleman who did

1 not work so much in the engine room, and I
2 can't think of his name.
3 A. Mateo?
4 Q. Yes, sorry. Is there any other
5 co-workers that worked with you or Mr.
6 Pappagallo on a somewhat regular basis, whose
7 name you can recall?
8 A. That is still alive?
9 Q. Let's start with still alive.
10 A. No, I don't recall.
11 Q. Okay, okay.
12 A. I was 20 years old when I started.
13 Everybody else was older than me. So I am
14 pushing 80, so --
15 Q. So you were approximately 20 when you
16 started. Do you know how old Mr. Pappagallo
17 was when you started?
18 A. I know he was seven or eight years older
19 than me. Oh, how old he was when he started?
20 Q. When you started.
21 A. Oh, when I started? I know he was seven
22 or eight years older than me, but --
23 Q. When you would work on a ship that came
24 into the shipyard, would you know the history

1 of that ship, like, when it had last been
2 worked on or --
3 A. Well, listen, we get to know that when
4 we got up in the rank.
5 Q. Okay, but not when you were starting
6 out?
7 A. Not when you started out. You go there,
8 there, and the foreman say, you, you, and you
9 go to that ship; you, you and you go to that
10 ship, you go to the engine room, you go to the
11 wheel head, you go to that thing, and you go
12 to wherever they send you.
13 Q. Understood.
14         So when you arrived for work
15 at the shipyard, did you report immediately to
16 a ship or did you report to the shop?
17 A. I didn't report to the shop. To the
18 outside machinist's office.
19 Q. And where was the outside machinist's
20 office at the shipyard?
21 A. It was a building right outside the
22 machine shop.
23 Q. Okay. I know we talked about your work
24 in the engine rooms on the ship. Were you

11 (Pages 38 - 41)

ANTONIO ALBANESE

1 ever assigned to work in the machine shop?
2 A.   Never assigned.  Like I said, like I
3 said before, when I worked with the
4 boilermaker, sometimes, there was no work, and
5 if there is work in the machine shop, then I
6 went to work in the machine shop.  It was not
7 assigned.  It was a choice.  They gave you the
8 choice, if you want to work, that's where the
9 work is.  If you want to take it, you take it.
10 You don't want to take, you don't take.
11 Q.    And would that be the same for Mr.
12 Pappagallo?  Do you know if he was ever
13 assigned to the machine shop?
14 A.   I don't know.
15 Q.   Okay, very good.  Now, you were --
16 A.    You got to remember, Mr. Pappagallo
17 started before me.  So he had a high
18 seniority, okay?  Before I get the call to go
19 the work, he got the call first.
20 Q.   He got the call first, got you.  There
21 is a period of time, from when you started in
22 1967, that you were both working as outside
23 machinists in the engine room; correct?  In
24 various engine rooms?

1 A.   Right.
2 Q.   But from what I understood from your
3 testimony, there may be times that you are
4 assigned to work in the same engine room?
5 A.   Yes.
6 Q.   But then there may be times where you
7 might be assigned to the engine room, and Mr.
8 Pappagallo might be assigned to a different
9 ship?
10 A.   Yes, yes.
11 Q.   Or a different engine room.
12        Is there a way to estimate how
13 many days a month, how many months a year, you
14 actually worked side by side with Mr.
15 Pappagallo in an engine room?
16 A.   I would never -- I could not estimate
17 that.
18 Q.   Could there be days, or even weeks,
19 where you did not work in the same engine
20 room?
21 A.   Yes.
22 Q.   Could there be months where you did not
23 work in the same engine room?
24 A.   I don't know, but yes, there could be.

1 It could be months, and then we did other
2 ships.
3 Q.   If there is no ships, then --
4 A.   We would be laid off.
5 Q.   You are laid off, or if there was shop
6 work or something like that?
7 A.   Exactly.
8 Q.   Understood.  Do you recall, during your
9 time at the shipyard, any large periods of
10 time where you recall being laid off?
11 A.   Yes, there was.  I mean, if you are
12 talking about -- if you are asking me how
13 long, I could not -- some time -- I guess the
14 most, it could be over a month.
15 Q.   If you were laid off at the shipyard,
16 and there weren't other positions at the
17 shipyard, would you go work somewhere else,
18 pick up part-time work outside the shipyard?
19 A.   If it was available, yes.
20 Q.   Do you know if there were periods that
21 Mr. Pappagallo -- I know he had more seniority
22 than you?
23 A.   He did, he had more seniority than me,
24 so he was working when I was laid off.

1 Q.   Understood.
2        Do you know -- and if you
3 don't know, I totally understand, but do you
4 know if there were times where he may have
5 been laid off from the shipyard?
6 A.   I know every time I was called to go to
7 work, he was there.
8 Q.   Understood.
9        Do you know -- and again, I
10 understand if you don't -- do you know if,
11 while working at the shipyard, Mr. Pappagallo
12 had any part-time work outside the shipyard?
13 A.   Not that I know of.
14 Q.   You gave me the names of two Navy ships.
15 Do you have a specific recollection if you and
16 Mr. Pappagallo worked together on those ships?
17 A.   No, I don't.  Like I said, one of them
18 was -- I think it was diesel, and we didn't
19 have that many.  One of those had turbine.
20 And I don't -- we worked on quite a few of the
21 Navy ships, and I don't remember, bad memory.
22 Q.   Understood.  And no worries.  It was a
23 long time ago.  And again, we can only ask you
24 what you know or what you remember today, and

ANTONIO ALBANESE

1 Q.   So as far as the Crane sheet gasket
2 material, you don't recall any number -- style
3 numbers or any numbers associated --
4 A.   If there was a number, I don't recall
5 it.
6 Q.   Okay, very good.
7       Did you ever meet anyone from
8 Crane or John Crane?
9 A.   No.
10 Q.   You -- I know we talked earlier about
11 whether Mr. Hackman's law firm represents you.
12 Do you have your own asbestos lawsuit?
13 A.   No.  Even if I am told that I have
14 asbestosis, I'm not -- so far, knock on wood,
15 I am doing okay.  I don't want any.
16 Q.   And you were told that by a doctor?
17 A.   Yes.
18 Q.   The last set of questions I have for
19 you, I just want to clarify.  We talked about
20 the different ships that came into the Hoboken
21 Shipyard while you and Mr. Pappagallo were
22 working there.  Do you have a recollection --
23 my understanding is, Mr. -- you have a
24 recollection of Mr. Pappagallo working on all

1 of the different types of ships that came into
2 the shipyard?
3 A.   Yes.
4 Q.   Do you recall him working on the
5 commercial ships?
6 A.   Yes.
7 Q.   Do you recall him working on Coast Guard
8 ships?
9       MR. HACKMAN:  Objection.
10       THE WITNESS:  Yes.
11 BY MS. TURNER:
12 Q.   Do you recall him working on Navy ships?
13       MR. HACKMAN:  Objection.
14       THE WITNESS:  Yes.
15 BY MS. TURNER:
16 Q.   And while he was working on the Navy
17 ships, he was working as an outside machinist?
18       MR. HACKMAN:  Objection.
19       THE WITNESS:  Yes.
20 BY MS. TURNER:
21 Q.   I know you said -- you gave us a couple
22 of names of the Navy ships.  Do you recall
23 any hull numbers for any Navy ships?
24 A.   No.

1 Q.   I didn't think so.  I just had to ask,
2 sorry.
3       And while Mr. Pappagallo was
4 an outside machinist, working on the Navy
5 ships, he was working hands-on with products
6 like gaskets and packing; correct?
7       MR. HACKMAN:  Objection.
8       THE WITNESS:  Yeah.
9 BY MS. TURNER:
10 Q.   Yes?
11 A.   Yes.
12 Q.   Do you have a recollection of him
13 working with all of the different brands of
14 gaskets and packing that you identified on the
15 Navy ship?
16       MR. HACKMAN:  Objection.
17       THE WITNESS:  As far as I
18 know, yes.
19       MS. TURNER:  Those are all the
20 questions I have for you.  Thank you, sir.
21       - - -
22       EXAMINATION
23       - - -
24 BY MR. HACKMAN:

1 Q.   Let me follow up on that.  When you
2 were asked about specific Navy ships, the
3 DuPont and the Intrepid, I think, you did not
4 recall Mr. Pappagallo working on those?
5 A.   No.
6 Q.   Right.  Do you specifically recall any
7 particular ship, Navy ship, that Mr.
8 Pappagallo worked on?
9 A.   Like I said, those are the one that I
10 remember the name.
11 Q.   Okay.
12 A.   I don't remember any -- I don't remember
13 the name of any other one.
14 Q.   The Navy ships were a small percentage
15 of the ships you worked on?
16       MS. TURNER:  Objection, form.
17       THE WITNESS:  Yes, a small
18 percentage of the ships.
19 BY MR. HACKMAN:
20 Q.   And you have a general recollection of
21 working with Mr. Pappagallo, which you have
22 talked about?
23 A.   Yes.
24 Q.   Do you have a specific memory in mind at

50 (Pages 194 - 197)

ANTONIO ALBANESE

Page 198

1 the present time of a particular Navy ship
2 that Mr. Pappagallo was working on?
3 A.   No, not that --
4 Q.   So your recollection of Mr. Pappagallo
5 working is on ships, generally, not
6 specifically on Navy ships?
7 A.   Right.
8             MS. TURNER:  Objection, form.
9             THE WITNESS:  Yes.
10            MR. HACKMAN:  That's all I
11 have.
12            - - -
13            EXAMINATION
14            - - -
15 BY MS. TURNER:
16 Q.   I have a question.  I know you can't
17 give us the name of a Navy ship or a hull
18 number, but do you have a recollection of Mr.
19 Pappagallo working on a Navy ship?
20            MR. HACKMAN:  Objection.
21            THE WITNESS:  With me,
22 together, no, definitely not.  That he worked
23 while I wasn't there, what he did by himself,
24 that, I cannot say, but with me, personally,

Page 199

1 it was not with me working on a Navy ship.
2 BY MS. TURNER:
3 Q.   Is there -- so with respect to the
4 commercial ships, can you give us the number
5 of commercial ships you specifically remember
6 being on, working on, with Mr. Pappagallo?
7 A.   I could say working together on the same
8 ship, it had to be at least, I don't know,
9 there were a few, a thousand more.  I cannot
10 recall how many times.  I know we worked
11 together quite a few -- and sometimes, the
12 ship get in and out in three, four days.  So
13 how can I remember?  I have been -- you know,
14 how many, ten years, because that was -- after
15 that, after we kind of separated.  I became a
16 union representative, he became snapper, so we
17 separated a little bit, but from '67 to '74,
18 '74, '75, that we work alternate some time.  I
19 worked day shift; some time, he worked night
20 shift; sometimes, we work together.
21            Sometimes, when the ship came
22 in, you have -- especially, some on SeaLand,
23 two, three days, they want to get out, so,
24 sometimes, we did a couple of ships together

Page 200

1 in a week, and sometimes, we did it in a
2 month.  I don't remember how many times, but I
3 could say that -- I mean, if you want a
4 number, I could say at least a dozen times,
5 but a specific number, I cannot give you a
6 specific number.
7 Q.   And that's over that timeframe you were
8 just giving me?
9 A.   Oh, yeah, over that timeframe, and plus,
10 it has got to be even more, but I cannot tell
11 you a hundred and then --
12            MS. TURNER:  Very good.
13            That's all the questions I
14 have.
15            MR. HACKMAN:  Okay, we are
16 done.
17            Thank you all.
18            THE VIDEO TECHNICIAN:  The
19 time is now 3:08 p.m.  We are going off the
20 video record.  This concludes today's
21 deposition.
22            - - -
23            (Witness excused.)
24            - - -

Page 201

1            (Whereupon the deposition was
2 concluded at 3:08 p.m.)
3            - - -
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

51 (Pages 198 - 201)

**EXHIBIT D**

Page 1

```
 1    ESTATE OF RAFFAELE       : COURT OF COMMON
      PAPPAGALLO, et al,       : PLEAS
 2        Plaintiffs           : PHILADELPHIA COUNTY
                               :
 3            vs.              :
                               :
 4    REDCO CORP., et al,      : NO. 2304-2099
          Defendants           :

 5

 6

 7              WEDNESDAY, MARCH 12, 2025

 8

 9              Video Taped Trial Deposition

10    of ANTONIO ALBANESE, taken pursuant to notice,

11    at 20 Hidden Meadow Drive, Easton,

12    Pennsylvania, on above date, beginning at or

13    about 10:30 a.m., before Jeanne Christian,

14    Professional Reporter and Notary Public and

15    Frankie Matus, Video Technician.

16

17

18

19

20

21

22

23              VERITEXT LEGAL SOLUTIONS

24                MID-ATLANTIC DIVISION
```

ANTONIO ALBANESE

Page 38

1 Q.  So let me then turn to the packing. You
2 have got new packing that's got to go into the
3 pump or into the valve stem.
4 A.  Right.
5 Q.  How many rings, typically, would you
6 have to cut to put into the --
7 A.  Well, that, again, depends on the size
8 of the pump and the size of the valve.
9 Usually, they will go from a minimum of a
10 four, five ring to about eight, nine, ten.
11 Q.  And how would you cut the packing?
12 First of all, how would the packing come to
13 you?
14 A.  Well, the packing, the Flex packing,
15 which was made just for the water pump and
16 things like that, just for -- that came in a
17 length. We got them from the -- off the
18 C-valve, and that would come from the
19 storeroom, the length of -- whatever you think
20 that you needed, that's what you get. For the
21 steam and things like that, that will come in
22 a ring in a packing. And that, we take it,
23 you know, we cut it to the size of the shaft
24 again, and we cut that. It all depends

Page 39

1 whatever you need, five, six, ten. We start
2 there. We cut with a knife.
3 Q.  I was just going to ask you, what did
4 you cut them with? You cut them with a knife?
5 A.  Correct.
6 Q.  When you would cut the packing, would
7 that material go in the air?
8          DEFENSE COUNSEL: Objection,
9 leading.
10          MS. TURNER: Objection, form.
11          THE WITNESS: Especially --
12 especially, if it was brittle on the -- it all
13 depended on the type of the packing. There
14 was always a small, what do you call it,
15 particle left from the packing.
16 BY MR. HACKMAN:
17 Q.  And did you and Ralph breathe that
18 material in?
19          MS. TURNER: Objection, form.
20          THE WITNESS: Yes, we did.
21 BY MR. HACKMAN:
22 Q.  So you mentioned it depends on the type
23 of the packing?
24 A.  Right.

Page 40

1 Q.  So describe for us the types of packing
2 you are talking about, if there are different
3 kinds --
4 A.  I would say if it is Flex packing, which
5 is for the water, when you cut it, it doesn't
6 leave no particle or anything like that.
7 Q.  Except for the hard --
8 A.  The hard packing is, like the steam
9 packing or whatever, it leaves -- you know,
10 when you cut it, it doesn't cut that way. It
11 always leave a little bit of --
12 Q.  Are there different -- forget the
13 Flexitallic packing for a minute. The
14 regular type of packing that you would have to
15 cut, did that -- were there different types,
16 different --
17 A.  Different types for very different
18 pressure of the valve. It was -- if it was
19 just hot water, if it was like steam packing,
20 it is altogether a different one.
21 Q.  Did it come in different sizes?
22 A.  Different sizes, because of the valve --
23 every valve had a different size of packing.
24 The smaller -- the bigger the valve, the

Page 41

1 bigger the size of the packing.
2 Q.  Did it come in different shapes?
3 A.  Yeah, it came in -- sometimes, it came
4 like they were square. Most of them, they
5 were square. And some of them, a particular
6 valve, they were like a cave, you know, like a
7 -- how should I express that? It was one
8 piece on top of the other.
9 Q.  Do you know who made any of the packing
10 that you and Ralph were working with?
11 A.  The most familiar that I am was Crane
12 and Garlock.
13 Q.  Crane and Garlock. And how did you know
14 that Crane and Garlock --
15 A.  It was on the box.
16 Q.  And did you see the name Crane on the
17 box?
18 A.  Yes.
19 Q.  Did you see the name Garlock on the box?
20 A.  Yes.
21 Q.  And were you using one more than the
22 other or were these about equal?
23 A.  I really have to say, we used one more
24 than the other, but I cannot tell you. Those

11 (Pages 38 - 41)

ANTONIO ALBANESE

Page 42

1 were the ones that were most familiar, and
2 probably, the other one, if I see it, I may
3 recognize them, but those were the one in
4 the --
5 Q.    And were these brands of packing ones
6 that you used every day or can you tell us how
7 frequently you used them?
8          MS. TURNER: Objection, form.
9          THE WITNESS: I cannot say
10 every day, but you know, most of the time, and
11 most of the valves, they are in there.
12 BY MR. HACKMAN:
13 Q.    Okay, so if it is not every day --
14 A.    If it is not every day, it was every
15 second day, and you know.
16 Q.    And you would cut the Crane packing the
17 way you described?
18 A.    Yes.
19 Q.    And you would cut the Garlock packing
20 the way you described?
21 A.    Yes.
22 Q.    And other mechanics would be doing the
23 same thing in the same spaces when you are
24 doing that?

Page 43

1 A.    Yes.
2          MS. TURNER: Objection, form.
3 BY MR. HACKMAN:
4 Q.    Would the other mechanics be using the
5 same brands of packing that you would be
6 using?
7 A.    If you were working on the same type of
8 valve, yes.
9          MS. TURNER: Objection, form.
10 BY MR. HACKMAN:
11 Q.    Let me ask you about the gaskets now.
12 You are cutting these gaskets to go onto the
13 flanges and to go onto the bonnet of the pump.
14          Do you know the names of any
15 of the gasket materials that you used?
16 A.    Again, if I remember, it is Crane and
17 Garlock.
18 Q.    And how would you know for the gasket
19 material the sheet --
20 A.    It was stamped on the sheet of the
21 gasket.
22 Q.    Okay, okay.  And so, some of these
23 gasket sheets would say Crane, some of them
24 would say Garlock; is that correct?

Page 44

1          MS. TURNER: Objection, form.
2          THE WITNESS: Yes.
3 BY MR. HACKMAN:
4 Q.    Are these brands of gaskets ones that
5 you used every day, every other day?  Can you
6 give us a frequency?
7          MS. TURNER: Objection, form.
8          THE WITNESS: It is not used
9 every day or every other day.  When the ship
10 stops, sometimes, the ship -- sometimes,
11 everyone laid off.  Sometimes, we didn't work,
12 so we cannot say that we use every day.  It
13 is not something -- how should I say?  The
14 shipyard is not a continuous work, okay?
15 Especially, you know, at the beginning, you
16 know, when there was no work, you know, we got
17 laid off.  Now, sometimes, we work on the
18 pump; sometimes, we don't work on the pump.
19 Sometimes, we work on the valve; sometimes, we
20 don't work on the valve.  It is not something
21 that every day that I use this packing or that
22 I use every other day.  Every time that the
23 ship was there, if we work on this valve, on
24 this pump, we use that.

Page 45

1 BY MR. HACKMAN:
2 Q.    Is it something you used then regularly?
3          MS. TURNER: Objection, form.
4          THE WITNESS: Regularly, every
5 time that we work on those things, yes.
6 BY MR. HACKMAN:
7 Q.    And other mechanics, would they use the
8 same brands of gasket material?
9 A.    That's the only one we had.
10          MS. TURNER: Objection, form.
11 BY MR. HACKMAN:
12 Q.    And did the other mechanics also cut
13 this gasket material out of sheets the way you
14 described?
15 A.    Yes.
16          MS. TURNER: Objection, form.
17 BY MR. HACKMAN:
18 Q.    And did Ralph do that work?
19          MS. TURNER: Objection, form.
20          THE WITNESS: Yes.
21 BY MR. HACKMAN:
22 Q.    Do you know any of the brands of the
23 pumps that you were doing this packing and
24 gasket work on using these brands of packing

12 (Pages 42 - 45)

ANTONIO ALBANESE

Page 62

1 portion.
2 BY MR. HACKMAN:
3 Q.   But you have a memory of 3M associated
4 with the masks at Bethlehem Steel?
5        MS. BRUNERMER: Objection.
6        THE WITNESS:  The mask, I
7 don't know what it was, but the 3M comes to
8 mind, but I cannot tell you what was it they
9 used.
10        MR. HACKMAN:  Okay, let's go
11 off the record for a minute.
12        THE VIDEO TECHNICIAN:  The
13 time is now 11:21 a.m.  We are going off the
14 video record.  This concludes Media Unit
15 Number 1.
16        - - -
17        (Whereupon a short break was
18 taken at this time.)
19        - - -
20        THE VIDEO TECHNICIAN:  The
21 time is now 11:27 a.m.  We are going back on
22 the video record.  This will begin Media Unit
23 Number 2.
24 BY MR. HACKMAN:

Page 63

1 Q.   Mr. Albanese, I have a few more
2 questions directed primarily at the packing
3 and gasket material.
4 A.   Okay.
5 Q.   Let me talk about the packing in
6 particular.
7 A.   Yes.
8 Q.   You mentioned you recall boxes of the
9 packing material.  Did you ever see rolls or
10 spools of packing material?
11        MS. TURNER:  Objection, form.
12        THE WITNESS:  That's what they
13 usually came with.
14 BY MR. HACKMAN:
15 Q.   Do you associate the name Crane with any
16 of the spools of material?
17        MS. TURNER:  Objection, form.
18        THE WITNESS:  Yeah, like I
19 said, Crane and Garlock is all I associate
20 with them.
21 BY MR. HACKMAN:
22 Q.   I'm going to show you a photograph of a
23 spool of packing material, and I want to ask
24 you -- well, Jeanne, I will have to send this

Page 64

1 to you to get marked.  I'm going to ask you
2 if the spool in that picture looks anything
3 similar to the spools that you used at Hoboken
4 Shipyard.
5 A.   Yeah.  Like I say, it could be the one.
6 They all look the same, except the name.
7 Q.   Do you remember seeing spools of
8 material that looked like that with the
9 name -- this name, Crane?  Or John Crane,
10 actually?
11        MS. TURNER:  Objection, form.
12        THE WITNESS:  Yeah, yes.
13 BY MR. HACKMAN:
14 Q.   And did you see spools of material like
15 this that said John Crane packing on them?
16        MS. TURNER:  Objection, form.
17        THE WITNESS:  Yes.
18 BY MR. HACKMAN:
19 Q.   And did Ralph work with that material,
20 too?
21 A.   If I did, he worked, too.  It is not
22 that I -- but everybody use it.  It is not
23 that I have specific packing for myself.
24 Q.   Okay.  You described different kinds of

Page 65

1 packing, different shapes, different sizes,
2 different --
3 A.   It all depends on what product and what
4 they were using it to do.  If they were using
5 it for steam, they use the steam packing; if
6 they were using it for water -- cold water was
7 Flex packing.  For hot water, whatever, they
8 were different type of packing, but it all
9 depends on the temperature of the product or
10 whatever they were using it to do.
11 Q.   And the John Crane or the Crane packing
12 that you remember, was that the different
13 sizes, different applications, or was that
14 just for one particular use, or did the Crane
15 packing that you used, could it be used for
16 all these different applications that you just
17 described?
18        MS. TURNER:  Objection, form.
19        THE WITNESS:  The way I
20 remember, to the best of my recollection, they
21 were using them for most of the things;
22 especially, for steam, but I don't remember if
23 they were used for Flex.
24        MR. HACKMAN:  Okay.  I think

17 (Pages 62 - 65)

**EXHIBIT E**

IN THE COURT OF COMMON PLEAS
FOR PHILADELPHIA COUNTY

IN RE: ASBESTOS LITIGATION : OCTOBER TERM, 1986
IN PHILADELPHIA COURT OF : NO. 8610-0001
COMMON PLEAS :

### PLAINTIFFS' GENERAL MASTER LONG-FORM COMPLAINT

  Pursuant to an Order dated July 30, 1986, by the
Honorable Edward J. Blake and the Honorable Richard B.
Klein, the undersigned attorneys for plaintiffs in asbestos
actions bring this Master General Long-Form Complaint
against the following defendants:

A. C. & S., INC.
180 W. Church Road
King of Prussia, Pennsylvania 19406

ABEX CORPORATION
c/o Prentice Hall Corporation
System, Inc.
100 Pine Street
Harrisburg, Pennsylvania 17108

AIRCO WELDERS SUPPLY
4501 N. Howard Street
Philadelphia, Pennsylvania 19140

ALLIED CORPORATION
Columbian Road & Park
Morristown, New Jersey 07961

ALLPAX (USA) INC.
Marmeroneck, New York

AMCHEM PRODUCTS, INC.
300 Brookside Avenue
Ambler, Pennsylvania  19002

AMERICAN ENERGY PRODUCTS, INC.
667 Brea Canyon Road
Suite 20-B
Walnut, California  91789

AMERICAN MOTORS SALES CORPORATION
c/o CT Systems
123 South Broad Street
Philadelphia, Pennsylvania  19107

AMERICAN STANDARD
Station Street
Wilmerding, Pennsylvania

AM GENERAL CORPORATION
701 Chippewa Avenue
South Bend, Indiana

AMOSA (PTY) LTD.
The Corner House
63 Fox Street
Johannesburg 2001 TVL
Republic of South Africa

ANCHOR PACKING COMPANY, INC.
One Buttonwood Square
2001 Hamilton Street
Philadelphia, Pennsylvania  19130

A.P. GREEN REFRACTORIES COMPANY
Hedley and Delaware Avenue
Philadelphia, Pennsylvania 19137

ARMSTRONG WORLD INDUSTRIES, INC.
Liberty and Charlotte Streets
Lancaster, Pennsylvania 17604

ASBEKA INDUSTRIES OF N.Y., INC.
2324 McDonald Avenue
Brooklyn, New York

ASBESTOS CORPORATION LTD.
1940 Sun Life Building
1155 Metcalf Street
Montreal, Canada  H3B2X6
        or
Thetford Mines
Quebec, Canada

ASBESTOS INSULATION COMPANY, INC.
a/k/a Deerland Corporation
311 West Marshall Street

Norristown, Pennsylvania 19401
ASBESTOS PRODUCTS MFG. CORPORATION
c/o Herbert L. Levine
3215 Avenue "H"
Brooklyn, New York  11210

ASBESTOSPRAY CORPORATION
c/o Herbert L. Levine
3215 Avenue "H"
Brooklyn, New York  11210

ASHLAND OIL, INC.
Box 391
Ashland, Kentucky  41114

ASSOCIATED INSULATION, INC.
Pennsylvania

ASSOCIATED MINERALS CORPORATION
Iver Lane Cowley, Uxbridge
Middlesex, England

ASTEN-HILL MANUFACTURING COMPANY
Henry and Roberts Avenues
Philadelphia, Pennsylvania

ATLAS TURNER, INC.
5600 Hochelaga Street
Montreal, Quebec, Canada

AUTOMOTIVE PARTS COMPANY
5505 Centre Avenue
Pittsburgh, Pennsylvania

A.W. CHESTERTON, INC.
Massachusetts

BABOCK and WILCOX
1810 Chapel Ave. West
Cherry Hill, New Jersey
        or
c/o Charles J. Tague, Jr.
P.O. Box 1310
Bryn Mawr, Pennsylvania  19010
        or
1010 Common Street
New Orleans, Louisiana  70106

BABCOCK and WILCOX TUBULAR PRODUCTS
Box 401
Beaver Falls, Pennsylvania  15010

BALTIMORE & OHIO RAILROAD
c/o Rudolph Garcia, Esquire
Centre Square West, 38th Floor
Philadelphia, Pennsylvania  19102

BARKER PIPE FITTINGS CO.
271 Lancaster Pike
Frazer, Pennsylvania  19355

BASIC, INCORPORATED
845 Hama Building
Cleveland, Ohio  44115

BELL ASBESTOS MINES, LTD.
c/o Thetford Mines
P.O. Box 99
Quebec, Canada

BENJAMIN FOSTER
Division of Amchem
25 Brookside Avenue
Ambler, Pennsylvania  19002

BEVCO INDUSTRIES
790 Birney Highway
Aston, Pennsylvania 19014

BIRD, INCORPORATED
Washington Street
East Walpole, Massachusetts  02032

BORG WARNER CORPORATION
615 Griswold
Detroit, Michigan 48226

BRAKE & CLUTCH COMPANY
OF PHILADELPHIA
1610 Fairmount Avenue
Philadelphia, Pennsylvania 19130

BRAND INSULATIONS, INC.
c/o Norman L. Haase
Kelly, Haase & Dunn
344 West Front Street
Media, Pennsylvania 19063

BRINCO MINING LTD.
2000 Guiness Tower
1055 W. Hastings Street
Vancouver, B.C.
Canada V6E 3VE

BRITISH SOUTH AFRICA CO., LTD.
40 Holborn Viaduct
London, England

CAPE ASBESTOS FIBRES, LTD.
114 Park Street
London, W1Y 4AB
England

CAPE ASBESTOS INDUSTRIES, LTD.
114 Park Street
London, England

CAPE ASBESTOS S.A. (PTY) UNITED LTD.
The Corner House
63 Fox Street
Johannesburg 2001 TVL
Republic of South Africa

CAPE BOARD & PANELS
Iver Lane, Uxbridge
UB8, 2IQ, England

CAPE INDUSTRIES, LTD.
114 Park Street
London, W1Y 4AB
England

CAREY-CANADA, INC.
P.O. Box 190
E. Boroughton Station
Quebec, Quebec,
Canada GON1HO

CARLISLE CORPORATION
Molded Materials Co.
d/b/a/ Motion Control Industries
P.O. Box P
Gillis Avenue
Ridgeway, Pennsylvania

CE MINERALS, INC.
443 South Gulph Road
King of Prussia, Pennsylvania   19406

CE REFRACTORIES
a Division of Combustion Engineering, Inc.
901 East 8th Avenue
King of Prussia, Pennsylvania
         or
900 Long Ridge Road
Stampen, Connecticut   06902

CELOTEX CORPORATION
c/o C.T. Corporation System
123 South Broad Street
Philadelphia, Pennsylvania 19109
         or
1500 W. Dalemabry Highway
Tampa, Florida   33607

CENTRAL JERSEY INDUSTRIES, INC.
2 Aldwyn Center
Villanova, Pennsylvania   19085

CENTRAL MINING FINANCE, LTD.
40 Holborn Viaduct
London, England

CERTAIN-TEED CORPORATION
Swedesford and Old School Roads
Valley Forge, Pennsylvania 19481

CHARLES F. GUYON
c/o Theodore Levy
900 South 4th Street
Harrison, New Jersey  07029

CHARTER CONSOLIDATED INVESTMENTS, LTD.
40 Holborn Viaduct
London, England

CHARTER CONSOLIDATED P.L.C.
40 Holborn Viaduct
London, England

CHARTER CONSOLIDATED SERVICES, LTD.
40 Holborn Viaduct
London, England

CHICAGO FIRE BRICK CO.
c/o Ralph Schindler
1467 N. Elston Avenue
Chicago, Illinois  60622

CHILDERS PRODUCTS COMPANY, INC.
23350 Merchantville Road
Cleveland, Ohio  44122

CHRYSLER CORPORATION
c/o G. Lee Philp
1200 Lynn Townsend Drive
Highland Park, Michigan  48203

CLARK CONTROLLER COMPANY
CT Company
123 South Broad Street
Philadelphia, Pennsylvania  19107

COLLINS PACKING COMPANY, INC.
5024 Mulberry Street
Philadelphia, Pennsylvania  19124

COLONIAL ELECTRIC SUPPLY
A Pennsylvania Corporation
2901 PSFS Building
Philadelphia, Pennsylvania

COLONIAL RUBBER
Elbo Lane and Texas Avenue
Mount Laurel, New Jersey 08054

COLUMBIA BOILER COMPANY OF POTTSTOWN
Old Reading Pike,
P. O. Box G
Pottstown, Pennsylvania 19464

COMBUSTION ENGINEERING CO., INC.
c/o Weaver, Willman & Arnold
705 McKnight Park Drive
Pittsburgh, Pennsylvania  15237
      or
900 Long Ridge Road
Stamford, Connecticut  06902

CONSOLIDATED MINES SELECTION CO., LTD.
40 Holborn Viaduct
London, England

CONSOLIDATED RAIL CORPORATION
Six Penn Center Plaza
Philadelphia, Pennsylvania  19104

COONEY BROTHERS, INC.
S.W. Corner 5th and Dauphin
Philadelphia, Pennsylvania 19133

CRANE PACKING
682 Parkway
Broomall, Pennsylvania

CROWN CORK & SEAL COMPANY, INC.
c/o C.T. Corporation System
123 South Broad Street
Philadelphia, Pennsylvania 19109

C. TENNANT & SONS & CO., OF NEW YORK
Division of Cargil
P. O. Box 9300
Minneapolis, Minnesota  55440

CULP BROTHERS, INC.
R.R.2
Box 369
Perkasie, Pennsylvania  18944

CURTIS INDUSTRIES
Division of Congoleum Corporation
CT Systems
123 South Broad Street
Philadelphia, Pennsylvania

DANA CORPORATION
4500 Dorr Street
P.O. Box 1000
Toledo, Ohio 43697
Corporate Trust Inc.
Resident Agent
32 South Street
Baltimore, Maryland  21202

D.A.R. INDUSTRIAL PRODUCTS, INC.
3645 N. Smedley Street
Philadelphia, Pennsylvania 19140

DAVIS BRAKE & EQUIPMENT
 CORPORATION
2219 N. Second Street
Philadelphia, Pennsylvania 19133

DECKER ASSOCIATES, INC.
Pennsylvania

DELAWARE INSULATION COMPANY
Fifth Avenue & Coleman Streets
Wilmington, Delaware 19899

DELAWARE VALLEY SAFEGUARD
COMPANY, INCORPORATED
Leiz's Road
R D #1
Leesport, Pennsylvania  19533

DELCO PRODUCTS
P.O. Box 1042
Dayton, Ohio
     or
3031 West Grand Blvd.
P.O. Box 33122
Detroit, Michigan

DRAVCO CORPORATION
One Oliver Plaza
Pittsburgh, Pennsylvania 15222

DRESSER INDUSTRIES, INC.
c/o CT Corporation Systems
320 Oliver Building
Pittsburgh, Pennsylvania  15222

DURABLA
27 Industrial Boulevard
Paoli, Pennsylvania  19301
     or

5th & Liberty Avenues
Pittsburgh, Pennsylvania

DURAMETALLIC CORPORATION
c/o C.T. Corporation System
123 South Broad Street
Philadelphia, Pennsylvania 19109

DUROX EQUIPMENT COMPANY
12351 Prospect Road
Cleveland, Ohio  44136

EAGLE-PICHER INDUSTRIES, INC.
c/o C.T. Corporation System
123 South Broad Street
Philadelphia, Pennsylvania 19109

EARL B. BEACH COMPANY
A Pennsylvania Corporation
546 Penn Street
Yeadon, Pennsylvania

EAST PENN REFRACTORIES
P. O. Box 277
Lehigh Street
Reading, Pennsylvania  19603

EATON CORPORATION, formerly known
as Cutler Hammer, Inc.
c/o C. T. Corporation
123 Broad Street
Philadelphia, Pennsylvania

EGNEP (PTY) LTD.
Burlington House
22 Rissik Street
Johannesburg, Tvl
Republic of South Africa

ELBO INDUSTRIAL SUPPLY COMPANY
305 N.6th Street
Philadelphia, Pennsylvania 19106

EMPIRE ACE INSULATION COMPANY
One Cozin Avenue
Brooklyn, New York 11207

EMPIRE INSULATION OF NORTHEAST MISSOURI
c/o Gilbert Coan
Box 215
Lewiston, Missouri  63452

ERIE-LACKAWANNA, INC.
1302 Midland Building
Cleveland, Ohio 44115

F. B. WRIGHT DISTRIBUTION CO.
180 Church Street
King of Prussia, Pennsylvania

FERRO ENGINEERING, a Division of
Oglebay Norton Company
100 West 10th Street
Wilmington, Delaware  19801

FIBREBOARD CORPORATION
22 Battery Street
Suite 404
San Francisco, California  94133

FIRESTONE TIRE & RUBBER CO.
Worldbestos Division
1112 South 25th Street
New Castle, Indiana  47362

FLEXITALLIC GASKET COMPANY
151 Heller Place
Bellmawr, New Jersey  08031

FLINTKOTE CO.
365 W. Passarc Street
Rochelle Park, New Jersey  07662
     or
4 Embarcadero Center
San Francisco, California  94111

FORD MOTOR COMPANY
c/o Sidney Kelly
The American Road
Dearborn, Michigan  48121

FOSECO, INCORPORATED
123 South Broad Street
Philadelphia, Pennsylvania  19109

FOSTER WHEELER CORPORATION
668 5th Avenue
New York, New York  10019

GAF CORPORATION
c/o Prentice Hall Corporation Systems
100 Pine Street
Harrisburg, Pennsylvania 17108
     or
1361 Alps Road
Wayne, New Jersey  07470

GARFIELD MOLDING COMPANY, INC.
P.O. Box 40
Garfield, New Jersey  17026

GARLOCK, INC.
P.O. Box 8090
Longview, Texas 75601

GENERAL ELECTRIC COMPANY
One River Road
Schnectady, New York

GENERAL MOTORS CORPORATION
c/o C.T. Corporation System
123 South Broad Street
Philadelphia, Pennsylvania 19109

GENERAL REFACTORIES
225 City Avenue
Bala Cynwyd, Pennsylvania  19004

GENSTAR CORPORATION
Suite 380o0
Four Embarcadero Center
San Francisco, California  96111

GEORGE A. ROWLEY & CO., INC.
a/k/a Peltz Rowley
5700 Tacony Street
Philadelphia, Pennsylvania  19135

GEORGE V. HAMILTON, INC.
326 Linden Street
McKees Rocks, Pennsylvania

GEORGIA-PACIFIC CORPORATION
c/o C.T. Corporation System
123 South Broad Street
Philadelphia, Pennsylvania 19109

GLOBE REFRACTORIES, INC.
P. O. Box D
Newell, West Virginia  26050

GOULDS PUMPS, INC.
240 Fall Street
Seneca Falls, New York  13148

GREEN TWEED & COMPANY, INC.
Deweiler Road
Kulpsville, Pennsylvania

GRIFFIN WHEEL COMPANY
Division of Amsted
3700 Prudential Plaza
Chicago, Illinois   60601

GRUMMAN OHIO CORPORATION
c/o C.T. Corporation
123 S. Broad Street
Philadelphia, Pennsylvania 19109

GTE SYLVANIA
c/o C. T. Corporation
123 Broad Street
Philadelphia, Pennsylvania

HAJOCA PLUMBING COMPANY
123 South Broad Street
Philadelphia, Pennsylvania 19109

HARNISCHFEGER CORPORATION
CT Systems
123 South Broad St.
Philadelphia, Pennsylvania 19107

H. K. PORTER CO., INC.
Porter Building
601 Grant Street
Pittsburgh, Pennsylvania   15219

HOPEMAN BROTHERS, INC.
435 Essex Avenue
Waynesboro, Virginia 22980

HUXLEY DEVELOPMENT CORP.
805 3rd Avenue, 28th Floor
New York, New York   10022

INDUSTRIAL PRODUCTS COMPANY
21 Cabot Boulevard
Langhorne, Pennsylvania   19047

INDUSTRIAL SALESMASTER
S. Clinton & Elmer
Trenton, New Jersey   08611

INSULATION MATERIALS, INC.
400 Penn Centre Boulevard
Suite 204
Pittsburgh, Pennsylvania

INSULATION PRODUCTS CORPORATION
2100 East Ohio Street
Pittsburgh, Pennsylvania

INTERNATIONAL HARVESTER COMPANY
5401 N. Michigan Avenue
Chicago, Illinois  60611

JACQUAYS ASBESTOS COMPANY
c/o Jacquay's Mining Corporation
1219 South 19th Avenue
Phoenix, Arizona  85009

J.H. FRANCE REFRACTORIES CO.
Clarence Road
Snow Shoe, Pennsylvania  16874

JOHN CRANE-HOUDAILLE, INC.
682 Parkway Drive
Broomall, Pennsylvania 19008
        or
c/o C. T. Corporation System
123 Broad Street
Philadelphia, Pennsylvania 19109

J. P. STEVENS, INC.
c/o C.T. Corporation System
123 South Broad Street
Philadelphia, Pennsylvania 19109

J. W. ROBERTS, LTD.
20 Saint Mary's Parsonage
Manchester M3 2NL, England

KANE BROTHERS
457 A Street
Sharon, Pennsylvania 16146

KAY WHEEL SALES
1771 Tomlinson Road
Philadelphia, Pennsylvania

KEENE CORPORATION
c/o Prentice Hall Corporations
Systems, Inc.
100 Pine Street
Harrisburg, Pennsylvania 17108

LAC D'AMIANTE DU QUEBEC LTEE.
P.O. Box 608, Black Lake
Quebec, GOW 1AO, Canada

LEAR SIEGLER, INC.
3171 South Bundy Drive
Santa Monica, California 90406

-13-

LEHIGH VALLEY RAILROAD COMPANY
415 Brighton Street
Bethlehem, Pennsylvania   19017

LEHIGH VALLEY REFRACTORIES, INC.
Roosevelt and MacArthur Roads
Whitehall, Pennsylvania

LENCO, INC.
319 W. Main Street
Jackson, Missouri 63755

LEONARD J. BUCK, INC.
c/o Francis J. Minchak
P. O. Box 505
2 Shumpike Road
Madison, New Jersey   07940

MACK TRUCKS, INC.
2100 Mack Boulevard
P.O. Box M
Allentown, Pennsylvania 18195

MANUFACTURED RUBBER PRODUCTS COMPANY
4502 N. Howard Street
Philadelphia, Pennsylvania 19140

MAREMONT CORPORATION
c/o C.T. Corporation System
123 South Broad Street
Philadelphia, Pennsylvania 19109
         or
200 E. Randolph Street
Chicago, Illinois

McCORD GASKET
191 Labadie Avenue
Wyandotte, Michigan   48192

MELRATH GASKET COMPANY, INC.
wholly-owned subsidiary of
Melrath Gasket Holding Company, Inc.
39th Street and Hunting Park Avenue
Philadelphia, Pennsylvania
a/k/a a TNT LIQUIDATING CO.

MELRATH GASKET HOLDING COMPANY, INC.
30th Street and Hunting Park Avenue
Philadelphia, Pennsylvania
a/k/a a TNT LIQUIDATING CO.

MERIDEN MOLDED PLASTICS, INC.
112 Empire Avenue
Meriden, Connecticut   06450

METROPOLITAN LIFE INSURANCE COMPANY
c/o Kennety D. Merin, Director
N.J. Department of Insurance
201 East State Street
CN 325
Trenton, New Jersey  08625

MOHAWK MANUFACTURING
7354 N. Caldwell
Niles, Illinois

MONSEY PRODUCTS
Cold Stream Road
Kimberton, Pennsylvania

MOTOR SERVICES
573 Fourth Avenue
Brooklyn, New York

NATIONAL GYPSUM COMPANY
c/o C.T. Corporation System
123 South Broad Street
Philadelphia, Pennsylvania 19109

NATIONAL RAILROAD PASSENGER CORPORATION
1617 J.F.K. Boulevard, Room 710
Philadelphia, Pennsylvania  19104

NATIONAL U.S. BOILER CO., INC.
New Castle, Pennsylvania

NAVISTAR INTERNATIONAL CORPORATION
c/o CT Corporation System
Oliver Building
Mellon Square
Pittsburgh, Pennsylvania  15222

NEW YORKER STEEL BOILER COMPANY, INC.
Bethlehem Pike
Colmar, Pennsylvania  18915

NICOLET, INC.
a Delaware corporation
Maple Street and Wissahickon Avenue
Ambler, Pennsylvania 19002

NIMCO BUS SALES AND BUS PARTS
252 Doremus Avenue
Newark, New Jersey  07105

NORCA CORPORATION
185 Great Neck Road
Great Neck, New York

NORTH AMERICAN ASBESTOS COMPANY
c/o Lord, Bisselle & Block
115 S. LaSalle Street
Chicago, Illinois

NOSROC CORPORATION
1500 Walnut
Philadelphia, Pennsylvania  19102

NUTURN CORPORATION
570 Metroplex Drive
Nashville, Tennessee  37211
          or
c/o C.T. Corporation System
530 Gay Street
Knoxville, Tennessee  37902

NYCAL
240 S. Main St.
S. Hackersock, New Jersey  07606

OWENS-CORNING FIBERGLAS CORP.
123 South Broad Street
Philadelphia, Pennsylvania 19109

OWENS-ILLINOIS GLASS CO.
460 N. Gulph Road
King of Prussia, Pennsylvania

OWENS-ILLINOIS, INC.
c/o C.T. Corporation System
123 South Broad Street
Philadelphia, Pennsylvania 19109

PARS MANUFACTURING COMPANY
60 East Penn Street
Norristown, Pennsylvania  19401

PARSON SALES COMPANY, INC.
Pennsylvania

PEERLESS INDUSTRIES, INC.
Spring and Schaeffer Streets
Boyertown, Pennsylvania  19512

PELTZ ROWLEY CHEMICAL COMPANY
5700 Tacony Street
Philadelphia, Pennsylvania

PENN CENTRAL CORPORATION
IVB Building
1700 Market Street
Philadelphia, Pennsylvania  19103

PENNSYLVANIA BRAKE BONDING
9001 Torresdale Avenue
Philadelphia, Pennsylvania  19124

PENN VALVE & FITTING CORPORATION
2440 Maryland Road
Willow Grove, Pennsylvania  19090

PFIZER, INC.
235 East 42nd Street
New York, New York  10017

PITTSBURGH CORNING CORPORATION
1670 Golden Mile Highway
Monroeville, Pennsylvania  15146

PORTER HAYDEN CO.
c/o C.T. Corporation System
123 South Broad Street
Philadelphia, Pennsylvania 19109

PPG INDUSTRIES
One Gateway Center
Pittsburgh, Pennsylvania  15222

QUIGLEY CO., INC.
c/o C.T. Corporation
123 Broad Street
Philadelphia, Pennsylvania
     or
c/o C.T. Corporation Systems
277 Park Avenue
New York, New York  10017

QUINT CORPORATION
140 East 16th Street
Erie, Pennsylvania  16512

RAND MINES LTD.
The Corner House
63 Fox Street
Johannesburg 2001 TVL
Republic of South Africa

RAYMARK INDUSTRIES INC.
c/o C.T. Corporation System
123 South Broad Street
Philadelphia, Pennsylvania 19109

THE READING COMPANY
1 North 12th Street
Philadelphia, Pennsylvania  19107

RICHARD KLINGER COMPANY
2350 Campbell Road
Sidney, Ohio  45365

RILEY STOKER CORPORATION
No. 9 Neponset Street
Worcesster, Massachusetts 01606

R-M FRICTION MATERIALS COMPANY
100 Oak View Drive
Trumbull, Connecticut  06611

ROCK BESTOS CO.
400 Penn Centre Boulevard
Suite 204
Pittsburgh, Pennsylvania

ROCKWELL INTERNATIONAL
c/o CT Corporation Systems
Oliver Building
Mellon Square
Pittsburgh, Pennsylvania  15222

ROCK WOOL MFG. CO.
P. O. Boc 506
Leeds, Alabama  35094

ROGERS CORPORATION
One Technology Drive
Rogers, Connecticut  06263

ROYAL ELECTRIC SUPPLY COMPANY
3730 Market Street
Philadelphia, Pennsylvania

SAGER CORPORATION, formerly known as
Sager Gloves
An Illinois Corporation
4030 North Nashville Street
Chicago, Illinois  60634

SEPCO CORPORATION
P. O. Box 854
     or
Clokan J. Hollan
27611 LaPaza Road
Laguna Niguel, California  92677

SID HARVEY MID ATLANTIC, INC.
King of Prussia, Pennsylvania

SMITH OF PHILADELPHIA
811 E. Cayuga Street
Philadelphia, Pennsylvania  19124

SMS AUTOMOTIVE PRODUCTS
4819 Langdon Street
Philadelphia, Pennsylvania

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION
AUTHORITY
130 S. 9th Street
5th Floor
Philadelphia, Pennsylvania  19107

SOUTHERN TEXTILE CORP.
c/o Porter Building
601 Grant Street
Pittsburgh, Pennsylvania 15219

SPECIAL MATERIALS, INC. - WISCONSIN
C.T. Corporation
222 Washington
Madison, Wisconsin
     or
3628 W. Pierce
Milwaukee, Wisconsin  53215

SPRAYON RESEARCH CORPORATION
c/o Richard Kempthorne
1390 South Ocean Blvd.
Pompano Beach, Florida  33062

STRAHMAN VALVES, INC.
Nicolet Avenue
Florham Park, New Jersey

STEARN'S DIV. OF F.M.C. CORP.
c/o C. T. Corporation
123 Broad Street
Philadelphia, Pennsylvania

STUDEBAKER-WORTHINGTON, INC.
c/o Corporation Trust Center
1209 Orange Street
Wilmington, Delaware  19801

THERMAL MATERIALS CORP.
360 Hurst Street
Linden, New Jersey

TNT LIQUIDATING COMPANY
600 First National Bank Bldg.
Erie, Pennsylvania

TRANSCO, INC.
55 East Jackson Boulevard
Chicago, Illinois  60604

TRANSVAAL CONSOLIDATION LAND
   & EXPLORATION CO.; LTD.
Johannesberg, South Africa

TURNER ASBESTOS FIBRES, LTD.
c/o Turner & Newall, Ltd.
20 St. Mary;s Parsonage
Manchester, M3 2NL, England

TURNER & NEWALL, LTD.
20 Saint Mary's Parsonage
Manchester, England M22-EA

UNION CARBIDE CORPORATION
c/o C.T. Corporation System
123 South Broad Street
Philadelphia, Pennsylvania 19109

UNIROYAL, INC.
c/o Prentice Hall Corporation
100 Pine Street
Harrisburg, Pennsylvania 17101

UNITED STATES GYPSUM COMPANY
c/o C.T. Corporation System
123 South Broad Street
Philadelphia, Pennsylvania 19109

UNITED STATES MINERAL PRODUCTS COMPANY
Farnace Street
Stanhope, New Jersey  97874

UNIVERSAL INSULATION COMPANY
c/o Arthur Rank
306 Hialeah Drive
Cherry Hill, New Jersey  08002

U.S. BRAKELINING CORP.
Miami, Florida

VERMONT ASBESTOS GROUP, INC.
Box 54B, R.R. #1
Morrisville, Vermont  05661
       or
c/o David Stockpole
P. O. Box 1016
Stowe, Vermont  05672

WAGNER ELECTRIC COMPANY
100 Misty Lane
Parsippany, New Jersey  07054

WARREN BALDERSTON CO.
375 North Will Street
Pittsburgh, Pennsylvania

WEIL McCLAIN CO.
Blaine Street
Michigan City, Illinois  46360

WEINSTEIN SUPPLY COMPANY
Moreland & Davisville Roads
Willow Grove, Pennsylvania 19090

WESTINGHOUSE ELECTRIC CORPORATION
Westinghouse Building
Gateway Center
Pittsburgh, Pennsylvania 15222

WEST PHILADELPHIA ELECTRIC SUPPLY
5828 Market Street
Philadelphia, Pennsylvania

WHEELING BRAKE BLOCK MANUFACTURING COMPANY
Wheeling, West Virginia

W.I.C.K., INC.
Michigan

WILMINGTON SUPPLY OF PENNSYLVANIA
Pennsylvania

W. R. GRACE CO.
Grace Plaza
1114 Avenue of Americas
New York, New York  10036

YORK INDUSTRIES, INC.,
d/b/a York Insulation Company
c/o Gabe Marx
360 Hurst Street
Linden, New Jersey
     or
c/o Ronca, McDonald, Judge & Hanley
600 South Livingston Avenue
Livingston, New Jersey 07039

YORK-SHIPLEY INC.
693 North Hills Road
York, Pennsylvania 17402


JURISDICTION AND VENUE

     1.   (a)  Jurisdiction over this action at law is
conferred upon this Court pursuant to 42 Pa.C.S. _ 931(a).

-21-

(b)  With respect to railroad defendants, juris-
diction is also conferred upon this Court by an Act of
Congress, known as the Federal Employers' Liability Act, 45
U.S.C. ___ 51-60, (referred to herein as "F.E.L.A.").

2.  This Court is the proper Court of venue since the
cause of action arose in Philadelphia County and/or since
all defendants are corporations that regularly conduct
business or have conducted business in Philadelphia County,
pursuant to 42 Pa.C.S. ___ 931(c) and Pa.R.C.P. ___ 2179(a)(2)
and (3) by the sale or shipment of asbestos in all forms
through or in Philadelphia.

3.  Pursuant to the Order of This Court, this Com-
plaint is a Master Complaint filed for all plaintiffs
represented by any plaintiffs' counsel who has signed
agreement to the Master Long Form Complaint and, by opera-
tion of such order, all allegations pleaded herein are
deemed pleaded in any "Short-Form" Complaint hereafter
filed.

<u>DEFENDANTS</u>

4.  (a)  The defendants are:

(1)  Defendant, A.C.& S., Inc., formerly known as
Armstrong Contracting & Supply Co., sued in its corporate
capacity and as successor by purchase of the Contracting
Units of Armstrong Cork Company, is a corporation organized
and existing under the laws of the State of Delaware, with
its principal place of business in Pennsylvania, and is
doing business in the Commonwealth of Pennsylvania and in
the Federal Eastern District of Pennsylvania.  At all times
material hereto, Defendant, A.C.&S. Inc., formerly known as,
Armstrong Contracting & Supply, Co. and/or its predecessors,
including, the Contracting Units of Armstrong Cork Company,
was a manufacturer, distributor and supplier of asbestos
products, including, but not limited to, products of some or
all of the various other defendants named herein, which
products were either directly or indirectly sold and/or
supplied in the geographical area in which plaintiffs worked
and/or to the employers of the plaintiffs and/or to contrac-
tors at job sites on which plaintiffs worked, when they were
exposed to said asbestos products.

(2)  Defendant, ABEX CORPORATION, is a corporation
organized and existing under the laws of the State of
Delaware, with its principal place of business in Pennsylva-
nia and is doing business in the Commonwealth of Pennsylva-
nia and in the Federal Eastern District of Pennsylvania.
Defendant ABEX CORPORATION is also sued as the successor to
American Brake Shoe and American Brake Block.  At all times
material hereto, Defendant, ABEX CORPORATION, manufactured,
produced and sold, either directly or indirectly, in the

-22-

geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, asbestos brakes, brake linings, brake blocks, brake discs and pads, clutch plates and other asbestos friction and railroad products.

(3)  Defendant, AETNA CASUALTY & SURETY CO. is a corporation organized and existing under the laws of the State of Connecticut, is a citizen and resident of the State of Connecticut, has its principal place of business in the State of Connecticut, and at all times material hereto was doing business in the State of New Jersey.  It is sued for its conduct and omissions as a consultant to certain defendants, as described in Count X herein.

(4)  Defendant, AIRCO WELDERS SUPPLY, INC., is the successor corporation of Welders Supply, Inc.  It is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at 4501 N. Howard Street, Philadelphia, Pennsylvania and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, defendant, AIRCO WELDERS SUPPLY, INC., produced, manufactured, distributed and/or sold, through its predecessor, Welders Supply Inc., either directly or indirectly to the employers of the plaintiffs and/or its predecessors, asbestos products including, but not limited to, asbestos brake shoes, asbestos brake linings and other asbestos friction products.

(5)  Defendant, ALLIED CORPORATION, sued in its corporate capacity and as successor in interest to the Bendix Corporation is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New Jersey, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, ALLIED CORPORATION and/or its predecessor Bendix Corporation, manufactured, produced and sold, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to the contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to asbestos brakes, brake linings, brake blocks, brake discs and pads, clutch plates, other friction products and asbestos gaskets, packing and sealing devices.

(6)  Defendant, ALLPAX (USA) INC., is a Pennsylvania Corporation with a principal place of business in Marmeroneck, NY.  Allpax (USA) Inc., is a subsidiary of Allpax Company, Inc.  At all times material hereto, defendant, ALLPAX (USA) INC., manufactured, produced, sold and/or

supplied, either directly or indirectly to the employer of the plaintiffs, asbestos products.

(7)   Defendant AMCHEM PRODUCTS, INC. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pennsylvania and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, AMCHEM PRODUCTS, INC., and/or its predecessors and subsidiaries including Benjamin Foster Co., manufactured, produced and sold, either directly or indirectly, in the georgaphical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked asbestos products, including, but not limited to, Foster Mastic, C. I. Mastic, and other asbestos products.

(8)   Defendant, AMERICAN ENERGY PRODUCTS, INC. is a corporation organized and existing under the laws of the State of California, is a citizen and resident of the State of California, and at all times material hereto was doing business in the Commonwealth of Pennsylvania and the State of New Jersey and in the Federal Eastern District of Pennsylvania. At all times material hereto, defendant, AMERICAN ENERGY PRODUCTS, INC., manufactured, produced, sold and/or supplied, either directly or indirectly to the employer of the plaintiffs, asbestos products, including, but not limited to SprayDon.

(9)   Defendant, AMERICAN MOTORS SALES CORPORATION, is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Michigan and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, defendant, AMERICAN MOTORS SALES CORPORATION manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, asbestos brakes, brake linings, brake blocks, brake discs and pads, clutch plates and other friction products.

(10)  Defendant AMERICAN STANDARD INC., is a Delaware Corporation with a principal place of business in New York and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. It is the successor in interest to Westinghouse Air Brake Co., which sold asbestos-containing brake shoes.

(11)  Defendant, AM GENERAL CORPORATION, is a corporation duly organized and existing under the laws of the State of Indiana with its principal place of business at

701 Chippewa Avenue, South Bend, Indiana, which is doing
business in the Commonwealth of Pennsylvania and in the
Federal Eastern District of Pennsylvania.  At all times
material hereto, AM GENERAL CORPORATION produced, distrib-
uted, manufactured, and/or sold asbestos friction products
to the employees of the plaintiffs or its predecessors
including, but not limited to, brake shoes and brake lin-
ings.

      (12) Defendant, ANCHOR PACKING COMPANY, INC., is a
corporation organized and existing under the laws of the
State of Delaware with its principal place of business in
Pennsylvania which is doing business in the Commonwealth of
Pennsylvania and in the Federal Eastern District of Pennsyl-
vania.  At all times material hereto, defendant, ANCHOR
PACKING COMPANY, INC., manufactured, produced and sold,
either directly or indirectly, in the geographical area in
which plaintiffs worked and/or to the employers of the
plaintiffs and/or to contractors on job sites on which
plaintiffs worked, asbestos products, including, but not
limited to, mechanical sealing devices, molded rubber
products, gaskets and asbestos-containing packings.

      (13) Defendant, A.P. GREEN REFRACTORIES COMPANY,
is a corporation organized and existing under the laws of
the State of Delaware, is qualified to do business in the
Commonwealth of Pennsylvania, with a principal place of
business at Hedley and Delaware River, Philadelphia, Penn-
sylvania  19137 which is doing business in the Commonwealth
of Pennsylvania and in the Federal Eastern District of
Pennsylvania.  At all times material hereto, Defendant, A.P.
GREEN REFRACTORIES COMPANY, mined, manufactured, produced,
and/or sold or distributed asbestos or products containing
asbestos, either directly or indirectly, in the geographical
area in which plaintiffs worked, and/or to the employers of
the plaintiffs, and/or to contractors on job sites on which
plaintiffs worked, which products were used in the vicinity
of the plaintiffs.   -

      (14) Defendant, ARMSTRONG WORLD INDUSTRIES, INC.,
formerly known as Armstrong Cork Company and/or Armstrong
Contracting & Supply Co., is a corporation organized and
existing under the laws of the Commonwealth of Pennsylvania,
with a principal place of business in Pennsylvania, and is
doing business in the Commonwealth of Pennsylvania and in
the Federal Eastern District of Pennsylvania.  At all times
material hereto, Defendant, ARMSTRONG WORLD INDUSTRIES,
INC., formerly known as Armstrong Cork Company and/or
Armstrong Contracting & Supply Co., manufactured, produced
and sold, either directly or indirectly, in the geographical
area in which plaintiffs worked and/or to the employers of
the plaintiffs and/or to contractors on job sites on which
plaintiffs worked, asbestos products, including, but not
limited to, LT Pipecovering, Armaspray and Armaspray 16

insulation, Armaflex adhesive, LT Cork Covering and asbestos gaskets, packing and sealing devices.  In addition, Defendant ARMSTRONG WORLD INDUSTRIES, INC., through its subsidiary and/or predecessor corporations, sold, distributed, supplied and/or installed insulation materials and/or contracted to install and maintain insulation materials, either directly or indirectly, in the geographical area in which plaintiffs worked and/or for the employers of the plaintiffs and/or for contractors on job sites on which plaintiffs worked and said insulation materials included, but were not limited to, asbestos products manufactured and produced by the other defendants including, but not limited to, Kaytherm Pipecovering and Block, High-Temperature Pipecovering and Block, Armstrong 85% Magnesia Pipecovering and Block, Bestfelt Pipecovering and Block, Aircell Pipecovering and Block, Kaylo Pipecovering and Block, Armabestos Pipecovering and Block, Oakdale High Pressure Pipecovering and Block, Duplex Pipecovering, Non-sweat Pipecovering, Non-frost Pipecovering, High-Temperature Cement, Armatemp #166 Cement, 85% Magnesia Cement, #152 Asbestos Cement, Amblerex #2 Cement, K.P. Asbestos Floats, "limpet" spray asbestos, and other asbestos products, including, but not limited to, asbestos gaskets, packing and sealing devices.

(15) Defendant, ASBEKA INDUSTRIES OF N.Y., INC., is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, ASBEKA INDUSTRIES OF N.Y., INC., manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos and/or asbestos products.

(16) Defendant, ASBESTOS CORPORATION OF AMERICA, is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in New Jersey, and at all times material to this Company, was doing business in the Eastern District of Pennsylvania.  At all times material hereto, Defendant ASBESTOS CORPORATION OF AMERICA, has been and/or is now engaged, directly or indirectly, in the mining, milling, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, distributing, and/or otherwise placing in the stream of commerce, asbestos, milled asbestos, raw asbestos, asbestos fiber, mined asbestos, processed asbestos, material containing asbestos, including, but not limited to, packaged or bagged asbestos, asbestos products and compounds (hereinafter collectively referred to as "asbestos products") in the geographic area in which plaintiffs worked and/or to employers of plaintiffs.

(17) Defendant, ASBESTOS CORPORATION, LTD. is a corporation organized and existing under the laws of Canada, with its principal place of business in Canada which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. Defendant, ASBESTOS CORPORATION, LTD., during all times material to this Complaint, and for a long time prior thereto, has been and/or is now engaged, directly or indirectly, in the mining, milling, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, distributing and/or otherwise placing in the stream of commerce, asbestos, milled asbestos, raw asbestos, asbestos fiber, mined asbestos, milled asbestos, processed asbestos, material containing asbestos, including, but not limited to, packaged or bagged asbestos, asbestos products and compounds (hereinafter collectively referred to as "asbestos prod-ucts") in the geographica area in which plaintiffs worked and/or to employers of plaintiffs.

(18) Defendant, ASBESTOS INSULATION COMPANY, INC., a/k/a Deerland Corporation, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pennsylvania and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, defendant, ASBESTOS INSULATION COMPANY, INC., manufactured, produced, sold and/or supplied, either directly or indirectly to the employer of the plaintiffs, asbestos products.

(19) Defendant ASBESTOS PRODUCTS MFG. CORP. is a corporation organized and existing under the laws of the State of New York, is a citizen and resident of the State of New York, and at all times material hereto was doing busi-ness in the Commonwealth of Pennsylvania, in the State of New Jersey and in the Federal Eastern District of Pennsylva-nia. At all times material hereto, defendant, ASBESTOS PRODUCTS MFG. CORP., manufactured, produced, sold and/or supplied, either directly or indirectly to the employer of the plaintiffs, asbestos products, including, but not limited to Spray Craft.

(20) Defendant, ASBESTOSPRAY CORPORATION is a corporation organized and existing under the laws of the State of New York, is a citizen and resident of the State of New York, and at all times material hereto was doing busi-ness in the State of New Jersey and in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsyl-vania. At all times material hereto, defendant, ASBESTOSPRAY CORPORATION, manufactured, produced, sold and/or supplied, either directly or indirectly to the employer of the plaintiffs, asbestos products, including, but not limited to Spray Craft.

(21) Defendant, ASHLAND OIL, INC., is a corporation organized and existing under the laws of the state of Kentucky, with its principal place of business in Kentucky, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, ASHLAND OIL, INC., and/or its predecessor in interest, F.H. Ross, has been and/or is now engaged, directly or indirectly, in the mining, milling, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, distributing and/or otherwise placing in the stream of commerce, asbestos, milled asbestos, raw asbestos, asbestos fiber, mined asbestos, processed asbestos, material containing, including, but not limited to packaged or bagged asbestos, asbestos products and compounds (hereinafter collectively referred to as "asbestos products") including all products manufactured by Johns-Manville Corporation, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked.

(22) Defendant, ASSOCIATED INSULATION, INC., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Pennsylvania, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, ASSOCIATED INSULATION, INC., manufactured, distributed and/or supplied asbestos products, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors at job sites on which plaintiffs worked when they were exposed to said asbestos products.

(23) Defendant, ASSOCIATED MINERALS CORPORATION is a foreign corporation organized and existing under the laws of a jurisdiction other than the State of New Jersey or the Commonwealth of Pennsylvania, has its principal place of business in London, England and at all times material hereto was doing business in the State of New Jersey and in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. It functions as a sales representative for various corporations in the Cape Industries group. It is also the successor for various corporations in the Cape Industries group that were engaged in the sale and supply of asbestos.

(24) Defendant, ASTEN-HILL MANUFACTURING COMPANY, is a business entity doing business in the Commonwealth of Pennsylvania with its principal place of business at Henry and Roberts Avenues, Philadelphia, Pennsylvania which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, ASTEN-HILL MANUFACTURING

-28-

COMPANY, mined, milled, manufactured, produced, processed, supplied, distributed, sold and/or otherwise placed in the stream of commerce, raw asbestos, asbestos fiber, mined asbestos, processed asbestos, material containing asbestos, including, but not limited to packaged or bagged asbestos, asbestos products and compounds (hereinafter collectively referred to as "asbestos products") to which plaintiff was continuously exposed in the course of his employment for this defendant.

(25) Defendant ATLAS TURNER, INC. is a corporation organized and existing under the laws of the Dominion of Canada, is a citizen and resident of the Dominion of Canada, has its principal place of business in the Province of Quebec, and at all times material hereto was doing business in the Commonwealth of Pennsylvania.  At all times material hereto, defendant, ATLAS ASBESTOS CO. mined, manufactured, produced, sold and/or supplied, either directly or indirectly to the employer of the plaintiffs, asbestos products including, but not limited to, Limpet, acoustical spray, fireproofing spray and other asbestos spray products.

(26) Defendant, AUTOMOTIVE PARTS CO., is a corporation organized and existing under the laws of the State of Pennsylvania and at all times material hereto was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, AUTOMOTIVE PARTS CO., mined, manufactured, produced, sold and supplied, either directly or indirectly to the employers of the plaintiffs at Fairless Hills, Pennsylvania, among other places, asbestos products including but not limited to industrial brake blocks, wire backed industrial brake blocks, and brake linings of various sizes including but not limited to Wagner Brake Linings.

(27) Defendant, A.W. CHESTERTON, INC., is a Massachusetts Corporation with a principal place of business in Massachusetts.  At all times material hereto, defendant, A.W. CHESTERTON, INC., mined, manufactured, produced, sold and/or supplied, either directly or indirectly to the employer of the plaintiffs, asbestos products.

(28) Defendant BABCOCK and WILCOX is a corporation organized and existing under the laws of a state other than New Jersey or Pennsylvania, has its principal place of business in the State of Louisiana and at all times material hereto was doing business in the Commonwealth of Pennsylvania.  At all times material hereto, defendant, BABOCK and WILCOX mined, manufactured, produced, sold and/or supplied, either directly or indirectly to the employer of the plaintiffs, asbesto products including, but not limited to, asbestos insulated boilers, asbestos block and asbestos cement.

-29-

(29) Defendant BABCOCK and WILCOX TUBULAR PRODUCTS is a Pennsylvania corporation with its principal place of business in Pennsylvania.  At all times material hereto, Defendant, BABCOCK and WILCOX TUBULAR PRODUCTS, manufactured, produced, mined, distributed and/or sold, and placed into the stream of commerce, either directly or indirectly to the employers of the plaintiffs, and/or to sub-contractors on their job site, asbestos products and materials to which plaintiffs were exposed.  Babcock and Wilcox sold asbestos-containing products, including cements, insulation products and boilers and burners containing asbestos.

(30) Defendant, BALTIMORE & OHIO RAILROAD, is a corporation organized and existing under the laws of the State of Maryland, and was incorporated on February 27, 1826, and is a citizen of the State of Maryland, doing business in the Commonwealth of Pennsylvania, with a registered address for service of process c/o Rudolph Garcia, Esquire, Centre Square West, 38th Floor, Philadelphia, Pennsylvania 19102.  BALTIMORE & OHIO RAILROAD operated a railroad which employed certain plaintiffs.

(31) Defendant, BARKER PIPE FITTINGS, CO., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 271 Lancaster Pike, Frazer, Pennsylvania 19355. At all times material hereto, defendant, BARKER PIPE FITTINGS, CO., manufactured, produced, sold and/or supplied, either directly or indirectly to the employer of the plaintiffs, asbestos products.

(32) Defendant, BASIC INCORPORATED, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Connecticut, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, BASIC INCORPORATED, manufactured, distributed and/or supplied asbestos products, including, but not limited to Kilnoise, either directly or indirectly, in the geographical area in which plaintiffs work and/or to the employers of the plaintiffs and/or to contractors at job sites on which plaintiffs worked when they were exposed to said asbestos products.

(33) Defendant, BELL ASBESTOS MINES, LTD., is a corporation organized and existing under the laws of Canada, with its principal place of business in Canada, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  Defendant, BELL ASBESTOS MINES, LTD., during all times material to this Complaint, and for a long time prior thereto, has been and/or is now engaged, directly or indirectly, in the mining, milling, manufacturing, producing, processing,

-30-

compounding, converting, selling, merchandising, supplying, distributing and/or otherwise placing in the stream of commerce, asbestos, milled asbestos, raw asbestos, asbestos fiber, mined asbestos, milled asbestos, processed asbestos, material containing asbestos, including, but not limited to, packaged or bagged asbestos, asbestos products and compounds (hereinafter collectively referred to as "asbestos products") in the geographica area in which plaintiffs worked and/or to employers of plaintiffs.

(34) Defendant, BENJAMIN FOSTER, Division of Amchem is a corporation organized and existing under the laws of the State of Delaware, is citizen and resident of the State of Delaware, has its principle place of business in the Commonwealth of Pennsylvania, and at all times material hereto was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, defendant, BENJAMIN FOSTER, Division of Amchem, manufactured, produced, sold and/or supplied, either directly or indirectly to the employer of the plaintiffs, asbestos products including, but not limited to fibrous adhesive tape and mastic.

(35) Defendant, BEVCO INDUSTRIES, is a corporation duly authorized to do business within the Commonwealth of Pennsylvania and Federal Eastern District of Pennsylvania, and is domiciled in Commonwealth of Pennsylvania. In 1981, BEVCO INDUSTRIES acquired the business and product lines property of Kay Asbestos, which then dissolved. Kay Asbestos was a distributor of asbestos products and sold such asbestos products to the places of employment relevant to this action. BEVCO INDUSTRIES itself was a distributor of asbestos products including gasket and packing materials. BEVCO is, therefore, liable to plaintiffs for injuries resulting from the sale of and inhalation of dust emitted by asbestos products of BEVCO or Kay Asbestos.

(36) Defendant, BIRD, INCORPORATED, Formerly known as Bird & Son, Inc., is a corporation organized and existing under the laws of the State of Massachusetts, with its principal place of business in Massachusetts, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, BIRD, INCORPORATED manufactured, distributed and/or supplied asbestos roofing and siding products, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors at job sites on which plaintiffs worked when they were exposed to said asbestos products.

(37) Defendant, BORG WARNER CORPORATION, is a corporation duly organized and existing under the laws of the State of Michigan with a principal place of business at

-31-

615 Griswold, Detroit, Michigan. At all times material hereto, defendant, BORG WARNER CORPORATION, manufactured, produced and/or sold asbestos products, either directly or indirectly to the employers of plaintiffs and/or its predecessors, asbestos products including, but not limited to, asbestos brake shoes, asbestos brake linings and other asbestos friction products.

(38) Defendant, BRAKE & CLUTCH COMPANY OF PHILA-DELPHIA, INC., is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at 1610 Fairmont Avenue, Philadelphia, Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, defendant, BRAKE & CLUTCH COMPANY OF PHILADELPHIA, INC., manufactured, distributed, produced and/or sold asbestos friction products, either directly or indirectly, in the geographical area in which plaintiffs worked, and/or to the employers of the plaintiffs, including, but not limited to, brake shoes, brake linings and Worldbestos Transit Mix and other asbestos friction products.

(39) Defendant, BRAND INSULATIONS, INC., sued in its corporate capacity and as successor by purchase of certain assets of Philip Carey Manufacturing Company, is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Illinois and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, BRAND INSULATIONS, INC., and/or its predecessors, was a manufacturer, distributor and supplier of asbestos products, including, but not limited to, products of some or all of the various other defendants named herein, including, but not limited to, as sole distributor of Philip Carey Manufacturing Company products in one of the geographical areas in which plaintiffs worked, which products were either directly or indirectly sold and/or supplied in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors at job sites on which plaintiffs worked, when they were exposed to said asbestos products.

(40) Defendant, BRINCO MINING LTD., is a corporation organized and existing under the laws of Canada, with its principal place of business in Canada which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania, and is successor by amalgamation to Cassiar Resources Ltd., formerly known as Cassiar Asbestos Corp., Ltd. Defendant, BRINCO MINING LTD., during all times material to this Complaint, and for a long time prior thereto, has been and/or is now engaged, directly or indirectly, in the mining, milling, manufacturing, producing, processing, compounding, converting, selling,

merchandising, supplying, distributing and/or otherwise placing in the stream of commerce, asbestos, milled asbestos, raw asbestos, asbestos fiber, mined asbestos, milled asbestos, processed asbestos, material containing asbestos, including, but not limited to, packaged or bagged asbestos, asbestos products and compounds (hereinafter collectively referred to as "asbestos products") in the geographica area in which plaintiffs worked and/or to employers of plaintiffs.

(41) Defendant, BRITISH SOUTH AFRICA CO., LTD. is a foreign corporation organized and existing under the laws of a jurisdiction other than the State of New Jersey, has its principal place of business in London, England and at all times material hereto was doing business in the State of New Jersey and in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. It is a wholly-owned subsidiary of defendant Charter Consolidated, Ltd., participating in the control of various corporate members of the Cape Industries Group and is therefore the alter ego and is the successor to the Cape Industries Group, North American Asbestos Corp. and Associated Minerals Corp. and is responsible for their tortious acts and omissions by virtue of the fact that it directed their policies and actions in a manner and/or for the purpose of committing a fraud, circumventing the law and/or otherwise defeating the ends of justice.

(42) Defendant, CAPE ASBESTOS FIBERS, LTD., is a corporation organized and existing under the laws of South Africa with its principal place of business in South Africa which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, CAPE ASBESTOS FIBERS, LTD., has been or is now engaged, directly or indirectly, in the mining, milling, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, distributing asbestos, processed asbestos, material containing asbestos, including but not limited to, products and compounds (hereinafter collectively referred to as "asbestos products") in the geographical area in which plaintiffs worked and/or to employers of plaintiffs. This defendant is also sued as both predecssor and successor in interest to North American Asbestos Company.

(43) Defendant, CAPE ASBESTOS INDUSTRIES, LTD. (formerly the Cape Asbestos Co., Ltd.) is a foreign corporation organized and existing under the laws of a jurisdiction other than the State of New Jersey, has its principal place of business in London, England and at all times material hereto was doing business in the State of New Jersey and in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, CAPE ASBESTOS INDUSTRIES, LTD., has been or is

now engaged, directly or indirectly, in the mining, milling, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, distributing asbestos, processed asbestos, material containing asbestos, including but not limited to, products and compounds (hereinafter collectively referred to as "asbestos products") in the geographical area in which plaintiffs worked and/or to employers of plaintiffs.  This defendant is also sued as both predecssor and successor in interest to North American Asbestos Company.

(44) Defendant, CAPE ASBESTOS S.A. (PTY) UNITED, LTD., sued in its corporate capacity and/or as parent and/or as an affiliated company and/or as successor to asbestos mining, milling, producing and distributing companies, including but not limited to, Cape Blue Mines (PTY), Ltd., and/or Egnep, Ltd., is a corporation organized and existing under the laws of South Africa with its principal place of business in South Africa which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, CAPE ASBESTOS S.A. (PTY) UNITED, LTD., has been or is now engaged, directly or indirectly, in the mining, milling, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, distributing asbestos, processed asbestos, material containing asbestos, including but not limited to, packaged or bagged asbestos, asbestos products and compounds (hereinafter collectively referred to as "asbestos products") in the geographical area in which plaintiffs worked and/or to employers of plaintiffs.  This defendant is also sued as both predecessor and successor in interest to North American Asbestos Company.

(45) Defendant, CAPE BOARD & PANELS, LTD. is a foreign corporation organized and existing under the laws of a jurisdiction other than the State of New Jersey or the Commonwealth of Pennsylvania, has its principal place of business at Uxbridge, England and at all times material hereto was doing business in the State of New Jersey and in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  It is a member of the Cape Industries group that manufactures and sells asbestos-containing products.  It is doing business in the United States at this time through its agent W.B. Arnold Co., Inc.

(46) Defendant, CAPE INDUSTRIES, LTD., sued in its corporate capacity and as parent, owner and/or successor to other asbestos mining companies, including, but not limited to, Amosa (PTY), Ltd., is a corporation organized and existing under the laws of the United Kingdom with its principal place of business in the United Kingdom which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times

material hereto, Defendant, CAPE INDUSTRIES, LTD., has been or is now engaged, directly or indirectly, in the mining, milling, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, distributing asbestos, processed asbestos, material containing asbestos, including but not limited to, packaged or bagged asbestos, asbestos products and compounds (hereinafter collectively referred to as "asbestos products") in the geographical area in which plaintiffs worked and/or to employers of plaintiffs. This defendant is also sued as both predecessor and successor in interest to North American Asbestos Company.

(47) Defendant, CAREY-CANADA, INC., formerly known as Carey-Canadian Mines, Ltd., is a corporation organized and existing under the laws of Canada, with its principal place of business in Canada which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. Defendant, CAREY-CANADA, INC., during all times material to this Complaint, and for a long time prior thereto, has been and/or is now engaged, directly or or indirectly, in the mining, milling, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, distributing and/or otherwise placing in the stream of commerce, asbestos, milled asbestos, raw asbestos, asbestos fiber, mined asbestos, milled asbestos, processed asbestos, material containing asbestos, including, but not limited to, packaged or bagged asbestos, asbestos products and compounds (hereinafter collectively referred to as "asbestos products") in the geographical area in which plaintiffs worked and/or to employers of plaintiffs.

(48) Defendant, CARLISLE CORPORATION, is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Ridgeway, Pennsylvania, with a post office number P.O. Box P, Gillis Avenue, Ridgeway, Pennsylvania and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, defendant, CARLISLE CORPORATION, distributed, produced and/or sold either directly or indirectly to the employers of the plaintiffs or their predecessors, asbestos friction products including, but not limited to, asbestos brake shoes, brake assemblies, clutch plates, brake linings, and Transit Mix. In addition, plaintiffs were exposed to asbestos fibers emitted by brake linings, clutch facings and other asbestos friction products used in Grumman or Flexible buses and sold by the defendant. In addition, CARLISLE CORPORATION sold asbestos products in rolls or sheets for use in buses and other vehicles of Septa and its predecessors. CARLISLE CORPORATION sold such asbestos products under the name CARLISLE CORPORATION and also through its unincorporated division, Motion Control

Industries.  CARLISLE CORPORATION liable for injuries
resulting from its torts and those of Motion Control Indus-
tries.

(49) Defendant, CE MINERALS, INC., is a corpora-
tion organized and existing under the laws of the Common-
wealth of Pennsylvania and its principal place of business
in Pennsylvania which is doing business in the Commonwealth
of Pennsylvania and in the Eastern District of Pennsylvania.
At all times material hereto, Defendant CE MINERALS, INC.,
formerly known as and/or also known and/or CE Refractories
Company, manufactured, produced and sold, either directly or
indirectly, in the geographical area in which plaintiffs
worked and/or to the employers of plaintiffs and/or to
contractors on job sites on which plaintiffs worked, asbes-
tos products, including but not limited to refractories.

(50) Defendant, CE REFRACTORIES (A DIVISION OF
COMBUSTION ENGINEERING, INC.), sued in its corporate capaci-
ty and as successor to Refractory and Insulation Corp., and
M.H. Dettrick Company, is a corporation organized and
existing under the laws of the State of Delaware with a
registered office situate at 123 South Broad Street, Phila-
delphia, Pennsylvania  19109 which is doing business in the
Commonwealth of Pennsylvania and in the Federal Eastern
District of Pennsylvania.  At all times material hereto,
defendant, C.E. Refractory, Division of Combustion Engineer-
ing, and/or its predecessors, Refractory and Insulation
Corp. and/or M.H. Dettrick Company, mined, manufactured,
produced, sold, or distributed, either directly or indirect-
ly, in the geographical area in which plaintiffs worked,
and/or to the employers of the plaintiffs, and/or to the
contractors on job sites on which plaintiffs worked, asbes-
tos products, including, but not limited to, refractory and
insulation materials and boilers.

(51) Defendant CELOTEX CORPORATION is a corpora-
tion duly organized and existing under the laws of the State
of Delaware and is a citizen of the State of Delaware and
has its principal place of business at 1500 N. Dale Mabry
Highway, Tampa, Florida.  It is successor by virtue of
merger with Panacon, Briggs Manufacturing Company, Rapid
American, Glen Alden, Philip Carey Corporation, and Philip
Carey Manufacturing Company, and Smith and Kanzler and
Philip Carey (New Jersey).  At all times material hereto,
Defendant Celotex Corporation itself mined, manufactured,
produced and sold asbestos products itself to the employers
of plaintiffs or sold asbestos products affixed to products
sold to the employers of decedent or its predecessor corpo-
rations and creatures sold asbestos products to the employ-
ers of the plaintiffs, including but not limited to:
Hightemp Pipecovering and Block, All Temp Pipecovering and
Block, 85% Magnesia Pipecovering and Block, Air Cell Cover-
ing, Fibrous Adhesive Bonding, Careytemp Bonding, 7-M-90

-36-

Asbestos Shorts, Insulation Cement, Vitracel Cement (Refractory Finishing), LF 20 Asbestos Cement (long fiber), No. 100 Asbestos Cement (hard finish), No. 303 Asbestos Cement, Asbestos Cement, MW-50 Cement, No. 707 Insulating Cement and Thermotex-B Insulating Cement, and asbestos shingles, roofing products and asbestos paper.  Furthermore, Philip Carey Corporation acquired Smith & Kanzler Company a wholly-owned subsidiary of Dana Corporation by way of stock purchase in 1969.  Prior to Smith & Kanzler Company's acquisition by Philip Carey, it produced, marketed and sold an asbestos product known a "Spray Craft."  After the acquisition, Philip Carey continued to produce, market and sell "Spray Craft."  Philip Carey Corporation has assumed the assets and liabilities of the Dana Corporation to the extent the Dana Spray Craft product.  Philip Carey Corporation has also assumed the assets and liabilities of the Spray Craft product line for its prior owners Smith & Kanzler Corporation and Victor Manufacturing & Gasket Company.  It later renamed its now mere creature Smith Kanzler as Philip Carey (New Jersey).  Celotex itself, after the acquisition referred to supra, sold the asbestos product lines formerly sold by Smith  Kanzler to plaintiffs' employers or is responsible for damages for injuries resulting from exposure to the products of Smith and Kanzler.  Celotex Corporation is thus also liable for torts and injuries arising from exposure to Smith and Kanzler asbestos paper, felt, and tape products.

(52) Defendant, CENTRAL JERSEY INDUSTRIES, INC., is a corporation organized and existing under the laws of the State of New Jersey, whose principal place of busienss and address for process of service is 2 Aldwyn Center, Villanova, Pennsylvania 19085.  Central Jersey Industries, Inc., was incorporated on February 26, 1847, as Central Railroad of New Jersey.  Central Railroad of New Jersey changed its name on September 7, 1979 to Central Jersey Industries, Inc.  CENTRAL JERSEY INDUSTRIES, INC. operated a railroad which employed certain plaintiffs.

(53) Defendant CENTRAL MINING FINANCE, LTD. is a foreign corporation organized and existing under the laws of a jurisdiction other than the State of New Jersey or the Commonwealth of Pennsylvania, has its principal place of business in London, England and at all times material hereto was doing business in the State of New Jersey and in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  It is a wholly-owned subsidiary of defendant Charter Consolidated, Ltd., and it owns, along with defendant Charter Consolidated Industries, Ltd., the controlling interest in the Cape Industries Group, inter alia, defendant Cape Industries, Ltd. and is therefore the alter ego and is the successor to the Cape Industries Group, North American Asbestos Corp. and Associated Minerals Corp. and is responsible for their tortious acts and omissions by

virtue of the fact that it directed their policies and actions in a manner and/or for the purpose of committing a fraud, circumventing the law and/or otherwise defeating the ends of justice.

(54) Defendant, CERTAIN-TEED CORPORATION, formerly known as Certain-Teed Products Corporation, is a corporation organized and existing under the laws of the State of Maryland with its principal place of business in Maryland and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. CERTAIN-TEED CORPORATION is also sued as successor to and in the capacity of purchaser of assets and liabilities of Keasbey and Mattison's asbestos line, which was absorbed into CERTAIN-TEED CORPORATION's Ambler facility, which manufactures, distributes and supplies, among other things, asbestos products. CERTAIN-TEED CORPORATION is also sued by virtue of its acquisition of Brand Insulations, Inc., during Certain-Teed's merger with Gustin-Bacon Manufacturing Company in 1966; prior to transfer of stock of Brand Insulations into a joint venture known as Certain-Teed Saint Gobain Insulation Corporation in 1967. At all times material hereto Brand Insulations, Inc. was a seller, distributor and/or supplier of asbestos products, as described supra. At all times material hereto, Defendant, CERTAIN-TEED CORPORATION, its predecessors and companies acquired by it, manufactured, produced, distributed and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, asbestos cement pipe, asbestos products used in insulation, and other products it manufactured, produced, distributed and/or supplied; and, at certain times relevant hereto, products, previously manufactured by Brand Insulations, Inc. and Keasbey and Mattison.

(55) Defendant, CHARLES F. GUYON is a corporation organized and existing under the laws of a state other than the State of New Jersey, is a citizen and resident of a state other than the State of New Jersey, has its principle place of business in a state other than the State of New Jersey, and at all times material hereto was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, defendant, CHARLES F. GUYON mined, manufactured, produced, sold and/or supplied, either directly or indirectly to the employer of the plaintiffs, asbestos products.

(56) Defendants, CHARTER CONSOLIDATED P.L.C., sued in its corporate capacities and as successors-in-interest to Cape Industries, Ltd., is a corporation organized and existing under the laws of Great Britain, with its principal places of business located at #40 Holborn Viaduct, London,

England, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times relevant hereto CHARTER CONSOLIDATED P.L.C. was the alter ego, parent company, and sole stockholder, and in full control of Cape Industries, Ltd., Amosa (PTY) Ltd., Cape Asbestos South Africa (PTY) United, Cape Blue Mines (PTY) Ltd., Egnep (PTY) Ltd., and other companies, which companies mined, manufactured, processed, imported, converted, compounded, sold, supplied, or delivered substantial amounts of asbestos and asbestos related materials for use, processing, or manufacturing in the Commonwealth of Pennsylvania. At all times material hereto, defendant directly and indirectly caused shipments of raw amosite fiber to be delivered to plaintiffs' worksites. In or around 1967, defendant assumed effective control of and operated an entity known as Cape Industries, which previously acted as a broker for the sale of asbestos fiber in the United States to, inter alia, worksites at which the plaintiffs were exposed. At all times material hereto, North American Asbestos Company was a corporation organized and existing under the laws of the State of Illinois, which acted as an agent and totally controlled division of Cape Industries for the purpose of causing raw amosite asbestos fibers to be shipped into the Commonwealth of Pennsylvania at worksites where plaintiffs were exposed. Raw amosite fiber was shipped through the city of Philadelphia by Cape Industries, said asbestos fibers being consigned to North American Asbestos Company for shipment to the worksites where plaintiffs were exposed. In or around 1978, North American Asbestos Company was dissolved by Cape Industries, at the direction of defendants and, accordingly, they cannot be sued. The dissolution was accomplished for the purpose of escaping liability for the injuries suffered by persons, such as plaintiffs, who were directly or indirectly exposed to raw amosite fiber. Cape Industries, although it can be subjected to the jurisdiction of this Court, by long arm service, has refused to appear in the United States for several years. In fact, Cape Industries has been personally served with process in other asbestos litigation, and has yet to acknowledge the jurisdiction of this Court.

(57) Defendant CHARTER CONSOLIDATED INVESTMENTS, LTD. is a foreign corporation organized and existing under the laws of a jurisdiction other than the State of New Jersey or the Commonwealth of Pennsylvania, has its principal place of business in London, England, and at all times material hereto was doing business in the State of New Jersey and in the Commonwealth of Pennsylvania and the Federal Eastern District of Pennsylvania. It is a wholly-owned subsidiary of defendant Charter Consolidated, Ltd., and it owns or owned, along with defendant Central Mining Finance, Ltd., a controlling interest in the Cape Industries Group, inter alia, defendant Cape Industries, Ltd. Defendant Charter Consolidated Investments, Ltd. is the alter ego

and is the successor to the Cape Industries Group, North American Asbestos Corp. and Associated Minerals Corp. and is responsible for their tortious acts and omissions by virtue of the fact that it directed their policies and actions in a manner and/or for the purpose of committing a fraud, circumventing the law and/or otherwise defeating the ends of justice.

(58) Defendant CHARTER CONSOLIDATED SERVICES, LTD. is a foreign corporation organized and existing under the laws of jurisdiction other than the State of New Jersey or the Commonwealth of Pennsylvania, has its principal place of business in London, England, and at all times material hereto was doing business in the State of New Jerseyand in the Commonwealth of Pennsylvania and the Federal Eastern District of Pennsylvania. It is a wholly-owned subsidiary of defendant Charter Consolidated, Ltd., and is therefore the alter ego and is the successor to the Cape Industries Group, North American Asbestos Corp. and Associated Minerals Corp. and is responsible for their tortious acts and omissions by virtue of the fact that it directed their policies and actions in a manner and/or for the purpose of committing a fraud, circumventing the law and/or otherwise defeating the ends of justice.

(59) Defendant, CHICAGO FIRE BRICK CO., is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in the Illinois, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, CHICAGO FIRE BRICK CO., manufactured, distributed and/or supplied asbestos products including but not limited to asbestos fiber, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors at job sites on which plaintiffs worked when they were exposed to said asbestos products.

(60) Defendant, CHILDERS PRODUCTS COMPANY, INC., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Ohio, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, CHILDERS PRODUCTS COMPANY, INC., manufactured, distributed and/or supplied asbestos products, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors at job sites on which plaintiffs worked when they were exposed to said asbestos products.

(61) Defendant, CHRYSLER CORPORATION, is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Michigan

which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, CHRYSLER CORPORATION, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked, and/or to employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to asbestos brakes, brake lining, brake blocks, brake discs and pads, clutch plates and other friction products.

(62) Defendant, CLARK CONTROLLER COMPANY is a corporation organized and existing under the laws of the State of Ohio, is a citizen and resident of the State of Ohio, has its principal place of business in the State of Ohio and at all times material hereto was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, CLARK CONTROLLER COMPANY, manufactured, produced, sold and/or supplied, either directly or indirectly or through its predecessors, to the employer of the plaintiffs, brake assemblies.

(63) Defendant, COLLINS PACKING COMPANY, INC., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pennsylvania, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, COLLINS PACKING COMPANY, INC., manufactured, produced and sold either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products including, but not limited to, mechanical seals and sealing devices, packing and gaskets.

(64) Defendant, COLONIAL ELECTRIC SUPPLY, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and is a citizen and resident of the State of Pennsylvania and at all times material hereto was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, COLONIAL ELECTRIC SUPPLY, manufactured, produced, sold and supplied, either directly or indirectly to the employers of the plaintiffs at Fairless Hills, Pennsylvania, among other places, asbestos products including but not limited to insulation block diatomoceous silicia, brake linings including but not limited to those manufactured by Cutler Hammer, and industrial brake blocks including but not limited to those manufactured by Clark Control.

(65) Defendant, COLONIAL RUBBER, is a corporation duly organized and existing under the laws of the State of New Jersey with its principal place of business at Elbo Lane and Texas Avenue, Mount Laurel, New Jersey. At all times material hereto, defendant, COLONIAL RUBBER, manufactured, produced, distributed and/or sold asbestos products either directly or indirectly to the employers of the plaintiffs or their predecessors, including, but not limited to asbestos paper and Thermoid matting.

(66) Defendant, COLUMBIA BOILER COMPANY OF POTTSTOWN, sued in its corporate capacity and as a successor by merger to Columbia Boiler Company, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pennsylvania which is doing business in the Commonwealth of Pennsylvania and in the Federal District of Pennsylvania. At all times material hereto, Defendant, COLUMBIA BOILER COMPANY OF POTTSTOWN and/or Columbia Boiler Company, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products.

(67) Defendant, COMBUSTION ENGINEERING, INC., sued in its corporate capacity and as successor in interest to and purchaser of Refractory and Insulation Company is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Connecticut which is doing business in the Commonwealth of Pennsylvania and in the Eastern District of Pennsylvania. At all times material hereto, Defendant COMBUSTION ENGINEERING, INC., and/or its predecessors, including Refractory and Insulation Company, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, and products incorporating asbestos components including but not limited to refractories and boilers.

(68) Defendant, CONSOLIDATED MINES SELECTION CO., LTD. is a foreign corporation organized and existing under the laws of a jurisdiction other than the State of New Jersey, has its principal place of business in London, England and at all times material hereto was doing business in the State of New Jersey. It is a wholly-owned subsidiary of defenant Charter Consolidated, Ltd., participating in the control of various corporate members of the Cape Industries Group and is therefore the alter ego and is the successor to the Cape Industries Group, North American Asbestos Corp. and Associated Minerals Corp. and is responsible for their tortious acts and omissions by virtue of the fact that it directed their policies and actions in a manner and/or for

-42-

the purpose of committing a fraud, circumventing the law and/or otherwise defeating the ends of justice.

(69) Defendant, CONSOLIDATED RAIL CORPORATION is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, whose principal place of business and address for service of process is Six Penn Center Plaza, Philadelphia, Pennsylvania 19104. Consolidated Rail Corporation is and has been since April 1, 1976 a common carrier by rail and is liable to the plaintiffs as their employer since that date under the Federal Employer's Liability Act and/or as a result of the obligation placed upon it by the Northeast Rail Reorganization Act as amended and/or as the purchaser of and successor to Penn Central Transportation Company, Central Railroad of New Jersey, Reading Company, Lehigh Valley Railroad Company and Erie Lackawanna Railway Company's railroad operations. CONSOLIDATED RAIL CORPORATION operated a railroad which employed certain plaintiffs.

(70) Defendant, COONEY BROTHERS, INC., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at the S.W. Corner of 5th & Dauphin Street, Philadelphia, PA 19133 which is doing business in the Commonwealth of Pennsylvania and the Federal Eastern District of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, defendant, COONEY BROTHERS, INC., manufactured, produced and/or sold, either directly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to plumbing supplies and materials that contained asbestos to which plaintiffs were exposed.

(71) Defendant, CRANE PACKING, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, is a citizen of the Commonwealth of Pennsylvania, and has a principal place of business at 682 Parkway, Broomall, Pennsylvania, which is doing business in the Commonwealth of Pennsylvania and the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, CRANE PACKING, distributed products containing asbestos, including, but not limited to, asbestos gaskets and packing manufactured or supplied by some of the defendants named herein, either directly or indirectly, in the geographical area in which plaintiffs worked, and/or to the employers of the plaintiffs, and/or to contractors on job sites on which plaintiffs worked, which products were used in the vicinity of the plaintiffs.

(72) Defendant, CROWN CORK & SEAL COMPANY, INC., sued in its corporate capacity and as successor by purchase of certain assets of Mundet Cork Corporation, is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Pennsylvania and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, CROWN CORK & SEAL COMPANY, INC., and/or its predecessors, including, Mundet Cork Corporation, was a manufacturer, distributor and supplier of asbestos products, including, but not limited to, products of some or all of the various other defendants, which products were either directly or indirectly sold and/or supplied in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors at job sites on which plaintiffs worked, when he was exposed to said asbestos products.

(73) Defendant, C. TENNANT SONS & CO., OF NEW YORK, is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, and at all times material to this Complaint, was doing business in the Eastern District of Pennsylvania. At all times material hereto, Defendant, C. TENNANT SONES & CO., OF NEW YORK, has been and/or is now engaged, directly or indirectly, in the mining, milling, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, distributing, and/or otherwise placing in the stream of commerce, asbestos, milled asbestos, raw asbestos, asbestos fiber, mined asbestos, processed asbestos, material containing asbestos, including, but not limited to packaged or bagged asbestos, asbestos products and compounds in the geographical area in which plaintiffs worked and/or to employers of plaintiffs.

(74) Defendant, CULP BROTHERS, INC., formerly known as Culp Industrial Insulation Company, sued in its corporate capacity and as successor in interest to Culp Industrial Insulation Company, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pennsylvania which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, CULP BROTHERS, INC., and/or its predecessors, including Culp Industrial Insulation Company, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products.

(75) Defendant, CURTIS INDUSTRIES, is a corporation organized and existing under the laws of the State of Delaware, is a citizen and resident of the State of

-44-

Delaware, has its principal place of business in the State
of Ohio and at all times material hereto was doing business
in the Commonwealth of Pennsylvania and in the Federal
Eastern District of Pennsylvania.  At all times material
hereto, defendant CURTIS INDUSTRIES, manufactured, produced,
sold and supplied, either directly or indirectly or through
its predecessors, to the employer of the plaintiff, asbestos
automotive products including, but not limited to brakes,
brake linings, clutches, clutch facings, gaskets and other
friction materials.

(76) Defendant, DANA CORPORATION, is a corporation
duly organized and existing in the Commonwealth of Virginia
and is a citizen of the Commonwealth of Virginia with a
principal place of business at 4500 Dorr Street, P.O. Box
1000, Toledo, Ohio.  Defendant acquired all of the stock
assets and liabilities of Smith and Kanzler employers of the
plaintiffs and its prececcesors whose stock, assets, before
being acquired by DANA.  On or about February 18, 1969,
Carey (Ohio) acquired the stock, assets and liabilites of
S&K from DANA.  Upon information and belief, there is an
indemnification agreement between Carey (Ohio), now Celotex
and DANA, under which DANA retained all liabilities for
injuries due to exposure to S&K asbestos products prior to
the acquisition by Carey (Ohio).  At all times material
hereto, Defendant, DANA CORPORATION, and its predecessor
corporations, including but not limited to Perfect Circle
Corporation, manufactured, produced and sold, either direct-
ly or indirectly, in the geographical area in which plain-
tiffs worked and/or to the employers of the plaintiffs
and/or to contractors on job sites on which plaintiffs
worked, asbestos products, including, but not limited to
Spraycraft Insulation and Tiger Lime and asbestos friction
materials.

(77) Defendant, D.A.R. INDUSTRIAL PRODUCTS, INC.,
formerly known as Delaware Asbestos & Rubber Co., is a
corporation organized and existing under the laws of the
Commonwealth of Pennsylvania, and is a citizen of the
Commonwealth of Pennsylvania doing business in the Common-
wealth of Pennsylvania and in the Federal Eastern District
of Pennsylvania.  At all times material hereto, Defendant,
D.A.R. INDUSTRIAL PRODUCTS, INC., and/or its predecessors,
including, Delaware Asbestos & Rubber Co., was a manufactur-
er, distributor and supplier of asbestos products, includ-
ing, but not limited to, products of some or all of the
various other defendants named herein, and including, but
not limited to, asbestos gaskets, packing and sealing
devices, which products were either directly or indirectly
sold and/or supplied in the geographical area in which
plaintiffs worked and/or to the employers of the plaintiffs
and/or to contractors at job sites on which plaintiffs
worked, when he was exposed to said asbestos products.

-45-

(78) Defendant, DAVIS BRAKE & EQUIPMENT CORPORA-
TION, is a corporation duly organized and existing under the
laws of the Commonwealth of Pennsylvania and is a citizen of
the Commonwealth of Pennsylvania with a principal place of
business at 2219 North Second Street, Philadelphia, Pennsyl-
vania and is doing business in the Commonwealth of Pennsyl-
vania and in the Federal Eastern District of Pennsylvania.
At all times material hereto, defendant, DAVIS BRAKE &
EQUIPMENT CORPORATION, manufactured, produced, distributed
and/or sold either directly or indirectly to the employers
of the plaintiffs or their predecessors, asbestos friction
products including, but not limited to, brake linings,
clutch plates, brake shoes, brake blocks and sheets.

(79) Defendant, DECKER ASSOCIATES, INC., is a
corporation organized and existing under the laws of the
Commonwealth of Pennsylvania, with its principal place of
business in Pennsylvania, which is doing business in the
Commonwealth of Pennsylvania and in the Federal Eastern
District of Pennsylvania.  At all times material hereto,
DECKER ASSOCIATES, INC., manufactured, distributed and/or
supplied asbestos products, either directly or indirectly,
in the geographical area in which plaintiffs worked and/or
to the employers of the plaintiffs and/or to contractors at
job sites on which plaintiffs worked when he was exposed to
said asbestos products.

(80) Defendant, DELAWARE INSULATION COMPANY, is a
corporation organized and existing under the laws of the
State of Delaware, with its principal place of business in
Delaware and is doing business in the Commonwealth of
Pennsylvania and in the Federal Eastern District of Pennsyl-
vania.  At all times material hereto, Defendant, DELAWARE
INSULATION COMPANY was a manufacturer, distributor and
supplier of asbestos products, including, but not limited
to, products of some or all of the various other defendants
named herein, which products were either directly or indi-
rectly sold and/or supplied in the geographical area in
which plaintiffs worked and/or to the employers of the
plaintiffs and/or to contractors at job sites on which
plaintiffs worked, when he was exposed to said asbestos
products.

(81) Defendant, DELAWARE VALLEY SAFEGUARD COMPANY,
INCORPORATED, is a corporation organized and existing under
the laws of the Commonwealth of Pennsylvania, with its
principal place of business in Pennsylvania, which is doing
business in the Commonwealth of Pennsylvania and the Federal
Eastern District of Pennsylvania.  At all times material
hereto, defendant, DELAWARE VALLEY SAFEGUARD COMPANY,
manufactured, produced, mined, distributed and/or sold, and
placed into the stream of commerce, either directly or
indirectly to the employers of the plaintiffs, and/or to

sub-contractors on their job site asbestos products and materials to which plaintiff was exposed.

(82) Defendant, DELCO PRODUCTS, a Division of General Motors Corporation, is a corporation duly organized and existing under the laws of the State of Ohio with its principal place of business at P.O. Box 1042, Dayton, Ohio. At all times material hereto, defendant, DELCO PRODUCTS, produced, manufactured, distributed and/or sold to the employers of the plaintiffs or their predecessors, asbestos-containing friction products.

(83) Defendant, DRAVO CORPORATION, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and is a citizen and resident of the Commonwealth of Pennsylvania and at all times material hereto was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, DRAVO CORPORATION, mined, manufactured, produced and sold, either directly or indirectly to the employers of the plaintiffs at Fairless Hills, Pennsylvania, among other places, asbestos products including but not limited various sizes of insulation pipe asbestos with 85% Magnesia.

(84) Defendant, DRESSER INDUSTRIES, INC., sued in its corporate capacity and as successor by merger to HARBISONWALKER COMPANY, is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Texas which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, DRESSER INDUSTRIES, INC., and/or to contractors on job sites on which plaintiffs worked, asbestos products, including but not limited to fireclay and other refractories.

(85) Defendant, DURAMETALLIC CORPORATION, is a corporation organized and existing under the laws of the State of Michigan with its principal place of business in Michigan, which is doing business in the Commonwealth of Pennsylvania and the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, DURAMETALLIC CORPORATION, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractor on job sites on which plaintiffs worked, asbestos products, including but not limited to, asbestos yarns, Type A-66-S, foil square rings, Styles 110 and 710, spiral packing, Types 66F, AL and AW, foil packing, Types D-10, D7-10 and B-71, Dura Plastic packing Types 8-7, D-2, 8-77 and D-22, and other asbestos containing packings, rope, braid and sealing products.

(86) Defendant, DURABLA, is a Pennsylvania corporation with its principal place of business at 27 Industrial Boulevard, Paoli, Pennsylvania 19301. At all times material hereto, defendant, DURABLA, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products.

(87) Defendant, DUROX EQUIPMENT COMPANY is a corporation organized and existing under the laws of State of Ohio, with its principal place of business in Cleveland, Ohio at 12351 Prospect Road, Cleveland, Ohio 44136, and is or was doing business with the Commonwealth of Pennsylvania. At all times material hereto, defendant, DUROX EQUIPMENT COMPANY, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products.

(88) Defendant, EAGLE-PICHER INDUSTRIES, INC., is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Ohio and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, EAGLE-PICHER INDUSTRIES, INC., manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, Epitherm 1200 Pipecovering and Block, Super 66 Insulating Cement, Hylo Cement, Hi-Stick Cement, One-Cote Cement, One-Coat Cement, Insulseal, PV Supertemp, E-P Blankets, E-P Magnesia, 99 Finishing Cement, 106 Finishing Cement, Eagle Dry Cote, Insulstic, 43 Finishing Cement, 85% Magnesia Pipecovering and Block, 33 Insulating Cement, 7M Asbestos Cement, Eagle 20 Cement, Hylo Pipecovering and Block, Swetchek Pipecovering and Block, Stalastic Pipecovering and Block, Vercel Block, Insulastic Pipecovering and Block, and Spraymastic Pipecovering and Block, MW-1, Armatemp No. 10 and Unarco No. 10 Cements and Stamastic and Swetchek covering.

(89) Defendant, EARL B. BEACH CO., is a corporation organized and existing under the laws of the State of Pennsylvania and is a citizen and resident of the State of Pennsylvania and at all times material hereto was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, EARL B. BEACH CO., mined, manufactured, produced, sold and supplied, either directly

or indirectly to the employers of the plaintiffs at Fairless Hills, Pennsylvania, among other places, asbestos products including but not limited to asbestos cloth.

(90) Defendant, EAST PENN REFRACTORIES, is a Pennsylvania corporation with its principal place of business on Lehigh Street, Reading, Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, defendant, EAST PENN REFRACTORIES, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products.

(91) Defendant, EATON CORPORATION, formerly known as Cutler Hammer, Inc., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and is a citizen and resident of the State of Pennsylvania and at all times material hereto was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, EATON CORPORATION, formerly known as Cutler Hammer, mined, manufactured, produced sold and supplied, either directly or indirectly to the employers of the plaintiffs at Fairless Hills, Pennsylvania, among other places, asbestos products including but not limited to brake linings and clutches.

(92) Defendant, EGNEP (PTY) LTD., is a foreign corporation organized and existing under the laws of a jurisdiction other than the State of New Jersey, has its principal place of business in Johannesburg, South Africa, and at all times material hereto was doing business in the State of New Jersey and in the Commonwealth of Pennsylvania and the Federal Eastern District of Pennsylvania.  At all times material hereto, defendant EGNEP, (PTY), LTD. was a wholly-owned subsidiary of the Cape Industries group.

(93) Defendant, ELBO INDUSTRIAL SUPPLY COMPANY, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at 305 N. 6th Street, Philadelphia, PA 19106 which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, defendant ELBO INDUSTRIAL SUPPLY COMPANY, manufactured, produced and/or sold, either directly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to plumbing supplies and materials that contained asbestos to which plaintiffs were exposed.

(94) Defendant, EMPIRE-ACE INSULATION COMPANY, is a corporation organized and existing under the laws of the State of New York with a principal place of business at One Cozine Avenue, Brooklyn, NJ 11207, which is doing business in the Commonwealth of Pennsylvania and the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant EMPIRE-ACE INSULATION COMPANY, manufactured, produced and/or sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, Air Cell Pipecovering, EM Cell Pipecovering, Air Cell Boards and Blocks, EM Cell Boards and Blocks, Wool Felt Covering, Anti-Sweat Covering, Resisto Climatic Pipecovering, Range Boiler Jackets, Sponge Felt, EM Felt Covering, Magnesia Covering and Blocks, Calcium Silicate Covering and Blocks and Insulating Cements.

(95) Defendant, EMPIRE INSULATION OF NORTHEAST MISSOURI, sued in its corporate capacity and as successor in interest to and purchaser of EMPIRE ASBESTOS COMPANY, is a corporation organized and existing under the laws of the State of Missouri with its principal place of business in the State of Missouri which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant EMPIRE INSULATION OF NORTEAST MISSOURI and as successor to EMPIRE ASBESTOS COMPANY, mined, manufactured, produced and sold, either directly or indirectly, in the geographic area in which plaintiffs worked and lived asbestos products, including, but not limited to, asbestos cement and other asbestos products.

(96) ERIE-LACKAWANNA, INC., is a corporation organized and existing under the laws of the State of Delaware, on April 14, 1983, said defendant was prior to April 14, 1983, known as the Erie-Lackawanna Railway Company.  ERIE-LACKAWANNA, INC. operated a railroad which employed certain plaintiffs.

(97) Defendant, F. B. WRIGHT DISTRIBUTION CO., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and is a citizen and resident of the Commonwealth of Pennsylvania and at all times material hereto was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, F. B. WRIGHT DISTRIBUTION CO., mined, manufactured, produced sold and supplied, either directly or indirectly to the employers of the plaintiffs at Fairless Hills, Pennsylvania, among other places, asbestos products including but not limited to asbestos cloth.

-50-

(98) Defendant, FERRO ENGINEERING, a Division of Oglebay Norton Company, is a corporation organized and existing under the laws of the State of Ohio and is a citizen and resident of the State of Ohio and at all times material hereto was doing business in the Commonwealth of Pennsylvania.  At all times material hereto, Defendant, FERRO ENGINEERING, a Division of Oglebay Norton Company, manufactured, produced, mined, distributed and/or sold and placed into the stream of commerce, either directly or indirectly to the employers of the plaintiff and/or to sub-contractors on their job sites, asbestos products and materials to which plaintiffs were exposed.

(99) Defendant, FIBREBOARD CORPORATION, including, but not limited to, the Pabco Industrial Products Division, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in California and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, FIBREBOARD CORPORATION, including, but not limited to, the Pabco Industrial Products Division, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, Caltemp Pipecovering and Block, Pabco Magnesia Pipecovering and Block, Prasco Pipecovering and Block, Super Caltemp Pipecovering and Block, Pabco Pipecovering and Block, Precision Molded Pipecovering and Block, F 1 Cement and No. 127 Cement.

(100)    Defendant, FIRESTONE TIRE & RUBBER COMPANY, is a corporation organized and existing under the laws of the State of Indiana with its principal place of business in the State of Indiana.  At all times material hereto, Defendant, FIRESTONE TIRE & RUBBER COMPANY, including, but not limited to, the Pabco Industrial Products Division, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products.

(101)    Defendant, FLEXITALLIC GASKET CORPORATION, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business in New Jersey which is doing business in the Commonwealth of Pennsylvania and the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant FLEXITALLIC GASKET CORPORATION, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job

sites on which plaintiffs worked, asbestos products, includ-
ing but not limited to, asbestos gaskets and packing materi-
als.

(102)    Defendant, FLINTKOTE CO., is a corpora-
tion organized and existing under the laws of the State of
Delaware, with its principal place of business in Ohio and
is doing business in the Commonwealth of Pennsylvania and in
the Federal Eastern District of Pennsylvania.  At all times
material hereto, Defendant, FLINTKOTE CO., manufactured,
produced and sold, either directly or indirectly, in the
geographical area in which plaintiffs worked and/or to the
employers of the plaintiffs and/or to contractors on job
sites on which plaintiffs worked, asbestos products, includ-
ing various building and construction materials and prod-
ucts, including but not limited to, Flintkote Cement,
Pipecoating, and Block Paste, tile, asbestos cement pipe,
roofing materials, and siding.

(103)    Defendant, FORD MOTOR COMPANY, is a
corporation organized and existing under the laws of the
State of Delaware with its principal place of business in
Michigan which is doing business in the Commonwealth of
Pennsylvania and in the Federal Eastern District of Pennsyl-
vania.  At all times material hereto, Defendant, FORD MOTOR
COMPANY manufactured, produced and sold, either directly or
indirectly, in the geographical area in which plaintiffs
worked, and/or to employers of the plaintiffs and/or to
contractors on job sites on which plaintiffs worked, asbes-
tos products, including, but not limited to, asbestos
brakes, brake linings, brake blocks, brake discs and pads,
clutch plates and other friction products.

(104)    Defendant, FOSECO, INC., is a corpora-
tion organized and existing under the laws of the state of
Delaware with its principal place of business in Ohio, which
is doing business in the Commonwealth of Pennsylvania and in
the Federal Eastern District of Pennsylvania.  Defendant,
FOSECO, INC., at all times material hereto, has been and/or
is now engaged, directly or indirectly, in the mining,
milling, manufacturing, producing, processing, compounding,
converting, selling, merchandising, supplying, distributing
and/or otherwise placing in the stream of commerce, asbes-
tos, milled asbestos, raw asbestos, asbestos fiber, mined
asbestos, processed asbestos, material containing asbestos,
including, but not limited to, packaged or bagged asbestos
and compounds (hereinafter collectively referred to as
"asbestos products") in the geographical area in which
plaintiffs worked and/or to employers of plaintiffs and/or
to contractors at job sites on which plaintiffs worked.

(105)    Defendant, FOSTER WHEELER CORPORATION is
a corporation organized and existing under the laws of the
State of New York with its principal place of business in

-52-

New Jersey which is doing business in the Commonwealth of Pennsylvania and in the Eastern District of Pennsylvania. At all times material hereto, Defendant FOSTER WHEELER CORPORATION manufactured, produced and sold asbestos products, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of plaintiffs and/or to contractors on job sites on which plaintiffs worked.

(106)    Defendant, GAF CORPORATION, sued in its corporate capacity and as successor by merger to Ruberoid Co., which was organized and existing under the laws of the State of New Jersey, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New Jersey and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, GAF CORPORATION, and/or its predecessors, including, Ruberoid Co. Mastic Tile, and Eternit, mined, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, 7M, 115 and 214 Insulation Cements, Calsilite Pipecovering and Block and Hylo Pipecovering and Block, T/NA-100 Insulation Jacketing, Asbestos Paper and Millboard and Calsilite Insulating Cement, and asbestos tile products. GAF is also sued as successor-in-interest and alter ego of Vermont Asbestos Corporation, Vermont Production Co., and The Vermont Asbestos Corporation, all of which mined and sold asbestos fiber.

(107)    Defendant, GARFIELD MOLDING COMPANY, INC., is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in New Jersey which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, GARFIELD MOLDING COMPANY, INC., manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos and/or asbestos products.

(108)    Defendant, GARLOCK, INC., including, but not limited to, the Precision Seal Division, is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Texas and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, GARLOCK INC., including but not limited to, the Precision Seal Division, manufactured, produced and sold, either directly or indirectly, in the

geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, asbestos gaskets, packing, and sealing devices.

(109)    Defendant, GENERAL ELECTRIC COMPANY ("GE"), is a corporation duly organized and existing under the laws of the State of New York with a principal place of business at One River Road, Schnectady, New York. At all times material hereto, GENERAL ELECTRIC COMPANY, through its distributor, General Electric Supply Company, distributed asbestos products that were used in and around plaintiffs. Certain of the electrical products of GE used in such repair, including wiring and millboard, are asbestos-containing products. As part of the repair and rehabilitation of Septa trolleys, old GE products which contained asbestos and which were decaying, broken, and emitting asbestos dust were removed from trolleys, and new GE asbestos containing asbestos products were installed. In the course of the use, removal, rehabilitation and/or installation of the GE products or activities by employees, asbestos products were cut, sliced and split, causing the emission into the air of asbestos dust and fibers which were inhaled by plaintiffs, all of which was or should have been foreseeable by GE. GE also distributed asbestos activator gaskets to Septa and/or its predecessors and manufactured and/or distributed other asbestos products to Septa and/or its predecessors.

(110)    Defendant, GENERAL MOTORS CORPORATION, including, but not limited to, the Delco Products, Delco-Remy and Delco Moraine divisions, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Michigan and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, GENERAL MOTORS CORPORATION, including, but not limited to, the Delco Products, Delco-Remy and Delco Moraine divisions, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked, and/or to employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, asbestos brakes, brake linings, brake blocks, brake discs and pads, clutch plates and other friction products.

(111)    Defendant, GENERAL REFRACTORIES COMPANY, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and is a citizen of the Commonwealth of Pennsylvania which is doing business in the Commonwealth of Pennsylvania and the Federal Eastern District of Pennsylvania. At all times material hereto,

defendant, GENERAL REFRACTORIES COMPANY, or its predecessors and/or alter egos, including East Penn Refractories, mined, manufactured, produced and/or sold or distributed asbestos or products containing asbestos either directly to the employers of the plaintiffs or to contractors on job sites where plaintiffs worked, which products were used in the vicinity of plaintiffs.

(112)    Defendant, GENSTAR CORPORATION, sued in its corporate capacity and as successor in interest to the Flintkote Company, is a corporation organized and existing under the laws of the Dominion of Canada, with its principal place of business in California which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, GENSTAR CORPORATION and/or its predecessors and divisions, including the Flintkote Company, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos and/or asbestos products.

(113)    Defendant, GEORGE A. ROWLEY & CO., INC., a/k/a Peltz Rowley, is a Pennsylvania corporation with its principal place of business at 5700 Tacony Street, Philadel- phia, Pennsylvania 19135.  At all times material hereto, Defendant, GEORGE A. ROWLEY & CO., INC., manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products.

(114)    Defendant, GEORGE V. HAMILTON, INC., is a corporation organized and existing under the laws of the State of Pennsylvania and is a citizen and resident of the State of Pennsylvania and at all times material hereto was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, GEORGE V. HAMILTON, INC., mined, manufactured, produced and sold, either directly or indi- rectly to the employers of the plaintiffs at Fairless Hills, Pennsylvania, among other places, asbestos products includ- ing but not limited to Insulation Felt 50 Waterproof Asbes- tos.

(115)    Defendant, GEORGIA-PACIFIC CORPORATION, is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Georgia and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsyl- vania.  At all times material hereto, Defendant, GEORGIA-PACIFIC CORPORATION, manufactured, produced and sold, either directly or indirectly, in the geographical

-55-

area in which plaintiffs worked and/or to the employers of
the plaintiffs and/or to contractors on job sites on which
plaintiffs worked, asbestos products, including, but not
limited to, spray asbestos.

(116)    Defendant, GLOBE REFRACTORIES, INC., is
a corporation organized and existing under the laws of the
State of Delaware with its principal place of business in
West Virginia which is doing business in the Commonwealth of
Pennsylvania and in the Eastern District of Pennsylvania.
At all times material hereto, Defendant GLOBE REFRACTORIES,
INC., manufactured, produced and sold, either directly or
indirectly, in the geographical area in which plaintiffs
worked and/or to the employers of plaintiffs and/or to
contractors on job sites on which plaintiffs worked, asbes-
tos products, including but not limited to refractories.

(117)    Defendant, GOULDS PUMPS, INC., is a
corporation organized and existing under the laws of the
State of New York with its principal place of business in
New York which is doing business in the Commonwealth of
Pennsylvania and in the Federal Eastern District of Pennsyl-
vania.  At all times material hereto, Defendant, GOULDS
PUMPS, INC., manufactured, produced, and sold, either
directly or indirectly, in the geographical area in which
plaintiffs worked and/or to the employers of the plaintiffs
and/or to contractors on job sites on which plaintiffs
worked, asbestos products, including, but not limited to,
pump and stuffing box packing, 1/8" Gland packing, 1/16"
gaskets, and other asbestos containing packings, gaskets and
sealing devices.

(118)    Defendant, GREEN TWEED & COMPANY, INC.
is a Pennsylvania Corporation with a principal place of
business in North Wales, PA.  At all times material hereto,
Defendant, GREEN TWEED & COMPANY, INC., manufactured,
produced, and sold, either directly or indirectly, in the
geographical area in which plaintiffs worked and/or to the
employers of the plaintiffs and/or to contractors on job
sites on which plaintiffs worked, asbestos products.

(119)    Defendent, GRIFFIN WHEEL COMPANY, is a
division of Amstead Industries, and is a corporation organ-
ized and existing under the laws of the State of Illinois
with its principal place of business in Illinois and is
doing business in the Commonewalth of Pennsylvania and in
the Federal Eastern District of Pennsylvania.  At all times
material hereto, defendant GRIFFIN WHEEL COMPANY sold
asbestos-containing brake shoes and other asbestos friction
materials.

(120)    Defendant, GRUMMAN OHIO CORPORATION,
formerly known as Grumman Flexible Corporation, is a corpo-
ration duly organized and existing under the laws of the

State of Delaware with its principal place of business in
Ohio.  At all times material hereto, defendant, GRUMMAN OHIO
CORPORATION, or Grumman Flexible Corporation, sold buses to
Septa or its predecessors.  These buses contained brakes,
brake linings, brake shoes and other friction products, each
of which contained asbestos to which plaintiffs was exposed.
Furthermore, defendant sold asbestos products including, but
not limited to, brake linings and brake shoes that contained
asbestos to which plaintiffs were exposed.

(121)    Defendant, GTE SYLVANIA, is a corpora-
tion organized and existing under the laws of the State of
Pennsylvania and is a citizen and resident of the State of
Pennsylvania and at all times material hereto was doing
business in the Commonwealth of Pennsylvania and in the
Federal Eastern District of Pennsylvania.  At all times
material hereto, Defendant, GTE SYLVANIA, mined, manufac-
tured, produced, sold and supplied, either directly or
indirectly through its predecessor corporations, Clark
Control and/or A. O. Smith to the employers of the plain-
tiffs at Fairless Hills, Pennsylvania, among other places,
asbestos products including but not limited to Clark Control
brakes, clutches and brake pads.

(122)    Defendant, HAJOCA PLUMBING COMPANY, is a
corporation organized and existing under the laws of the
State of Maine, with a registered business office at 123 S.
Broad Street, Philadelphia, PA 19109, which is doing busi-
ness in the Commonwealth of Pennsylvania and in the Federal
Eastern District of Pennsylvania.  At all times material
hereto, defendant, HAJOCA PLUMBING COMPANY, manufactured,
produced and/or sold, either directly, in the geographical
area in which plaintiffs worked and/or to the employers of
the plaintiffs and/or to contractors on job sites on which
plaintiffs worked, asbestos products, including, but not
limited to plumbing supplies and materials that contained
asbestos to which plaintiffs was exposed.

(123) ----- Defendant, HARNISCHFEGER CORPORATION, is
a corporation organized and existing under the State of
Delaware, is a citizen and resident of the State of Dela-
ware, has its principal place of business in the State of
Wisconsin, and at all times material hereto was doing
business in the Commonwealth of Pennsylvania and in the
Federal Eastern District of Pennsylvania.  At all times
material hereto, defendant, HARNISCHFEGER CORPORATION,
manufactured, produced, sold and/or supplied, either direct-
ly or indirectly or through its predecessors, to the employ-
er of the plaintiffs, asbestos friction materials, including
but not limited to hoist, travel, swing and boom brakes and
other friction material.

(124)      Defendant, H. K. PORTER CO., INC., sued in its corporate capacity as successor by merger with Thermoid Co., and Tallman-McCluskey and as parent of Southern Textile Corp., and including, but not limited to, the Thermoid Division, is a corporate organized and existing under the laws of the State of Delaware, with its principal place of business in Pennsylvania and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, H.K. PORTER COMPANY, INC., and/or its predecessors, and/or its subsidiary, Southern Textile Corp. and including, but not limited to, the Thermoid Division, mined, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, cloth, tape, yarn/cord, felt, rope/wick, tubing and amosite blankets such as Portersite, Portersite G, Porterlag, and other cloth such as Thermagard, Cleangard, Covergard, Flamegard, Guardian, Heatgard, Splashgard, Weldgard, Insulgard, and Soundgard.

(125)      Defendant, HOPEMAN BROTHERS, INC., is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 435 Essex Avenue, P.O. Box 820, Waynesboro, VA  22980 which is doing business in the Commonwealth of Pennsylvania and the Federal Eastern District of Pennsylvania, with a registered office situate at 123 South Broad Street, Philadelphia, Pennsylvania  19109.  At all times material hereto, defendant, HOPEMAN BROTHERS, INC., manufactured, supplied, produced, and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, asbestos wallboard, including Marnite.

(126)      Defendant, HUXLEY DEVELOPMENT CORP., is a corporation with a principal office located at 1133 Avenue of Americas, New York 10036 and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant HUXLEY DEVELOPMENT CORPORATION, has been and/or is now engaged, directly or indirectly, in the mining, milling, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, distributing, and/or otherwise placing in the stream of commerce, asbestos, milled asbestos, raw asbestos, asbestos fiber, mined asbestos, processed asbestos, material containing asbestos, including, but not limited to, packaged or bagged asbestos, asbestos products and compounds in the geographic area in which plaintiffs worked and/or to employers of plaintiffs.

(127)     Defendant, INDUSTRIAL PRODUCTS COMPANY, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 21 Cabot Boulevard, Langhorne, Pennsylvania, which is doing business in the Commonwealth of Pennsylvania and the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, INDUSTRIAL PRODUCTS COMPANY, manufactured, produced, mined, distributed and/or sold, and placed into the stream of commerce, either directly or indirectly to the employers of the plaintiff, and/or to sub-contractors on his job site, asbestos products and materials to which plaintiff was exposed.

(128)     Defendant INDUSTRIAL SALESMASTER is a corporation organized and existing under the laws of the state of New Jersey with its principal place of business in New Jersey. At all times material hereto defendant INDUS-TRIAL SALESMASTER manufactured, supplied, produced, and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of plaintiffs asbestos cloth and friction products.

(129)     Defendant, INSULATION MATERIAL, INC., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Pennsylvania, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, INSULATION MATERIAL, INC., manufactured, distributed and/or supplied asbestos products, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors at job sites on which plaintiffs worked when they were exposed to said asbestos products.

(130)     Defendant, INSULATION PRODUCTS CORPORA-TION, is a corporation organized and existing under the laws of the State of Pennsylyania and is a citizen and resident of the Stte of Pennsyulvania and at all times material heeto was doing business in the Commonwealth of Pennsylvania. At all times material hereto, Defendant, INSULATION PRODUCTS CORPORATION, mined, manufactured, produced and sold, either directly or indirectly to the employers of the plaintiffs asbestos products including but not limited to various sizes of asbestos pipe insulation.

(131)     Defendant, INTERNATIONAL HARVESTER COMPANY, is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Illinois which is doing business in the Common-wealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, INTERNATIONAL HARVESTER COMPANY, manufactured, produced and sold, either directly or indirectly, in the geographical

area in which plaintiffs worked and/or to the employers of
the plaintiffs and/or to contractors on job sites on which
plaintiffs worked, asbestos products, including but not
limited to, asbestos brakes, brake linings, brake blocks,
brake discs and pads, clutch plates, other friction products
and asbestos gaskets, packing and sealing devices.

(132)    Defendant, JACQUAYS ASBESTOS COMPANY, is
a corporation organized and existing under the laws of the
State of Arizona, having its principal place of business in
the State of Arizona which is doing business in the Common-
wealth of Pennsylvania and in the Federal Eastern District
of Pennsylvania.  At all times material hereto, JACQUAYS
ASBESTOS COMPANY, during all times material to this Com-
plaint, and for a long time prior thereto, has been and/or
is now engaged directly or indirectly, in the mining,
milling, manufacturing, producing, processing, compounding,
converting, selling, merchandising, supplying, distributing
and/or otherwise placing in the stream of commerce, asbes-
tos, milled asbestos, raw asbestos, asbestos fiber, mined
asbestos, processed asbestos, material containing asbestos,
including, but not limited to, packaged or bagged asbestos,
asbestos products and compounds in the geographic area in
which plaintiffs worked and/or to employers of plaintiffs.

(133)    Defendant, J. H. FRANCE REFRACTORIES CO.
is a corporation organized and existing under the laws of
Commonwealth of Pennsylvania, is a citizen and resident of
the Commonwealth of Pennsylvania, has its principle place of
business in the Commonwealth of Pennsylvania, and at all
times material hereto was doing business in the Commonwealth
of Pennsylvania and in the Federal Eastern District of
Pennsylvania.  At all times material hereto, defendant, J.H.
FRANCE REFRACTORIES CO., mined, manufactured, produced, sold
and/or supplied, either directly or indirectly to the
employer of the plaintiffs, asbestos products.

(134)    Defendant, JOHN CRANE-HOUDAILLE, INC.,
formerly Crane Packing Company, is a corporation organized
and existing under the laws of the State of Delaware with
its principal place of business in Illinois, which is doing
business in the Commonwealth of Pennsylvania and in the
Federal Eastern District of Pennsylvania.  At all times
material hereto, Defendant, JOHN CRANE - HOUDAILLE, INC.,
manufactured, produced and sold either directly or indirect-
ly, in the geographical area in which plaintiffs worked
and/or to the employers of the plaintiffs and/or to contrac-
tors on job sites on which plaintiffs worked, asbestos
products including, but not limited to, mechanical seals and
sealing devices, pumps, machine and industrial tools and
packing.  At all times material hereto, Defendant, JOHN
CRANE - HOUDAILLE INC., formerly Crane Packing Company,
manufactured, distributed and supplied asbestos products of
some or all of the various other defendants named herein.

(135)    Defendant, J. P. STEVENS, INC., is a corporation organized and existing under the Laws of the State of Delaware, with its principal place of business in New York and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, J. P. STEVENS, INC., manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, asbestos cloth, blankets, lagging, pad cloth and other textile products.

(136)    Defendant, J. W. ROBERTS, LTD., is a corporation organized and existing under the laws of Great Britain, with its principal place of business at 20 St. Mary's Parsonage, Manchester, England, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant J. W. ROBERTS, LTD., manufactured, produced and sold either directly or indirectly in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to the contractors at job sites on which plaintiffs worked, asbestos products including, but not limited to "Limpet" spray asbestos.

(137)    Defendant, KANE BROTHERS, is a corporation organized and existing under the laws of the State of Ohio with a principal place of business at 457 A Street, Sharon, PA 16146 which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, defendant, KANE BROTHERS, manufactured, produced and/or sold, either directly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to plumbing supplies and materials that contained asbestos to which plaintiffs were exposed.

(138)    Defendant, KAY WHEEL SALES is a corporation organized and existing under the laws of the State of Pennsylvania, and is a citizen and resident of the State of Pennsylvania and at all times material hereto was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times it sold asbestos-containing friction products to which plaintiffs were exposed.

(139)    Defendant, KEENE CORPORATION, sued in its corporate capacity and as successor by purchase of certain assets of Mundet Cork Corporation, is successor by

merger to Keene Building Products Corporation, which was successor by merger to Baldwin-Ehret-Hill, Inc., which was organized and existing under the laws of the Commonwealth of Pennsylvania, and which was successor by merger to Ehret Magnesia Manufacturing Company, which was formerly a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, KEENE CORPORATION, and/or its predecessors, including, Mundet Cork Corporation, Keene Building Products Corporation, Baldwin-Ehret-Hill, Inc., and/or Ehret Magnesia Manufacturing Company, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, Thermasil Pipecovering and Block, Monoblock Pipecovering and Block, Thermalite Pipecovering and Block, Enduro Block, Superpowerhouse Cement, Powerhouse Cement, BEH No. 1 Plus Insulating Cement, Bondtite Cement, Thermasil Cement, Pyrospray Types I, T, S, MonoSpray, Fibrekote, Ehret Asbestos Sponge Felt, Aircell Pipecovering and Block, and asbestos gaskets, packing and sealing devices.

(140)    Defendant, LAC D'AMIANTE DU QUEBEC, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Canada, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. Defendant, LAC D'AMIANTE DU QUEBEC, during all times material to this Complaint, and for long time prior thereto, has been and/or is now engaged, directly or indirectly, in the mining, milling, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, distributing and/or otherwise placing in the stream of commerce, asbestos, milled asbestos, raw asbestos, asbestos fiber, mined asbestos, milled asbestos, processed asbestos, material containing asbestos, including, but not limited to, packaged or bagged asbestos, asbestos products and compounds (hereinafter collectively referred to as "asbestos products") in the geographical area in which plaintiffs worked and/or to employers of plaintiffs.

(141)    Defendant, LEAR SIEGLER, INC., including, but not limited to, any Brake Products Divisions, sued in its corporate capacity and as successor by merger to Royal Industries, Inc., which was successor to Century Engineers, which was organized and existing under the laws of the State of California, and which reincorporated and was organized and existing under the laws of the State of Delaware, is a corporation organized and existing under the

laws of the State of Delaware, with its principal place of
business in California and is doing business in the Common-
wealth of Pennsylvania and in the Federal Eastern District
of Pennsylvania. At all times material hereto, Defendant,
LEAR SIEGLER INC., and/or its predecessors including, Royal
Industries, Inc., and Century Engineers, manufactured, pro-
duced and sold, either directly or indirectly, in the geo-
graphical area in which plaintiffs worked and/or to the
employers of the plaintiffs and/or to contractors on job
sites on which plaintiffs worked, asbestos products, includ-
ing, but not limited to, asbestos brakes, brake linings,
brake blocks, brake discs and pads, clutch plates and other
friction products.

(142)    Defendant, LEHIGH VALLEY RAILROAD
COMPANY, is a corporaiton organized and existing under the
laws of the Commonwealth of Pennsylvania, whose principal
place of business and address for service of process is 415
Brighton Street, Bethlehem, Pennsylvania 19017 and is a
citizen of the Commonwealth of Pennsylvania and doing
business in the Commonwealth of Pennsylvania. LEHIGH VALLEY
RAILROAD COMPANY operated a railroad which employed certain
plaintiffs.

(143)    Defendant, LEHIGH VALLEY REFRACTORIES,
INC., is a corporation organized and existing under the laws
of the Commonwealth of Pennsylvania, with its principal
place of business in Pennsylvania, which is doing business
in the Commonwealth of Pennsylvania and in the Federal
Eastern District of Pennsylvania. At all times material
hereto, LEHIGH VALLEY REFRACTORIES, INC., manufactured,
distributed and/or supplied asbestos products, either
directly or indirectly, in the geographical area in which
plaintiffs worked and/or to the employers of the plaintiffs
and/or to contractors at job sites on which plaintiffs
worked when they were exposed to said asbestos products.

(144)    Defendant, LENCO, INC., is a corporation
duly organized and existing under the laws of the State of
Missouri, with its principal place of business at 319 West
Main Street, Jackson Missouri. At all times material
hereto, defendant, LENCO, INC., produced, distributed,
manufactured, and/or sold asbestos products to the employers
of the plaintiffs or its predecessors including, but not
limited to, asbestos containing jackets, cape sleeves and
aprons.

(145)    Defendant, LEONARD J. BUCK, INC. is a
corporation organized and existing under the laws of the
State of Delaware, has its principal place of business in
the State of Delaware and at all times material hereto was
doing business in the State of New Jersey and in the Common-
wealth of Pennsylvania and in the Federal Eastern District
of Pennsylvania. At all times material hereto, LEONARD J.

-63-

BUCK, INC., manufactured, distributed and/or supplied
asbestos products, either directly or indirectly, in the
geographical area in which plaintiffs worked and/or to the
employers of the plaintiffs and/or to contractors at job
sites on which plaintiffs worked when they were exposed to
said asbestos products.

(146)    Defendant, MACK TRUCKS, INC., is a
corporation organized and existing under the laws of the
Commonwealth of Pennsylvania which is doing business in the
Commonwealth of Pennsylvania and in the Federal Eastern
District Pennsylvania.  At all times material hereto,
Defendant, MACK TRUCKS, INC., manufactured, produced and
sold, either directly or indirectly, in the geographical
area in which plaintiffs worked, and/or to employers of the
plaintiffs and/or to contractors on jobsites on which
plaintiffs worked, asbestos products, including but not
limited to, asbestos brakes, brake linings, brake blocks,
brake discs and pads, clutch pads and other friction prod-
ucts.

(147)    Defendant, MANUFACTURED RUBBER PRODUCTS
COMPANY, is a corporation duly authorized and existing under
the laws of the Commonwealth of Pennsylvania and is a
citizen of the Commonwealth of Pennsylvania with a principal
place of business at 4501 Tacony Street, Philadelphia,
Pennsylvania and in the Federal Eastern District of Pennsyl-
vania.  At all times material hereto, defendant, MANUFAC-
TURED RUBBER PRODUCTS COMPANY, produced, manufactured,
distributed and/or sold either directly or indirectly, to
the employers of the plaintiffs or its predecessors, asbes-
tos products including, but not limited to, asbestos paper.

(148)    Defendant, MAREMONT CORPORATION, former-
ly known as Maremont-Delaware, Inc., is a corporation
organized and existing under the laws of the State of
Illinois, with its principal place of business in Illinois
and is doing business in the Commonwealth of Pennsylvania
and in the Federal Eastern District of Pennsylvania.  At all
times material hereto, Defendant, MAREMONT CORPORATION,
and/or its predecessors, including, MaremontDelaware, Inc.,
manufactured, produced and sold, either directly or indi-
rectly, in the geographical area in which plaintiffs worked
and/or to the employers of the plaintiffs and/or to contrac-
tors on job sites on which plaintiffs worked, asbestos
products, including, but not limited to, asbestos brakes,
brake linings, brake blocks, brake discs and pads, clutch
plates and other friction products.

(149)    Defendant, McCORD GASKET COMPANY is a
corporation organized and existing under the laws of the
State of Michigan and is authorized to do business in
Pennsylvania, and at all times material hereto was conduct-
ing business in the Commonwealth of Pennsylvania and in the

-64-

Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant McCORD GASKET COMPANY, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos and/or asbestos products.

(150)    Defendant, MELRATH GASKET COMPANY, INC., is a wholly-owned subsidiary of Melrath Gasket Holding Company, Inc., a Pennsylvania corporation, a/k/a a TNT Liquidating Co.  At all times material hereto, Defendant MELRATH GASKET COMPANY, INC., manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos and/or asbestos products.

(151)    Defendant, MELRATH GASKET HOLDING COMPANY, INC., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  On August 28, 1983, MELRATH GASKET COMPANY, INC., became a wholly-owned subsidiary of MELRATH GASKET HOLDING COMPANY, INC., a Pennsylvania Corporation, a/k/a TNT Liquidating Company.

(152)    Defendant, MERIDEN MOLDED PLASTICS, INC., is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business in Connecticut which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant MERIDEN MOLDED PLASTICS, INC., manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos and/or asbestos products.

(153)    Defendant, METROPOLITAN LIFE INSURANCE CO. is an insurance company organized and existing under the laws of the State of New Jersey, has its principal place of business in the State of New Jersey and at all times material hereto was doing business in the State of New Jersey.  It is sued for its conduct and omissions as a consultant to certain defendants, as described in Count IX herein.

(154)  Defendant MOHAWK MANUFACTURING is a corporation organized and existing under the laws of Illinois, with its principal place of business in Illinois, which is doing business in the Commonwealth of Pennsylvania and the Federal Eastern District of Pennsylvania.  At all times it

manufactured and sold asbestos-containing friction products to which plaintiffs were exposed.

(155)    Defendant, MONSEY PRODUCTS, is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business in Pennsylvania, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times it manufactured and/or sold asbestos-containing friction products to which plaintiffs were exposed.

(156)  Defendant MOTOR SERVICES is a corporation organized and existing under the laws of the State of New York, with its principal place of business in the State of New York, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times it manufactured and/or sold asbestos-containing friction products to which plaintiffs were exposed.

(157)    Defendant, NATIONAL GYPSUM COMPANY, is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Texas which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, NATIONAL GYPSUM COMPANY, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, Thermacoustic, Sprayolite, Fireshield, Macoustic, Texas Texture, Perfolyte, joint compounds, joint cements, toppings, textures, spackles, plasters, siding, roofing, and Gold Bond products.

(158)    Defendant, NATIONAL RAILROAD PASSENGER CORPORATION is a corporation organized and existing under the laws of Washington, D.C., whose address for service of process is 1617 J.F.K. Boulevard, Room 710, Philadelphia, Pennsylvania 19104.  National Railroad Passenger Corporation is and has been since October 30, 1970 a common carrier by rail and is liable to the plaintiffs as his employer since that date under the Federal Employer's Liability Act and/or as a result of the obligation placed upon it by the Rail Passenger Service Act as amended and/or as the purchaser of and successor to Penn Central Corporation's railroad operations.  NATIONAL RAILROAD PASSENGER CORPORATION operated a railroad which employed certain plaintiffs.

(159)    Defendant, NATIONAL U.S. BOILER CO., INC., is a Pennsylvania Corporation with a principal place of business in New Castle, PA.  At all times material hereto, defendant, NATIONAL U.S. BOILER CO., INC.,

-66-

manufactured, produ.ced, sold and supplied, either directly
or indirectly or through its predecessors, to the employer
of the plaintiffs, asbestos National U.S. Boiler products.

(160)    Defendant, NAVISTAR is a corporation
organized and existing under the laws of the State of
Delaware, is a citizen and resident of the State of Dela-
ware, has its principal place of business in a State other
than New Jersey or Pennsylvania and at all times material
hereto was doing business in the Commonwealth of Pennsylva-
nia and in the Federal Eastern District of Pennsylvania.
Navistar is successor by name change to International
Harvester Company.  At all times material hereto, defendant,
NAVISTAR manufactured, produced, sold and supplied, either
directly or indirectly or through its predecessors, to the
employer of the plaintiffs, asbestos automotive products
incuding, but not limited to brakes, brake linings, clutch-
es, clutch facings, gaskets and other friction materials.

(161)    Defendant, NEW YORKER STEEL BOILER
COMPANY, INC., is a corporation organized and existing under
the laws of the Commonwealth of Pennsylvania with its
principal place of business in Pennsylvania which is doing
business in the Commonwealth of Pennsylvania and in the
Federal Eastern District of Pennsylvania.  At all times
material hereto, Defendant, NEW YORKER STEEL BOILER COMPANY,
INC., manufactured, produced and sold, either directly or
indirectly, in the geographical area in which plaintiffs
worked and/or to the employers of plaintiffs and/or to
contractors on job sites on which plaintiffs worked, asbes-
tos products.

(162)    Defendant, NICOLET, INC., formerly known
as Nicolet Industries, Inc., sued in its corporate capacity
and as successor by purchase of certain assets of Keasbey &
Mattison's Asbestos Products Division, is a corporation
organized and existing under the laws of the State of
Delaware, with its principal place of business in Pennsylva-
nia and is doing business in the Commonwealth of Pennsylva-
nia and in the Federal Eastern District of Pennsylvania.  At
all times material hereto, Defendant, NICOLET, INC., former-
ly known as Nicolet Industries, Inc., and/or its predeces-
sors including Keasbey & Mattison, mined, manufactured,
produced and sold, either directly or indirectly, in the
geographical area in which plaintiffs worked and/or to the
employers of the plaintiffs and/or to contractors on job
sites on which plaintiffs worked, asbestos products, includ-
ing, but not limited to, 7M Cement, millboard, paper, sheet
packing, cement boards, pipecovering and block including,
but not limited to, Norriscell Corrugated Paper, Nicobestos,
Nicospec, Nicosat, Nicolam, SBR Sheets, Kon-X, Nicoseal, as
well as 85% Magnesia Pipecovering and Block, Zebra Pipe-
covering, Kaytherm Pipecovering and Block, Kaytherm 1700
Pipecovering, Hytemp Pipecovering and Block, Bestfeld

Pipecovering, Aircell Pipecovering and Block, and other
asbestos products, including, but not limited to, asbestos
gaskets, packing and sealing devices. At all times relevant
hereto NICOLET was the alter ego, parent company, and sole
stockholder and in full control of Nicolet Asbestos Mines,
Ltd., which company mined, manufactured, processed, import-
ed, converted, compounded, sold, supplied or delivered
substantial amounts of asbestos and asbestos related materi-
als for use, processing, or manufacturing in the Common-
wealth of Pennsylvania and in the Federal Eastern District
of Pennsylvania. At all times relevant hereto, this action
is brought against NICOLET as the legal successor to
Keasbey & Mattison based on one or more of the following
factors: NICOLET's purchase of one or more of Keasbey &
Mattison's division; NICOLET's purchase of some or all of
the assets of Keasbey & Mattison's industrial products
division; NICOLET's purchase of land, buildings, machinery,
equipment, inventory, business records, materials, supplies,
processes, patents, and trademarks of Keasbey & Mattison;
NICOLET's purchase of Keasbey & Mattison's good will and th
right to use Keasbey's name; NICOLET's employment of some of
Keasbey & Mattison's key personnel; NICOLET's continuing to
manufacture some of Keasbey & Mattison's products, NICOLET
holding itself out as and/or advertising itself has an
ongoing enterprise of Keasbey & Mattison; NICOLET's continu-
ation of the Keasbey & Mattison product line; and NICOLET's
continuing sales to Keasbey & Mattison customers. This
action is further brought against NICOLET as successor to
Keasbey & Mattison as a matter of public policy under the
product liability laws of the Commonwealth of Pennsylvania
and in the Federal Eastern District of Pennsylvania. At all
times relevant hereto NICOLET, INC. was the alter ego,
parent company, and sole stockholder and in full control of
Nicolet Asbestos Mines, Ltd. which company mined, manufac-
tured, processed, imported, converted, compounded, sold,
supplied or delivered substantial amounts of asbestos and
asbestos related materials for use, processing, or manufac-
turing in the Commonwealth of Pennsylvania and in the
Federal Eastern District of Pennsylvania.

(163)     Defendant, NIMCO BUS SALES AND BUS
PARTS, is a corporation duly organized and existing under
the laws of the State of New Jersey with its principal place
of business at 252 Doremus Avenue, Newark, New Jersey. At
all times material hereto, defendant NIMCO BUS SALES AND BUS
PARTS produced, manufactured, distributed and/or sold,
either directly or indirectly to the employers of the
plaintiffs or its predecessors, asbestos friction products
including, but not limited to, brake pads and brake shoes.

(164)     Defendant, NORCA CORPORATION, is a
corporation organized and existing under the laws of the
State of New York with its principal place of business in
New York, which is doing business in the Commonwealth of

Pennsylvania and in the Federal Eastern District of
Pennsylvania.  At all times material hereto, Defendant,
NORCA CORPORATION, was a manufacturer, distributor and
supplier of asbestos products, including, but not limited
to, products of some or all of the various other defendants
named herein, which products were either directly or indi-
rectly sold and/or supplied in the geographical area in
which plaintiffs worked and/or to the employers of the
plaintiffs and/or to contractors at jobsites on which
plaintiffs worked, when they were exposed to said asbestos
products.

      (165)    Defendant, NORTH AMERICAN ASBESTOS
COMPANY, is a corporation organized and existing under the
laws of the State of Illinois, is a citizen of the State of
Illinois, and at all times material to this Complaint, was
doing business in the Commonwealth of Pennsylvania and in
the Federal Eastern District of Pennsylvania.  The defendant
was dissolved but was the alter ego of defendants CAPE
ASBESTOS FIBRES, LTS., CAPE ASBESTOS INDUSTRIES, LTD., CAPE
INDUSTRIES, LTD., among others.

      (166)    Defendant, NOSROC CORPORATION, sued in
its corporate capacity and as successor in interest to
G.W.H. Corson, is a corporation organized and existing under
the laws of the Commonwealth of Pennsylvania with a princi-
pal place of business c/o G & W.H. Corson, Inc., Joshua Road
and Stenton Avenue, Plymouth Meeting, Pennsylvania 19462
which is doing business in the Commonwealth of Pennsylvania
and the Federal Eastern District of Pennsylvania with a
registered office situate at 123 South Broad Street, Phila-
delphia, Pennsylvania 19109.  At all times material hereto,
defendant, NOSROC CORPORATION, and its predecessors, includ-
ing, but not limited to, G.W.H. Corson, was the sole dis-
tributor of the asbestos products mined, manufactured,
produced, and sold by various of the defendants named
herein, including, but not limited to, Ehret-Magnesia,
Baldwin-Ehret-Hill, and Keene Corporation, including, but
not limited to Kilboard, Superpowerhouse Cement, Powerhouse
Cement, B.H. #1 Insulating Cement, PyroSpray, and other
asbestos products, which products were either directly or
indirectly sold and/or supplied in the geographical area in
which plaintiffs worked and/or to the employers of the
plaintiffs and/or to contractors at job sites on which
plaintiffs worked, when he was exposed to said asbestos
products.

      (167)    Defendant, NUTURN CORPORATION, is a
corporation duly organized and existing under the laws of the
State of Tennessee with its principal place of business
in at 570 Metroplex drive, Nashville, Tennessee which is
doing business in the Commonwealth of Pennsylvania and in
the Federal Eastern District of Pennsylvania.  At all times
material hereto, defendant, NUTURN CORPORATION, produced,

manufactured, distributed, and/or sold, either directly or indirectly to the employers of the plaintiffs, asbestos products including, but not limited to, brake linings, brake shoes, other friction products, World Bestos Transit Mix or Carlisle B33 Mix. Defendant, NUTURN CORPORATION, is also sued as successor by purchase of the Brake Systems Division of Maremont Corporation in 1977.

(168) Defendant NYCAL is a corporation organized and existing under the laws of New York with its principal place of business in New Jersey, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times, it sold asbestos-containing friction products to which plaintiffs were exposed.

(169) Defendant, OWENS-CORNING FIBERGLAS CORP., sued in its corporate capacity and as successor by purchase of the Kaylo Division of Owens-Illinois Glass Company, now known as Owens-Illinois, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Ohio and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, OWENS-CORNING FIBERGLAS CORP., and/or its predecessors, including, the Kaylo Division of Owens-Illinois Glass Company, now known as Owens-Illinois, Inc., manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, Kaylo Pipecovering and Block, Kaylo 20 Pipecovering and Block and 660 Cement. Furthermore, No. 100 Asbestos Cement (hard finish), No. 303 Asbestos Cement, MW-50 Cement, No. 707 Insulating Cement, Thermotex-B Insulating Cement, and other asbestos products, including, but not limited to, asbestos gaskets, packing and sealing devices. Defendants predecessor, Philip Carey Corporation, maintained a contracting unit that installed and/or repaired asbestos products in the vicinity in which plaintiffs worked during his employment.

(170) Defendant, OWENS-ILLINOIS GLASS CO., is an Ohio Corporation with a principal place of business at 460 N. Gulph Road, King of Prussia, Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, OWENS-ILLINOIS GLASS CO., formerly known as Owens-Illinois Glass Company, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products.

(171)      Defendant, OWENS-ILLINOIS, INC., former-
ly known as Owens-Illinois Glass Company, is a corporation
organized and existing under the laws of the State of Ohio,
with its principal place of business in Ohio and is doing
business in the Commonwealth of Pennsylvania and in the
Federal Eastern District of Pennsylvania.  At all times
material hereto, Defendant, OWENS-ILLINOIS, INC., formerly
known as Owens-Illinois Glass Company, manufactured, pro-
duced and sold, either directly or indirectly, in the
geographical area in which plaintiffs worked and/or to the
employers of the plaintiffs and/or to contractors on job
sites on which plaintiffs worked, asbestos products, includ-
ing, but not limited to, Kaylo insulation material and Kaylo
Pipecovering and Block.

(172)      Defendant, PARS MANUFACTURING COMPANY,
sued in its corporate capacity and as a successor in inter-
est to Pars Manufacturing Company, a proprietorship, and
LAUGHTON PARSONS GASKET MANUFACTURING COMPANY, a proprietor-
ship, is a corporation organized and existing under the laws
of the Commonwealth of Pennsylvania which is doing business
in the Commonwealth of Pennsylvania and in the Federal
Eastern District of Pennsylvania.  At all times, materials
hereto, Defendant, PARS MANUFACTURING COMPANY, and/or its
predecessors manufactured, produced and sold, either direct-
ly or indirectly, in the geographical area in which plain-
tiffs worked and/or to the employers of the plaintiffs
and/or to contractors on job sites on which plaintiffs
worked, asbestos containing products, particularly high
temperature ceiling gaskets, including but not limited to,
folded gaskets, die cut gaskets, braided and twisted pack-
ings and rope, cloth and various textiles, woven and bolt
hole tape, wick, tubing, blankets, curtains, gloves, "tad-
pole tape", sewed asbestos gaskets, industrial and marine
brake linings and Teflon impregnated asbestos packings.  In
addition, Defendant, PARS MANUFACTURING COMPANY and/or its
predecessors were manufacturers, distributors and suppliers
of some or all of various other defendants named herein.

(173)      Defendant, PARSONS SALES COMPANY, INC.,
is a corporation organized and existing under the laws of
the Commonwealth of Pennsylvania, with its principal place
of business in Pennsylvania, which is doing business in the
Commonwealth of Pennsylvania and in the Federal Eastern
District of Pennsylvania.  At all times material hereto,
PARSONS SALES COMPANY, INC., and/or its predecessors,
manufactured, distributed and/or supplied asbestos products,
either directly or indirectly, in the geographical area in
which plaintiffs worked and/or to the employers of the
plaintiffs and/or to contractors at job sites on which
plaintiffs worked when they were exposed to said asbestos
products.

(174)    Defendant, PEERLESS INDUSTRIES, INC., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pennsylvania which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, PEERLESS INDUSTRIES, INC., manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products.

(175)    Defendant, PELTZ ROWLEY CHEMICALS COMPANY sued in its corporate capacity and as successor to George A. Rowley & Co., Inc., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pennsylvania which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, PELTZ ROWLEY CHEMICALS COMPANY and/or its predecessors, including George A. Rowley & Co., Inc., manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos and/or asbestos products.

(176)    Defendant, PENN CENTRAL CORPORATION is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, whose address for purposes of service is IVB Building, 1700 Market Street, Philadelphia, Pennsylvania 19103.  Penn Central Corporation is the corporation which arose out of the reorganization of the Penn Central Transportation Company and as such is liable for the Federal Employers' Liability Act claim of the plaintiffs against Penn Central Transportation Company, a common carrier by rail.  PENN CENTRAL CORPORATION operated a railroad which employed certain plaintiffs.

(177)    Defendant, PENNSYLVANIA BRAKE BONDING, is a corporation duly authorized and existing under the laws of the Commonwealth of Pennsylvania and is a citizen of the Commonwealth of Pennsylvania with a principal place of business at 9001 Torresdale Avenue, Philadelphia, Pennsylvania which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, defendant, PENNSYLVANIA BRAKE BONDING, produced, manufactured, distributed and/or sold either directly or indirectly, to the employers of the plaintiffs and/or its predecessors, asbestos products including, but not limited to, asbestos containing friction products.

(178)      Defendant, PENN VALVE & FITTING CORPORA-
TION, is a corporation organized and existing under the laws
of the Commonwealth of Pennsylvania with its principal place
of business in Pennsylvania which is doing business in the
Commonwealth of Pennsylvania and in the Federal Eastern
District of Pennsylvania.  At all times material hereto,
Defendant, PENN VALVE & FITTING CORPORATION, manufactured,
produced and sold either directly or indirectly, in the
geographical area in which plaintiffs worked and/or to the
employers of the plaintiffs and/or to contractors on job
sites on which plaintiffs worked, asbestos products includ-
ing, but not limited to, mechanical seals and sealing
devices, packing and gaskets.

(179)      Defendant, PFIZER INC., is a corporation
organized and existing under the laws of the State of
Connecticut with its principal place of business in New York
which is doing business in the Commonwealth of Pennsylvania
and in the Federal Eastern District of Pennsylvania.  At all
times material hereto, PFIZER INC., manufactured, produced
and sold, either directly or indirectly, in the geographical
area in which plaintiffs and/or to contractors on job sites
on which plaintiffs worked, asbestos products, including,
but not limited to asbestos spray insulation.

(180)      Defendant, PITTSBURGH CORNING CORPORA-
TION, sued in its corporate capacity and as successor by
purchase of the Insulation Division of Union Asbestos and
Rubber Company, now known as Unarco Industries, Inc., is a
corporation organized and existing under the laws of the
Commonwealth of Pennsylvania, with a principal place of
business in Pennsylvania and is doing business in the
Commonwealth of Pennsylvania and in the Federal Eastern
District of Pennsylvania.  At all times material hereto,
Defendant, PITTSBURGH CORNING CORPORATION, and/or its
predecessors, including, Union Asbestos and Rubber Company,
manufactured, produced and sold, either directly or indi-
rectly, in the geographical area in which plaintiffs worked
and/or to the employers of the plaintiffs and/or to contrac-
tors on job sites on which plaintiffs worked, asbestos
products, including, but not limited to, Unibestos
Pipecovering and Block.

(181)      Defendant, PORTER HAYDEN CO., is a
corporation organized and existing under the laws of the
State of Maryland, with its principal place of business in
Maryland and is doing business in the Commonwealth of
Pennsylvania and in the Federal Eastern District of Pennsyl-
vania.  At all times material hereto, Defendant, PORTER
HAYDEN CO., manufactured, produced and sold, either directly
or indirectly, in the geographical area in which plaintiffs
worked and/or to the employers of the plaintiffs and/or to
contractors on job sites on which plaintiffs worked,

asbestos products, including, but not limited to, friction materials, asbestos gaskets, packing and sealing devices.

(182)    Defendant, PPG INDUSTRIES, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and is a citizen of the Commonwealth of Pennsylvania doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, PPG INDUS-TRIES, INC., as the one-half equitable owner of Pittsburgh-Corning Corporation, acquired the assets of Union Asbestos and Rubber Company in 1962 and, through Pittsburgh-Corning Corporation, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, as asbestos products, including, but not limited to, Unibestos Pipecovering.  In addition, PPG Industries, Inc., is sued in its capacity as a manufacturer and/or distributor of "Pyrocal", an asbestos-containing insulation product, between 1968 and 1971.

(183)    Defendant, QUIGLEY COMPANY INC., is a subsidiary of Pfizer, Inc., and is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, QUIGLEY COMPANY, INC., a subsidiary of Pfizer, Inc., mined, manufactured, produced, sold and supplied, either directly or indirectly to the employers of the plaintiffs asbestos products including, but not limited to Insulag-AF.

(184)  Defendant QUINT CORPORATION is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business in Pennsylvania, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, QUINT CORPORATION, a subsidiary of Pfizer, Inc., mined, manufactured, produced, sold and supplied, either directly or indirectly to the employers of the plaintiffs asbestos products.

(185)    Defendant, RAND MINES, LTD., is a corporation organized and existing under the laws of South Africa and at all times material to this Complaint was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  This defendant is sued in its corporate capacity and as successor in interest to Cape Asbestos S.A. (Pty) Ltd., Amosa (Pty), Ltd., Cape Blue Mines (Pty), Ltd. and/or Egnep, Ltd.

(186)      Defendant, RAYMARK INDUSTRIES, INC., is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business in Connecticut and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, RAYMARK INDUSTRIES INC., mined, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, Allbestos Tape, Sealsafe Tape, Glassbestos Cloth and Tape, Gator Tape, Novatex Cloth and Fabric, Speedlag Cloth Adhesive and other cloth, asbestos rope, wick and yarn and fabrics, including, but not limited to, Terrybestos, Fluorobestos, Goldbestos, Micabestos, Novabestos, Polybestos, Pyrotex, Novatex, Rhinobestos, Silvabestos and Tribestos and other asbestos products, inclduing, but not limited to, asbestos gaskets, packing and sealing devices and asbestos paper, asbestos blankets, asbestos brakes, brake linings, brake blocks, brake discs and pads, clutch plates and other friction products.

(187)      Defendant, THE READING COMPANY is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, whose address for purposes of service is 1 North 12th Street, Philadelphia, Pennsylvania 19107. The Reading Company is the corporation which arose out of the reorganization of the Reading Company and as such is liable for the Federal Employer's Liability Act claim of the plaintiffs against the Reading Company, a common carrier by rail. THE READING COMPANY operated a railroad which employed certain plaintiffs.

(188)      Defendant, RICHARD KLINGER COMPANY, is a corporation organized and existing under the laws of the State of Ohio and is a citizen and resident of the State of Ohio and at all times material hereto was doing business in the Commonwealth of Pennsylvania. At all times material hereto, Defendant, RICHARD KLINGER COMPANY, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos containing products.

(189)      Defendant, RILEY STOKER CORPORATION, sued in its corporate capacity, is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business in Massachusetts which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, RILEY STOKER CORPORATION

-75-

manufactured, produced and sold, either directly or indi-
rectly, in the geographical area in which plaintiffs worked
and/or to the employers of the plaintiffs and/or to contrac-
tors on job sites on which plaintiffs worked, asbestos
containing products including, boilers, furnaces and other
equipment which contained asbestos containing components.

(190)  Defendant R-M FRICTION MATERIALS COMPANY is
a corporation organized and existing under the laws of the
State of Connecticut, with its principal place of business
in Connecticut and is doing business in the Commonwealth of
Pennsylvania and in the Federal Eastern District of Pennsyl-
vania.  At all times material hereto, Defendant, R-M FRIC-
TION MATERIALS COMPANY, mined, manufactured, produced and
sold, either directly or indirectly, in the geographical
area in which plaintiffs worked and/or to the employers of
the plaintiffs and/or to contractors on job sites on which
plaintiffs worked, asbestos products, including, but not
limited to, asbestos brakes, brake linings, brake blocks,
brake discs and pads, clutch plates and other friction
products.

(191)  Defendant, ROBERT A. KEASBEY CO. is a
corporation organized and existing under the laws of a state
other than the State of New Jersey or the Commonwealth of
Pennsylvania, is a citizen and resident of a state other
than the State of New Jersey or the Commonwealth of Pennsyl-
vania, has its principal place of business in a state other
than the State of New Jersey or the Commonwealth of Pennsyl-
vania, and at all times material hereto was doing business
in the Commonwealth of Pennsylvania and in the Federal
Eastern District of Pennsylvania.  At all times material
hereto, defendant, ROBERT A. KEASBEY CO. mined, manufac-
tured, produced, sold and/or supplied, either directly or
indirectly to the employer of the plaintiff, asbestos
products.

(192)  Defendant, ROCK BESTOS CO.,  is a
corporation organized and existing under the laws of the
Commonwealth of Pennsylvania and is a citizen and resident
of the Commonwealth of Pennsylvania and at all times materi-
al hereto was doing business in the Commonwealth of Pennsyl-
vania and in the Federal Eastern District of Pennsylvania.
At all times material hereto, Defendant, ROCK BESTOS CO.,
mined, manufactured, produced and sold, either directly or
indirectly to the employers of the plaintiffs at Fairless
Hills, Pennsylvania, among other places, asbestos products
including but not limited to asbestos insulated electric
cables.

(193)  Defendant, ROCKWELL INTERNATIONAL, is a
corporation duly organized and existing under the laws of
the State of Delaware with its principal place of business
at 600 Grant Street, Pittsburgh, Pennsylvania, which is

doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, defendant ROCKWELL INTERNATIONAL produced, manufactured, distributed and/or sold, either directly or indirectly to Septa or its predecessors, and/or the employers of plaintiffs, asbestos friction products including , but not limited to, asbestos brakes, brake shoes, brake assemblies, brake linings and clutch plates.  In addition, plaintiffs were exposed to asbestos friction products used in GRUMMAN an/or flexible buses.  This defendant sold those asbestos friction products for use on GRUMMAN or Flexible buses.

(194)    Defendant, ROCK WOOL MFG. CO., is a corporation organized and existing under the laws of the State of Delaware, is a citizen and resident of the State of Delaware, has its principle place of business in the State of Delaware, and at all times material hereto was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, defendant, ROCK WOOL MANUFACTURING CO., manufactured, produced, sold and/or supplied, either directly or indirectly to the employer of the plaintiffs, asbestos products including, but not limited to Delta-Maid One Shot Insulating Cement and Delta-Maid Hi-Temp Master Insulating Cement.

(195)    Defendant, ROGERS CORPORATION is a corporation organized and existing under the laws of the State of Connecticut and at all times material hereto was conducting business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, ROGERS CORPORATION, manufactured, produced, mined, distributed and/or sold, and placed into the stream of commerce, either directly or indirectly to the employers of the plaintiff, and/or to sub-contractors on their job sites, asbestos products.

(196)    Defendant, ROYAL ELECTRIC SUPPLY CO., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and is a citizen and resident of the Commonwealth of Pennsylvania and at all times material hereto was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, ROYAL ELECTRIC SUPPLY CO., mined, manufactured, produced and sold, either directly or indirectly to the employers of the plaintiffs at Fairless Hills, Pennsylvania, among other places, asbestos products including but not limited to insulation block diatomoceous silicia, brake linings including but not limited to those manufactured by Cutler Hammer, and industrial brake blocks including but not limited to those manufactured by Clark Control.

(197)    Defendant SAGER CORPORATION is a corporation organized and existing under the laws of Illinois with a principal place of business in Illinois which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, SAGER CORPORATION, manufactured, produced, mined, distributed and/or sold, and placed into the stream of commerce, either directly or indirectly to the employers of the plaintiff, and/or to sub-contractors on their job sites, asbestos products and materials, including, but not limited to, asbestos gloves, to which plaintiffs were exposed.

(198)    Defendant, SEPCO CORPORATION, is a corporation organized and existing under the laws of the State of Alabama with its principal place of business in Alabama which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, SEPCO CORPORATION manufactured, produced and sold, either directly or indirectly in the geographical area in which plaintiffs worked and/or to employers of plaintiffs and/or to contractors on job sites on which plaintiffs worked asbestos products including but not limited to insulation, gaskets, gasketing materials and packing.

(199)    Defendant, SID HARVEY MIDATLANTIC, INC., is a Pennsylvania Corporation with its principal place of business located in King of Prussia, Pennsylvania, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, SID HARVEY MIDATLANTIC, INC., manufactured, produced, mined, distributed and/or sold, and placed into the stream of commerce, either directly or indirectly to the employers of the plaintiff, and/or to sub-contractors on their job sites, asbestos products.

(200)    Defendant, SMITH OF PHILADELPHIA, is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania and is a citizen of the Commonwealth of Pennsylvania with a principal place of business at 811 East Cayuga Street, Philadelphia, Pennsylvania, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, said corporation distributed asbestos board and insulating compound and asbestos friction products including but not limited to brakes, brake linings, disc pads, etc., and predecessors for use at the Courtland Depot and other depots.

(201)    Defendant, SMS AUTOMOTIVE PRODUCTS, is a Pennsylvania corporation with an office at 4819 Langdon Street, Philadelphia, PA 19124, which does business in the Commonwealth of Pennsylvania and in the Federal Eastern

-78-

District of Pennsylvania.  At all times material hereto, Defendant SMS AUTOMOTIVE PRODUCTS INCORPORATED, manufactured, produced and sold, either directly or indirectly in the geographic area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including but not limited to, asbestos brakes, brake linings, brake blocks, brake discs and pads, clutch facings and other friction products.

(202)    Defendant, SOSMETAL PRODUCTS, INC. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, is a citizen and resident of the Commonwealth of Pennsylvania, has its principal place of business in the Commonwealth of Pennsylvania and at all times material hereto was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto defendant, SOSMETAL PRODUCTS INC., manufactured, produced, sold and supplied, either directly or indirectly or through its predecessors, to the employer of the plaintiffs, asbestos automotive products including, but not limited to brakes, brake linings, clutches, clutch facings, gaskets and other friction materials.

(203)    Defendant, SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY is a transportation authority created as an agency and instrumentality of the Commonwealth of Pennsylvania by the Metropolitan Transportation Authority Act of 1963, whose principal place of business and address for process of service is 130 S. 9th Street, 5th Floor, Philadelphia, Pennsylvania 19107.  SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY operated a railroad which employed certain plaintiffs.

(204)    Defendant, SOUTHERN TEXTILE CORP., formerly known as Southern Asbestos Company, sued in its corporate capacity and as a subsidiary of H. K. Porter Co., Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in North Carolina and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, SOUTHERN TEXTILE CORP., and/or its predecessors, including, Southern Asbestos Company, and/or its successors, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, cloth, tape, yarn/cord, felt, rope/wick, tubing, amosite, blankets such as Portersite and Porterlag, and other cloth such as Thermagard, Cleangard, Covergard, Flamegard, Guardian, Heatgard, Splashgard, Weldgard, Insulgard, and Soundgard.

(205)    Defendant, SPECIAL MATERIALS, INC., is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business in Wisconsin which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, SPECIAL MATERIALS, INC., has been and/or is now engaged, directly or indirectly, in the mining, milling, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, distributing and/or otherwise placing in the stream of commerce, asbestos, milled asbestos, raw asbestos, asbestos fiber, mined asbestos, processed asbestos, material containing asbestos, including, but not limited to, packaged or bagged asbestos, asbestos products and compounds (hereinafter collectively referred to as "asbestos products") in the geographical area in which plaintiffs worked and/or to employers of plaintiffs.

(206)    Defendant, SPRAYON RESEARCH CORPORATION is a corporation organized and existing under the laws of the State of Florida, is a citizen and resident of the State of Florida, and at all times material hereto was doing business in the State of New Jersey and in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, defendant, SPRAYON RESEARCH CORPORATION, manufactured, produced, sold and/or supplied either directly or indirectly to the employer of the plaintiffs, asbestos products, including, but not limited to Sprayon.

(207)    Defendant, STRAHMAN VALVES, INC., is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in New Jersey and is doing business in the Commonwealth of Pennsylvania and the Federal Eastern District of Pennsylvania. At all times material hereto, defendant, STRAHMAN VALVES, INC., manufactured, produced, sold and/or supplied either directly or indirectly to the employer of the plaintiffs, asbestos products.

(208)    Defendant, STEARN'S DIV. F.M.C. CORP., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and is a citizen and resident of the Commonwealth of Pennsylvania and at all times material hereto was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, STEARN'S DIV. F.M.C. CORP., mined, manufactured, produced and supplied, either directly or indirectly to the employers of the plaintiffs at Fairless Hills, Pennsylvania, among other places, asbestos products including but not limited to asbestos clutches and brakes.

(209)    Defendant, STUDEBAKER-WORTHINGTON, INC. is a corporation organized and existing under the State of Delaware, with its principal place of business in Delaware. Studebaker-Worthingotn, Inc. acquired the assets, the product line(s), and assumed the liabilities of Alco Products, Inc., Worthington Pump & Machinery Corporation, Worthington Corporation and American Locomotive Company and/or was doing business at all material times as that corporation and/or was the alter-ego of Alco Products, Inc., Worthington Pump & Machinery Corporation, Worthington Corporation and American Locomotive Company and/or had exerted such dominion and control over Alco Products, Inc., Worthington Pump & Machinery Corporation, Worthington Corporation and American Locomotive Company as to make it its agent or instrumentality and/or held a majority of the common stock of Alco Products, Inc., Worthington Pump & Machinery Corporation, Worthington Corporation adn American Locomotive Company and/or at material times hereto, Alco Products, Inc., Worthington Pump & Machinery Corporation, Worthington Corporation and American Locomotive Company was a wholly-owned subsidiary of Studebaker-Worthington, Inc. and/or is the predecessor-in-interest to Studebaker-Worthington, Inc. and/or was doing business at all material times as said corporations, within the State of Delaware, and in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania, with its service of process at c/o Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

(210)    Defendant, THERMAL MATERIALS CORP., is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in New Jersey and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, defendant THERMAL MATERIALS CORP., manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to the contractors on job sites which plaintiffs worked, asbestos products.

(211)    Defendant, TNT LIQUIDATING COMPANY, sued in its own right and as successor to MELRATH SUPPLY AND GASKET CO., INC., and TANNETICS, INC., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pennsylvania which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, defendant TNT LIQUIDATING COMPANY and/or its predecessor MELRATH SUPPLY AND GASKET CO., INC., and for TANNETICS, INC., manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to the contractors on job

sites which plaintiffs worked, asbestos products, including but not limited to, mechanical seals and sealing devices, packing and gaskets. TNT LIQUIDATING COMPANY filed Articles of Dissolution on January 31, 1985.

(212)    Defendant, TRANSCO, INC., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Illinois, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, TRANSCO, INC., manufactured, distributed and/or supplied asbestos products, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors at job sites on which plaintiffs worked when they were exposed to said asbestos products.

(213) Defendant, TRANSVAAL CONSOLIDATED LAND & EXPLORATION CO., LTD. is a foreign corporation organized and existing under the laws of a jurisdiction other than the State of New Jersey or the Commonwealth of Pennsylvania, has its principal place of business in Johannesburg, South Africa and at all times material hereto was doing business in the State of New Jersey and in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. It also maintains an office at, and does business through defendant Charter Consolidated's headquarters in London, England. In June of 1979 the defendant Transvaal Consolidated purchased the assets and liabilities of these members of the Cape Industries Group who mined and shipped asbestos. Defendant Transvaal Consolidated is the alter ego and is the successor to the Cape Industries Group, North American Asbestos Corp., and Associated Minerals Corp., and is responsible for their tortious acts and omissions by virtue of the fact that it directed their policies and actions in a manner and/or for the purpose of committing a fraud, circumventing the law and/or otherwise defeating the ends of justice.

(214)      Defendant, TURNER ASBESTOS FIBRES, LTD., is a corporation organized and existing under the laws of England with its principal place of business at 20 St. Mary's Parsonage, Manchester, M3, 2NL, England. At all times material hereto, Defendant, TURNER ASBESTOS FIBRES, LTD., manufactured, distributed and/or supplied asbestos products, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors at job sites on which plaintiffs worked when they were exposed to said asbestos products.

(215)     Defendant, TURNER & NEWALL, LTD., including, but not limited to, any of its affiliated companies and or its former subsidiaries, and including, but not

limited to, its subsidiary and mere alter ego at certain times material hereto, Keasbey & Mattison, is a corporation organized and existing under the laws of Great Britain, located at 20 St. Mary's Parsonage, Manchester, England M22-EA, and at all times material to this Complaint, was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times hereto, Defendant, TURNER & NEWALL LTD., and/or its affili-ated companies and/or its subsidiaries including, Keasbey & Mattison, mined, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, raw asbestos and "limpet" spray asbestos. At all times relevant hereto TURNER & NEWALL, LTD. was the alter ego, parent company, and sole stockholder and in full control of Keasbey & Mattison which company mined, manufactured, processed, imported, converted, compounded, sold, supplied or delivered substantial amounts of asbestos and asbestos related materials for use, processing, or manufacturing in the Commonwealth of Pennsylvania.

(216)    Defendant, UNION CARBIDE CORPORATION, is a corporation organized and existing under the laws of the State of New York, with its principal place of business in * and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, UNION CARBIDE CORPORATION, manufactured, produced and sold, either directly or indi-rectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contrac-tors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, asbestos brakes, brake linings, brake blocks, brake discs and pads, clutch plates and other friction products.

(217)    Defendant, UNIROYAL, INC., is a corpora-tion organized and existing under the laws of the State of New Jersey, with its principal place of business in * and is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, UNIROYAL, INC., manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked, and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, includ-ing, but not limited to, asbestos brakes, brake linings, brake blocks, brake discs and pads, clutch plates and other friction products, and asbestos cloth.

(218)    Defendant, UNITED STATES GYPSUM COMPANY, is a corporation organized and existing under the laws of the State of Delaware with its principal place of business

-83-

in Illinois which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, UNITED STATES GYPSUM COMPANY, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, Accoustone, Firecode Spray, K-Fac 19 block, textures, joint compounds, plasters, toppings, spackle and Red Top products.

(219)   Defendant, UNITED STATES MINERAL PRODUCTS COMPANY, is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in New Jersey which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, UNITED STATES MINERAL PRODUCTS COMPANY, mined, manufactured, produced and sold either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including but not limited to CAFCO and other asbestos spray products.

(220)   Defendant, UNIVERSAL INSULATION COMPANY, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, Pennsylvania with its principal place of business in Pennsylvania, and is doing business in the Commonwealth of Pennsylvania, and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, UNIVERSAL INSULATION COMPANY, was a manufacturer, distributor and supplier of asbestos products, including, but not limited to, products of some or all of the various other defendants named herein, including, but not limited to, as sole distributor of Johns-Manville Products in one of the geographical areas in which plaintiffs worked, which products were either directly or indirectly sold and/or supplied in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors at job sites on which plaintiffs worked, when they were exposed to said asbestos products.

(221)   Defendant, U.S. BRAKELINING CORP., is a corporation organized and existing under the laws of the State of Florida and is a citizen of the State of Florida with its principal place of business in the State of Florida. At all times material hereto, Defendant U.S. BRAKELINING, has been and/or is now engaged, directly or indirectly, in the mining, milling, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, distributing and/or otherwise placing in

-84-

the stream of commerce, asbestos products, including asbestos-containing friction materials, in the geographic area in which plaintiffs worked and/or to employers of plaintiffs.

(222)    Defendant, VERMONT ASBESTOS GROUP, INC., is a corporation organized and existing under the laws of the State of Vermont, having its principal place of business in the State of Vermont which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant VERMONT ASBESTOS GROUP, INC., during all times material to this Complaint, and for a long time prior thereto, has been and/or is now engaged, directly or indirectly, in the mining, milling, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, distributing and/or otherwise placing in the stream of commerce, asbestos, milled asbestos, raw asbestos, asbestos fiber, mined asbestos, processed asbestos, material containing asbestos, including, but not limited to, packaged or bagged asbestos, asbestos products and and compounds in the geographic area in which plaintiffs worked and/or to employers of plaintiffs.

(223)    Defendant, WAGNER ELECTRIC COMPANY, is a corporation duly authorized and existing under the laws of the State of New Jersey with its principal place of business at 100 Misty Lane, Parsippany, New Jersey, which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, defendant, WAGNER ELECTRIC COMPANY, manufactured, produced, distributed and/or sold, either directly or indirectly, to the employers of the plaintiffs and/or its predecessors, including, but not limited to, asbestos friction products.

(224)    Defendant, WARREN BALDERSTON, is a business organized and existing under the laws of the State of New Jersey and its a citizen and resident of the State of New Jersey and at all times material hereto was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, WARREN BALDERSTON, mined, manufactured, produced and sold, either directly or indirectly to the employers of the plaintiffs at Fairless Hills, Pennsylvania, among other places, asbestos products including but not limited to Insulation Felt 50 Waterproof Asbestos.

(225)    Defendant, WEIL-McLAIN COMPANY, a division of THE MARLEY COMPANY which is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Kansas

which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, WEIL-McLAIN COMPANY, manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of plaintiffs and/or to contracttors on job sites on which plaintiffs worked, asbestos products.

(226)    Defendant, WEINSTEIN SUPPLY COMPANY, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at Moreland & Davisville Roads, Willow Grove, PA 19090 which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, defendant, WEINSTEIN SUPPLY COMPANY, manufactured, produced and/or sold, either directly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to plumbing supplies and materials that contained asbestos to which plaintiffs were exposed.

(227)    Defendant, WESTINGHOUSE ELECTRIC CORPORATION, sued in its corporate capacity and as parent of Westinghouse Canada, Inc., and including, but not limited to, its subsidiary, Westinghouse Air Brake Co., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, and is a citizen of the Commonwealth of Pennsylvania doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, WESTINGHOUSE ELECTRIC CORPORATION, and/or its predecessors and/or its subsidiaries, including, Westinghouse Air Brake Co., manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including, but not limited to, asbestos brakes, brake linings, brake blocks, brake discs and pads, clutch plates and other friction products, and asbestos cloth, canvas and other products.

(228)    Defendant, WEST PHILADELPHIA ELECTRIC SUPPLY COMPANY, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and is a citizen and resident of the Commonwealth of Pennsylvania and at all times material hereto was doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, WEST PHILADELPHIA ELECTRIC SUPPLY COMPANY, mined, manufactured, produced sold and supplied, either directly or indirectly to the employers of the plaintiffs at Fairless Hills, Pennsylvania, among other places, asbestos products

including but not limited to brake linings, clutches and electrical insulation.

(229)    Defendant, WHEELING BRAKE BLOCK MANUFAC-TURING COMPANY, is a corporation organized and existing under the laws of the State of Virginia with its principal place of business in the State of Virginia.  At all times material hereto, defendant, WHEELING BRAKE BLOCK MANUFACTUR-ING COMPANY, manufactured, produced and/or sold, either directly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products.

(230)    Defendant, W.I.C.K., INC. is a corpora-tion organized and existing under the laws of the State of Michigan, is a citizen and resident of the State of Michi-gan, has its principle place of business in the State of Michigan, and at all times material hereto was doing busi-ness in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  Defendant, W.I.C.K., INC. mined, manufactured, produced, sold and/or supplied, either directly or indirectly to the employer of the plaintiffs, asbestos products.

(231)    Defendant, WILMINGTON SUPPLY COMPANY OF PENNSYLVANIA, INC., is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pennsylvania which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania.  At all times material hereto, Defendant, WILMINGTON SUPPLY COMPANY OF PENNSYLVANIA, INC., manufactured, produced and sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products.

(232)    Defendant, W.R. GRACE CO., INC., is a corporation organized and existing under the laws of the State of Connecticut with a principal place of business in New York which is doing business in the Commonwealth of Pennsylvania and the Federal Eastern District of Pennsylva-nia.  At all times material hereto, Defendant, W.R. GRACE CO., INC., manufactured, produced and/or sold, either directly or indirectly, in the geographical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products, including but not limited to, asbestos spray insulation known as Zonalite, Spraytex and other names.

(233)    Defendant, YORK INDUSTRIES CORP., formerly known as York Insulation Company, is a corporation

organized and existing under the laws of the State of New Jersey with a registered agent located in New Jersey, which is doing business in the Commonwealth of Pennsylvania and the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, YORK INDUSTRIES, INC and/or its predecessor, York Insulation Company, manufactured, produced and/or sold, either directly or indirectly, in the geograph-ical area in which plaintiffs worked and/or to the employers of the plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products including but not limited to aircell materials.

(234)    Defendant, YORK-SHIPLEY, INC., a divi-sion of ROBINTECH, INC., which is a corporation organized and existing under the laws of the Commonwealth of Pennsyl-vania with its principal place of business in Pennsylvania which is doing business in the Commonwealth of Pennsylvania and in the Federal Eastern District of Pennsylvania. At all times material hereto, Defendant, YORK-SHIPLEY, INC., directly or indirectly, in the geographical area in which plaintiffs worked and/or to the *employers of plaintiffs and/or to contractors on job sites on which plaintiffs worked, asbestos products.

(b) Defendants who are successor corporations have assumed the assets and liabilities of their predecessors and they are responsible for the liabilities of their predeces-sors, both as to compensatory damages and as to punitive damages. As used in this Complaint, "defendant(s)" in-cludes, unless expressly stated to the contrary above, all predecessors for whose actions plaintiffs claim the named defendant(s) is(are) liable.

5.    (a)  At all times material hereto, defendants and/or their predecessors acted through their agents, servants or employees, who were acting within the scope of their employment on the business of the defendants.

(b)  The defendants are all corporations, compa-nies or other business entities, which, during all times material hereto, and for a long time prior thereto, have been and/or are now engaged, directly or indirectly, in the mining, milling, manufacturing, producing, processing, compounding, converting, selling, merchandising, supplying, distributing and/or otherwise placing in the stream of commerce, asbestos, material containing asbestos, asbestos products and asbestos compounds (hereinafter collectively referred to as "asbestos products"). The term "asbestos products," for the purposes of this action, shall include asbestos fiber in any form and manufactured or finished products containing asbestos.

## COUNT I - NEGLIGENCE AND OUTRAGEOUS CONDUCT

6.   Plaintiffs hereby incorporate by reference paragraphs 1 through 5 inclusive, as if each of said paragraphs were set forth fully hereunder.

7.   At all times material hereto, the asbestos products mined, manufactured, produced, processed, compounded, converted, sold, merchandised, supplied, distributed and/or otherwise placed in the stream of commerce by the defendants which the plaintiffs continually worked with, used, handled, and were caused to come into contact with and be exposed to were under the exclusive control of the defendants and, accordingly, plaintiffs invoke the Doctrines of Exclusive Control and Res Ipsa Loquitur.

8.   At all times material hereto, defendants knew or should and/or could have known that their asbestos products, as set forth above and in their ordinary and foreseeable use would be used in connection with installation of insulation in new construction, would be used for installation of insulation in reconstruction and repair, would be used in the manufacture of asbestos products or would be used in a variety of work settings,  would be ripped out and/or removed during reconstruction and repair (and that such ripping would initially cause large quantities of asbestos dust and fibers to be released into the atmosphere of the work area for extended periods of time, to be later followed by the additional dust and fibers to be released into the atmosphere of the same work area upon the application of new asbestos products) and that asbestos dust released by those products during their intended and foreseeable use would be brought home by asbestos workers on their work clothes and tools, all of which defendants knew or should have known created hazardous and unsafe work areas and risk to the health of plaintiffs and others similarly situated.

9.   At all times material hereto, defendants mined, manufactured, produced, processed, compounded, converted, sold, merchandised, distributed, supplied, and/or otherwise placed in the stream of commerce the said asbestos products, all of which the defendants knew, or in the exercise of ordinary care should and/or could have known, were inherently defective, ultrahazardous, dangerous, deleterious, poisonous and otherwise highly harmful to the plaintiffs, and to other persons similarly situated.

10.   At all times material hereto, plaintiffs, and other persons similarly situated in the general community, did not know of the nature and extent of the danger to their lungs, respiratory system, heart, other bodily parts including bone and tissue, and their general health that would result from their contact with and exposure to the defendants' asbestos products and to the inhalation of the

asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products; and, at all times material hereto, each of the defendants knew, should have known, or could have reasonably determined that the plaintiffs, and other persons similarly situated, would be in contact with and be exposed to the defendants' asbestos products and to the inhalation of the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products; and, despite such facts, defendants, individually, jointly and severally, as part of the conspiracy as alleged herein and/or as a result of tacit agreement or cooperation and/or as a result of industry-wide standards or practice:

(a) mined, manufactured, produced, processed, compounded, converted, sold, supplied, merchandised, distributed, and/or otherwise placed in the stream of commerce, asbestos products which defendants knew, or in the exercise of ordinary care should and/or could have known, were inherently defective, dangerous, deleterious, ultrahazardous, poisonous and otherwise highly harmful to plaintiffs, and to other persons similarly situated;

(b) affirmatively misrepresented to plaintiffs and other members of the public in advertising, labels and otherwise that their asbestos products were safe in their ordinary and foreseeable use, which material misrepresentation induced plaintiffs to expose themselves to hazards;

(c) failed to take any reasonable precautions or to exercise reasonable care to adequately or sufficiently warn plaintiffs, and other persons similarly situated, of the risks, dangers and harm to which they were exposed by continuous work with, contact with, use, handling, and exposure to defendants' asbestos products and the inhalation of the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products;

(d) failed and omitted to provide the plaintiffs, and other persons similarly situated, with the knowledge of reasonably safe and sufficient safeguards, wearing apparel and proper safety equipment and appliances necessary to protect them from being injured, poisoned, disabled, killed, or otherwise harmed, by working with, using, handling, coming into contact with, and being exposed to the defendants' asbestos products and the inhalation of the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products;

(e) failed and omitted to place warnings, or adequate and sufficient warnings, on the containers of the said asbestos products regarding the risks, dangers, and harm therefrom and the precautions necessary to make said asbestos products safe for their ordinary and foreseeable

use by plaintiffs and other persons similarly situated in the general community;

(f) failed to package the said asbestos products so that, in the ordinary and foreseeable use and handling thereof, the plaintiffs, and other persons similarly situated, would not come into contact with and be exposed to the inhalation of the asbestos dust and fibers from said asbestos products;

(g) failed to take reasonable, sufficient and proper precautions reasonably calculated to reach such persons as the plaintiffs, and other persons similarly situated in the general community, to warn them of the inherently dangerous, deleterious, ultrahazardous, poisonous, and otherwise highly harmful effects of the inhalation of the asbestos dust and fibers resulting from the ordinary and foreseeable use of the defendants' asbestos products and to instruct them in the proper and safe use and handling of said asbestos products;

(h) failed to take any reasonable, sufficient and proper precautions or to exercise reasonable care to protect the plaintiffs, and other persons similarly situated, from harm and danger resulting from working with, using, handling, coming into contact with and being exposed to the defendants' asbestos products and the inhalation of the asbestos dust and fibers from the ordinary and foreseeable use of said asbestos products;

(i) failed to adopt and enforce a safe, sufficient and proper plan and method of working with, using, handling, and coming into contact with and being exposed to defendants' asbestos products so that plaintiffs, and other persons similarly situated, would not inhale the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products;

(j) failed to adequately test their respective asbestos products before offering them for sale and use so that plaintiffs, and other persons similarly situated, would not inhale the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products;

(k) failed to render such asbestos products safe or to provide proper and sufficient safeguards for the use and handling thereof so that plaintiffs, and other persons similarly situated, would not inhale the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products;

(l) failed to remove and recall said asbestos products from the stream of commerce and marketplace upon ascertaining that said asbestos products would cause

asbestosis, scarred lungs, respiratory disorders, cardiovascular disorders, mesothelioma, lung cancer, other cancers and other injuries, some or all of which are permanent and may be fatal;

(m)  failed to comply with the Federal Hazardous Substance Act, 15 U.S.C. _1261 et seq;

(n)  failed to advise the plaintiffs, and others similarly situated in the general community, whom the defendants knew and/or should have and/or could have known had been exposed to long-term inhalation of the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products, to cease all future exposure to the inhalation of all types of other fumes, smoke, dust and fibers, to keep dust and fibers on work clothes and tools away from the home environment, to be examined by a lung specialist to determine the nature and extent of any and all diseases caused by such exposure and inhalation and to receive treatment for such diseases;

(o)  defendants did or could have joined together in trade associations or industrial hygiene associations wherein information relative to the hazards of asbestos inhalation was available, but defendants by their actions, withheld such information from the plaintiffs, failed to assimilate such information for distribution to the plaintiffs, distorted such information by watering it down so that sales would not be interfered with, and actively engaged in disseminating counter information;

(p)  failed to manufacture or design their products so that said asbestos could or would not be released into the ambient air during their use;

(q)  failed to advise plaintiffs and others similarly situated who the defendants knew and/or should have known had been exposed to long-term inhalation of the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products, of the progressive nature of the disease process to which all defendants were causing them to be subjected;

(r)  failed to advise plaintiffs and other similarly situated who the defendants knew and/or should have and/or could have known had been exposed to long-term inhalation of the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products, to cease all future exposure to the inhalation of all types of other fumes, smoke, dust and fibers and to be examined by a lung specialist to determine the nature and extent of any and all diseases caused by such exposure and the inhalation of asbestos dust and fibers and to receive treatment for such diseases.

(s)   were otherwise careless and negligent under the law.

## COUNT II - STRICT LIABILITY

11.   Plaintiffs hereby incorporate by reference paragraphs 1 through 10 inclusive, as if each of said paragraphs were set forth fully hereunder.

12.   Defendants, acting individually, jointly and severally, as part of the conspiracy as alleged herein and/or as a result of tacit agreement or cooperation and/or as a result of industry-wide standards or practice knew, or in the exercise of reasonable care should and/or could have known, that their asbestos products would be sold to the public, including employers of the plaintiffs and others similarly situated, and would be used by plaintiffs, and other persons similarly employed in the general community, and would be relied upon by such persons to be fit for the use and to accomplish the purpose for which they were mined, manufactured, produced, processed, sold, supplied, distributed and/or otherwise placed in the stream of commerce; and the defendants, because of their positions as miners, manufacturers, producers, processors, sellers, suppliers and distributors, are strictly liable to the plaintiffs, for the following reasons:

(a)   Defendants, as manufacturers-sellers, are engaged in the business, inter alia, of selling asbestos products;

(b)   At the time of the manufacture and sale of the said asbestos products by the defendants to the plaintiffs or plaintiffs' employers, defendants knew, or had reason to know, that the said asbestos products would be used by plaintiffs, and other persons similarly situated, as the ultimate users or consumers;

(c)   The said asbestos products were sold by the defendants in a defective condition, unreasonably dangerous to the plaintiffs, and others similarly situated, as users or consumers, and that all throughout the many years of the plaintiffs'and others' similarly situated  exposure to and use of the said products, the said asbestos products were expected to and did reach the users or consumers without substantial change in the condition in which they were sold;

(d)   The said asbestos products were defective in that they were incapable of being made safe for their ordinary and intended use and purpose, and those uses believed safe by the general community, and said defendants

failed to give adequate or sufficient warnings or instructions about the risks, dangers, and harm inherent in said asbestos products;

(e) The defendants affirmatively mispresented to plaintiffs and other members of the public in advertising, labels and otherwise that their asbestos products were safe in their ordinary and forseeable use, which material misrepresentation induced plaintiffs and others to expose themselves to hazards; and

(f) The ordinary and foreseeable use of the defendants' asbestos products is an intrinsically dangerous and ultrahazardous activity; and

(g) The said asbestos products were defeective because they contained asbestos; and

(h) The said asbestos products were defective because they were defectively packaged.

## COUNT III - CONSPIRACY

13. Plaintiffs hereby incorporate by reference paragraphs 1 through 12 inclusive, as if each of said paragraphs were set forth fully hereunder.

14. Defendants, individually, jointly, and in conspiracy with each other and with other entities, the identities of which are presently unknown to plaintiffs, and as an industrial group and through trade associations including, but not limited to the Air Hygiene Foundation, the Industrial Hygiene Foundation of America, the Industrial Health Foundation, the Asbestos Textile Institute, the Asbestos Information Association, the National Insulation Manufacturers Association, the Thermal Insulation Manufacturers Association, the Quebec Asbestos Mining Association, and the Saranac Laboratory since at least the 1930's, and continuing to the present, have been possessed of medical and scientific data which clearly indicated that the inhalation of asbestos dust and fibers resulting from the ordinary and foreseeable use of their asbestos products was unreasonably dangerous, ultrahazardous, deleterious, carcinogenic, and potentially deadly.

15. Despite the medical and scientific data possessed by and available to them, the defendants, acting willfully, maliciously, callously, deliberately, and with wanton disregard for the rights, safety, and position of plaintiffs, and other persons similarly situated, individually, jointly, and in conspiracy with each other and with other entities, the identities of which are presently unknown to

plaintiffs, which conduct and conspiracy continues to the present, fraudulently and deliberately:

(a)   manufactured, sold, distributed, and caused to be used inherently dangerous asbestos products which, through their ordinary and foreseeable use, and unbeknownst to the plaintiffs, and other persons similarly situated, would result in the serious and severe injuries which plaintiffs have suffered;

(b)   exposed and continued to expose plaintiffs, and other persons similarly situated, to the risks and dangers of asbestosis, mesothelioma, scarred lungs, cancer and other illnesses all of which risks and dangers defendants or their predecessors knew, should have known or could have known;

(c)   participated and continue to participate in the fraudulent scheme described above to keep the plaintiffs, and other persons similarly situated in the general community, in ignorance of their rights by fraudulently misrepresenting and concealing the nature and extent of the harm which they suffered as a result of handling, working with, using and being exposed to the defendants' asbestos products and by fraudulently misrepresenting and concealing that this harm was the direct and proximate result of the occupational handling, use and exposure to the defendants' asbestos products and the inhalation of the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products and, in fact, said fraudulent scheme did keep the plaintiffs, and others similarly situated, in ignorance of their rights;

(d)   intended by the fraudulent misrepresentations and willful omissions set forth above and below to induce the plaintiffs, and others similarly situated in the general community, to rely upon said fraudulent misrepresentations and willful omissions, and to continue to expose themselves to the risks and dangers that the defendants knew to be inherent in the use of and exposure to their asbestos products and the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products, without warning the plaintiffs, and others similarly situated, of these risks and dangers, thereby depriving them of the opportunity of informed free choice as to whether to continue to use said asbestos products and to expose themselves to these dangers and risks;

(e)   withheld or misrepresented the medical conditions of and altered other material and significant medical information on their employees, on other asbestos workers, on other workers in the construction industry, including plaintiffs, and withheld from or misrepresented to these workers and their families information about these

workers' medical conditions, concerning, in particular, confirmatory evidence, appearance, suspicion or belief of asbestos-related diseases or other illnesses;

(f)    reviewed, altered, distorted and/or caused to be misdiagnosed medical records and test results of their employees or other asbestos workers, for the purpose of intentionally, fraudulently and maliciously preventing said employees or other workers and their families, including plaintiffs, from being able to discover the true state of their medical conditions, or the true state of the medical conditions of other asbestos employees, or workers, or otherwise treating same;

(g)    intended and caused their employees and other asbestos workers and their families, including plaintiffs:

(i)   to refrain from or lose the ability to file workmen's compensation or other disability claims for the occupational diseases suffered by them by the defendants' seeking methods to ignore or defeat their claims;

(ii)  to fail to obtain proper medical care so as to cure, arrest, abate or otherwise treat their developing or existing asbestos-related diseases or other illnesses;

(iii) to increase their risk of harm and further aggravate or complicate developing or existing asbestos related diseases or other illnesses;

(iv)  to deny them the right to decide or exercise their options to withdraw from unsafe and deleterious working or household conditions, exposing them to asbestos products, asbestos dust or fibers;

(v)   to keep them ignorant of their medical conditions, thereby preventing them from taking any safety or precautionary measures available either through their employment or other independent means; and,

(vi)  to prevent, limit or otherwise bar their right to seek recovery of compensatory and/or punitive damages against the defendants for the injuries suffered by them and caused by said defendants;

(h)    manufactured, sold and distributed asbestos products in such a manner as to camouflage and make indistinguishable, and to conceal the identity, source, and manufacturer and/or distributor of said products for the purpose of misleading and keeping ignorant the users and consumers of same, thereby preventing injured plaintiffs from identifying and suing the proper defendant or defendants;

(i)   entered into secret relabelling and distri-
bution agreements, produced products without any labels or
distinguishing characteristics, distributed products bearing
no identification whatsoever, manufactured and distributed
products identical in color, texture and/or appearance, and
concealed the sale and/or transfer of corporate assets or
entities through "secret" contracts and/or agreements and/or
through the continuation of predecessor trademarks,
tradenames, logos, or labels in successor companies and/or
successor products, so as to deceive the ultimate users,
including the injured plaintiffs herein, as to the true
identity, source, manufacturer and distributor of said
hazardous products;

(j)   used indistinguishable standardization of
products and removal of trademarks, tradenames, markings,
logos, labels or other identifying characteristics, in order
to limit and exclude liability from claims brought by
persons, including the plaintiffs, through the use and
handling of said products and exposure to said asbestos
products, asbestos dust and fibers and also entered into
open and considered agreements for the purpose of concealing
the identity and source of asbestos and asbestos products in
the marketplace;

(k)   caused to be released, published and dissemi-
nated data and/or reports concerning the dangers and/or
safety of their asbestos products, which data and reports
they knew, should have known, or could have reasonably
determined to be incorrect, incomplete, outdated and mis-
leading;

(l)   failed and refused to provide the public, or
workers such as plaintiffs who would foreseeably use and/or
be exposed to their products and to the inhalation of the
asbestos dust and fibers resulting from the ordinary and
foreseeable use of said asbestos products, with any warning
as to the risks, dangers, and harm that the defendants knew,
or should have known, or could have known to be inherent in
the use of and exposure to said asbestos products and to the
inhalation of asbestos dust and fibers in the ordinary and
foreseeable use of said products fearing that adequate and
proper warnings would adversely affect sales;

(m)   deliberately chose to provide patently
inadequate and ambiguous warnings and intentionally failed
to warn of the known risks and dangers of their asbestos
products and the inhalation of asbestos dust and fibers
rersulting from the ordinary and foreseeable use of said
products fearing that adequate and proper warnings would
adversely affect sales;

(n)   refused and failed to meaningfully test their
asbestos products regarding the risks and dangers to persons

-97-

who use or were exposed to their asbestos products and the inhalation ok the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products;

(o) when the aforesaid asbestos products were tested they willfully concealed and or refused to publish adverse test results, or distorted said adverse test results so that the public and persons such as plaintiffs were misled into believing that the test results were not adverse and that their asbestos products were safe for their ordinary and forseeable use;

(p) ignored medical and scientific data which demonstrated a causal connection between asbestos exposure and asbestosis, cancer, and mesothelioma, or other diseases, or which discussed the risk of those diseases from asbestos expsoure;

(q) attempted to discredit scientists, doctors, writers, and medical literature who or which indicated, demonstrated, or established a causal connection between asbestos and asbestos related diseases;

(r) sought to create favorable publicity about the safe nature of their asbestos products for pecuniary motives when they knew of the risks and danger inherent in their asbestos products;

(s) failed to seek safe substitute products for their asbestos products because pecuniary motives of profit were followed at the expense of human lives;

(t) ignored, withheld and/or actively concealed the existence of tests, data, studies, literature and medical reports regarding the causal connection between asbestos exposure and cancer, mesothelioma, asbestosis, respiratory diseases, scarred lungs and other illnesses and diseases;

(u) chose to rely upon and cause to be disseminated reports, tests, medical and scientific data that they knew, should have known, or could have known to be inaccurate, insufficient, incomplete, outdated and misleading medical or scientific research or data regarding the causal connection between asbestos products and disease in order to avoid any possible adverse publicity that would affect the sales of asbestos products;

(v) refused to conduct, contribute to and/or to authorize testing and research involving the causal relationship of illness and disease to exposure to and the use of their asbestos products and the inhalation of the asbestos dust and fibers resulting from the ordinary and foreseeable use of said asbestos products fearing adverse test results and the publicity thereof would affect the highly

profitable market of asbestos products sales, which
pecuniary motives of profit were followed at the expense of
human lives; and

(w) are presently relying upon invalid medical
reports and data in order to defend suits such as those
brought by clients of the undersigned.

16. Plaintiffs reasonably and in good faith relied
upon the fraudulent misrepresentations, concealments, and
willful omissions made by the defendants, individually,
jointly, and in conspiracy with each other and with other
entities, the identities of which are presently unknown to
plaintiffs, regarding the safe nature of their asbestos
products, which reliance resulted in illnesses and injuries
to plaintiffs, the particulars of which will be more fully
set forth in each plaintiffs' "Short-Form Complaint."

## COUNT IV - BREACH OF WARRANTY

17. Plaintiffs hereby incorporate by reference para-
graphs 1 through 16 inclusive, as if each of said paragraphs
were set forth fully hereunder.

18. Defendants, acting individually, jointly and
severally, as part of the conspiracy as alleged hereinabove
and/or as a result of tacit agreement or cooperation and/or
as a result of industry-wide standards or practice,
impliedly warranted that the asbestos products which they
mined, manufactured, produced, compounded, converted,
processed, sold, supplied, merchandised, distributed, and/or
otherwise placed in the stream of commerce were reasonably
fit for use and safe for their intended purposes.

19. Defendants, acting individually, jointly and
severally, as part of the conspiracy as alleged hereinabove
and/or as a result of tacit agreement or cooperation and/or
as a result of industry-wide standards or practice, breached
said warranties to plaintiffs in that their said asbestos
products were inherently defective, ultrahazardous, danger-
ous, unfit for use, not properly merchantable, and not safe
for, nor reasonably fit for, their intended ordinary and
foreseeable use and purpose.

## COUNT V - ADMIRALTY (IN SHIPYARD CASES ONLY)

20. Plaintiffs hereby incorporate by reference para-
graphs 1 through 19 inclusive as if each of said paragraphs
were set forth fully hereunder.

21. Plaintiffs further allege that there is jurisdic-
tion of this cause of action pursuant to U.S.C.A. _1333(1),

-99-

46 U.S.C.A. _740, et seq., and the general admiralty and maritime law of the United States.

22.  Plaintiffs aver that their employment was necessary to the seaworthiness of maritime vessels upon which they worked and that during the years of their employment heretofore stated, a majority of their work was upon seagoing vessels or vessels being constructed for use at sea.

23.  Plaintiffs further aver that during the years of their employment, plaintiffs worked on or near naval vessels of the United States Navy or its allies, upon United States Merchant Marine vessels, merchant vessels and passenger vessels, both in dry dock and on the navigable waters of the United States, performing the traditional maritime activities of shipbuilding and ship repair.

24.  In the performance of such traditional maritime activities plaintiffs were continually required either to install, remove and/or perform their duties in the proximity of co-employees engaged in the installation, removal and repair and/or replacement of the defendants' asbestos products which products were or became appurtenances of the aforesaid ships and plaintiffs continually worked with, used and/or were caused to come into contact with and be exposed to the defendants' asbestos products, asbestos dust and fibers resulting from the ordinary and foreseeable use of said maritime asbestos products as has been more particularly described herein.

25.  Plaintiffs were injured as has previously been described in the course of the aforementioned traditional maritime activities and such injuries were proximately caused by the ordinary and foreseeable use of the said maritime asbestos products which were or became appurtenances of the said vessels on which plaintiffs worked.

## COUNT VI - NEIGHBORHOOD AND HOUSEHOLD EXPOSURE

26.  Plaintiffs hereby incorporate by reference paragraphs 1 through 25 inclusive as if each of said paragraphs were set forth fully hereunder.

27.  Plaintiffs' relatives with whom they lived at various times during their lives were employed by certain of the defendants and/or used asbestos products manufactured by the defendants.

28.  As a result of living with the relatives as aforesaid, plaintiffs were caused to come into contact with and inhale asbestos particles, dust, and fibers carried on the persons and/or clothing of their aforesaid relatives

and/or brought into their residence by the aforesaid rela-
tives.

29.    Further, the defendants allowed asbestos parti-
cles, dust, and fibers to be emitted into the air in the
neighborhood of plaintiffs' residence from its plants and
dump sites located near the plaintiffs' residence, which
asbestos particles, dust and fibers were inhaled by plain-
tiffs.

30.    At all times relevant hereto, defendants knew or
should have known of the health hazards caused by the
afore-stated asbestos fibers, dust, particles, and/or
pollution being emitted into the air outside the plant and
should have known that said dust, fibers, particles, and/or
pollution were deleterious, poisonous, and highly harmful to
plaintiffs' bodies, lungs, and respiratory system and to the
bodies, lungs, and respiratory systems of other people
living near the defendants' facility, yet defendants failed
to provide adequate and sufficient warnings.

<u>COUNT VII - EMPLOYER DEFENDANTS' TORTIOUS CONDUCT</u>

31.    Plaintiffs hereby incorporate by reference para-
graphs 1 through 30 inclusive as if each of said paragraphs
were set forth fully hereunder.

32.    Certain of the defendants (referred to here as
"defendant employers") employed plaintiffs.  Defendant
employers at all times relevant hereto were negligent,
reckless, careless and performed intentional torts, which
acts or omissions to act caused injuries to plaintiffs, in
the following conduct:

(a)  failing to advise plaintiffs of the presence
of asbestos and of the dangerous characteristics of the
asbestos and asbestos related products which they were
working with in connection with their employment;

(b)  failing to provide plaintiffs with appropri-
ate protective equipment and applicances necessary in order
to protect them from being becoming injured or disabled by
way of exposure to asbestos and asbestos related products;

(c)  failing to provide plaintiffs with a safe
place to work;

(d)  failing to provide proper instruction and
supervision to plaintiffs in the performance of their duties
in handling asbestos or asbestos products;

(e)  failing to provide plaintiffs with necessary
and proper safety equipment to use while performing their
work duties in and around asbestos and asbestos products;

(f)  failing to take adequate precautions to prevent plaintiffs from suffering injuries as a result of their employment;

(g)  being otherwise negligent, reckless and careless in failing to protect the health, safety and welfare of their employees;

(h)  failing to advise plaintiffs of the results of their x-rays, examinations and pulmonary function tests which were taken by or on behalf of defendant employer during the course of their employment and/or failing to advise plaintiffs to cease further asbestos exposure; and

(i)  failing to advise plaintiffs after plaintiffs' exposure to asbestos ceased, about the dangers of exposure to asbestos, about the dangers of past or present asbestos exposure in combination with smoking or exposure to other fumes and dust, and about the need for future medical surveillance.

33.  At all times relevant hereto, defendant employers intentionally, fraudulently, deliberately and systematically misrepresented and/or intentionally, fraudulently, deliberately and systematically failed to represent their knowledge of the presence of asbestos and the health hazards associated with asbestos exposure to the employed plaintiffs, all with the intent to deceive and injure plaintiffs.

34.  At all times relevant hereto, defendant employers acted maliciously, deceitfully, recklessly, intentionally, willfully, negligently, and/or deliberately and in a conspiratorial manner with other persons or entities in order to withhold from plaintiffs their knowledge of the condition of plaintiffs' health as it is related to asbestos exposure and their knowledge of health hazards in general related to asbestos exposure.

35.  At all times relevant hereto, defendant employers had in their possession and control, or had available to them, medical information including but not limited to medical reports, x-ray findings and pulmonary function testing results which indicated that plaintiffs had suffered damage to their body, lungs, and/or internal organs as a result of plaintiff's exposure to asbestos at their workplace and defendant employesr callously, maliciously, intentionally, recklessly, willfully, negligently, and/or deliberately withheld from plaintiffs for many years their aforesaid medical reports, x-ray findings and pulmonary function testing results, failed to adequately advise plaintiffs of the information that they had available to them and/or continued to allow plaintiffs to work in an asbestos environment without changing their job locations which was detrimental to plaintiffs' health and which caused

-102-

plaintiffs to develop diseases and/or aggravated the initial work related injury that plaintiffs suffered. Furthermore, defendant employers authorized their medical staffs to participate in the fraud and deceit of plaintiffs with the intent to injure the plaintiffs by authorizing their medical staffs to withhold medical information, medical reports, x-ray results, pulmonary function testing results, and physical examination results from the plaintiffs at all times referred to herein.

36. Plaintiffs bring this claim against the defendant employers based on common law principles of negligence and have been advised and therefore allege that their claims are not precluded by the applicable Workmen's Compensation and/or Occupational Disease Acts of Pennsylvania, Delaware, New Jersey or of any other state or territory of the United States, by reason of the fact that:

(a)  injury or personal injury to plaintiffs, resulting in disability and/or death, did not occur within the statutory time provisions of the date of the last employment in an occupation or industry in which they were exposed to hazards which could result in asbestos related diseases;

(b)  the defendant employers committed intentional acts and/or conduct as described above; and

(c)  the defendant employers engaged in activities, such as supplying and/or installing asbestos products, which were not the ordinary activities for which plaintiffs were employed and plaintiffs therefore rely upon the "dual capacity" exception to the Workers' Compensation bar against third party suits.

## COUNT VIII - RAILROAD DEFENDANTS

37. Plaintiffs hereby incorporate by reference paragraphs 1 through 36 inclusive, as if each paragraph were fully set forth hereunder.

38. Certain of the defendants (referred to herein as "railroad defendants") employed plaintiffs. While employed by the railroad defendants, the plaintiffs acting within the scope of such employment were engaged in the furtherance of interstate commerce within the meaning of F.E.L.A.

39. All the property, equipment and operations involved in the harm to plaintiffs described herein were owned and/or under the direct and exclusive control of the defendant railroads, their agents, servants and/or employees.

40. The injuries and disability of plaintiffs while working as employees of the railroad defendants were caused

by plaintiffs' exposure to toxic and/or pathogenic liquids, solids, dusts, fumes, vapors, mists or gases, including asbestos.

41.  The injuries and disability of plaintiffs were caused in whole or in part by the negligence, carelessness and/or recklessness of the railroad defendants, generally and more specifically as follows:

(a)  in failing to exercies reasonable care to adequately warn plaintiffs of the risks, dangers and harm to which they were exposed in working with, touching or inhaling toxic and/or pathogenic liquids, solids, dusts, fumes, vapors, mists or gases, including asbestos;

(b)  in failing to provide the plaintiffs with reasonably safe and sufficient personal safety apparel and equipment including but not limited to respirators as was necessary to protect them from being injured, poisoned, disabled, killed or otherwise harmed, by working with, using, handling and/or coming in contact with and being exposed to toxic and/or pathogenic liquids, solids, dusts, fumes, vapors, mists, or gases, including asbestos;

(c)  in failing to provide plaintiffs with a reasonably safe place in which to work;

(d)  in failing and omitting to minimize or eliminate plaintiffs' exposure to substances containing toxic and/or pathogenic liquids, solids, dusts, fumes, vapors, mists, or gases, including asbestos by providing ventilating and exhaust fans, dampening or wetting procedures and other recommended and available procedures;

(e)  in failing and omitting to conduct any test to determine the presence and/or amount of toxic and/or pathogenic liquids, solids, dusts, fumes, vapors, mists, or gases, including asbestos, in and around plaintiffs' workplace;

(f)  in failing to transfer plaintiffs from workplaces where they had been exposed to toxic and/or pathogenic liquids, solids, dusts, fumes, vapors, mists or gases, including asbestos, to other employment with no such or lesser exposure;

(g)  in faiing to conduct physical examinations of plaintiffs of such quality as to detect any effects of toxic and/or pathogenic liquids, solids, dusts, fumes, vapors, mists, or gases, including asbestos, so that their employees, such as plaintiffs, could be advised as to the danger and take appropriate safety measures;

(h)  in violating the provisions of the Boiler Inspection Act, 45 U.S.C. __22-34;

(i)  in failing to substitute non-toxic and non-pathogenic material for hazardous material;

(j)  in failing to issue and enforce appropriate safety rules limiting or eliminating exposure to toxic and/or pathogenic liquids, solids, dusts, fumes, vapors, mists, or gases, including asbestos; and

(k)  in failing to obey appropriate and relevant federal and state regulations and industrial hygiene recommendations intended to protect plaintiffs from exposure to toxic and/or pathogenic liquids, solids, dusts, fumes, vapors, mists, or gases, including asbestos.

### COUNT IX - LIABILITY OF DEFENDANT
### METROPOLITAN LIFE INSURANCE COMPANY

42.  Plaintiffs hereby incorporate by reference paragraphs 1 through 41 inclusive as if the said paragraphs were set forth fully hereunder.

43.  Beginning as early as the 1930s, up to and including the present time, defendant Metropolitan undertook and assumed a duty to provide the asbestos industry and particularly GAF and Johns-Manville with information, inspections, instructions, supervision, recommendations, assistance, notices, reports, methods findings, cautions, warnings, advise, designs, devices, equipment, safeguards, guidance and services to properly, adequately and reasonably provide safe working conditions, and to preserve and protect the life, health and safety of asbestos industry employees, particularly GAF employees, and particularly to protect them from the dangerous properties of asbestos, asbestos products and compounds and/or other dangerous substances at or about many facilities, including but not limited to the GAF plant in Gloucester, New Jersey and to the Johns-Manville plant in Manville, New Jersey.

44.  At least as early as the 1930s, defendant Metropolitan, its Industrial Health Section, its Industrial Hygiene Laboratory, its Medical Department, and the respective staffs of these departments were (a) possessed of medical and scientific data which clearly indicated that asbestos and asbestos compounds are hazardous to life and health, and (b) regarded by the industry as leaders and pioneers in researching, discovering and reporting to employers the dangers of exposing workers to asbestos fiber in the workplace.

45.  During the course of certain plaintiffs' employment with GAF and Johns-Manville, among other employers, and

for some time prior thereto, defendant Metropolitan provided services to GAF and Johns-Manville whereby Metroplitan performed industrial health studies and/or surveys concerning industrial hygiene conditions in general and the dangers of exposure to asbestos fiber in particular at various plants both in and outside of New Jersey, including but not limited to the GAF plant in Gloucester, New Jersey and the Johns-Manville plant in Manville, New Jersey.

46.   The results of these surveys and/or studies performed by defendant Metropolitan were incorporated in reports which were compiled and delivered to GAF and Johns-Manville, among others.

47.   These reports contained some findings and recommendations made by defendant Metropolitan to GAF and Johns-Manville, among others, concerning the health hazards existing at its various manufacturing plants including but not limited to the GAF plant in Gloucester, New Jersey and the Johns-Manville plant in Manville, New Jersey, in regard to the dangers associated with asbestos exposure and what steps should be taken by GAF and Johns-Manville to rectify the existing hazardous conditions.

48.   These reports failed to make complete findings and recommendations to GAF and to Johns-Manville, among others, concerning the health hazards existing at its various manufacturing plants including but not limited to the GAF plant in Gloucester, New Jersey and the Johns-Manville plant in Manville, New Jersey, in regard to the dangers associated with asbestos exposure and what steps should be taken by GAF and Johns-Manville to rectify the existing hazardous conditions.

49.   GAF, Johns-Manville, their employees, their spouses, including certain plaintiffs, and all others similarly situated, were dependent upon defendant Metropolitan's undertakings to preserve and protect life, health and safety at all times after the commencement of said relationship between GAF and defendant Metropolitan and between Johns-Manville and defendant Metropolitan.

50.   Defendant Metropolitan became aware that GAF and Johns-Manville were not taking the necessary steps to insure that their employees and their spouses were not being exposed to asbestos dust generated during the manufacturing processes taking place at a number of its plants including but not limited to the Gloucester, New Jersey plant.

51.   Despite the fact that defendant Metropolitan knew that GAF and Johns-Manville were not following its recommendations and were exposing their employees to asbestos dust, it failed to take appropriate and necessary measures to

insure employees would not be exposed to asbestos at the Gloucester and Manville plants.

52. Defendant Metropolitan, knowing that GAF ans Johns-Manville were not implementing its recommendations and realizing that the employees at the Gloucester and Manville plants were being exposed to asbestos dust, failed to warn employees or take steps to insure warning of the potential hazards attendant to exposure to asbestos.

53. Certain plaintiffs' injuries were directly and proximately caused by defendant Metropolitan's gross and wanton negligence, willful acts and omissions, conscious indifference and utter disregard for their life, health, safety and welfare in that defendant Metropolitan, its agents, servants, employees and representatives, while possessed of superior scientific and industrial health knowledge concerning the dangers of exposure to asbestos fiber without adequate protection, performed industrial health surveys, determined that dangerous harmful and deadly conditions existed at many GAF and Johns-Manville plants including, but not limited to the Gloucester and Manville, New Jersey plants, and failed to take necessary and appro- priate steps to safeguard GAF and Johns-Manville employees and all others similarly situated.

54. Defendant Metropolitan by its active and passive negligence failed to exercise the standard of care and skill it was obliged to exercise by reason of its aforesaid undertaking and assumption of duty, including but not limited to the failure to GAF and Johns-Manville and persons such as plaintiffs, and failed to make recommendations regarding dust control and the proper method for using and handling asbestos, thereby causing, creating or permitting dangerous conditions and dangerous and defective substances on or about the GAF Gloucester plant and the Johns-Manville plant at Manville, New Jersey, as aforesaid.

55. Defendant, Metropolitan Life Insurance Company, expressly and impliedly warranted that the aforesaid under- taking was reasonably accurate, reliable and professionally competent.

56. Plaintiffs relied upon the express and implied warranties of the defendant, Metropolitan, to protect the life, health and safety of plaintiffs.

57. Defendant Metropolitan breached said warranties in that it failed to disclose and prevent the existence of unreasonably dangerous conditions in said premises, provided defective and inadequate devices, warnings, safeguards, and systems, and failed to provide adequate safeguards and protect the life, health and safety of decedent as a result

of which the plaintiffs were injured. Defendant Metropolitan is strictly liable in tort to plaintiffs.

58. Plaintiffs were intended to be Third Party beneficiary of the Agreements whereby defendant Metropolitan undertook certain work and obligations with and for GAF Corporation, as aforesaid.

59. Defendant Metropolitan by its breach of contract, negligence and breach of warranty, as aforesaid, caused and permitted the intended Third Party beneficiary, plaintiffs, to be greviously and permanently injured and damaged as aforesaid.

## COUNT X - LIABILITY OF DEFENDANT
## AETNA CASUALTY & SURETY COMPANY

60. Plaintiff hereby incorporates by reference paragraphs 1 through 59 inclusive, as if the said paragraphs were set forth fully hereunder.

61. At various times prior to and subsequent thereto, up to and including the present time, defendant AETNA CASUALTY & SURETY COMPANY, undertook and assumed a duty to provide OWENS-CORNING FIBERGLAS CORP. and its predecessors with information, dust studies, inspections, instructions, supervision, recommendations, assistance, notices, reports, methods, findings, cautions, warnings, designs, devices, equipment, safeguards, guidance, and services to adequately and reasonably provide safe working conditions, and to preserve and protect the life, health and safety, of the OWENS-CORNING FIBERGLAS CORP. plant and their employees, including certain plaintiffs and all other persons similarly employed, and particulary to protect them from dangerous and defective properties of asbestos, asbestos products, and compounds and other dangerous substances at or about Berlin, New Jersey plant of OWENS-CORNING FIBERGLAS CORP. or its predecessors.

62. OWENS-CORNING FIBERGLAS CORP. and its predecessors and its employees including decedent and all other persons similarly employed, depended upon the undertaking of the AETNA CASUALTY & SURETY COMPANY to preserve and protect the lives, health and safety of OWENS-CORNING FIBERGLAS CORP. employees, and the employees of their predecessors, at all times from commencement of the said relationship between OWENS-CORNING FIBERGLAS CORP., and defendant AETNA CASUALTY & SURETY COMPANY.

63. Defendant, AETNA CASUALTY & SURETY COMPANY by its active and passive negligence failed to exercise the standard of care and skill it was obliged to exercise by reason of their aforesaid undertaking and assumption of duty, including but not limited to the failure to OWENS-CORNING

FIBERGLAS CORP. and persons such as decedent, and failed to make recommendations regarding dust control and the proper method for using and handling asbestos, thereby causing, creating or permitting dangerous conditions and dangerous and defective substances on or about the OWENS-CORNING FIBERGLAS CORP. plant in Berlin, New Jersey, as aforesaid.

64. Defendant AETNA CASUALTY & SURETY COMPANY is strictly liable to plaintiffs and other persons similarly situated on this Count.

## COUNT XI - WRONGFUL DEATH

65. Plaintiff hereby incorporates by reference paragraphs 1 through 64 inclusive, as if each of said paragraphs were set forth fully hereunder.

66. As the direct and proximate result of the afore-said some of the plaintiffs or people who were exposed to the defendants' asbestos products (hereafter referred to as "decedents"), were caused to contract the diseases and injuries described herein, causing extreme pain, suffering and mental anguish and died as a direct and proximate result of defendants' gross negligence, carelessness, breach of waranty, strict liability, conspiracy, misrepresentation and willful conduct, as alleged herein.

## COUNT XII - DAMAGES

67. Plaintiffs hereby incorporate by reference paragraphs 1 through 70 inclusive, as if each of said paragraphs were set forth fully hereunder.

68. As a direct and proximate result of the negligence, carelessness, gross negligence, willful misconduct, breach of warranty, strict liability, fraudulent concealment, conspiracy, misrepresentation, willful omissions, recklessness and outrageous conduct of the defendants as described in Counts I-VII supra, plaintiffs were caused to contract diseases and injuries to plaintiffs' respiratory system, heart and other parts of the body, the full extent of which has not yet been determined, including pleural thickening, pleural placques, asbestos-related pleural disease, asbestosis, scarred lungs, cancer of the lungs and other parts of the body, mesothelioma, and/or the risks of these same diseases, some or all of which are permanent and/or fatal, as set forth in each plaintiff's "short-form" complaint to be filed, and may suffer in the future from other diseases which have not yet been diagnosed, causing plaintiffs pain, suffering and mental anguish.

69. As a direct and proximate result of the aforesaid, plaintiffs were obliged to spend various sums of money to treat their diseases and injuries and plaintiffs continue to

be obliged for the expenses of same; as a direct and proximate result of the aforesaid, plaintiffs have sustained a loss of earnings and earning capacity; and as a direct and proximate result of the aforesaid, plaintiffs' enjoyment of life has been impaired and plaintiffs' life expectancies shortened, all to plaintiffs' great loss.

70.  As a direct and proximate result of the aforesaid, plaintiffs have undergone great physical pain, mental anguish, and shock to their nervous system.

71.  As a direct and approximate result of the aforesaid, and since plaintiffs first learned of their injuries, plaintiffs have developed severe anxiety, hysteria or phobias, any or all of which have developed into a reasonable and traumatic fear of an increased risk of additional asbestos caused and/or related disease, including, but not limited to, cancer, resulting from exposure, directly and indirectly, to the asbestos products of the defendants.

72.  As a direct and proximate result of the aforesaid, plaintiffs have and will continue to suffer permanent and ongoing psychological damage which may require future psychological and/or medical treatment.

73.  As a direct and proximate result of the aforesaid, plaintiffs have and will continue to suffer a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

74.  As a direct and proximate cause of the aforesaid, plaintiff-spouses have suffered the loss of the plaintiff-workers' society, services and companionship and a deterioration of the marital relationship, and may continue to be so deprived, and, accordingly, plaintif-spouses claim damages for loss of consortium.

75.  As a direct and proximate result of the aforesaid, decedents incurred hospital, nursing and medical expenses. Decedents' beneficiaries have incurred hospital, nursing, medical, funeral and estate administration expenses as a result of decedents' death.  Plaintiffs as Executors/Executrices of the Estates of decedents bring this claim on behalf of decedents' lawful beneficiaries for these damages and for all pecuniary losses sustained by said beneficiaries pursuant to 42 Pa. C.S.A. _8301 and 2A N.J.S.A. _13-1.

76.  As a direct and proximate result of the aforesaid, decedents, prior to their deaths, were obliged to spend various sums of money to treat their injuries, which debts have been assumed by their estates; as a direct and proximate result of the aforesaid, decedents were caused pain,

suffering, mental anguish and impairment of the enjoyment of life, until the date of their deaths; and, as a direct and proximate result of the aforesaid, decedents suffered a loss of earnings and earning capacity. Plaintiffs, as Executors/Executrices of decedents' estates bring this claim on behalf of the estates for damages under 42 Pa. C.S.A. _8302 and 2A N.J.S.A. _15-13.

77. As a direct and proximate result of the aforesaid, decedents and their spouses, until the time of decedents' deaths, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder. This claim is brought on behalf of the estates of decedents, pursuant to 42 Pa. C.S.A. _8302, and 2A N.J.S.A. _15-13 and on behalf of plaintiff-spouses in their own right.

78. As a direct and proximate result of the aforesaid, and since first learning of decedents' and/or living plaintiff-workers' injuries, all other plaintiffs have developed severe anxiety, hysteria or phobias, any and all of which has developed into a reasonable and traumatic fear of an increased risk of asbestos-caused and/or related disease, including, but not limited to, cancer to plaintiffs, resulting from exposure, directly and indirectly, to the asbestos products of defendants, to decedents' and plaintiff-workers' work clothes and tools.

79. As a direct and proximate result of the aforesaid, and including the observance of the suffering of their spouses, decedents, until the date of their deaths, suffered permanent and ongoing psychological damage; as a direct and proximate result of the aforesaid, and including the observance of the suffering and physical deterioration of their spouses, until the date of their death, plaintiffs have and will continue to suffer permanent and ongoing psychological damage which may require future psychological and/or medical treatment. Plaintiffs as Executors/Executrices or Administrators/Administratrices of decedents' estates bring the claim on behalf of the estate for damages under 42 Pa. C.S.A. _8302, and in their own right.

WHEREFORE, Plaintiffs pray for judgment against the defendants and each of them individually, jointly and severally on each of the above Counts, for compensatory damages in an amount in excess of TWENTY THOUSAND DOLLARS ($20,000.00) and (except on Count IV) punitive damages in a sum in excess of TWENTY THOUSAND DOLLARS ($20,000.00) plus costs of suit, and such other and further relief as is just and proper.

AND NOW, this  30th day of  September        , BROOKMAN, ROSENBERG, BROWN & SANDLER hereby adopts the foregoing Plaintiffs' Long-Form Complaint on behalf of all of its clients whose "Short-Form Complaints" will be filed from this point forward.



BROOKMAN, ROSENBERG, BROWN & SANDLER

BY: _____

LAURENCE H. BROWN, ESQUIRE
230 South Broad Street - Fifteenth Floor
Philadelphia, PA  19102
(215) 546-2660

AND NOW, this 6th day of October, 1986, the undersigned law firm hereby adopts the foregoing Plaintiff's Long-Form Complaint on behalf of all of its clients whose "Short-Form Complaints" will be filed from this point forward, except that no claims are raised by clients of the undersigned firm against the following defendants included in the Long-Form Complaint:

GENERAL REFRACTORIES

GREEN TWEED & COMPANY, INC.

KAY WHEEL SALES

MONSEY PRODUCTS

BLANK, ROME, COMISKY & McCAULEY

By: _____
    NORMAN PERLBERGER

1200 Four Penn Center Plaza
Philadelphia, Pennsylvania 19103
(215) 569-5500

AND NOW, this 6th day of October, 1986, the undersigned law firm hereby adopts the foregoing Plaintiff's Long-Form Complaint on behalf of all of its clients whose "Short-Form Complaints" will be filed from this point forward, except that no claims are raised by clients of the undersigned firm against the following defendants included in the Long-Form Complaint:

GENERAL REFRACTORIES

GREEN TWEED & COMPANY, INC.

KAY WHEEL SALES

MONSEY PRODUCTS

BLANK, ROME, COMISKY & McCAULEY

By: _____

NORMAN PERLBERGER

1200 Four Penn Center Plaza
Philadelphia, Pennsylvania 19103
(215) 569-5500

**EXHIBIT F**

MIL-A-17472B ▆ 9999906 1073913 221 ▆

MIL-A-17472B
22 May 1964
SUPERSEDING
MIL-A-0017472A(SHIPS)
4 January 1963
MIL-A-17472(NAVY)
12 February 1953

## MILITARY SPECIFICATION

### ASBESTOS SHEET, COMPRESSED (GASKET MATERIAL)

This specification is mandatory for use by all Departments and Agencies of the Department of Defense.

### 1. SCOPE

1.1 This specification covers symbol 2150 compressed asbestos sheet gasket material used as a gasket joint sealing material for steam, hot and cold water or brine, air and gases, and oils.

### 2. APPLICABLE DOCUMENTS

2.1 The following documents, of the issue in effect on date of invitation for bids or request for proposal, form a part of this specification to the extent specified herein:

SPECIFICATIONS

FEDERAL

| | | |
|---|---|---|
| UU-P-271 | - | Paper, Wrapping. |
| PPP-B-576 | - | Box, Wood, Veneer, Paper Overlaid. |
| PPP-B-585 | - | Boxes, Wood Wirebound. |
| PPP-B-591 | - | Boxes, Fiberboard, Wood-cleated. |
| PPP-B-601 | - | Boxes, Wood, Cleated-Plywood. |
| PPP-B-621 | - | Boxes, Wood, Nailed and Lock Corner. |
| PPP-B-636 | - | Box, Fiberboard. |
| PPP-B-640 | - | Boxes, Fiberboard-Corrugated, Triple Wall. |

MILITARY

| | | |
|---|---|---|
| MIL-L-10547 | - | Liners, Case, and Sheet, Overwrap, Water-Vaporproof or Waterproof, Flexible. |

STANDARDS

FEDERAL

| | | |
|---|---|---|
| FED-STD-601 | - | Rubber, Sampling and Testing. |

MILITARY

| | | |
|---|---|---|
| MIL-STD-105 | - | Sampling Procedures and Tables for Inspection by Attributes. |
| MIL-STD-129 | - | Marking for Shipment and Storage. |
| MIL-STD-147 | - | Palletized Unit Loads. |

(Copies of specifications, standards, drawings and publications required by suppliers in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

### 3. REQUIREMENTS

3.1 Qualification. - The compressed asbestos sheet furnished under this specification shall be a product which has been tested, and passed the qualification tests specified herein, and has been listed on or approved for listing on the applicable qualified products list.

FSC 5330

01149

Comes from DOCUMENT ENGINEERING DOCUMENTS

MIL-A-17472B ■ 9999906 1073914 168 ■

MIL-A-17472B

3.2 Material.- The compressed asbestos sheet shall be made of asbestos fiber combined with either natural or synthetic rubber, or both, and suitable mineral fillers.

3.2.1 Asbestos fiber.- The asbestos fiber shall be chrysotile and shall contain not less than 12 percent chemically combined water (see 4.5.1).

3.3 Construction.- The compressed asbestos sheet shall be either cross-laminated or not.

3.4 Asbestos fiber and rubber content.- The compressed asbestos sheet shall contain not less than 70 percent by weight, of asbestos fiber, and not less than 10 percent by weight, of rubber (see 4.5.1).

3.5 Loss of weight on heating.- The loss in weight on heating at $900^\circ$ to $925^\circ$ Centigrade ($^\circ$C.) shall not be more than 35 percent (see 4.5.2).

3.6 Thickness and weight.- The thickness and weight of the finished compressed asbestos sheet shall be as shown in table I as specified (see 6.2).

Table I - Thickness and weight

| Thickness | Weight, minimum |
|---|---|
| Inch | Pounds per square yard |
| 1/64 | 0.8 |
| 1/32 | 2.0 |
| 1/16 | 4.0 |
| 3/32 | 6.0 |
| 1/8 | 8.0 |
| 3/16 | 12.0 |
| 1/4 | 16.0 |

3.6.1 Thickness tolerances.- The permissible tolerances in thickness shall be as shown in table II.

Table II - Thickness tolerance

| Thickness | Tolerance |
|---|---|
| Inch | |
| 1/64 | +0.005 inch; -0.002 inch |
| 1/32 | ±0.005 inch |
| 1/16 and over | ±10 percent |

3.7 Length and width.- Unless otherwise specified (see 6.2), asbestos sheet shall be furnished in widths not less than 36 inches, and in lengths not greater than 150 inches.

3.8 Compressibility and recovery.- The compressibility of the sheet shall be not less than 7 percent nor more than 17 percent. The recovery shall be not less than 40 percent (see 4.5.3).

3.9 Tensile strength.- The average tensile strength of sheets 1/32 inch and thicker shall be not less than 3500 pounds per square inch (p.s.i.). Single ply sheets 1/64 inch thick shall have a minimum average tensile strength of 1200 p.s.i. in the weakest direction and an average tensile strength of both the longitudinal and transverse directions of not less than 2,000 p.s.i. (see 4.5.4).

3.10 Graphite.- Unless otherwise specified (see 6.2), the finished sheets shall not be lubricated or graphited.

3.11 Branding.- Each square foot of the asbestos sheet shall be plainly marked with the manufacturer's name, brand identification, and symbol 2150.

2

01150

MIL-A-17472B ■ 9989906 1073915 0T4 ■

3.12 Workmanship. - Workmanship shall be first class in every respect. The asbestos sheet shall have smooth surfaces and shall be free from imperfections.

## 4. QUALITY ASSURANCE PROVISIONS

4.1 Responsibility for inspection. - Unless otherwise specified in the contract or purchase order, the supplier is responsible for the performance of all inspection requirements as specified herein. Except as otherwise specified, the supplier may utilize his own facilities or any commercial laboratory acceptable to the Government. The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure supplies and services conform to prescribed requirements.

4.2 Qualification tests [1/]. - Qualification tests shall be conducted at a laboratory satisfactory to the Bureau of Ships. Qualification tests shall consist of the tests specified in 4.5.

4.3 Sampling. -

4.3.1 Lot. - For purposes of sampling a lot shall consist of all asbestos sheet of the same thickness produced under essentially the same conditions and offered for delivery at one time.

4.3.2 Sampling for quality conformance inspection. -

4.3.2.1 Sampling for examination. - A random sample of sheets shall be selected from each lot offered for examination in accordance with MIL-STD-105 at Inspection Level II. The Acceptable Quality Level shall be 2.5 percent defective.

4.3.2.2 Sampling for tests. - Two samples of gasket material shall be selected at random from each 2,000 pound lot or less for the tests described in 4.4.2. Each sample piece shall be 12 by 12 inches.

4.4 Quality conformance inspection. -

4.4.1 Examination. - Each of the sample sheets selected in accordance with 4.3.2.1 shall be surface examined, and measured to determine conformance with the requirements of this specification which do not require tests. Any sheet in the sample containing one or more visual or dimensional defects shall not be offered, and if the number of defective sheets in any sample exceeds the acceptance number for that sample, this shall be cause for rejection of the lot represented by the sample.

4.4.2 Lot tests. - The samples selected in accordance with 4.3.2.2 shall be subjected to the tests specified in 4.5.2 through 4.5.4. If any of the samples tested is found to be not in conformance with this specification this shall be cause for rejection of the lot represented by the sample.

4.5 Test procedures. -

4.5.1 Chemical analysis. -

4.5.1.1 Preparation of sample for analysis. - Small strips or cross-sections shall be cut from various parts of the sample so as to be representative of the sample. The specimen shall be split with the aid of a knife to produce relatively thin layers of material.

4.5.1.1.1 Lubricant (graphite) when specified. -

4.5.1.1.1.1 A 1 to 3 gram specimen shall be weighed accurately and placed in a siphon cup without a filter thimble. If graphite is present, a few milliliters of chloroform shall be added to the cup and agitated gently to dislodge the bulk of the graphite, which shall be removed by decanting into the extraction flask. This is done to prevent the siphon cup from becoming plugged. Two or three treatments are usually sufficient to remove most of the graphite which shall be collected in the extraction flask along with the chloroform soluble material. The siphon cup shall then be assembled in the extraction flask, sufficient

---

[1/] Application for Qualification tests shall be made in accordance with "Provisions Governing Qualification" (see 6.3 and 6.4).

3

MIL-A-17472B

chloroform added to bring the volume up to about 50 milliliters, and the extraction shall be continued in the usual manner for a period of 2 hours.

4.5.1.1.1.2 The extracted material shall then be transferred to a watch glass and permitted to air dry. When dry, the fibers shall be carefully separated, and the remaining graphite carefully brushed off and collected on the watch glass, then added to the extraction flask. The residue shall be reserved for subsequent determinations.

4.5.1.1.1.3 The chloroform shall be distilled from the extraction flask on a steam bath, using a gentle stream of filtered air to prevent boiling. The flask shall then be dried for 1 hour at 105° Centigrade (C), cooled in a desiccator and weighed.

4.5.1.1.1.4 Calculation.-

$$\text{Lubricant, percent} = \frac{L}{S} \times 100$$

Where L = weight of graphite and soluble material.
S = weight of specimen.

4.5.1.2 Rubber.-

4.5.1.2.1 A specimen of approximately 2 grams and prepared as specified in 4.5.1.1 shall be placed in a 125 milliliter (ml.) lipped assay flask or a 250 ml. Erlenmeyer flask fitted with a standard taper and an air condenser. Ten grams of paranitrotoluene and 25 ml. of orthodichlorobenzene shall be added, and the mixture heated to 180 to 190° C. on a hot plate under a hood with occasional stirring until the rubber dissolves. From 4 to 10 hours are usually sufficient to effect solution.

4.5.1.2.2 The flask and contents shall be cooled, 10 ml. of chloroform added, and the mixture decanted through a 100 mesh screen. The residue shall be washed with chloroform until the insoluble fillers are removed as indicated by a clear filtrate. If undissolved rubber remains, the fibers shall be returned to the digestion flask and the treatment with paranitrotoluene and orthodichlorobenzene repeated.

4.5.1.2.3 The filtrates and wash solutions shall be combined and poured through a portion of the sieve that is free of fibers in order to collect any fibers that may have passed through previously. The fibers shall then be transferred to a siphon cup and extracted for 1 hour with chloroform, dried at 105° C. for 1 hour, cooled and weighed.

4.5.1.2.4 Calculation.-

$$\text{Asbestos fibers, percent} = \frac{F}{S} \times 100$$

$$\text{Rubber content, percent} = 100-A-B$$
Where F = weight of fibers
S = weight of specimen
A = percent fibers
B = percent lubricant

4.5.1.3 Chemically combined water.- A specimen of approximately 1 gram shall be taken from the fibrous material which has been treated as required in 4.5.1.2.3. It shall be dried for 1 hour in a platinum crucible at a temperature of 105 to 110° C., cooled in a desiccator and again weighed. The specimen and crucible shall be ignited in an electric furnace at a temperature of 800° to 825° C., or over a blast lamp, to a constant weight.

4.5.1.3.1 Calculation.-

$$\text{Chemically combined water,}$$
$$\text{percent} = \frac{S-R}{S} \times 100$$

4

Licensed from GLOBAL ENGINEERING DOCUMENTS
15 Inverness Way E, Englewood, CO 80112 (303)397-7956 (800)854-7179

MIL-A-17472B ■ 9999906 1073917 977 ■

Where R = weight of specimen after
ignition

S = weight of specimen before
ignition

4.5.1.3.2 Two specimens shall be tested. The average of the results obtained from the two specimens shall be chemically combined water of the sample.

4.5.1.4 Cotton, asbestos and chemically combined water.- If the fibrous material contains cotton or other organic materials as indicated by nonconformance to 3.2.1 it may be determined as follows: The asbestos content of the fibrous material which has been treated as specified in 4.5.2.2 shall be determined by the combustion procedure for cotton and asbestos. If graphite, carbon black, or other material insoluble in the paranitrotoluene - orthodichlorobenzene mixture remains on the fibers, the combustion method will not give reliable results, and in such cases the results obtained shall be considered to be approximations.

4.5.1.4.1 A specimen weighing approximately 1 gram shall be taken from the fibrous material (see 4.5.1.2). It shall be placed in a porcelain or platinum combustion boat, dried for 1 hour at a temperature of 105° to 110°C., cooled in a desiccator and weighed. The dried specimen in the boat shall be inserted in the combustion tube of an electric organic combustion furnace. The specimen shall be maintained at a temperature of 900 + 50°C. for approximately 30 minutes or until combustion of the cotton is complete. During the combustion period a current of oxygen (carbon dioxide free) shall be passed through the combustion tube at a rate of approximately 200 milliliters per minute. The combustion gases shall be passed through either two U-tubes containing calcium chloride or through a drying tube containing anhydrous magnesium perchlorate or calcium sulphate to remove the moisture; and finally the gases shall be passed into either a weighed Vanier or similar absorption bulb containing a strong solution of caustic potash, or in a weighed carbon dioxide absorption bulb containing a sodium hydroxide impregnated base (the absorbent having the trade name "ascarite" is of this type) to absorb the carbon dioxide. Three-elevenths of the increase in weight of the Vanier or other carbon dioxide absorption bulb shall represent the weight of the carbon in the fibrous material. This shall be 44.40 percent of the cotton. These factors may be combined to give a constant of 0.614. When the combustion has been completed, the absorption tube shall be weighed, the combustion boat containing the ignited residue shall be removed from the furnace, cooled in a desiccator and weighed.

4.5.1.4.2. Calculation. - The percentage of cotton shall be calculated as follows:

$$A = \frac{61.4 \times C}{E}$$

Where:

A = Percentage of cotton
C = Weight of carbon dioxide, grams.
E = Weight of fiber specimen, grams.

4.5.2 Loss in weight on heating.-

4.5.2.1 Preparation of sample. - Small strips or cross-sections shall be cut from various parts of the sample so as to be representative of the sample. The specimen shall be split with the aid of a knife to produce relatively thin layers of material.

4.5.2.2 Procedure.- Specimens of approximately 5 grams each prepared as in 4.5.2.1 shall be dried for 1 hour in a porcelain crucible at a temperature at 105° to 110°C., cooled in a desiccator and again weighed. The specimen and crucible shall be ignited in an electric furnace at a temperature of 900° to 925°C., or over a blast lamp, to a constant weight. The loss in weight shall be calculated as follows:

Loss in weight (percent

$$ash) = \frac{R}{S} \times 100$$

5 (

MIL-A-17472B ■ 9999906 1073918 803 ■

MIL-A-17472B

Where R  = weight of specimen after ignition
      S  = weight of specimen before ignition

4.5.3 Compressibility and recovery.- Compressibility and recovery shall be determined in accordance with method 3331 of FED-STD-601.

4.5.4 Tensile strength.- Specimens 1/2 inch wide by 6 inches long shall be used, with a 3-inch length of specimen between the jaws. The testing machine shall be operated at a rate of separation of the grips of 12 + 1 inches per minute. Three specimens shall be cut lengthwise of the sheet (longitudinal) and three specimens at right angles thereto (transverse). All specimens shall be conditioned at 212° F. for 1 hour and cooled to room temperature in a desiccator before testing. The average of the results of six specimens shall be used to determine the average tensile strength. The average of the results of three specimens from one direction of the asbestos sheet shall be the average tensile strength of the asbestos sheet in that direction.

4.6 Examination of preparation for delivery.- Packaging, packing and marking shall be examined to determine conformance with the requirements of section 5.

5. PREPARATION FOR DELIVERY

5.1 Packaging.- Packaging shall be Level A or C as specified (see 6.2).

5.1.1 Level A.-

5.1.1.1 Rolls.- Asbestos sheets shall be rolled and restrained from unwinding. The roll shall be wrapped with Class 2 Kraft paper conforming to Specification UU-P-271 with ends enclosed. All seams, joints and closures shall be sealed with adhesives or other suitable materials to afford waterproofness equal to that of the wrap material itself. A minimum of 2-inch overlap shall be provided at all overlapping edges.

5.1.1.2 Sheets.- No over packaging required.

5.1.2 Level C.- Asbestos sheet shall be packaged in accordance with the supplier's standard practice.

(5.2 Packing.- Packing shall be Level A, B or C, as specified (see 6.2).

5.2.1 Compressed asbestos sheet, in thicknesses up to and including 1/16 inch thick, shall be furnished in rolls and compressed asbestos sheet, in thicknesses exceeding 1/16 inch, shall be furnished in flat sheets.

5.2.1.1 Level A.- Rolls and sheets shall be packed in containers conforming to any one of the following specifications at the option of the contractor:

| Specification | Classification |
|---|---|
| PPP-B-576 | Class 2 |
| PPP-B-585 | Class 3 use |
| PPP-B-591 | Overseas type |
| PPP-B-601 | Overseas type |
| PPP-B-621 | Class 2 |
| PPP-B-636 | Class 2 |
| PPP-B-640 | Class 2 |

5.2.1.1.1 Shipping containers shall be closed, strapped or banded in accordance with the applicable box specification or appendix thereto. The gross weight of wood or wood-cleated boxes shall not exceed 200 pounds; fiberboard boxes shall not exceed the weight limitations of the applicable fiberboard box specification.

5.2.1.1.1.1 Caseliners.- Shipping containers for sheets shall have caseliners conforming to MIL-L-10547. Caseliners shall be closed and sealed in accordance with the appendix to MIL-L-10547. Caseliners for fiberboard boxes, PPP-B-636 and PPP-B-640, may be omitted provided all center and edge

6

Licensed from GLOBAL ENGINEERING DOCUMENTS
15 Inverness Way E. Englewood CO 80112 (303)397-7956 (800)854-7179

MIL-A-17472B

...ms and manufacturer's joint are sealed and waterproofed with pressure sensitive tape in accordance with the applicable fiberboard box specification.

5.2.1.2 **Level B.** – Rolls and sheets shall be packed in containers conforming to any one of the following specifications at the option of the contractor:

| Specification | Classification |
|---|---|
| PPP-B-576 | Class 1 |
| PPP-B-585 | Class 1 or 2 use |
| PPP-B-591 | Domestic type |
| PPP-B-601 | Domestic type |
| PPP-B-621 | Class 1 |
| PPP-B-636 | Class 1 |
| PPP-B-640 | Class 1 |

5.2.1.2.1 Shipping containers shall be closed in accordance with the applicable box specification or appendix thereto. The gross weight of wood or wood-cleated boxes shall not exceed 200-pounds; fiberboard boxes shall not exceed the weight limitations of the applicable fiberboard box specification. Rolls packaged as specified in 5.1.1.1 shall need no over packing.

5.2.1.3 **Level C.** – The asbestos shall be packed in a manner that will insure arrival at destination in satisfactory condition and be acceptable to the carrier at lowest rate.

5.2.1.4 **Palletization.** – When specified (see 6.2), shipping containers shall be palletized in accordance with MIL-STD-147.

5.3 **Marking.** – In addition to any special marking required by the contract or order, shipping containers shall be marked for shipment in accordance with MIL-STD-129.)

6. **NOTES**

8.1 **Intended use.** – Compressed asbestos sheet is intended for use for the following services:

    (a) Saturated steam to 300 psig.
    (b) Oil-fuel, lubricating, diesel to 500 psig and 250° F.
    (c) Water-fresh, brine, hot, cold to 400 psig.
    (d) Air or gas to 3,000 psig.
    (e) Gases of combustion to 500 psig and 700° F.

6.2 **Ordering data.** – Procurement documents should specify the following:

    (a) Title, number, and date of this specification.
    (b) Thickness required (see 3.6).
    (c) Length and width of sheet required (see 3.7).
    (d) Whether finished sheet should be lubricated or graphited (see 3.10).
    (e) Level of packaging and level of packing required (see 5.1 and 5.2).
    (f) When pallets are required (see 5.2.1.4).

6.3 With respect to products requiring qualification, awards will be made only for such products as have, prior to the time set for opening of bids, been tested and approved for inclusion in Qualified Products List QPL-17472, whether or not such products have actually been so listed by that date. The attention of suppliers is called to this requirement, and manufacturers are urged to arranged to have the products that they propose to offer to the Federal Government, tested for qualification, in order that they may be eligible to be awarded contracts or orders for the products covered by this specification. The activity responsible for the qualified products list is the Bureau of Ships, Department of the Navy, Washington, D.C. 20360 and information pertaining to qualification of products may be obtained from that activity. Application for Qualification tests shall be made in accordance with "Provisions Governing Qualification" (see 6.3).

7



MIL-A-17472B ■■ 9999906 1073920 461 ■■

MIL-A-17472B

6.4  Copies of "Provisions Governing Qualification" may be obtained upon application to Commanding Officer, Naval Supply Depot, 5801 Tabor Avenue, Philadelphia, Pennsylvania 19120

Custodians:                                                      Preparing activity:
   Army - MR                                              Navy - SH
   Navy - SH                                              (Project 5330-0100)
   Air Force - 69

Reviewer:
   Army - MR, MU, WC, MI
   Navy - WP, YD
   Air Force - 69, 85

User:
   Army - GL

Note:  Review/user information is current as of the date of this document.  For future coordination of changes to this document, draft circulation should be based on the information in the current DODISS.

8

Issued from GLOBAL ENGINEERING DOCUMENTS
15 Inverness Way E. Englewood, CO 80112 (303)397-7956 (800)854-7179

01156

## DOCUMENT CERTIFICATION

I, Thomas F. McCaffery, do swear under the penalties of perjury that the documents (_160-169_ pages and initialed) in Volume I of the binder entitled, "Dana Corporation, General Information, Gasket-Related Specification" are to the best of my knowledge and belief, true and accurate copies of original U.S. Government documents.

_____
Thomas F. McCaffery

I, _MARISA A. TRASATTI_, a commissioned Notary Public in and for the County of _HARFORD_, State of _MD_, do certify that Thomas F. McCaffery appeared before me on this date in the City of Baltimore, State of Maryland and that I took his oath aforesaid.

Date: _5/30/03_

My commission expires: _8/29/06_

SEAL

**EXHIBIT G**

HH-P-0046D(NAVY-Ships)
July 27, 1973
Interim Revision of
Fed. Spec. HH-P-46C
May 26, 1966
(See 6.7 and 6.8)

## FEDERAL SPECIFICATION

### PACKING; ASBESTOS, SHEET, COMPRESSED

This interim Federal specification was developed by the Naval Ship Engineering Center, Prince George's Center, Center Building, Hyattsville, Maryland 20782, based upon currently available technical information. It is recommended that Federal agencies use it in procurement and forward recommendations for changes to the preparing activity at the address shown above. The General Services Administration has authorized the use of this interim Federal specification as a valid exception to Federal specification HH-P-46C.

### 1. SCOPE AND CLASSIFICATION

1.1 Scope. This specification covers two classes of compressed asbestos sheet packing materials for use in pipe joints.

1.2 Classification. Asbestos sheet packing materials shall be of the following classes, as specified (see 6.2):

Class 1 - For gasket joint sealing material for steam, hot and cold water, except potable water, or brine, air and gases (other than halocarbon refrigerant), and oil.

Class 2 - For gasket joint sealing material for halocarbon refrigerant systems (R11, R12, R22, and R114).

### 2. APPLICABLE DOCUMENTS

2.1 The following documents of the issue in effect on date of invitation for bids or request for proposal, form a part of the specification to the extent specified herein:

FEDERAL SPECIFICATIONS:

VV-L-825 - Lubricating Oil, Refrigerant Compressor.
PPP-B-576 - Box, Wood, Cleated, Veneer, Paper Overlaid.
PPP-B-585 - Boxes, Wood, Wirebound.
PPP-B-591 - Boxes, Fiberboard, Wood-Cleated.
PPP-B-601 - Boxes, Wood, Cleated-Plywood.
PPP-B-621 - Boxes, Wood, Nailed and Lock-Corner.
PPP-B-636 - Boxes, Shipping Fiberboard.
PPP-B-640 - Boxes, Fiberboard, Corrugated, Triple-Wall.
PPP-B-1055 - Barrier Material, Waterproofed, Flexible.

FEDERAL STANDARD:

FED-STD-123 - Marking for Domestic Shipment (Civil Agencies).

(Activities outside the Federal Government may obtain copies of Federal Specifications and Standards as outlined under General Information in the Index of Federal Specifications and Standards and at the prices indicated in the Index. The Index, which includes cumulative monthly supplements as issued, is for sale on a subscription basis by the Superintendent of Documents, U.S. Government Printing Office, Washington D.C. 20402.)

(Single copies of this specification and other product specifications required by activities outside the Federal Government for bidding purposes are available without charge at the General Services Administration Regional Offices in Boston, New York, Atlanta, Chicago, Kansas City, Mo., Dallas, Denver, San Francisco, Los Angeles, Seattle, and Washington, D.C.)

(Federal Government activities may obtain copies of Federal Specifications and Standards and the Index of Federal Specifications and Standards from established distribution points in their agencies.)

FSC 5330

0446

HH-P-0046D(NAVY-Ships)

**MILITARY SPECIFICATIONS:**

MIL-L-19547 - Liners, Case, and Sheet, Overwrap, Water-Vaporproof or Waterproof, Flexible.

MIL-F-20670 - Flanges, Pipe, Carbon Steel, 150 P.S.I.; W.S.P. (For Naval Shipboard Use).

**MILITARY STANDARDS:**

MIL-STD-105 - Sampling Procedures and Tables for Inspection by Attributes.

MIL-STD-129 - Marking for Shipment and Storage.

MIL-STD-147 - Palletized and Containerized Unit Loads, 40" X 48", Pallets, Skids, Runners, or Pallet-Type Base.

(Copies of specifications, standards, drawings, and publications required by suppliers in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

2.2 Other publications. The following documents form a part of this specification to the extent specified herein. Unless otherwise indicated, the issue in effect on date of invitation for bids or request for proposal shall apply.

UNIFORM CLASSIFICATION COMMITTEE
Uniform Freight Classification Rules

(Application for copies should be addressed to the Uniform Classification Committee, Room 1106, 222 South Riverside Plaza, Chicago, Illinois 60606.)

NATIONAL CLASSIFICATION BOARD
National Motor Freight Classification Rules

(Application for copies should be addressed to National Motor Freight Traffic Association, Inc., 1616 "P" Street, N.W., Washington, D.C. 20036.)

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)

D471-68 - Change in Properties of Elastomeric Vulcanizates Resulting from Immersion in Liquids, Test for.

F36-66 - Compressibility and Recovery of Gasket Materials, Test for.

F39-59 - Compressed Asbestos Sheet Packing, Testing.

(Copies may be obtained from the American Society for Testing and Materials, 1916 Race Street, Philadelphia, Pennsylvania 19103.)

(Technical society and technical association specifications and standards are generally available for reference from libraries. They are also distributed among technical groups and using Federal agencies.)

3. REQUIREMENTS

3.1 Qualification. Compressed asbestos sheet furnished under this specification shall be products which are qualified for listing on the applicable qualified products list at the time set for opening of bids (see 4.2 and 6.5).

3.2 Material. The compressed asbestos sheet shall be made of asbestos fiber, natural or synthetic elastomer, or a mixture of the two, vulcanizing agent and suitable mineral fillers.

3.2.1 Asbestos fiber. The asbestos fiber shall be chrysotile and shall contain not less than 12 percent water of crystallization (see 4.4.1).

3.2.2 Solvents. The finished sheet shall be free of gasoline or other solvents used in the process of manufacture.

3.3 Lubricant. Unless otherwise specified (see 6.2), the finished sheets of packing shall not be lubricated. When a lubricant is required, it shall be tested as specified in 4.4.1.1.1.

3.4 Asbestos fiber and rubber content. The packing shall contain not less than 70 percent by weight of asbestos fiber and not less than 16 percent by weight of natural or synthetic rubber when tested as specified in 4.4.1.1.2.

2



MH-P-0046D(NAVY-Ships)

3.4.1 Chemically combined water. The asbestos fiber shall be chrysotile and the dry asbestos fiber shall contain not less than 12 percent by weight of chemically combined water (water of crystallization), when tested as specified in 4.4.1.1.3.

3.5 Construction. The packing shall be thoroughly and evenly mixed to the desired consistency (see 3.4), and compressed into a sheet of compact and uniform texture either cross-laminated or single-ply.

3.6 Weight and thickness. The weight and thickness of the finished compressed asbestos sheet shall be as specified (see 6.2), and in accordance with table I.

Table I - Weight and thickness.

| Weight (pounds per square yard) | Thickness | |
|---|---|---|
| Minimum | Required (inch) | Tolerance (inch) |
| 0.8 | 0.0156 | {+0.005<br>{-0.002 |
| 2.0 | .0313 | +0.005 |
| 4.0 | .0625 | ∓0.0063 |
| 6.0 | .0938 | ∓0.0894 |
| 8.0 | .1250 | ∓0.0125 |
| 12.0 | .1875 | ∓0.0188 |
| 16.0 | .250 | ∓0.0250 |

3.6.1 Form. Compressed asbestos packing in thicknesses up to and including 1/16 inch shall be furnished in rolls (see 5.1.1.1); and compressed asbestos packing exceeding 1/16 inch in thickness shall be furnished in flat sheets.

3.7 Length and width. Unless otherwise specified (see 6.2), asbestos packing sheets shall be furnished in widths not less than 36 inches, and in lengths not greater than 153 inches when examined as specified in 4.3.3.

3.8 Loss of weight on heating. The loss of weight of the packing on heating at 900° to 925° Celsius (C) (1662° to 1697° Fahrenheit (F)) shall be not more than 35 percent when tested as specified in 4.4.2.

3.9 Compressibility and recovery. The compressibility of the sheet shall be not less than 7 percent nor more than 17 percent. The recovery shall be not less than 40 percent. Tests shall be as specified in 4.4.4.

3.10 Tensile strength. Tests for tensile strength shall be made as specified in 4.4.5.

(a) Sheets 1/32 inch and thicker shall have an average tensile strength of not less than 3,500 pounds per square inch (psi).
(b) Single-ply sheets 1/64 inch thick shall have a minimum average tensile strength for each sheet of 1,200 psi in the weakest direction and an average tensile strength in both the longitudinal and transverse directions of not less than 2,000 psi.

3.11 Identification of product. Unless otherwise specified (see 6.2), sheets and rolls shall be legibly marked with a fuel-oil resistant lacquer, ink, or dye to show information as follows:

| Class 1 | Class 2 |
|---|---|
| (a) Symbol 2150, HH-P-46, class 1 | (a) HH-P-46, class 2 |
| (b) Manufacturer's name | (b) Manufacturer's name |
| (c) Product identification | (c) Product identification |

The markings shall be not less than 3/8 inch in height, on one side only, and shall be on every square foot, or less, of the packing.

3.11.1 When lubricant is required (see 6.2), sheets and rolls shall have attached a sturdy paper tag containing the information required by 3.11, marked thereon in a fuel-oil resistant lacquer, ink, or dye.

3

01026

HH-P-0846D(NAVY-Ships)

3.12  Limitation on age.  The packing shall be not older than 4 quarters from date of manufacture, when offered for delivery to the Government (see 5.3).

3.13  Simulated performance - class 2 only.  The flanged joint containing the compressed asbestos sheet shall not leak after being subjected to the simulated performance test specified in 4.4.6.  There shall be no corrosion of the test flanges in the gasket contact area.

3.13.1  Class 2 gaskets shall permit no leakage of refrigerant during the 14 days under pressure in the test described in 4.4.6.

3.14  Oil immersion.  Samples of class 2 gaskets immersed in oil conforming to VV-L-825, class II, shall not swell more than 20 percent, nor decompose after a 48-hour immersion period (see 4.4.7).

4.  QUALITY ASSURANCE PROVISIONS

4.1  Responsibility for inspection.  Unless otherwise specified in the contract or purchase order, the supplier is responsible for the performance of all inspection requirements as specified herein.  Except as otherwise specified in the contract or order, the supplier may use his own or any other facilities suitable for the performance of the inspection requirements specified herein, unless disapproved by the Government.  The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure supplies and services conform to prescribed requirements.

4.2  Qualification tests.  Qualification tests shall be conducted at a laboratory satisfactory to the Naval Ship Engineering Center.  Qualification tests shall consist of the tests specified in 4.4.  Application for Qualification tests shall be made in accordance with "Provisions Governing Qualification SD-6" (see 6.5 and 6.6).

4.3  Quality conformance inspection.

4.3.1  Lot.  For purposes of sampling, a lot shall consist of all asbestos sheet of the same thickness produced under essentially the same conditions and offered for delivery at one time.

4.3.2  Sampling.

4.3.2.1  Sampling for examination of asbestos packing.  A random sample of rolls or sheets shall be selected from each lot offered for examination in accordance with MIL-STD-105 at Inspection Level II.  The Acceptable Quality Level (AQL) shall be 2.5 percent defective.  The sample rolls or sheets shall be obtained in equal number from each shipping container, as nearly as possible.

4.3.2.2  Sampling for tests.  Two samples, each 12 inches by 12 inches, shall be selected from each lot.

4.3.2.3  Sampling for examination of packaging, packing, and marking for shipment.  A random sample of exterior containers shall be selected from each lot in accordance with MIL-STD-105 at Inspection Level S-1.

4.3.3  Visual and dimensional examination.  Each of the sample rolls or sheets selected in accordance with 4.3.2.1 shall be surface examined, and measured to determine conformance with the requirements of this specification which do not require tests.  Any sample containing one or more visual or dimensional defects shall not be offered, and if the number of defective rolls or sheets in any sample exceeds the acceptance number for that sample, this shall be cause for rejection of the lot represented by the sample.

4.3.3.1  Gasket material which is delivered in rolls shall be unrolled sufficiently to expose the required sample area (square yards).  Both sides (faces) shall be inspected whether flat sheet or bulk materials.  Visual and dimensional examination shall be directed to the characteristics of table II.

01027

HH-P-0046D(NAVY-Ships)

Table II - Classification of defects.

| Category | Item | Defect |
|---|---|---|
| Critical | | None defined |
| Major | | |
| 101 | Asbestos sheets and rolls | Thickness is not as specified |
| 102 | | Width is less than 36 inches |
| 103 | | Length is greater than 153 inches |
| 104 | | Marking is not as specified; class and manufacturer's name and brand missing |
| 105 | | Surface is not smooth |
| 106 | | Evidence of lubricant on the sheets |
| 107 | | Sheet is damaged; not suitable for making gaskets |
| 108 | | Material is not in rolls, as specified |
| 109 | | Material is not in flat sheets, as specified |
| 110 | Asbestos sheets (see 5.2.1.2) | No caseliners or provisions made for omitting caseliners in accordance with applicable box specification |
| 111 | Box open (see 5.2.1.1, 5.2.2, and 5.2.3) | Box wrong type, improper size |
| 112 | | Box not properly packed |
| 113 | Box closed (see 5.2.1.2.1, 5.2.2.1, or 5.2.3, 5.3, and 5.4) | Lack of or improper strapping |
| 114 | | Box weight excessive |
| 115 | | Box improperly closed, improperly marked |
| 116 | | Not palletized, if required |
| Minor | | None defined |

4.3.4  Examination of packaging, packing, and marking for shipment.  Sample units of exterior containers, selected in accordance with 4.3.2.3 shall be examined for the defects shown in table II, with an AQL of 1.5.

4.3.5  Lot tests.  The samples selected in accordance with 4.3.2.2 shall be subjected to the tests specified in 4.4.2 through 4.4.5.  Failure in any test shall be cause for rejection of the lot.

4.4  Tests.

4.4.1  Chemical analysis (see 6.3).

4.4.1.1  Preparation of specimen for analysis.  From the samples selected in accordance with 4.3.2.2, small strips of cross-sections shall be cut from various parts so that the specimen shall be representative of all the samples.  The specimen shall be split with the aid of a knife to produce relatively thin layers of material.

4.4.1.1.1  Lubricant content, when specified (see 6.2).  A 1 to 3 gram (g) specimen, prepared as specified in 4.4.1.1 shall be weighed accurately and placed in a siphon cup without a filter thimble.  If graphite is present, a few milliliters (ml) of chloroform shall be added to the cup and agitated gently to dislodge the bulk of graphite, which shall be removed by decanting into the extraction flask.  This is done to prevent the siphon cup from becoming plugged.  Two or three treatments are usually sufficient to remove most of the graphite which shall be collected in the extraction flask along with the chloroform soluble material.  The siphon cup shall then be assembled in the extraction flask, sufficient chloroform added to bring the volume up to about 50 ml, and the extraction continued in the usual manner for a period of 2 hours.  The extracted material shall then be transferred to a watchglass and permitted to air dry.  When dry, the fibers shall be carefully separated, and the remaining lubricant carefully brushed off and collected on the watchglass, then added to the extraction flask.  The residue shall be reserved for subsequent determinations.  The chloroform shall be distilled from the extraction flask on a steam bath, using a gentle stream of filtered air to prevent boiling.  The flask shall then be dried for 1 hour at 105°C (22°F), cooled in a desiccator, and weighed.

5

01028

HH-P-0046D(NAVY-Ships)

Calculation.

$$\text{Lubricant, percent} = \frac{L}{S} \times 100$$

Where:
 L = weight of lubricant and soluble material.
 S = weight of specimen.

4.4.1.1.2  Asbestos fiber and rubber content.  A specimen of approximately 2 g and prepared as specified in 4.4.1.1 shall be placed in a 125 ml lipped assay flask or a 250 ml Erlenmeyer flask or equal fitted with a standard taper and an air condenser.  Ten g of paranitrotoluene and 25 ml of orthodichlorobenzene shall be added, and the mixture heated to 180° to 190°C (356° to 374°F) on a hotplate under a hood with occasional stirring until the rubber dissolves.  From 4 to 10 hours are usually sufficient to effect solution.  The flask contents shall then be cooled, 10 ml of chloroform added, and the mixture decanted through a 100 mesh screen.  The residue shall be washed with chloroform until the insoluble fillers are removed as indicated by a clear filtrate.  If undissolved rubber remains, the fibers shall be returned to the digestion flask and the treatment with paranitrotoluene and orthodichlorobenzene repeated.  The filtrates and wash solutions shall be combined and poured through a portion of the sieve that is free of fibers, in order to collect any fibers that may have passed through previously.  The fibers shall then be transferred to a siphon cup and extracted for 1 hour with chloroform, dried at 105°C (221°F), for 1 hour, cooled, and weighed.

Calculation.

$$\text{Asbestos fibers percent} = \frac{F}{S} \times 100$$

$$\text{Rubber content, percent} = 100 - A - B.$$

Where:
 F = weight of fibers.
 S = weight of specimen.
 A = percent fibers.
 B = percent lubricant.

4.4.1.1.3  Chemically combined water.  Two specimens of approximately 1 g each shall be taken from the fibrous material which has been treated as required in 4.4.1.1.2.  They shall be dried for 1 hour in platinum crucibles at a temperature of 105° to 110°C (221° to 230°F), cooled in a desiccator, and again weighed.  The specimens and crucibles shall be ignited in an electric furnace at a temperature of 800° to 825°C (1472° to 1517°F), or over a blast lamp, to a constant weight.

Calculation.

$$\text{Chemically combined water, percent} = \frac{S - R}{S} \times 100$$

Where:
 R = weight of specimen after ignition.
 S = weight of specimen before ignition.

The average of the results obtained from the two specimens shall be the chemically combined water of the sample.

4.4.1.1.4  Cotton, asbestos, and chemically combined water.  If the fibrous material contains cotton or other organic materials as indicated by nonconformance with 3.4.1, it may be determined as follows:  The asbestos content of the fibrous material which has been treated as specified in 4.4.1.1.2 shall be determined by the combustion procedure for cotton and asbestos.  If lubricant, carbon black, or other material insoluble in the paranitrotoluene - orthodichlorobenzene mixture remains on the fibers, the combustion method will not give reliable results, and in such cases the results obtained shall be considered to be approximations.  A specimen weighing approximately 1 g shall be taken from the fibrous material of 4.4.1.1.2.  It shall be placed in a porcelain or platinum combustion boat, dried for 1 hour at a temperature of 105° to 110°C (221° to 230°F), cooled in a desiccator, and weighed.  The dried specimen in the boat shall be inserted in the combustion tube of an electric organic combustion furnace.  The specimen shall be maintained at a temperature of 900° ± 50°C (1652° ± 90°F) for approximately 30 minutes or until combustion of the cotton is complete.  During the combustion period, a current of oxygen (carbon dioxide free) shall be passed

6

01029

MM-P-0046D (NAVY-Ships)

through the combustion tube at a rate of approximately 200 ml per minute.  The combustion gases shall be passed through either two U-tubes containing calcium chloride or through a drying tube containing anhydrous magnesium perchlorate or calcium sulphate to remove the moisture; and finally the gases shall be passed into either a weighed Vanier or similar absorption bulb containing a strong solution of caustic potash, or in a weighed carbon dioxide absorption bulb containing a sodium hydroxide impregnated base (the absorbent having the trade name "ascarite" is of this type), to absorb the carbon dioxide.  Three-elevenths of the increase in weight of the Vanier or other carbon dioxide absorption bulb shall represent the weight of the carbon in the fibrous material.  This shall be 44.40 percent of the cotton.  These factors may be combined to give a constant of 0.614.  When the combustion has been completed, the absorption tube shall be weighed, and the combustion boat containing the ignited residue shall be removed from the furnace, cooled in a desiccator, and weighed.

Calculation.  The percentage of cotton shall be calculated as follows:

$$A = \frac{61.4 \times C}{E}$$

Where:
    A = Percentage of cotton.
    C = Weight of carbon dioxide, grams.
    E = Weight of fiber specimen, grams.

4.4.2  Loss in weight on heating.

4.4.2.1  Preparation of sample.  Small strips or cross-sections shall be cut from various parts of the sample so as to be representative of the sample.  The specimen shall be split with the aid of a knife to produce relatively thin layers of material.

4.4.2.2  Procedure.  Specimens of approximately 5 g each, prepared as in 4.4.2.1 shall be dried for 1 hour in a porcelain crucible at a temperature at 105° to 110°C (221° to 230°F), cooled in a desiccator, and again weighed.  The specimen and crucible shall be ignited in an electric furnace at a temperature of 900° to 925°C (1652° to 1697°F) or over a blast lamp, to a constant weight.  The loss in weight shall be calculated as follows:

Loss in weight (percent ash) = $\frac{R}{S}$ x 100

Where:
    R = weight of specimen after ignition.
    S = weight of specimen before ignition.

4.4.3  Thickness.  The thickness of the asbestos packing shall be determined as specified in ASTM F39-59.

4.4.4  Compressibility and recovery.  Compressibility and recovery shall be determined as specified in ASTM F36-66, procedure A.

4.4.5  Tensile strength.  Tensile strength shall be determined as specified in ASTM F39-59.

4.4.6  Performance - class 2 only.  The test shall be conducted in a pipe flange gasket test apparatus consisting of two commercial flat-faced flanges in accordance with MIL-F-20670, type C (slip-on welding flanges), 1 inch size, connected to a refrigerant tank as shown on figure 1.  The refrigerant line shall be fitted with a pressure gage and valve so that when the valve is closed, any change in pressure will be indicated by the gage.  The refrigerant shall be supplied from a pressure storage vessel provided with a means to control pressure.  Winding the tank with a variable temperature electrical heating tape has been found satisfactory.  The temperature of the tank shall be measured by some means, such as a thermocouple attached to the tank between heating elements.  The vessel shall never exceed a temperature at least 10° below the safe temperature limit for that particular vessel.  The four flange bolts shall be fitted with washer type force gages (electrical strain gages) wired through a strain gage switching unit to a strain indicator.  The gasket specimen, cut to fit the full face of the flange from 1/32 inch sheet material, shall be installed in the flange joint and the flange bolts tightened to compress the gasket to 2000 psi.  The refrigerant tank valve and connecting line valve shall be opened to admit refrigerant to the joint.  The tank shall be heated until the desired pressure (100 + 5 psi for R-11, and R-114, 200 + 5 psi for R-12 and R-22) is contained in the flange joint.  This pressure shall be maintained by adjusting the electrical input to the tank heater.  A pressure sensing electrical switch shall be connected to the refrigerant line.  It shall be set to maintain the correct refrigerant pressure.  The electrical contacts of the switch shall be connected to the heater

7

MM-P-0046D(NAVY-Ships)

circuit to control the heater thereby controlling the pressure. The apparatus should be valved off and the heating unit secured during extended periods when it is left unattended (for example, at night). No leakage shall occur during 14 days. Test for leakage may be made at shorter intervals and the test discontinued if leakage is evident. Duplicate determinations shall be made (see figure 1).

4.4.6.1  Prior to subjecting the class 2 gasket material to the test above, the sample shall be immersed in VV-L-825, class II oil for a period of 24 hours.

4.4.6.2  The refrigerant leak testing shall be conducted using an electronic leak detector. During the test the sensitivity of the leak detector shall be set to detect a leak of one ounce per year or larger. Any refrigerant leak detected shall be cause for rejection.

4.4.7  Oil immersion - class 2 only. Oil immersion test shall be conducted as specified in ASTM D471-68. Test specimens, 1 inch by 2 inches, shall be cut at random from one sheet of class 2 material. Specimens shall be completely immersed in VV-L-825, class II oil, and heated to 300°F (149°C) for a period of 48 hours. Samples shall be dried and the percent swell determined. Five specimens shall be tested. Failure of any specimen to comply with 3.14 shall be cause for rejection of the lot.

5.  PREPARATION FOR DELIVERY

(The preparation for delivery requirements specified herein apply only for direct Government procurements.)

5.1  Packaging. Packaging shall be level A or C as specified (see 6.2).

5.1.1  Level A.

5.1.1.1  Rolls. Asbestos packing shall be rolled and restrained from unwinding. The rolls shall be wrapped with class E2 barrier material conforming to PPP-B-1055 with ends enclosed. All seams, joints, and closures shall be sealed with adhesives or other suitable materials to afford waterproofness equal to that of the wrap material itself. A minimum of 2-inch overlap shall be provided at all overlapping edges.

5.1.1.2  Sheets. No overpackaging required.

5.1.2  Level C. Asbestos packing in the form specified (see 6.2), shall be packaged to afford protection against deterioration and damage from the supply source to the first receiving activity for immediate use. The supplier's normal packaging method may be used when such meets the requirements of this level.

5.2  Packing. Packing shall be level A, B, or C, as specified (see 6.2).

5.2.1  Level A.

5.2.1.1  Rolls and sheets. Rolls and sheets shall be packed in containers conforming to any of the following specifications at the option of the contractor:

| Specification | Classification |
|---|---|
| PPP-B-576 | Class 2 |
| PPP-B-585 | Class 3 use |
| PPP-B-591 | Overseas type |
| PPP-B-601 | Overseas type |
| PPP-B-621 | Class 2 |
| PPP-B-636 | Weather-resistant |
| PPP-B-640 | Class 2 |

5.2.1.2  Case liners for flat sheets. Shipping containers for flat sheets shall have case liners conforming to MIL-L-10547. Case liners shall be closed and sealed in accordance with the appendix to MIL-L-10547. Case liners for fiberboard boxes, PPP-B-636 and PPP-B-640, may be omitted provided all center and edge seams and manufacturer's joints are sealed and waterproofed with pressure-sensitive tape in accordance with the applicable fiberboard box specification.



01031

MIL-P-0046D (NAVY-Ships)

5.2.1.2.1  Shipping containers shall be closed and strapped or banded in accordance with the applicable box specification or appendix thereto.  The gross weight of wood or wood-cleated boxes shall not exceed 200 pounds; fiberboard boxes shall not exceed the weight limitations of the applicable fiberboard box specification.

5.2.2  **Level B**.  Asbestos packing shall be furnished in rolls or sheets as specified in 5.1.1.

    (a)  Rolls packaged as specified in 5.1.1.1 will need no overpacking.
    (b)  Sheets shall be packed in containers conforming to any of the following specifications at the option of the contractor.

| Specification | Classification |
|---|---|
| PPP-B-576 | Class 1 |
| PPP-B-585 | Class 1 or 2 use |
| PPP-B-591 | Domestic type |
| PPP-B-601 | Domestic type |
| PPP-B-621 | Class 1 |
| PPP-B-636 | Class domestic |
| PPP-B-640 | Class 1 |

5.2.2.1  Shipping containers shall be closed in accordance with the applicable box specification or appendix thereto.  The gross weight of wood or wood-cleated boxes shall not exceed 200-pounds; fiberboard boxes shall not exceed the weight limitations of the applicable fiberboard box specification.

5.2.3  **Level C**.  Asbestos packaged as specified shall be packed in a manner to insure carrier acceptance and safe delivery at destination at the lowest rate.  Containers, packing, or method of shipment shall comply with Uniform Freight Classification Rules, National Motor Freight Classification Rules, or other carrier rules as applicable to the mode of transportation.

5.3  **Marking**.  Containers shall be marked in accordance with 5.3.1 or 5.3.2, as applicable, and shall include any special marking specified in the contract or order (see 6.2).  In addition, the date of manufacture (see 3.12), expressed by quarter and year (for example sheets manufactured in January, February, or March 1966 would be marked 1-66), shall be marked on the outside of each shipping container.  The size of letters and material for the marking for date-of-manufacture shall conform to FED-STD-123 or MIL-STD-129, as applicable.

5.3.1  **Civil agencies**.  In addition to the marking specified in 5.3, all containers for civil agencies shall be marked in accordance with FED-STD-123.

5.3.2  **Military agencies**.  In addition to the marking specified in 5.3, all containers for military agencies shall be marked in accordance with MIL-STD-129.

5.4  **Palletization**.  When specified (see 6.2), shipping containers shall be palletized in accordance with MIL-STD-147.

6.  NOTES

6.1  **Intended use**.  The packing is intended for use in pipe joints under the following conditions:

6.1.1  **Class 1**.

    (a)  Saturated steam to 300 pounds per square inch gage (psig) or alternatively steam to 300 pounds pressure and 600°F (350°C) temperature.
    (b)  Hot or cold water or brine to 400 pounds pressure, except potable water.
    (c)  Air to 3,000 pounds pressure.
    (d)  Gases of combustion to 300 pounds pressure and 600°F (350°C) temperature.
    (e)  Fuel oil to 580 pounds pressure and 250°F (121°C) temperature.

6.1.2  **Class 2**.

    (a)  Refrigerant service to 225 pounds pressure and 300°F (149°C) temperature.

9

MH-P-0046D(NAVY-Ships)

6.2 <u>Ordering data</u>. Procurement documents should specify the following:

(a) Title, number, and date of this specification.
(b) Class required (see 1.2).
(c) Whether the finished sheet shall be furnished with lubricant on one or both sides (see 3.3).
(d) Weight, thickness and form required (see 3.6 and 3.6.1).
(e) Minimum and maximum length and width of sheet required (see 3.7).
(f) Whether identification of product shall be other than that specified (see 3.11).
(g) Whether lubricant is required (see 3.11.1 and 4.4.1.1.1).
(h) Selection of applicable levels of packaging and packing required (see 5.1, 5.1.2, and 5.2).
(i) Whether special marking is required (see 5.3.1 or 5.3.2).
(j) Whether shipping containers shall be palletized (see 5.4).

6.3 <u>Chemical analysis</u>. Present known methods of chemical analysis of this type of material do not have a high degree of accuracy. It is necessary to make assumptions and, unless one has run this type of test many times, it is difficult to arrive at the correct answer on what is in the sheet and have other laboratories be able to duplicate the findings. At the same time the importance of accurately determining what is in the sheet is considered important. It has been found, however, that once the material has been approved and is satisfactory, a comparison of the results of the loss of weight test with previous results, where the material passed the chemical analysis test, is sufficient to assure that the material is the same as that previously supplied.

6.5 With respect to products requiring qualification, awards will be made only for products which are at the time set for opening of bids, qualified for inclusion in applicable Qualified Products List QPL MH-P-46 whether or not such products have actually been so listed by that date. The attention of the suppliers is called to this requirement, and manufacturers are urged to arrange to have the products that they propose to offer to the Federal Government tested for qualification in order that they may be eligible to be awarded contracts or orders for the products covered by this specification. The activity responsible for the Qualified Products List is the Naval Ship Engineering Center, Prince George's Center, Center Building, Hyattsville, Maryland 20782, and information pertaining to qualification of products may be obtained from that activity. Application for Qualification tests shall be made in accordance with "Provisions Governing Qualification SD-6" (see 6.6).

6.6 Copies of "Provisions Governing Qualification SD-6" may be obtained upon application to Commanding Officer, Naval Publications and Forms Center, 5801 Tabor Avenue, Philadelphia, Pennsylvania 19120.

6.7 <u>Supersession data</u>. The asbestos sheet covered by Military Specification MIL-A-17472B, Asbestos Sheet, Compressed (Gasket Material), dated 12 May 1964 is now class I of this specification.

6.8 THE MARGINS OF THIS SPECIFICATION ARE MARKED "+" TO INDICATE WHERE CHANGES (ADDITIONS, MODIFICATIONS, CORRECTIONS, DELETIONS) FROM THE PREVIOUS ISSUE HAVE BEEN MADE. THIS WAS DONE AS A CONVENIENCE ONLY AND THE GOVERNMENT ASSUMES NO LIABILITY WHATSOEVER FOR ANY INACCURACIES IN THESE NOTATIONS. BIDDERS AND CONTRACTORS ARE CAUTIONED TO EVALUATE THE REQUIREMENTS OF THIS DOCUMENT BASED ON THE ENTIRE CONTENT IRRESPECTIVE OF THE MARGINAL NOTATIONS AND RELATIONSHIP TO THE LAST PREVIOUS ISSUE.

Preparing activity:
Navy - SH
(Project 5330-N037)

10



HH-P-0046D (NAVY-Ships)



Figure 1 - Schematic Diagram of Pipe Flange Gasket Apparatus
For Testing Refrigerant Gasket Materials.

SH 10663

☆ U. S. GOVERNMENT PRINTING OFFICE: 1973-713-145/923

01034

## DOCUMENT CERTIFICATION

I, Thomas F. McCaffery, do swear under the penalties of perjury that the documents (*160 pages* and initialed) in Volume I of the binder entitled, "Dana Corporation, General Information, Gasket-Related Specification" are to the best of my knowledge and belief, true and accurate copies of original U.S. Government documents.

_Thomas F. McCaffery_

Thomas F. McCaffery

I, _MARLISA A. TRASATTI_, a commissioned Notary Public in and for the County of _HARFORD_, State of _MD_, do certify that Thomas F. McCaffery appeared before me on this date in the City of Baltimore, State of Maryland and that I took his oath aforesaid.

_[signature]_

SEAL

Date: _5/30/03_

My commission expires: _8/29/06_

**EXHIBIT H**

E-51-17

HH-P-452
March 3, 1975
SUPERSEDING
Int. Fed. Spec. HH-P-0046D (NAVY-Ships)
July 27, 1973 and
Fed. Spec. HH-P-46C
May 26, 1966
(See 6.7 and 6.8)

FEDERAL SPECIFICATION

PACKING; ASBESTOS, SHEET, COMPRESSED

This specification was approved by the Commissioner, Federal Supply Service,
General Services Administration, for the use of all Federal agencies

1. SCOPE AND CLASSIFICATION

1.1 Scope. This specification covers two classes of compressed asbestos sheet packing materials for use in pipe joints.

1.2 Classification. Asbestos sheet packing materials shall be of the following classes, as specified (see 6.2):

Class 1 - For gasket joint sealing material for steam, hot and cold water, except potable water, or brine, air and gases (other than halocarbon refrigerant), and oil.

Class 2 - For gasket joint sealing material for halocarbon refrigerant systems (R11, R12, R22, and R114).

2. APPLICABLE DOCUMENTS

2.1 The following documents of the issue in effect on date of invitation for bids or request for proposal, form a part of the specification to the extent specified herein:

FEDERAL SPECIFICATIONS:

VV-L-825 - Lubricating Oil, Refrigerant Compressor.
PPP-B-576 - Boxes, Wood, Cleated, Veneer, Paper Overlaid.
PPP-B-585 - Boxes, Wood, Wirebound.
PPP-B-591 - Boxes, Fiberboard, Wood-Cleated.
PPP-B-601 - Boxes, Wood, Cleated-Plywood.
PPP-B-621 - Boxes, Wood, Nailed and Lock-Corner.
PPP-B-636 - Boxes, Shipping, Fiberboard.
PPP-B-640 - Boxes, Fiberboard, Corrugated, Triple-Wall.
PPP-B-1055 - Barrier Material, Waterproofed, Flexible.

FEDERAL STANDARD:

Fed. Std. No. 123 - Marking for Domestic Shipment (Civil Agencies).

(Activities outside the Federal Government may obtain copies of Federal Specifications and Standards as outlined under General Information in the Index of Federal Specifications and Standards and at the prices indicated in the Index. The Index, which includes cumulative monthly supplements as issued, is for sale on a subscription basis by the Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402.

(Single copies of this specification and other Federal specifications required by activities outside the Federal Government for bidding purposes are available without charge at the General Services Administration Regional Offices in Boston, New York, Washington, DC, Atlanta, Chicago, Kansas City, MO, Fort Worth, Denver, San Francisco, Los Angeles, and Seattle, WA.

(Federal Government activities may obtain copies of Federal Specifications and Standards and the Index of Federal Specifications and Standards from established distribution points in their agencies.)

FSC 5330

THIS DOCUMENT CONTAINS 11 PAGES.

Obtained from GLOBAL ENGINEERING DOCUMENTS
15 Inverness Way E, Englewood, CO 80112 (303)397-7956 (800)854-7179

RR-P-46E

MILITARY SPECIFICATIONS:

MIL-L-10547 - Liners, Case, and Sheet, Overwrap; Water-Vaporproof or Waterpr[...]
                Flexible.
MIL-F-20670 - Flanges, Pipe, Carbon Steel, 150 P.S.I.; W.S.P. (For Naval Shipboar[...]
                Use).

MILITARY STANDARDS:

MIL-STD-105 - Sampling Procedures and Tables for Inspection by Attributes.
MIL-STD-129 - Marking for Shipment and Storage.
MIL-STD-147 - Palletized Unit Loads for 40" X 48" Pallets.

(Copies of Military Specifications and Standards required by suppliers in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

2.2  Other publications.  The following documents form a part of this specification to the extent specified herein.  Unless otherwise indicated, the issue in effect on date of invitation for bids or request for proposal shall apply.

Uniform Classification Committee, Agent;
    Uniform Freight Classification.

(Application for copies should be addressed to the Uniform Classification Committee, Room 1106, 222 South Riverside Plaza, Chicago, Illinois 60606.)

National Motor Freight Traffic Association, Inc., Agent;
    National Motor Freight Classification.

(Application for copies should be addressed to the American Trucking Associations, Inc., ATTN: Tariff Order Section, 1616 P Street, N.W., Washington, DC 20036.)

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)
    D471 - Change in Properties of Elastomeric Vulcanizates Resulting from Immersion
            in Liquids, Test for.
    F36 - Compressibility and Recovery of Gasket Materials, Test for.
    F39 - Compressed Asbestos Sheet Packing, Testing.

(Copies may be obtained from the American Society for Testing and Materials, 1916 [...] Street, Philadelphia, Pennsylvania 19103.)

(Technical society and technical association specifications and standards are generally available for reference from libraries.  They are also distributed among technical groups and using Federal agencies.)

3.  REQUIREMENTS

3.1  Qualification.  Compressed asbestos sheet furnished under this specification shall be products which are qualified for listing on the applicable qualified products list at the time set for opening of bids (see 4.3 and 6.4).

3.2  Material.  The compressed asbestos sheet shall be made of asbestos fiber, natural or synthetic elastomer, or a mixture of the two, vulcanizing agent and suitable mineral fillers.

3.2.1  Asbestos fiber.  The asbestos fiber shall be chrysotile and shall contain not less than 12 percent water of crystallization (see 4.5.1).

3.2.2  Solvents.  The finished sheet shall be free of gasoline or other solvents used in the process of manufacture (see 4.4.3.1).

3.3  Lubricant.  Unless otherwise specified (see 6.2), the finished sheets of packing shall not be lubricated.  When a lubricant is required, either a graphite or silicone type may be used.

3.4  Asbestos fiber and rubber content.  The packing shall contain not less than 70 percent by weight of asbestos fiber and not less than 10 percent by weight of natural or synthetic rubber when tested as specified in 4.5.1.1.2.

2

Obtained from GLOBAL ENGINEERING DOCUMENTS
15 Inverness Way E, Englewood, CO 80112 (303)397-7956 (800)854-7179

HH-P-46E

3.4.1 <u>Chemically combined water</u>. The asbestos fiber shall be chrysotile and the dry asbestos fiber shall contain not less than 12 percent by weight of chemically combined water (water of crystallization), when tested as specified in 4.5.1.1.3.

3.5 <u>Construction</u>. The packing shall be thoroughly and evenly mixed to the desired consistency (see 3.4), and compressed into a sheet of compact and uniform texture either cross-laminated or single-ply.

3.6 <u>Weight and thickness</u>. The weight and thickness of the finished compressed asbestos sheet shall be as specified (see 6.2), and in accordance with table I.

TABLE I – Weight and thickness.

| Weight (pounds per square yard) | Thickness | |
|---|---|---|
| Minimum | Required (inch) | Tolerance (inch) |
| 0.8 | 0.0156 | +0.005 −0.002 |
| 2.0 | .0313 | ±0.005 |
| 4.0 | .0625 | ±0.0063 |
| 6.0 | .0938 | ±0.0094 |
| 8.0 | .1250 | ±0.0125 |
| 12.0 | .1875 | ±0.0188 |
| 16.0 | .250 | ±0.0250 |

3.6.1 <u>Form</u>. Compressed asbestos packing in thicknesses up to and including 1/16 inch shall be furnished in rolls (see 5.1.1.1); and compressed asbestos packing exceeding 1/16 inch in thickness shall be furnished in flat sheets.

3.7 <u>Length and width</u>. Unless otherwise specified (see 6.2), asbestos packing sheets shall be furnished in widths not less than 36 inches, and in lengths not greater than 153 inches when examined as specified in 4.4.3. The tolerance limits for both length and width shall be −0 percent to plus 1 percent.

3.8 <u>Loss of weight on heating</u>. The loss of weight of the packing on heating at 900° to 925° Celsius (C) (1652° to 1697° Fahrenheit (F)) shall be not more than 35 percent when tested as specified in 4.5.2.

3.9 <u>Compressibility and recovery</u>. The compressibility of the sheet shall be not less than 5 percent nor more than 20 percent for 1/64 inch thickness, and not less than 7 percent nor more than 17 percent for 1/32 inch thickness. The recovery shall be not less than 40 percent. Tests shall be as specified in 4.5.4.

3.10 <u>Tensile strength</u>. Tests for tensile strength shall be made as specified in 4.3.5.

   (a)  Sheets 1/32 inch and thicker shall have an average tensile strength of not
        less than 3,500 pounds per square inch (psi).
   (b)  Single-ply sheets 1/64 inch thick shall have a minimum average tensile
        strength for each sheet of 1,200 psi in the weakest direction and an average
        tensile strength in both the longitudinal and transverse directions of not
        less than 2,000 psi.

3.11 <u>Identification of product</u>. Unless otherwise specified (see 6.2), sheets and rolls shall be legibly marked with a fuel-oil resistant lacquer, ink, or dye to show information as follows:

| Class 1 | Class 2 |
|---|---|
| (a)  HH-P-46, class 1 | (a)  HH-P-46, class 2 |
| (b)  Manufacturer's name | (b)  Manufacturer's name |
| (c)  Product identification | (c)  Product identification |

The markings shall be not less than 3/8 inch in height, on one side only, and shall be on every square foot, or less, of the packing.

3.11.1 When lubricant is required (see 6.2), sheets and rolls shall have attached a sturdy paper tag containing the information required by 3.11, marked thereon in a fuel-oil resistant lacquer, ink, or dye.

3

Obtained from GLOBAL ENGINEERING DOCUMENTS
15 Inverness Way E. Englewood, CO 80112 (303)397-7956 (800)854-7179

01015

3.12 **Limitation on age.** The packing shall be not older than 4 quarters from date of manufacture, when offered for delivery to the Government (see 5.3).

3.13 **Simulated performance - class 2 only.** The flanged joint containing the compressed asbestos sheet shall not leak after being subjected to the simulated performance test specified in 4.5.6. There shall be no corrosion of the test flanges in the gasket contact area.

3.13.1 Class 2 gaskets shall permit no leakage of refrigerant during the 14 days under pressure in the test described in 4.5.6.

3.14 **Oil immersion.** Samples of class 2 gaskets immersed in oil conforming to VV-L-825 class II, shall not swell more than 20 percent, nor decompose after a 48-hour immersion period (see 4.5.7).

4. QUALITY ASSURANCE PROVISIONS

4.1 **Responsibility for inspection.** Unless otherwise specified in the contract or purchase order, the supplier is responsible for the performance of all inspection requirements as specified herein. Except as otherwise specified in the contract or order, the supplier may use his own or any other facilities suitable for the performance of the inspection requirements specified herein, unless disapproved by the Government. The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure supplies and services conform to prescribed requirements.

4.2 **Classification of inspections.** The inspection requirements specified herein are classified as follows:

    (a)  Qualification inspection (see 4.3).
    (b)  Quality conformance inspection (see 4.4).

4.3 **Qualification tests.** Qualification tests shall be conducted at a laboratory satisfactory to the Naval Ship Engineering Center. Qualification tests shall consist of the examinations of 4.4.3 and the tests specified in 4.5. Application for Qualification tests shall be made in accordance with "Provisions Governing Qualification SD-6" (see 6.4 and 6.5).

4.4 **Quality conformance inspection.**

4.4.1 **Lot.** For purposes of sampling, a lot shall consist of all asbestos sheet of same class and thickness produced under essentially the same conditions and offered for delivery at one time.

4.4.2 **Sampling.**

4.4.2.1 **Sampling for examination of asbestos packing.** A random sample of rolls or sheets shall be selected from each lot offered for examination in accordance with MIL-STD-105 at Inspection Level II. The Acceptable Quality Level (AQL) shall be 2.5 percent defective. The sample rolls or sheets shall be obtained in equal number from each shipping container, as nearly as possible.

4.4.2.2 **Sampling for tests.** Two samples, each 12 inches by 12 inches, shall be selected from each lot.

4.4.2.3 **Sampling for examination of packaging, packing, and marking for shipment.** A random sample of exterior containers shall be selected from each lot in accordance with MIL-STD-105 at Inspection Level S-1.

4.4.3 **Visual and dimensional examination.** Each of the sample rolls or sheets selected in accordance with 4.4.2.1 shall be surface examined, and measured to determine conformance with the requirements of this specification which do not require tests. Any sample containing one or more visual or dimensional defects shall not be offered, and if the number of defective rolls or sheets in any sample exceeds the acceptance number for that sample, this shall be cause for rejection of the lot represented by the sample.

4.4.3.1 Gasket material which is delivered in rolls shall be unrolled sufficiently to expose the required sample area (square yards). Both sides (faces) shall be inspected whether flat sheet or roll materials. Visual and dimensional examination shall be directed to the characteristics of table II.

4

Obtained from GLOBAL ENGINEERING DOCUMENTS
15 Inverness Way E. Englewood, CO 80112 (303)397-7956 (800)854-7179

HH-P-46E

### TABLE II – Classification of defects.

| Category | Item | Defect |
|---|---|---|
| Critical | | None defined |
| Major | | |
| 101 | Asbestos sheets and rolls | Thickness is not as specified |
| 102 | | Width is less than 36 inches |
| 103 | | Length is greater than 153 inches |
| 104 | | Marking is not as specified; class and manufacturer's name and brand missing |
| 105 | | Surface is not smooth |
| 106 | | Evidence of lubricant on the sheets |
| 107 | | Sheet is damaged; not suitable for making gaskets |
| 108 | | Material is not in rolls, as specified |
| 109 | | Material is not in flat sheets, as specified |
| 110 | Asbestos sheets (see 3.2.2, 3.7, and 5.2.1.2) | No caseliners or provisions made for omitting caseliners in accordance with applicable box specification |
| 111 | | Finished sheet not free of gasoline or other solvents |
| 112 | | Sheet less than minimum length required |
| 113 | Box open (see 5.2.1.1, 5.2.2, and 5.2.3) | Box wrong type, improper size |
| 114 | | Box not properly packed |
| 115 | Box closed (see 5.2.1.2.1, 5.2.2.1, or 5.2.3, 5.3, and 5.4) | Lack of or improper strapping |
| 116 | | Box weight excessive |
| 117 | | Box improperly closed, improperly marked |
| 118 | | Not palletized, if required |
| Minor | | None defined |

4.4.4  <u>Examination of packaging, packing, and marking for shipment</u>.  Sample units of exterior containers, selected in accordance with 4.4.2.3 shall be examined for the defects shown in table II, with an AQL of 1.5.

4.4.5  <u>Lot tests</u>.  The samples selected in accordance with 4.4.2.2 shall be subjected to the tests specified in 4.5.2 through 4.5.5.  Failure in any test shall be cause for rejection of the lot.

4.5  <u>Tests</u>.

4.5.1  <u>Chemical analysis (see 6.3)</u>.

4.5.1.1  <u>Preparation of specimen for analysis</u>.  From the samples selected in accordance with 4.4.2.2, small strips of cross-sections shall be cut from various parts so that the specimen shall be representative of all the samples.  The specimen shall be split with the aid of a knife to produce relatively thin layers of material.

4.5.1.1.1  <u>Asbestos fiber and rubber content</u>.  A specimen of approximately 2 grams (g) and prepared as specified in 4.5.1.1 shall be placed in a 125 milliliters (ml) lipped assay flask or a 250 ml Erlenmeyer flask of equal fitted with a standard taper and an air condenser.  Ten g of paranitrotoluene and 25 ml of orthodichlorobenzene shall be added, and the mixture heated to 180° to 190°C (356° to 374°F) on a hotplate under a hood with occasional stirring until the rubber dissolves.  From 4 to 10 hours are usually sufficient to effect solution.  The flask contents shall then be cooled, 10 ml of chloroform added, and the mixture decanted through a 100 mesh screen.  The residue shall be washed with chloroform until the insoluble fillers are removed as indicated by a clear filtrate.  If undissolved rubber remains, the fibers shall be returned to the digestion flask and the treatment with paranitrotoluene and orthodichlorobenzene repeated.  The filtrates and wash solutions shall be combined and poured through a portion of the sieve that is free of fibers, in order to collect any fibers that may have passed through previously.  The fibers shall then be transferred to a siphon cup and extracted for 1 hour with chloroform, dried at 105°C (221°F), for 1 hour, cooled, and weighed.

5

Obtained from GLOBAL ENGINEERING DOCUMENTS
15 Inverness Way E. Englewood, CO 80112 (303)397-7956 (800)854-7179

MH-P-J62

Calculation.

Asbestos fibers percent = $\frac{F}{S}$ x 100

Rubber content, percent = 100-A-B.

Where:
F = weight of fibers.
S = weight of specimen.
A = percent fibers.
B = percent lubricant.

4.5.1.1.2  Chemically combined water.  Two specimens of approximately 1 g each shall be taken from the fibrous material which has been treated as required in 4.5.1.1.2.  They shall be dried for 1 hour in platinum crucibles at a temperature of 105° to 110°C (221° to 230°F), cooled in a desiccator, and again weighed.  The specimens and crucibles shall be ignited in an electric furnace at a temperature of 800° to 825°C (1472° to 1517°F), or over a blast lamp, to a constant weight.

Calculation.

Chemically combined water, percent = $\frac{S-R}{S}$ x 100

Where:
R = weight of specimen after ignition.
S = weight of specimen before ignition.

The average of the results obtained from the two specimens shall be the chemically combined water of the sample.

4.5.1.1.3  Cotton, asbestos, and chemically combined water.  If the fibrous material contains cotton or other organic materials as indicated by nonconformance with 3.4.1, it may be determined as follows:  The asbestos content of the fibrous material which has been treated as specified in 4.5.1.1.2 shall be determined by the combustion procedure for cotton and asbestos.  If lubricant, carbon black, or other material insoluble in the paranitrotoluene - orthodichlorobenzene mixture remains on the fibers, the combustion method will not give reliable results, and in such cases the results obtained shall be considered to be approximations.  A specimen weighing approximately 1 g shall be taken from the fibrous material of 4.5.1.1.2.  It shall be placed in a porcelain or platinum combustion boat, dried for 1 hour at a temperature of 105° to 110°C (221° to 230°F), cooled in a desiccator, and weighed.  The dried specimen in the boat shall be inserted in the combustion tube of an electric organic combustion furnace.  The specimen shall be maintained at a temperature of 900° to 950° (1652° + 90°F) for approximately 30 minutes or until combustion of the cotton is complete.  During the combustion period, a current of oxygen (carbon dioxide free) shall be passed through the combustion tube at a rate of approximately 200 ml per minute.  The combustion gases shall be passed through either two U-tubes containing calcium chloride or through a drying tube containing anhydrous magnesium perchlorate or calcium sulphate to remove the moisture; and finally the gases shall be passed into either a weighed Vanier or similar absorption bulb containing a strong solution of caustic potash, or in a weighed carbon dioxide absorption bulb containing a sodium hydroxide impregnated base (the absorbent having the trade name "ascarite" is of this type), to absorb the carbon dioxide.  Three-elevenths of the increase in weight of the Vanier or other carbon dioxide absorption bulb shall represent the weight of the carbon in the fibrous material.  This shall be 44.40 percent of the cotton.  These factors may be combined to give a constant of 0.614.  When the combustion has been completed, the absorption tube shall be weighed, and the combustion boat containing the ignited residue shall be removed from the furnace, cooled in a desiccator, and weighed.

Calculation.  The percentage of cotton shall be calculated as follow:

$$A = \frac{61.4 \times C}{E}$$

Where:
A = Percentage of cotton.
C = Weight of carbon dioxide, grams.
E = Weight of fiber specimen, grams.

6

Obtained from GLOBAL ENGINEERING DOCUMENTS
15 Inverness Way E. Englewood, CO 80112 (303)397-7956 (800)854-7179

01018

4.5.2 <u>Loss in weight on heating</u>.

4.5.2.1 <u>Preparation of sample</u>. Small strips or cross-sections shall be cut from various parts of the sample so as to be representative of the sample. The specimen shall be split with the aid of a knife to produce relatively thin layers of material.

4.5.2.2 <u>Procedure</u>. Specimens of approximately 5 g each, prepared as in 4.5.2.1 shall be dried for 1 hour in a porcelain crucible at a temperature at 105° to 110°C (221° to 230°F), cooled in a desiccator, and again weighed. The specimen and crucible shall be ignited in an electric furnace at a temperature of 900° to 925°C (1652° to 1697°F) or over a blast lamp, to a constant weight. The loss in weight shall be calculated as follows:

$$\text{Loss in weight (percent ash)} = \frac{R}{S} \times 100$$

Where:

R = weight of specimen after ignition.
S = weight of specimen before ignition.

4.5.3 <u>Thickness</u>. The thickness of the asbestos packing shall be determined as specified in ASTM F39.

4.5.4 <u>Compressibility and recovery</u>. Compressibility and recovery shall be determined as specified in ASTM F36, procedure A.

4.5.5 <u>Tensile strength</u>. Tensile strength shall be determined as specified in ASTM F39.

4.5.6 <u>Performance - class 2 only</u>. The test shall be conducted in a pipe flange gasket test apparatus consisting of two commercial flat-faced flanges in accordance with MIL-F-20670, type C (slip-on welding flanges), 1 inch size, connected to a refrigerant tank as shown on figure 1. The refrigerant line shall be fitted with a pressure gage and valve so that when the valve is closed, any change in pressure will be indicated by the gage. The refrigerant shall be supplied from a pressue storage vessel provided with a means to control pressure. Winding the tank with a variable temperature electrical heating tape has been found satisfactory. The temperature of the tank shall be measured by some means, such as a thermocouple attached to the tank between heating elements. The vessel shall never exceed a temperature at least 10° below the safe temperature limit for that particular vessel. The four flange bolts shall be fitted with washer type force gages (electrical strain gages) wired through a strain gage switching unit to a strain indicator. The gasket specimen, cut to fit the full face of the flange from 1/32 inch sheet material, shall be installed in the flange joint and the flange bolts tightened to compress the gasket to 2000 pounds per square inch gage ($lb/in^2g$). The refrigerant tank valve and connecting line valve shall be opened to admit refrigerant to the joint. The tank shall be heated until the desired pressure (100 $\pm$ 5 $lb/in^2g$ for R-11, and R-114, 200 $\pm$ 5 $lb/in^2g$ for R-12 and R-22) is contained in the flange joint. This pressure shall be maintained by adjusting the electrical input to the tank heater. A pressure sensing electrical switch shall be connected to the refrigerant line. It shall be set to maintain the correct refrigerant pressure. The electrical contacts of the switch shall be connected to the heater circuit to control the heater thereby controlling the pressure. The apparatus should be valved off and the heating unit secured during extended periods when it is left unattended (for example, at night). No leakage shall occur during 14 days. Test for leakage may be made at shorter intervals and the test discontinued if leakage is evident. Duplicate determinations shall be made (see figure 1).

4.5.6.1 Prior to subjecting the class 2 gasket material to the test above, the sample shall be immersed in VV-L-825, class II oil for a period of 24 hours.

4.5.6.2 The refrigerant leak testing shall be conducted using an electronic leak detector. During the test the sensitivity of the leak detector shall be set to detect a leak of one ounce per year or larger. Any refrigerant leak detected shall be cause for rejection.

4.5.7 <u>Oil immersion - class 2 only</u>. Oil immersion test shall be conducted as specified in ASTM D471. Test specimens, 1 inch by 2 inches, shall be cut at random from one sheet of class 2 material. Specimens shall be completely immersed in VV-L-825, class II oil, and heated to 149°C (300°F) for a period of 48 hours. Samples shall be dried and the percent swell determined. Five specimens shall be tested. Failure of any specimen to comply with 3.14 shall be cause for rejection of the lot.

7

Obtained from GLOBAL ENGINEERING DOCUMENTS
15 Inverness Way E. Englewood, CO 80112 (303)397-7956 (800)854-7179



HH-P-46B

5.  PREPARATION FOR DELIVERY

(The preparation for delivery requirements specified herein apply only for direct Government procurements.  For the extent of applicability of the preparation for delivery requirements of reference documents listed in section 2, see 6.6.)

5.1  Packaging.  Packaging shall be level A or C as specified (see 6.2).

5.1.1  Level A.

5.1.1.1  Rolls.  Asbestos packing shall be rolled and restrained from unwinding.  The rolls shall be wrapped with class E2 barrier material conforming to PPP-B-1055 with ends enclosed.  All seams, joints, and closures shall be sealed with adhesives or other suitable materials to afford waterproofness equal to that of the wrap material itself.  A minimum of 2-inch overlap shall be provided at all overlapping edges.

5.1.1.2  Sheets.  No overpackaging required.

5.1.2  Level C.  Asbestos packing in the form specified (see 6.2), shall be packaged to afford protection against deterioration and damage from the supply source to the first receiving activity for immediate use.  The supplier's normal packaging method may be used when such meets the requirements of this level.

5.2  Packing.  Packing shall be level A, B, or C, as specified (see 6.2).

5.2.1  Level A.

5.2.1.1  Rolls and sheets.  Rolls and sheets shall be packed in containers conforming to any of the following specifications at the option of the contractor:

| Specification | Classification |
|---|---|
| PPP-B-576 | Class 2 |
| PPP-B-585 | Class 3 use |
| PPP-B-591 | Overseas type |
| PPP-B-601 | Overseas type |
| PPP-B-621 | Class 2 |
| PPP-B-636 | Weather-resistant |
| PPP-B-640 | Class 2 |

5.2.1.2  Case liners for flat sheets.  Shipping containers for flat sheets shall have case liners conforming to MIL-L-10547.  Case liners shall be closed and sealed in accordance with the appendix to MIL-L-10547.  Case liners for fiberboard boxes, PPP-B-636 and PPP-B-640, may be omitted provided all center and edge seams and manufacturer's joints are sealed and waterproofed with pressure sensitive tape in accordance with the applicable fiberboard box specification.

5.2.1.2.1  Shipping containers shall be closed and strapped or banded in accordance with the applicable box specification or appendix thereto.  The gross weight of wood or wood-cleated boxes shall not exceed 200 pounds; fiberboard boxes shall not exceed the weight limitations of the applicable fiberboard box specification.

5.2.2  Level B.  Asbestos packing shall be furnished in rolls or sheets as specified in 5.1.1.

(a)  Rolls packaged as specified in 5.1.1.1 will need no overpacking.
(b)  Sheets shall be packed in containers conforming to any of the following specifications at the option of the contractor.

| Specification | Classification |
|---|---|
| PPP-B-576 | Class 1 |
| PPP-B-585 | Class 1 or 2 use |
| PPP-B-591 | Domestic type |
| PPP-B-601 | Domestic type |
| PPP-B-621 | Class 1 |
| PPP-B-636 | Class domestic |
| PPP-B-640 | Class 1 |

8




Obtained from GLOBAL ENGINEERING DOCUMENTS
15 Inverness Way E, Englewood, CO 80112 (303)397-7956 (800)854-7179

HH–P–462

5.2.2.1 Shipping containers shall be closed in accordance with the applicable box specification or appendix thereto. The gross weight of wood or wood-cleated boxes shall not exceed 200-pounds; fiberboard boxes shall not exceed the weight limitations of the applicable fiberboard box specification.

5.2.3 Level C. Asbestos packaged as specified shall be packed in a manner to insure carrier acceptance and safe delivery at destination at the lowest rate. Containers, packing, or method of shipment shall comply with Uniform Freight Classification Rules or National Motor Freight Classification Rules.

5.3 Marking. Containers shall be marked in accordance with 5.3.1 or 5.3.2, as applicable, and shall include any special marking specified in the contract or order (see 6.2). In addition, the date of manufacture (see 3.12), expressed by quarter and year (for example sheets manufactured in January, February, or March 1966 would be marked 1–66), shall be marked on the outside of each shipping container. The size of letters and material for the marking for date-of-manufacture shall conform to FED-STD-123 or MIL-STD-129, as applicable.

5.3.1 Civil agencies. In addition to the marking specified in 5.3, all containers for civil agencies shall be marked in accordance with FED-STD-123.

5.3.2 Military agencies. In addition to the marking specified in 5.3, all containers for military agencies shall be marked in accordance with MIL-STD-129.

5.4 Palletization. When specified (see 6.2), shipping containers shall be palletized in accordance with MIL-STD-147.

6. NOTES

6.1 Intended use. This packing is intended for use in pipe joints under the following conditions:

6.1.1 Class 1.

(a) Saturated steam to 300 lb/in$^2$ or alternatively steam to 300 pounds pressure and 350°C (600°F) temperature.
(b) Hot or cold water or brine to 400 pounds pressure, except potable water.
(c) Air to 3,000 pounds pressure.
(d) Gases of combustion to 300 pounds pressure and 350°C (600°F) temperature.
(e) Fuel oil to 1500 pounds pressure and 121°C (250°F) temperature.

6.1.2 Class 2.

(a) Refrigerant service to 225 pounds pressure and 149°C (300°F) temperature.

6.2 Ordering data. Procurement documents should specify the following:

(a) Title, number, and date of this specification.
(b) Class required (see 1.2).
(c) Whether the finished sheet shall be furnished with lubricant (see 3.3 and 3.11.1).
(d) Weight, thickness and form required (see 3.6 and 3.6.1).
(e) Minimum and maximum length and width of sheet required (see 3.7).
(f) Whether identification of product shall be other than that specified (see 3.11).
(g) Selection of applicable levels of packaging and packing required (see 5.1, 5.1.2, and 5.2).
(h) Whether special marking is required (see 5.3).
(i) Whether shipping containers shall be palletized (see 5.4).

6.3 Chemical analysis. Present known methods of chemical analysis of this type of material do not have a high degree of accuracy. It is necessary to make assumptions and, unless one has run this type of test many times, it is difficult to arrive at the correct answer on what is in the sheet and have other laboratories be able to duplicate the findings. At the same time the importance of accurately determining what is in the sheet is considered important. It has been found, however, that once the material has been approved and is satisfactory, a comparison of the results of the loss of weight test with previous results, where the material passed the chemical analysis test, is sufficient to assure that the material is the same as that previously supplied.

9

Obtained from GLOBAL ENGINEERING DOCUMENTS
15 Inverness Way E. Englewood, CO 80112 (303)397-7956 (800)854-7179

01021

BH-P-452

6.4  With respect to products requiring qualification, awards will be made only for products which are at the time set for opening of bids, qualified for inclusion in applicable Qualified Products List QPL BH-P-46 whether or not such products have actually been so listed by that date. The attention of the suppliers is called to this requirement, and manufacturers are urged to arrange to have the products that they propose to offer to the Federal Government tested for qualification in order that they may be eligible to be awarded contracts or order for the products covered by this specification. The activity responsible for the Qualified Products List is the Naval Ship Engineering Center, Prince George's Center, Center Building, Hyattsville, Maryland 20782, and information pertaining to qualification of products may be obtained from that activity. Application for Qualification tests shall be made in accordance with "Provisions Governing Qualification SD-6" (see 6.5).

6.5  Copies of "Provisions Governing Qualification SD-6" may be obtained upon application to Commanding Officer, Naval Publications and Forms Center, 5801 Tabor Avenue, Philadelphia, Pennsylvania 19120.

6.6  Sub-contracted material and parts. The preparation for delivery requirements of referenced documents listed in section 2 do not apply when material and parts are procured by the supplier for incorporation into the equipment and lose their separate identity when the equipment is shipped.

6.7  Supersession data. The asbestos sheet covered by Military Specification MIL-A-17472B, Asbestos Sheet, Compressed (Gasket Material), dated 22 May 1964 is now class 1 of this specification.

6.8  THE MARGINS OF THIS SPECIFICATION ARE MARKED "$" TO INDICATE WHERE CHANGES (ADDITIONS, MODIFICATIONS, CORRECTIONS, DELETIONS) FROM THE PREVIOUS ISSUE HAVE BEEN MADE. THIS WAS DONE AS A CONVENIENCE ONLY AND THE GOVERNMENT ASSUMES NO LIABILITY WHATSOEVER FOR ANY INACCURACIES IN THESE NOTATIONS. BIDDERS AND CONTRACTORS ARE CAUTIONED TO EVALUATE THE REQUIREMENTS OF THIS DOCUMENT BASED ON THE ENTIRE CONTENT IRRESPECTIVE OF THE MARGINAL NOTATIONS AND RELATIONSHIP TO THE LAST PREVIOUS ISSUE.

Custodians:
  Army - MR
  Navy - SH
  Air Force - 68
Review activities:
  Army - MR, AT
  Navy - SH, YD
  Air Force - 68
User activities:
  Army - AV
  Navy - NC, OS

Preparing activity:
  Navy - SH
  (Project 5330-0237)

Orders for this publication are to be placed with General Services Administration, acting as an agent for the Superintendent of Documents. See Section 2 of this specification to obtain extra copies and other documents referenced herein. Price 40 cents each.

10

Obtained from GLOBAL ENGINEERING DOCUMENTS
15 Inverness Way E, Englewood, CO 80112 (303)397-7956 (800)854-7179





Figure 1 – Schematic Diagram of Pipe Flange Gasket Apparatus for Testing Refrigerant Gasket Materials.

SH 10653

Obtained from GLOBAL ENGINEERING DOCUMENTS
15 Inverness Way E, Englewood, CO 80112 (303)397-7956 (800)854-7179

01023

## DOCUMENT CERTIFICATION

I, Thomas F. McCaffery, do swear under the penalties of perjury that the documents (160-pages and initialed) in Volume I of the binder entitled, "Dana Corporation, General Information, Gasket-Related Specification" are to the best of my knowledge and belief, true and accurate copies of original U.S. Government documents.

Thomas F. McCaffery

I, MARISA A. TRASATTI, a commissioned Notary Public in and for the County of HARFORD, State of MD, do certify that Thomas F. McCaffery appeared before me on this date in the City of Baltimore, State of Maryland and that I took his oath aforesaid.

SEAL

Date: 5/30/03

My commission expires: 8/29/06

**EXHIBIT I**

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120838 4 ■■

MIL—STD—129H
**3 January 1978**

SUPERSEDING
MIL—STD—129G
1 September 1976

# MILITARY STANDARD

# MARKING FOR SHIPMENT AND STORAGE



FSC PACK

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100801] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120839 6 ■■

MIL-STD-129H
3 January 1978

### DEPARTMENT OF DEFENSE

### WASHINGTON, DC 20402

Marking for Shipment and Storage

MIL-STD-129H

**1.** This Military Standard is approved for use by all Departments and Agencies of the Department of Defense.

**2.** Beneficial comments (recommendations, additions, deletions) and any pertinent data which may be of use in improving this document should be addressed to: Director, DARCOM Packaging, Storage, and Containerization Center, ATTN: SDSTO-TP, Tobyhanna Army Depot, Tobyhanna, PA 18466, by using the self-addressed Standardization Document Improvement Proposal (DD Form 1426) appearing at the end of this document or by letter.

ii

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [036409100001] - PEGGYINCA@ME.COM,
Not for Resale.2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ▆ 9999911 0120840 2 ▆

MIL-STD-129H
NOTICE 2
1 July 1980

## MILITARY STANDARD

### MARKING FOR SHIPMENT AND STORAGE

**TO ALL HOLDERS OF MIL-STD-129H**

1.  THE FOLLOWING PAGES OF MIL-STD-129H HAVE BEEN REVISED AND SUPERSEDE THE PAGES LISTED:

| NEW PAGE | DATE | SUPERSEDED PAGE | DATE |
|---|---|---|---|
| iii | 1 July 1980 | iii | 3 January 1978 |
| iv | 1 July 1980 | iv | 3 January 1978 |
| v | 1 July 1980 | v | 3 January 1978 |
| vi | 1 July 1980 | vi | 1 November 1978 |
| vii | 1 July 1980 | vii | 1 November 1978 |
| viii | 1 July 1980 | viii | 3 January 1978 |
| ix | 1 July 1980 | ix | 3 January 1978 |
| x | 1 July 1980 | x | 3 January 1978 |
| xi | 1 July 1980 | xi | 3 January 1978 |
| xii | 1 July 1980 | xii | 3 January 1978 |
| 1 | 1 July 1980 | 1 | 3 January 1978 |
| 2 | 1 July 1980 | 2 | 3 January 1978 |
| 3 | 1 July 1980 | 3 | 3 January 1978 |
| 4 | 1 July 1980 | 4 | 3 January 1978 |
| 5 | 1 July 1980 | 5 | 3 January 1978 |
| 6 | 1 July 1980 | 6 | 3 January 1978 |
| 7 | 1 July 1980 | 7 | 3 January 1978 |
| 8 | 1 July 1980 | 8 | 3 January 1978 |
| 9 | 1 July 1980 | 9 | 1 November 1978 |
| 10 | 1 July 1980 | 10 | 3 January 1978 |
| 11 | 1 July 1980 | 11 | 3 January 1978 |
| 12 | 1 July 1980 | 12 | 3 January 1978 |
| 13 | 1 July 1980 | 13 | 3 Janaury 1978 |
| 14 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 15 | 1 July 1980 | 15 | 3 January 1978 |
| 16 | 1 July 1980 | 16 | 3 January 1978 |
| 17 | 1 July 1980 | 17 | 1 November 1978 |
| 18 | 1 July 1980 | 18 | 1 November 1978 |
| 19 | 1 July 1980 | 19 | 1 November 1978 |
| 20 | 1 July 1980 | 20 | 3 January 1978 |

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:25:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120841 4 ■

MIL-STD-129H
NOTICE 2
1 July 1980

| NEW PAGE | DATE | SUPERSEDED | DATE |
|---|---|---|---|
| 21 | 1 July 1980 | 21 | 1 November 1978 |
| 22 | 1 July 1980 | 22 | 3 January 1978 |
| 23 | 1 July 1980 | 23 | 3 January 1978 |
| 24 | 1 July 1980 | 24 | 3 January 1978 |
| 25 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 26 | 1 July 1980 | 26 | 3 January 1978 |
| 27 | 1 July 1980 | 27 | 3 January 1978 |
| 28 | 1 July 1980 | 28 | 3 January 1978 |
| 31 | 1 July 1980 | 31 | 3 January 1978 |
| 32 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 33 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 34 | 1 July 1980 | 34 | 1 November 1978 |
| 39 | 1 November 1978 | (REPRINTED WITHOUT CHANGE) | |
| 40 | 1 July 1980 | 40 | 1 November 1978 |
| 45 | 1 November 1978 | (REPRINTED WITHOUT CHANGE) | |
| 46 | 1 July 1980 | 46 | 3 January 1978 |
| 47 | 1 July 1980 | 47 | 3 January 1978 |
| 48 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 59 | 1 July 1980 | 59 | 3 January 1978 |
| 60 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 69 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 70 | 1 July 1980 | 70 | 3 January 1978 |
| 71 | 1 July 1980 | 71 | 3 January 1978 |
| 72 | 1 July 1980 | 72 | 1 November 1978 |
| 73 | 1 July 1980 | 73 | 1 November 1978 |
| 73a | 1 July 1980 | | |
| 74 | 1 July 1980 | 74 | 1 November 1978 |
| 75 | 1 July 1980 | 75 | 3 January 1978 |
| 76 | 1 July 1980 | 76 | 1 November 1978 |
| 78a | 1 July 1980 | | |
| 78b | 1 July 1980 | | |
| 78c | 1 July 1980 | | |
| 78d | 1 July 1980 | | |
| 78e | 1 July 1980 | | |
| 81 | 1 July 1980 | 81 | 3 January 1978 |
| 82 | 1 July 1980 | 82 | 3 January 1978 |
| 83 | 1 July 1980 | 83 | 1 November 1978 |
| 84 | 1 July 1980 | 84 | 3 January 1978 |
| 85 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 86 | 1 July 1980 | 86 | 3 January 1978 |
| 87 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 88 | 1 July 1980 | 88 | 1 November 1978 |

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A MCCLOSKEY [03840910000I] - PEGGYINCA@ME.COM,
Not for Resale,2020-08-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120842 6 ■

MIL-STD-129H
NOTICE 2
1 July 1980

2.  RETAIN THIS NOTICE AND INSERT BEFORE TABLE OF CONTENTS.

3.  Holders of MIL-STD-129H will verify that page changes and additions indicated above have been entered.  This notice page will be retained as a check sheet.  This issuance, together with appended pages, is a separate publication.  Each notice is to be retained by stocking points until the Military Standard is completely revised or cancelled.

Custodians:
  Army – SM
  Navy – SA
  Air Force – 16
Defense Logistics Agency – DH

Preparing activity:
  Army – SM
Project:  PACK 0608

Review activities:
  Army – CR, AL, AR, AT, ME, AV, MD, EA, ER, MI
  Navy – YD, MC, SH, AS, OS, MS, EC, CG
  Air Force – 11, 43, 45, 69, 99
  DLA – CT, CS, DM, ES, GS, IS, PS
  Federal – GSA

User activities:
  DSA– IP, SS
  Army – GL, MT

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A. MCCLOSKEY [0384091000001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120843 8 ■

MIL-STD-129H
NOTICE I
1 November 1978

MILITARY STANDARD

MARKING FOR SHIPMENT AND STORAGE

TO ALL HOLDERS OF MIL-STD-129H

I. THE FOLLOWING PAGES OF MIL-STD-129H HAVE BEEN REVISED AND SUPERSEDE THE PAGES LISTED:

| NEW PAGE | DATE | SUPERSEDED PAGE | DATE |
|---|---|---|---|
| v | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| vi | 1 November 1978 | vi | 3 January 1978 |
| vii | 1 November 1978 | vii | 3 January 1978 |
| viii | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 9 | 1 November 1978 | 9 | 3 January 1978 |
| 10 | 2 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 17 | 1 November 1978 | 17 | 3 January 1978 |
| 18 | 1 November 1978 | 18 | 3 January 1978 |
| 19 | 1 November 1978 | 19 | 3 January 1978 |
| 20 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 21 | 1 November 1978 | 21 | 3 January 1978 |
| 22 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 33 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 34 | 1 November 1978 | 34 | 3 January 1978 |
| 39 | 1 November 1978 | 39 | 3 January 1978 |
| 40 | 1 November 1978 | 40 | 3 January 1978 |
| 45 | 1 November 1978 | 45 | 3 January 1978 |
| 46 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 71 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 72 | 1 November 1978 | 72 | 3 January 1978 |
| 73 | 1 November 1978 | 73 | 3 January 1978 |
| 74 | 1 November 1978 | 74 | 3 January 1978 |
| 75 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 76 | 1 November 1978 | 76 | 3 January 1978 |
| 77 | 1 November 1978 | 77 | 3 January 1978 |
| 78 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 83 | 1 November 1978 | 83 | 3 January 1978 |
| 84 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 87 | 3 January 1978 | (REPRINTED WITHOUT CHANGE) | |
| 88 | 1 November 1978 | 88 | 3 January 1978 |

2. RETAIN THIS NOTICE AND INSERT BEFORE TABLE OF CONTENTS.

3. Holders of MIL-STD-129H will verify that page changes and additions indicated above have been entered. This notice page will be retained as a check sheet. This issuance, together with appended pages, is a separate publication. Each notice is to be retained by stocking points until the Military Standard is completely revised or canceled.

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226503
Sold to MARGARET A MCCLOSKEY {03840S100001} - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120844 T ■

MIL-STD-129H
NOTICE 1
1 November 1978

| | |
|---|---|
| Custodians: | Preparing activity: |
| Army – SM | |
| Navy – SA | Army – SM |
| Air Force – 16 | |
| Defense Logistics Agency – DH | Project: PACK 0591 |

Review activities:
  Army – CR, GL, AL, AR, AT, ME, AV, MD, EA, ER
  Navy – YD, MC, SH, AS, OS, MS, EC, CG
  Air Force – 11, 43, 45, 69, 99
  DLA – CT, CS, DM, ES, GS, IS, PS
  Federal – GSA

User activities:
  DSA – IP, SS
  Army – MI, MT

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A. MCCLOSKEY [036409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

Case 5:25-cv-01852-JMG    Document 1    Filed 04/10/25    Page 256 of 440

MIL-STD-129H
1 July 1980

## CONTENTS

Page

Paragraph 1.   SCOPE ------------------------------------ 1
1.1    Purpose ------------------------------ 1
1.2    Application --------------------------- 1

2.   REFERENCED DOCUMENTS ------------------ 2
2.1    Issues of documents --------------------- 2
2.2    Other publications ----------------------- 3

3.   DEFINITIONS ----------------------------- 6

4.   GENERAL REQUIREMENTS ------------------ 14
4.1    Abbreviations --------------------------- 14
4.2    Marking and marking material ------------ 16
4.3    Method of marking and size of marking -- 17

5.   DETAILED REQUIREMENTS ------------------ 21
5.1    Interior and exterior identification and
       contract data markings ---------------- 21
5.2    Domestic and oversea address marking -- 34
5.3    Subsistence markings -------------------- 50
5.4    Interior and exterior container special
       markings ----------------------------- 55
5.5    Packing lists and DD Form 1348-1
       (DOD Single Line Item Release/Receipt
       Document) ---------------------------- 74
5.6    Ammunition markings -------------------- 78a

APPENDICES

Appendix A.   Supply class marking requirements -------- 80
B.   Shelf-life codes --------------------------- 83
C.   Additional NSN and item description
      markings on exterior containers
      shipped overseas ----------------------- 84
D.   Hazardous material labels and supply
      type labels ----------------------------- 87

Supersedes page iii of 3 January 1978.

iii

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ▇ 9999911 0120846 3 ▇

MIL-STD-129H
1 July 1980

INDEX

| SUBJECT | PAGES (S) | PARAGRAPH (S) | FIGURE (S) |
|---|---|---|---|
| Abbreviations | 14-16 | 4.1, 4.1.1 | |
| Address marking | 34-50, 53 | 5.2-5.2.1.3.13, 5.3.3.1, 5.3.3.2 | 19-42, 45, 46 |
| Additional identification markings | 34, 84 | 5.1.4.9, Appendix C | 87 |
| Advertising matter | 16, 50 | 4.2.1, 5.3.2.1 | |
| Agency for International Development | 62 | 5.4.13 | 60 |
| Air shipments | 65, 66, 72 | 5.4.21, 5.4.22, 5.4.33.1.2, 5.4.33.2 | 63, 75 |
| Ammunition | 6, 78a-e | 3.1, 5.6-5.6.6 | 83-85 |
| APO and FPO parcel post | 40, 41 | 5.2.1.2.2, 5.2.1.2.3 | |
| Arrows (UP) (TOP) | 56 | 5.4.2 | 49 |
| Assembly or set marking | 60, 61 | 5.4.9-5.4.9.3 | 56-58 |
| Assorted items | 23 | 5.1.2.3 | |
| Bags | 26, 44 | 5.1.4.5, 5.2.1.3.5 | 6, 32 |
| Bales | 25, 43 | 5.1.4.3, 5.2.1.3.3 | 4, 28, 29 |
| Barrels | 27, 44, 45 | 5.1.4.6, 5.2.1.3.6 | 7, 33 |
| Batch number | 9, 59 | 3.30, 5.4.7 | 54 |

Supersedes page iv of 3 January 1978.

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120847 5 ■

MIL-STD-129H
1 July 1980

INDEX--Continued

| SUBJECT | PAGE(S) | PARAGRAPH(S) | FIGURE(S) |
|---|---|---|---|
| Battery with equipment | 63 | 5.4.18 | 61 |
| Boxes | 24, 28, 42 | 5.1.4.1, 5.1.4., 5.1.4.8.1, 5.2.1.3.1, 5.2.1.3.2 | 2, 9, 26, 27 |
| Bundles | 25, 43 | 5.1.4.4, 5.2.1.3.4 | 5, 30, 31 |
| Center of balance | 66, 67 | 5.4.24 | 65 |
| Chilled medical material | 69 | 5.4.29 | 71 |
| Classified shipment | 63, 76 | 5.4.14, 5.5.1.5.2 | |
| Clothing and textile items | 22, 76 | 5.1.2.2, 5.5.1.5.4 | |
| Color of markings | 17 | 4.3.1.2 | |
| Concealed/omitted identification | 76 | 5.5.1.5.3 | |
| Condition of surfaces to be marked | 17 | 4.3.1.1 | |
| Contract data | 23 | 5.1.3 | |
| Controlled items | 7 | 3.11 | |
| Crates | 24, 42 | 5.1.4.1, 5.1.4.2, 5.2.1.3.1 | 2, 3, 26 |
| Cube | 7, 23 | 3.12, 5.1.2.3, 5.1.2.5 | |
| Cure date | 7, 55 | 3.14, 5.4.1 | |
| Cylindrical containers | 27, 28, 44 | 5.1.4.6, 5.1.4.7, 5.2.1.3.6 | 7, 8, 33 |

Supersedes page v of 3 January 1978.

v

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY (035409100001) - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ▆ 9999911 0120848 7 ▆

MIL-STD-129H
1 July 1980

## INDEX--Continued

| SUBJECT | PAGE(S) | PARAGRAPH(S) | FIGURE(S) |
|---------|---------|--------------|-----------|
| Date manufactured | 7, 55 | 3.15, 5.4.1 | 48 |
| Definitions | 6-13 | 3 | |
| Disaster relief | 62 | 5.4.13 | 60 |
| Drugs | 55 | 5.4.1 | 48 |
| Durability of markings | 17 | 4.3.1.2 | |
| Embossing | 18 | 4.3.1.6 | |
| Envelope protectors | 17, 76, 77 | 4.2.6, 5.5.2, 5.5.1.6 | |
| Envelopes, water-resistant | 17, 74, 77 | 4.2.5, 5.5.1.6, 5.5.2 | |
| Equipment with battery | 63 | 5.4.18 | 61 |
| Expedited handling | 64 | 5.4.19 | 62 |
| Explosives and other dangerous items | 71 | 5.4.33 | |
| Export permit number | 59 | 5.4.8 | 55 |
| Exterior and interior container identification and contract data markings | 21-33, 50-51 | 5.1-5.4.1.8.9, 5.3.1-5.3.2.2 | 1-18, 43, 44 |
| Exterior and interior container special markings | 54, 55, 74 | 5.3.4, 5.4-5.4.38 | 47-79 |
| Federal supply code for manufacturers | 21, 22 | 5.1.1, 5.1.2.1 | |
| Flash point | 72 | 5.4.34 | 76 |

Supersedes page vi of 1 November 1978.

vi

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120849 9 ■

INDEX--Continued

| SUBJECT | PAGE(S) | PARAGRAPH(S) | FIGURE(S) |
|---|---|---|---|
| Foreign military sales | 39-41, 77 | 5.2.1.2.1-5.2.1.2.3, 5.5.2.3 | 23-25 |
| Fragile | 57, 58 | 5.4.4 | 51 |
| Frozen medical material | 69 | 5.4.28 | 70 |
| Full carload/truckload | 38 | 5.2.1.1.3 | |
| Gross weight | 8, 23 | 3.22, 5.1.2.4 | |
| Hand lettering | 17 | 4.3.1 | |
| Hazardous chemicals, substance and labels | 71-73a, 87 | 5.4.33, 5.4.35, Appendix D | 75, 77-77b |
| Hazardous materials | 8, 22, 71, 73 | 3.23, 5.1.2.1, 5.4.33, 5.4.35 | |
| Household goods | 1 | 1.2.3 | |
| Items description | 8 | 3.26 | |
| Identification markings | 20, 21-34, 50-53 | 4.3.2.1.1, 5.1, 5.3.1-5.3.3.1 | 1-18, 43-45 |
| Ink, stencil | 16 | 4.2.2.2.1 | |
| Labels | 16, 18, 19, 20, 87 | 4.2.3, 4.2.3.1, 4.3.1.3, 4.3.1.8, 4.3.2.1.3, Appendix D | |
| Legibility | 17 | 4.3.1.2 | |
| Less than carload/truckload | 38 | 5.2.1.1.2 | |
| Levels of protection | 9 | 3.28 | |
| Limited unrefrigerated medical material | 70 | 5.4.30 | 72 |

Supersedes page vii of 1 November 1978.

vii

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120850 5 ■

MIL-STD-129H
1 July 1980

INDEX--Continued

| SUBJECT | PAGE(S) | PARAGRAPH(S) | FIGURE(S) |
|---|---|---|---|
| Lithographing | 18 | 4.3.1.6 | |
| Load bearing area | 67 | 5.4.25 | 67 |
| Location of address | 42, 53 | 5.2.1.3, 5.3.3.1, 5.3.3.2 | 26-42, 45, 46 |
| Lot, batch or control number | 9, 59 | 3.30, 5.4.7 | 54 |
| Magnetic equipment | 65, 66, 74 | 5.4.21-5.4.23, 5.4.37 | 63, 64, 78, 79 |
| Manufacturer's part number | 21, 22 | 5.1.1, 5.1.2.1 | |
| Marking | 9, 16 | 3.31, 4.2 | |
| Marking for assorted items | 23 | 5.1.2.3 | |
| Marking of Agency for IL Dev (AID) Shipments | 62 | 5.4.13 | 60 |
| Marking of gross weight | 23 | 5.1.2.4 | |
| Marking materials | 16 | 4.2 | |
| Material condition marking | 64, 65 | 5.4.20-5.4.20.5 | |
| Method II | 57 | 5.4.3 | 50 |
| Method of marking | 17 | 4.3 | |
| MILSTRIP documents (DD Form 1348-1) | 77, 78 | 5.5.2-5.5.2.5 | 82 |
| MILVAN | 9, 48 | 3.33, 5.2.1.3.11 | 38 |
| Modification work order | 9, 58 | 3.34, 5.4.5 | 52 |

Supersedes page viii of 3 January 1978.

viii

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409160001] - PEGGYINC4@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120851 7 ■■

MIL-STD-129H
1 July 1980

INDEX--Continued

| SUBJECT | PAGE(S) | PARAGRAPH(S) | FIGURE(S) |
|---|---|---|---|
| Multipack | 23 | 5.1.2.3-5.1.3 | |
| National Item Identifi-fication Number | 10 | 3.36.2 | |
| National/NATO stock number | 9, 10 | 3.36, 3.36.3 | |
| Net weight | 10 | 3.37 | |
| Obliterating lacquer, enamel & paint | 16 | 4.2.2.3 | |
| Omission of marking on outside shipping container | 22, 76 | 5.1.2.2, 5.5.1.5.2, 5.5.1.5.3 | |
| Outside dimensions | 62 | 5.4.12 | |
| Overcoating | 16, 19 | 4.2.2.1, 4.3.1.8.1.2 | |
| Packing list | 74-76, 78e | 5.5-5.5.1.7, 5.6.4 | 78e, 80, 81 |
| Palletized unit loads | 10, 31, 32, 46 | 3.42, 5.1.4.8.7, 5.2.1.3.8 | 15, 35 |
| Parcel post | 10, 36, 40-42 | 3.43, 5.2.1.1.1, 5.2.1.2.2, 5.2.1.2.3, 5.2.1.3.2 | 21, 24, 25, 27 |
| Preservation | 11 | 3.46 | |
| Piece number | 35, 39, 40, 46 | 5.2.1.1, 5.2.1.2 | 19, 22-24 |
| Polyethylene bags | 77 | 5.5.2.2 | |
| Positioning of exterior identification and con-tract data markings | 24 | 5.1.4 | |
| Printing | 18 | 4.3.1.5 | |

Supersedes page ix of 3 January 1978.

ix

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A. MCGLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:28:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120852 9 ■■

MIL-STD-129H
1 July 1980

INDEX--Continued

| SUBJECT | PAGE(S) | PARAGRAPH(S) | FIGURE(S) |
|---|---|---|---|
| Priority markings | 34, 36-40, 64 | 5.2.1, 5.2.1.2, 5.4.19 | 19, 22, 23, 62 |
| Project codes | 11, 70 | 3.49, 5.4.32 | 74 |
| Proper shipping name | 11, 22, 72, 78a | 3.50, 5.1.2.1, 5.4.33.1.1, 5.6.1.2 | |
| Protective coating of labels | 19 | 4.3.1.8.1.2 | |
| Quantity and unit | 11, 13, 21, 22, 50, 53, 78a | 3.51, 3.67, 5.1.1, 5.1.2, 5.3.2.1, 5.3.2.3, 5.6.1.1 | |
| Radioactive material | 1, 73a | 1.2.4, 5.4.36 | 77b |
| Restrictive marking | 22, 63 | 5.1.2.2, 5.4.14 | |
| Sacks | 27, 44 | 5.1.4.5, 5.2.1.3.5 | 6, 32 |
| SEAVAN | 11, 48 | 3.54, 5.2.1.3.11 | 38 |
| Securing labels | 17-19 | 4.2.3.2, 4.3.1.3, 4.3.1.8.1.2, 4.3.1.8.1.4 | |
| Security and valuable items | 63 | 5.4.15 | |
| Sensitive items | 11, 22, 74 | 3.55, 5.1.2.2, 5.4.37 | 78, 79 |
| Serial number | 12, 58 | 3.56, 5.4.6 | 53 |
| Set or assembly | 60, 61 | 5.4.9-5.4.9.3 | 56-58 |
| Shelf life and shelf-life codes | 12, 55, 83 | 3.58-3.60.2, 5.4.1, Appendix B | 48 |
| Signature security | 70 | 5.4.31 | 73 |

Supersedes page x of 3 January 1978.

x

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [036409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-08-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120853 0 ■■

MIL-STD-129H
1 July 1980

INDEX--Continued

| SUBJECT | PAGE(S) | PARAGRAPH(S) | FIGURE(S) |
|---------|---------|--------------|-----------|
| Size of markings | 19, 20 | 4.3.1.8.1.3, 4.3.2-4.3.2.1.3 | |
| Sling point | 66 | 5.4.24 | 66 |
| Small arms | 22 | 5.1.2.2 | |
| Small containers exterior | 28 | 5.1.4.8.1 | 9 |
| Special handling | 68 | 5.4.27 | 69 |
| Special handling data/ certification (DD Form 1387-2) | 72 | 5.4.33.2 | 75 |
| Special markings | 55-74 | 5.4-5.4.37 | 48-79 |
| Steel products | 1, 38, 50 | 1.2.2, 5.2.1.2, 5.2.1.3.13 | |
| Stenciling | 16-18, 24, 27, 28, 31, 68, 78b, 78c | 4.2.2.2, 4.3, 4.3.1.4, 5.1.4.1, 5.1.4.6, 5.1.4.8.1, 5.4.26, 5.6.1.3, 5.1.4.8.7, 5.1.4.8.8 | |
| Structural markings | 63 | 5.4.17 | |
| Subsistence | 26, 27, 31, 44, 46, 50-54 | 5.1.4.5, 5.1.4.6, 5.1.4.8.7, 5.2.1.3.6, 5.2.1.3.8, 5.3-5.3.4 | 6, 7, 15, 32, 35, 44-47 |
| Supply class marking requirements | 62, 80 | 5.4.11, Appendix A | |
| Tags | 17, 18, 20, 39, 78b, 78c | 4.2.4, 4.3.1.7, 4.3.2.1.3, 5.6.1.3 | 22 |
| Technical order change | 58 | 5.4.5 | 52 |

Supersedes page xi of 3 January 1978.

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120854 2 ■

MIL-STD-129H
1 July 1980

INDEX--Continued

| SUBJECT | PAGE(S) | PARAGRAPH(S) | FIGURE(S) |
|---|---|---|---|
| Unpacked items | 28-30, 45, 47 | 5.1.4.8.1-5.4.8.6, 5.2.1.3.7, 5.2.1.3.9, 5.2.1.3.10 | 10-14, 36, 37 |
| Unrefrigerated medical material, limited | 70 | 5.4.30 | 72 |
| Use no hooks | 68 | 5.4.26 | 68 |
| Use of labels | 18, 19 | 4.3.1.3, 4.3.1.8 | |
| Valuable and security items | 22, 63 | 5.1.2.2, 5.4.15 | |
| Varnish, waterproofing | 16 | 4.2.2.1 | |
| Vehicles address marking | 45 | 5.2.1.3.7 | 34 |
| Warranty markings | 61 | 5.4.10 | 59 |
| Waterproofing | 16, 19 | 4.2.2.1, 4.3.1.8.1.2 | |
| Water-resistant envelopes | 17, 74-78 | 4.2.5, 5.5.1-5.5.2.4 | |
| Weight, gross | 8, 23 | 3.22, 5.1.2.4 | |
| Wood products | 31-33, 48-50 | 5.1.4.8.8- 5.1.4.8.8.2, 5.2.1.3.12- 5.2.1.3.12.2.3 | 16-18, 39-42 |

Supersedes page xii of 3 January 1978.

xii

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120855 4 ■■

## 1. SCOPE

1.1 Purpose. This standard provides the requirements for the uniform marking of military supplies and equipment for shipment and storage. It accommodates the requirements for coded and in-the-clear data and forms required by Military Standard Requisitioning and Issue Procedures (MILSTRIP) and Military Standard Transportation and Movement Procedures (MILSTAMP) for movement processing.

1.2 Application. Marking of all supplies and equipment, unless exempted in whole or part by paragraphs 1.2.1 through 1.2.7, shall be as specified herein.

1.2.1 Marking for shipment and storage of petroleum products shall be as specified in MIL-STD-290.

1.2.2 Marking for shipment and storage of unfabricated steel mill products shall be as specified in MIL-STD-163.

1.2.3 Marking for household goods shall be as specified in MIL-STD-212.

1.2.4 Marking of cargo for international movement by all international means of transport shall be as specified herein and in STANAG 2023.

1.2.5 Marking of hazardous materials shall be as specified herein and in 49 CFR Section 172.300 and 172.400.

1.2.6 Marking of tires shall be as specified herein and in MIL-T-4.

1.2.7 Marking of ammunition shall be as specified herein and in appropriate drawings or in similar item or commodity peculiar documentation.

Supersedes page 1 of 3 January 1978.

1

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226553
Sold to:MARGARET A MCCLOSKEY [03840910000!] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:28:22 UTC

MIL-STD-129H
1 July 1980

2.  REFERENCED DOCUMENTS

2.1  Issues of documents.  The following documents of the issues in
effect on the date of invitation for bids or request for proposal form a part
of this standard to the extent specified herein.


SPECIFICATIONS

FEDERAL

| | |
|---|---|
| L-P-387 | – Plastic Sheet, Laminated, Thermosetting (for Designation Plates). |
| L-T-90 | – Tape, Pressure-Sensitive, Adhesive (Cellophane and Cellulose Acetate). |
| NN-P-530 | – Plywood, Flat Panel. |
| TT-E-489 | – Enamel, Alkyd, Gloss  (for Exterior and Interior Surfaces). |
| TT-E-515 | – Enamel, Alkyd, Lusterless, Quick Drying. |
| TT-I-1795 | – Ink, Marking, Stencil, Opaque (Porous and Nonporous Surfaces). |
| TT-L-20 | – Lacquer, Camouflage. |
| TT-L-40 | – Lacquer, Lusterless, Obliterating. |
| TT-P-38 | – Paint, Aluminum, Ready-Mixed. |
| TT-V-121 | – Varnish, Spar, Water-Resisting. |
| UU-T-81 | – Tag, Shipping and Stock. |
| MMM-A-105 | – Adhesive and Sealing Compounds, Cellulose Nitrate Base, Solvent Type. |
| MMM-A-178 | – Adhesive, Paper Label, Water-Resistant. |
| MMM-A-179 | – Adhesive, Paper Label, Water-Resistant, Water Emulsion Type. |
| PPP-C-186 | – Container, Packaging and Packing for Drugs, Chemical and Pharmaceuticals. |
| PPP-D-729 | – Drums, Shipping and Storage, Steel, 55-Gallon. |
| PPP-E-540 | – Envelope:  Water-Resistant, for Packing Lists and Shipping Documents. |
| PPP-F-320 | – Fiberboard, Corrugated and Solid, Sheet Stock (Container Grade), and Cut Shapes. |
| PPP-P-700 | – Protector, Packing List. |
| PPP-T-42 | – Tape, Packaging/Masking, Paper. |
| PPP-T-60 | – Tape, Packaging, Waterproof. |
| PPP-T-70 | – Tape, Packaging, Plastic Film. |

Supersedes page 2 of 3 January 1978.

2

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to MARGARETA MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:20:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120857 8 ■

MIL-STD-129H
1 July 1980

MILITARY

| | |
|---|---|
| MIL-T-4 | – Tire, Pneumatic, and Inner Tube, Pneumatic Tire, Tire w/Flap, Packaging and Packing of. |
| MIL-P-116 | – Preservation-Packaging, Methods of. |
| MIL-S-4473 | – Shielding of Magnetron Tubes and Magnets for Air Shipment. |
| MIL-P-13983 | – Paint, Temporary, Lusterless, Gasoline Removable. |
| MIL-C-17504 | – Coating Compound, Acrylic, Clear. |
| MIL-P-52108 | – Paint, Water Emulsion Type (For Stenciling and Obliterating). |

STANDARDS

FEDERAL

| | |
|---|---|
| FED-STD-595 | – Colors. |

MILITARY

| | |
|---|---|
| MIL-STD-163 | – Steel Mill Products Preparation for Shipment and Storage. |
| MIL-STD-212 | – Preparation of Household Goods for Shipment and Storage and Related Services. |
| MIL-STD-290 | – Packaging of Petroleum and Related Products. |
| MIL-STD-1188 | – Commercial Packaging of Supplies and Equipment. |

HANDBOOKS

| | |
|---|---|
| MIL-HDBK-600 | – Guidelines for Identification, Marking, Labeling, Storage, and Transportation of Radioactive Commodities. |
| MIL-HDBK-758 | – Special Handling Data/Certification for Shipment Via Military Aircraft. |

(Copies of specification, standards, drawings, and publications required by contractors in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

2.2 Other publications. The following documents form a part of this standard to the extent specified herein. Unless otherwise indicated the issues in effect on date of invitation for bids or request for proposal shall apply.

Supersedes page 3 of 3 January 1978.

3

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H
1 July 1980

GOVERNMENTAL

CODE OF FEDERAL REGULATIONS (CFR)

CFR Title 10 - Atomic Energy.
CFR Title 21 - Food and Drug.
CFR Title 29 - Labor, Public Law 92-596, Occupational Safety
and Health Act.
CFR Title 49 - Transportation.
CFR Title 40 - Environmental Protection Agency.

(Application for copies should be addressed to the Superintendent of
Documents, US Government Printing Office, Washington, DC  20402.)

JOINT MILITARY

AFR 71-4/TM 38-250/NAVSUP Pub 505 (REV)/MCO P4030.19D/
DLAM 4145.3 - Packaging and Materials Handling--Preparation of
Hazardous Materials for Military Air Shipment.
DOD 4140-17-M - Military Standard Requisitioning and Issue Procedures.
DOD 4500.32-R - Military Standard Transportation and Movement
Procedures.
Cataloging Handbook H4, Federal Supply Code for Manufacturers
(FSCM).
Cataloging Handbook H6, Federal Item Name Directory for Supply
Cataloging.

(Application for copies should be addressed to the Superintendent of
Documents, US Government Printing Office, Washington, DC  20402.
Contractors may obtain information through the Contract Administration Office.)

NATO

STANAG 2023 - Marking of Military Cargo For International Movement
by All International Means of Transport.

(Copies are available from Department of Navy, Navy Forms and Publications,
Naval Supply Depot, 581 Tabor Avenue, Philadelphia, PA  19120.)

NONGOVERNMENTAL

American National Standard for the Precautionary Labeling of
Hazardous Industrial Chemicals ANSI Z129.1-1976.
American National Standards Institute (ANSI) Pictorial Markings for
Handling of Goods.

(Application for copies should be addressed to Amercian National Standards
Institute, 1430 Broadway, New York, NY  10018.)

Supersedes page 4 of 3 January 1978.

4

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to MARGARET A. MCCLOSKEY (036408100001) - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120859 1 ■

MIL-STD-129H
1 July 1980

Civil Aeronautics Board (C.A.B. No. 82) Official Air Transport Restricted Articles Tariff No. 6-D.

(Application for copies should be addressed to Airline Tariff Publishing Co., P.O. Box 17415, Washington, DC 20041.)

International Air Transport Association (IATA) Restricted Articles Regulations.

(Application for copies should be addressed to International Air Transport Association, 1155 Mansfield Street, Montreal 113, Quebec, Canada.)

International Atomic Energy Agency's (IAEA) "Regulations for the Safe Transport of Radioactive Materials."

(Application for copies should be addressed to Office of Hazardous Materials, US Department of Transportation, Washington, DC 20590.)

Bureau of Explosives Tariff, Hazardous Materials Regulations of the Department of Transportation

NOTE: This Tariff publishes 49 CFR, Parts 170-179.

(Application for copies should be addressed to Association of American Railroads, American Railroads Building, 1920 "L" Street, N.W., Washington, DC 20036.)

Technical society and technical association specifications and standards are generally available for reference from libraries. They are also distributed among technical groups and using federal agencies.

Supersedes page 5 of 3 January 1978.

5

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [036409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120860 8 ■

MIL-STD-129H
1 July 1980

3. DEFINITIONS

For purposes of this standard, the following definitions shall apply:

3.1 Ammunition. A device charged with explosives, propellants, pyrotechnics, initiating composition, or nuclear, biological, or chemical material for use in connection with defense or offense, including demolitions.

3.2 Assembly. A group of two or more physically connected or related parts which is capable of disassembly (e.g., carburetor, powerpack, inter-mediate frequency (IF) circuit, amplifier).

3.3 Bale. Compressible articles or materials assembled into a shaped unit and bound with cord, strapping, or metal ties under tension.

3.4 Break bulk point. A transshipping activity to which unitized shipment units for various ultimate consignees may be consigned for further distribution as separate shipment units.

3.5 Bundle. Two or more articles bound or rolled together, usually without compression, to form a pack.

3.5.1 Bundle, cloth covered. An item (such as tents) pattern folded and packed by covering with jute, burlap, or cotton osnaburg cloth.

3.6 Cognizant activity. The activity having responsibility or jurisdiction:

3.6.1 For marking at contractors' facilities. Administrative Contracting Office (ACO) or Procuring Contracting Officer (PCO), as appropriate.

3.6.2 For marking at installations. Head of the agency, bureau, com-mand, or service responsible for storage and shipment.

3.7 Consignor. The party who ships materiel and whose name appears in the "From" block of the shipping label.

3.8 Consignee. The party to whom materiel is shipped and whose name appears in the "Ultimate Consignee or Mark For" block of the shipping label.

3.9 Consolidated shipment. Two or more shipment units moving to break bulk point or ultimate consignee under a single transportation control number (TCN).

Supersedes page 6 of 3 January 1978.

6

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:25:22 UTC

MIL-STD-129H NOTICE 2 PA ██ 9999911 0120861 T ██

MIL-STD-129H
1 July 1980

3.10 <u>Contract number (delivery order number, when specified) or purchase order number</u>. The procurement instrument identification number (PIIN) appearing on the procurement document covering the shipment and titled as such.

3.11 <u>Controlled</u>. Items which require additional control and security in accordance with published regulations and statutes, including money, negotiable instruments, narcotics, registered mail, precious metal alloys, ammunition, ethyl alcohol and drug abuse items.

3.12 <u>Cube</u>. The volume of space occupied by the unit under consideration computed by multiplying overall exterior length, width, and height. For shipping purposes, cube is expressed to the nearest tenth of a cubic foot, i.e., CU 2.1.

3.13 <u>Date assembled</u>. The date that the items or parts are assembled into kits; components are assembled into sets; or the date various components or sets are assembled into a unit.

3.14 <u>Date cured</u>. The date that the item or materiel was altered industrially, i.e., as to vulcanize (rubber), or to treat (synthetic elastomers) with heat or chemicals to make infusible.

3.15 <u>Date manufactured</u>.

a. The date the item, materiel, or commodity was fabricated, processed, produced, or formed for use.
b. For drugs, chemicals, and biologicals, the date of manufacture shall conform to the definition established by the Food and Drug Administration (FDA), Agriculture Research Service (ARS) or other regulatory agencies. The date of manufacture shall not be shown for items having an expiration date.

3.16 <u>Date packed</u>. For all items required to be date marked, the date packed shall be that date on which the product was packed in the unit pack, regardless of the date of exterior packing, shipping, or additional processing.

3.17 <u>Defense Transportation System (DTS)</u>. DTS consists of military controlled terminal facilities, Military Airlift Command (MAC) controlled air-lift, Military Sealift Command (MSC) controlled or arranged sealift and Government-owned or controlled air or land transportation.

3.18 <u>Department of Defense Identification Code (DODIC)</u>. A letter and three numerals or two letters and two numerals assigned to an ammunition generic description within the Federal Supply Classification.

3.19 <u>EXPEDITED HANDLING shipments</u>. Shipments to be afforded the highest precedence in shipment processing and movement such as code 999 and not operationally ready supply (NORS).

Supersedes page 7 of 3 January 1978.

7

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [9384091006011] - PEGOYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120862 1 ■

MIL-STD-129H
1 July 1980

3.20 <u>Expiration date</u>. A date, as determined by technical test data, beyond which shelf-life items should be suspended from continued issue or use.

3.21 <u>Expiration dating period</u>. For medical items and chemicals, the expiration dating period represents the storage period after which the product, upon termination of its expiration dating period, is no longer suitable for issue or use.

3.22 <u>Gross weight</u>. The combined weight of the container, packing material, and contents.

3.23 <u>Hazardous material</u>. A substance or material which has been determined by the Secretary of Transportation to be capable of posing an unreasonable risk to health, safety, and property when transported in commerce, and which has been so designated in 49 CFR 172.101, or other documents.

3.23.1 <u>Explosive</u>. A chemical compound or mixture of substances which, when subjected to suitable initiating impulses or agents such as flame, spark, heat, impact or friction (whether applied mechanically or electrically), will undergo chemical and physical transformation at speeds varying from extremely rapid to instantaneous, resulting in sudden and rapid development of very high pressure in the surroundings.

3.24 <u>Inspection/test date</u>. A date by which all shelf-life items should be subjected to storage surveillance inspection during the period of storage prior to issue and use.

3.25 <u>Intermediate pack</u>. A wrap, box, or bundle which contains two or more unit packs of identical items.

3.26 <u>Item description</u>. The item description is the exact name and description of the item as it appears in the contract, purchase order, or requisition (e.g., drilling machine; radial; chair; ink).

      NOTE:  Item description shall consist of the item name approved by the Directorate of Item Identification, Defense Logistics Services Center (DLSC). Approved item names, basic names, and colloquial names are published in Cataloging Handbook H6, Federal Item Name Directory for Supply Cataloging. Clothing and textile item description shall always include item size. Abbreviated descriptions as authorized by the cognizant activity will be permitted.

3.27 <u>Kit</u>. A packed unit or group of items used in modification, installation or survival. The items in a kit normally in themselves do not constitute a complete function.

Supersedes page 8 of 3 January 1978.

8

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120863 3 ■

3.28 Levels of protection.  The degree of preservation or packing required to prevent deterioration or damage to supplies and equipment due to the hazards to which they may be subjected during shipment and storage.  The degrees of protection are maximum protection (designated as level A); intermediate protection (designated as level B) and minimum protection (designated as either commercial packaging or level C).

3.29 Loose or unpacked item.  An identifiable item that is unencumbered by a tie, wrap, or container.

3.30 Lot, batch, or identification control number.  That series of numbers, or letters, or both, established to record production and control of the product.

3.31 Marking.  Application of numbers, letters, labels, tags, symbols or colors for handling or identification during shipment and storage.

3.32 Methods of preservation.  Methods established by MIL-P-116.

3.33 MILVAN.  Military-owned-demountable container, conforming to United States and International Standards, and operated in a centrally controlled fleet for movement of military cargo.

3.34 Modification work order  (MWO).  Official publication providing authentic and uniform instructions for the alteration and modification of existing materiel, including joint service publications published as retrofit orders.

3.35 Name and address of contractor.  The name and address of the contractor is the exact name of the individual, partnership, corporation, company, etc., to whom the contract has been awarded, and the city, state, country (if other than USA), and zip code.

3.36 National stock number (NSN).  The term used for the 13-digit stock number used in all United States material management functions, e.g., 4931-00-561-0730.

3.36.1 National Codification Bureau (NCB) code.  A two-digit significant number used to identify the central cataloging office of the North Atlantic Treaty Organization (NATO) or other friendly country that assigned the National Item Identification Number (NIIN), e.g., 4931-00-561-C730.

Supersedes page 9 of 1 November 1978.

9

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY (036409100001) - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120864 5 ■

MIL-STD-129H
1 July 1980

3.36.2 <u>National Item Identification Number (NIIN)</u>. A nine-digit number assigned to an individual item of supply which differentiates it from all other items of supply. It consists of the two-digit NCB code combined with seven other digits, e.g., 4931-<u>00-561-0130</u>.

3.36.3 <u>NATO Stock Number (NSN)</u>. A 13-digit number used to identify an item of supply produced by a NATO member nation other than the United States and is identified by the military forces of that nation by the assignment of a NATO stock number.

Example:     <u>1005</u>           <u>13</u>              <u>13-123-4567</u>
         NATO Supply      NATO Code              NIIN
        Classification Code   for NCBs      (9-digit number, see 3.36.2)

3.37 <u>Net weight</u>. The net weight is the weight of the commodity alone not including any packaging material or container. When required by statute, total net weight shall be the drained weight (especially applicable to subsistence items). Unless otherwise specified in the contract or order, the net weight shall be expressed in pounds to the nearest pound.

3.38 <u>Nonperishable item</u>. An item which normally does not require refrigeration or freezing during transportation and storage.

3.39 <u>Pack, exterior</u>. A container, bundle, or assembly which is sufficient by reason of material, design, and construction to protect materiel during shipment and storage. This can be the unit pack or a container with any combination of unit or intermediate packs.

3.40 <u>Packing</u>. Assembling of items into a unit, intermediate, or exterior pack with necessary blocking, bracing, cushioning, weather-proofing, reinforcement, and marking.

3.41 <u>Packaging</u>. A generic term describing the processes and procedures used to protect materiel from deterioration and/or damage. It includes cleaning, drying, preserving, packing, marking, and unitization.

3.42 <u>Palletized unit load</u>. A quantity of item(s), packed or unpacked, which is arranged on a pallet in a specified manner and secured strapped or fastened thereto so the whole is handled as a unit.

3.43 <u>Parcel post</u>. Any packed materiel placed in United States Postal Service (USPS) channels.

3.44 <u>Perishable item</u>. An item which normally requires some type of refrigeration or freezing during transportation and storage.

Supersedes page 10 of 3 January 1978.

10

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226553
Sold to:MARGARET A. MCCLOSKEY [058409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:28:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120865 ? ■

MIL-STD-129H
1 July 1980

3.45 <u>Pilferable</u>. Materiel having a ready resale value, civilian utility or application as to personal possession and which is, therefore, especially subject to theft.

3.46 <u>Preservation</u>. Application of protective measures, including cleaning, drying, preservative materials, barrier materials, cushioning and containers when necessary.

3.47 <u>Port of debarkation (POD)</u>. An authorized point of entry into a foreign country or CONUS.

3.48 <u>Port of embarkation (POE)</u>. An authorized point of departure from a foreign country or CONUS.

3.49 <u>Project code</u>. A three-position alphabetic/numeric code which identifies plans, program, and exercises.

3.50 <u>Proper shipping name</u>. The name of the hazardous material shown in Roman print in CFR 49 172.101, and in capital letters in chapter 4 of AFR 71.4/TM 38-250/NAVSUP PUB 505 (REV)/MCO P4030.19D/DLAM 4145.3.

3.51 <u>Quantity</u>. The number of units of issue contained in a unit pack, intermediate pack, shipping container, bundle, or secure lift.

3.52 <u>Required delivery date (RDD)</u>. The Julian date when material is required by the requisitioner or consignee and is specified on the requisition. Delivery dates computed from the requisition data and priority based on Uniform Materiel Movement and Issue Priority System (UMMIPS) are not considered RDDs for purposes of this standard.

3.53 <u>Resale item</u>. A perishable/nonperishable specification or non-specification item or an item which may be identified by label as to brand or trade name and procured for the purpose of being resold through a commissary store.

3.54 <u>SEAVAN</u>. Commercial or Government-owned (or leased) shipping containers which are moved via ocean transportation without bogey wheels attached, i.e., lifted on and off the ship.

3.55 <u>Sensitive items</u>. Materiel which requires a high degree of protection and control due to statutory requirements or regulations, such as narcotics and drug abuse items; precious metals; items which are of high value, highly technical or of a hazardous nature; and small arms, ammunition, explosives and demolition materiel.

Supersedes page 11 of 3 January 1978.

11

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:28:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120866 9 ■

MIL-STD-129H
1 July 1980

3.56 Serial number. The number appearing on the items as assigned by the manufacturer or the Government for identification or control purposes.

3.57 Set. A unit or units and necessary assemblies, subassemblies and parts connected or associated together to perform an operational function (e.g., tool set, television set, radio receiving set).

3.58 Shelf life. The total period of time beginning with the date of manufacture/cure/assembly or inspection of test/restorative action that an item may remain in the combined wholesale (including manufacturer) and retail storage system and still maintain suitability for issue/use by the end user. (Shelf life is not to be confused with service life which is a measurement of anticipated total in-use time.)

3.59 Shelf-life code (SLC). A code assigned to a shelf-life item to identify the period of time, beginning with the date of manufacture/cure/assembly and terminated by a date by which the item must be used or be subjected to inspection/ test/restorative or disposal action (app B). (Codes will not be marked on containers.)

3.60 Shelf-life item. An item of supply possessing deteriorative or unstable characteristics to the degree that a storage time period must be assigned to assure that the item will perform satisfactorily in service. There are two types of shelf-life items--type I and type II.

3.60.1 Type I shelf-life item. An item of supply which is determined, through an evaluation of technical test data and/or actual experience, to be an item with a definite nonextendible period of shelf life.

3.60.2 Type II, shelf-life items. An item of supply having an assigned shelf-life time period which may be extended after the completion of prescribed inspection/test/restorative action.

3.61 Shipment number. The number assigned by a contractor to a shipment being made under a shipment order or contract, i.e., shipment No. 6 to denote the sixth shipment on the contract.

3.62 Shipping container. A container which meets minimum carrier regulations and is of sufficient strength, by reason of material, design, and construction, to be shipped safely without further packing, either as a primary pack or as an outer container, for unit packs. Examples: wooden boxes or crates; fiber and metal drums; corrugated and solid fibers boxes; multiwall paper shipping sacks; textile shipping bags; etc.

Supersedes page 12 of 3 January 1978.

12

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [036409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120867 0 ■■

MIL-STD-129H
1 July 1980

3.63  Stamping.  Impressing or imprinting by metal dies or rubber stamps.

3.64  Storage point.  Any point at which supplies are stored for distribution to consuming activities.

3.65  Transporation control number (TCN).  The 17-position number assigned to control a shipment/consolidated shipment unit within DTS.

3.66  Unit load.  An assemblage of two or more items, in or out of containers, designed to permit handling these items as a single entity using mechanical materials handling equipment.  The act of constructing a unit load may consist of consolidating items into a larger container compatible with materials handling equipment, securing to a pallet or similar load handling base, or, simply, bundling.

3.67  Unit of issue.  A standard or basic quantity as indicated in a requisition, contract or order, in which an item of supply is divided, issued, or used.  Examples are piece, pair, bottle, can, each, dozen, gross, pound, gallon, foot, yard, set, etc.  (See 4.1 for abbreviations.)

3.67.1  Nondefinitive unit of issue.  A type of unit of issue designation that does not indicate an exact quantity of volume, linear measurement, weight, or count, e.g., drum, can, box, roll, reel, etc.  When a nondefinitive unit of issue is specified, it must be accompanied by a quantitative expression (see 3.67.2).

3.67.2  Quantitative expression.  The exact quantity of volume, linear measurement, weight or count contained in a unit of issue, e.g., 5 gallons 25 feet, 10 lbs., 25 each (see 3.67.1).

3.68  Unit pack.  The first tie, wrap, or container applied to a single item or a quantity thereof, or to a group of items of a single stock number, preserved or unpreserved, which constitutes a complete identifiable pack.

Supersedes page 13 of 3 January 1978.

13

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120868 2 ■■

MIL-STD-129H
3 January 1978

4. GENERAL REQUIREMENTS

4.1 Abbreviations. The following abbreviations are authorized for use. In addition, abbreviations of the item descriptions will be permitted when approved by the cognizant activity concerned. Periods will not be used with abbreviations.

a. Package units:

| | | | | | |
|---|---|---|---|---|---|
| Ampoule | AM | Container | CO | Pyramid | PY |
| Assembly | AY | Crate | CR | Ration | RA |
| Assortment | AT | Cylinder | CY | Reel | RL |
| Bag | BG | Deck | DK | Ribbon | RN |
| Bale | BE | Drum | DR | Roll | RO |
| Ball | BA | Engine Container | EC | Sack | SA |
| Bar | BR | Engine Cradle | ED | Section | SC |
| Barrel | BL | Envelope | EN | Set | SE |
| Block | BC | Flask | FL | Sheet | SH |
| Bolt | BO | Hank | HK | Shot | SO |
| Book | BK | Head | HE | Skein | SK |
| Bottle | BT | Jar | JR | Skid Box | SB |
| Box | BX | Jug | JG | Sleeve | SV |
| Brick | BI | Keg | KE | Spool | SL |
| Bundle | BD | Kit | KT | Stack | SS |
| Cake | CK | Length | LG | Stick | SX |
| Can | CN | Link | LK | Strip | SP |
| Capsule | CP | Pack | PK | Tablet | TT |
| Carboy | CB | Package | PG | Tape | TP |
| Carton | CT | Pad | PD | Tin | TI |
| Case | CS | Pail | PL | Tube | TU |
| Cask | KS | Pallet | PT | Unit | UN |
| Chain | KK | Panel | PN | Vial | VI |
| Chest | CH | Paper | PA | Wafer | WF |
| Coil | CL | Piece | PC | Wrap | WR |
| Cone | CE | | | | |

b. Quantitative units:

| | | | | | |
|---|---|---|---|---|---|
| Ampoule | AM | Hundred | HD | Peck | PE |
| Dozen | DZ | Ingot | IG | Quire | QR |
| Each | EA | Loose (not | | Ream | RM |
| Great gross | GG | packaged) | LS | Round | RD |
| Gross | GR | Lot | LO | Skid | SD |
| Group | GP | Pair | PR | Thousand | MX |
| Hogshead | HH | | | | |

14

Reprinted without change.

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [034409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 19:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120867 0 ■■

3.63 <u>Stamping</u>. Impressing or imprinting by metal dies or rubber stamps.

3.64 <u>Storage point</u>. Any point at which supplies are stored for distribution to consuming activities.

3.65 <u>Transporation control number (TCN)</u>. The 17-position number assigned to control a shipment/consolidated shipment unit within DTS.

3.66 <u>Unit load</u>. An assemblage of two or more items, in or out of containers, designed to permit handling these items as a single entity using mechanical materials handling equipment. The act of constructing a unit load may consist of consolidating items into a larger container compatible with materials handling equipment, securing to a pallet or similar load handling base, or, simply, bundling.

3.67 <u>Unit of issue</u>. A standard or basic quantity as indicated in a requisition, contract or order, in which an item of supply is divided, issued, or used. Examples are piece, pair, bottle, can, each, dozen, gross, pound, gallon, foot, yard, set, etc. (See 4.1 for abbreviations.)

3.67.1 <u>Nondefinitive unit of issue</u>. A type of unit of issue designation that does not indicate an exact quantity of volume, linear measurement, weight, or count, e.g., drum, can, box, roll, reel, etc. When a nondefinitive unit of issue is specified, it must be accompanied by a quantitative expression (see 3.67.2).

3.67.2 <u>Quantitative expression</u>. The exact quantity of volume, linear measurement, weight or count contained in a unit of issue, e.g., 5 gallons 25 feet, 10 lbs., 25 each (see 3.67.1).

3.68 <u>Unit pack</u>. The first tie, wrap, or container applied to a single item or a quantity thereof, or to a group of items of a single stock number, preserved or unpreserved, which constitutes a complete identifiable pack.

Supersedes page 13 of 3 January 1978.

13

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY (038409100001) - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120868 2 ■

MIL-STD-129H
3 January 1978

4. GENERAL REQUIREMENTS

4.1 <u>Abbreviations</u>. The following abbreviations are authorized for use. In addition, abbreviations of the item descriptions will be permitted when approved by the cognizant activity concerned. Periods will not be used with abbreviations.

a. Package units:

| | | |
|---|---|---|
| Ampoule --------- AM | Container ------- CO | Pyramid ----------- PY |
| Assembly ------- AY | Crate ----------- CR | Ration ------------ RA |
| Assortment------- AT | Cylinder--------- CY | Reel -------------- RL |
| Bag ------------- BG | Deck------------- DK | Ribbon ----------- RN |
| Bale ------------ BE | Drum ----------- DR | Roll -------------- RO |
| Ball ------------ BA | Engine Container - EC | Sack------------- SA |
| Bar ------------,BR | Engine Cradle --- ED | Section------------ SC |
| Barrel ----------- BL | Envelope--------- EN | Set -------------- SE |
| Block ----------- BC | Flask ----------- FL | Sheet ------------ SH |
| Bolt ------------- BO | Hank ----------- HK | Shot -------------- SO |
| Book ----------- BK | Head ----------- HE | Skein ------------ SK |
| Bottle ----------- BT | Jar ------------- JR | Skid Box --------- SB |
| Box ------------- BX | Jug ------------- JG | Sleeve------------ SV |
| Brick ----------- BI | Keg ------------- KE | Spool ------------ SL |
| Bundle --------- BD | Kit ------------- KT | Stack ------------ SS |
| Cake ----------- CK | Length----------- LG | Stick ------------ SX |
| Can ------------- CN | Link------------- LK | Strip ------------ SP |
| Capsule --------- CP | Pack------------- PK | Tablet ----------- TT |
| Carboy --------- CB | Package --------- PG | Tape ------------ TP |
| Carton----------- CT | Pad ------------- PD | Tin -------------- TI |
| Case------------- CS | Pail ------------- PL | Tube ------------ TU |
| Cask ----------- KS | Pallet ----------- PT | Unit -------------- UN |
| Chain ----------- KK | Panel ----------- PN | Vial -------------- VI |
| Chest ----------- CH | Paper ----------- PA | Wafer ------------ WF |
| Coil ------------- CL | Piece ----------- PC | Wrap ------------ WR |
| Cone------------- CE | | |

b. Quantitative units:

| | | |
|---|---|---|
| Ampoule --------- AM | Hundred--------- HD | Peck ------------ PE |
| Dozen ----------- DZ | Ingot ----------- IG | Quire ------------ QR |
| Each------------- EA | Loose (not | Ream ------------ RM |
| Great gross ----- GG | packaged) ----- LS | Round ------------ RD |
| Gross ----------- GR | Lot ------------- LO | Skid ------------ SD |
| Group ----------- GP | Pair------------- PR | Thousand --------- MX |
| Hogshead ------- HH | | |

14

Reprinted without change.

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINC4@ME.COM,
Not for Resale,2020-06-30 13:36:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120869 4 ■

MIL-STD-129H
1 July 1980

c. Weights and measure units:

| | | | | | |
|---|---|---|---|---|---|
| Board foot | BF | Grain | GN | Milliliter | ML |
| Bushel | BU | Gram | G | Millimeter | MM |
| Centigram | CG | Hundred feet | HF | Ounce | OZ |
| Centimeter | CM | Hundred square | | Pennyweight | DWT |
| Cord | KD | feet | HS | Pint | PT |
| Cube | CU | Hundredweight | CWT | Pound | LB |
| Cubic centimeter | CC | Hundred yard | HY | Quart | QT |
| Cubic foot | CF | Inch | IN | Quart imperial | QI |
| Cubic inch | CI | Kilogram | KG | Short ton | ST |
| Cubic meter | CZ | Kilometer | KM | Square foot | SF |
| Cubic yard | CD | Length | LG | Square inch | SI |
| Decagram | DC | Linear foot | LF | Square meter | SM |
| Decigram | DG | Linear yard | LY | Square yard | SY |
| Deciliter | DL | Liter | L | Thousand cubic feet | MC |
| Decimeter | DE | Long ton | LT | Thousand feet | MF |
| Dram | DM | Measurement ton | M/T | Ton | TN |
| Foot | FT | Meter | M | Volume | VO |
| Gallon | GL | Mile | MI | Weight | WT |
| Gallon imperial | GB | Milliampere | MA | Yard | YD |
| Gill | GI | Milligram | MG | | |

d. Miscellaneous abbreviations:

| | | | | | |
|---|---|---|---|---|---|
| Bill of lading | B/L | Moisture fungus | | Palletized unit load | |
| Combat service | C/S | proofed | MFP | (other than code | |
| Contract | CONTR | Multi-wall con- | | MW) | PT |
| Copy | CY | tainer (former- | | Port transportation | |
| Dimensions | DMN | ly referred to as | | officer | PTO |
| Engine | ENG | triple-wall or tri- | | Quantity | QTY |
| Federal item | | wall secured or | | Ready to cook | RTC |
| identification | | attached to | | Report | REPT |
| guides | FIIGs | pallet) | MW | Requisition | RQN |
| Fryer | FRY | National codifica- | | Shipment order | S/O |
| Government bill | | tion bureau | NCB | Tare weight | T/WT |
| of lading | GBL | National item identi- | | Transportation | |
| Identification | IDENT | fication number | NIIN | control number | TCN |
| Invoice | INV | National stock | | Transportation | |
| Item name code | INC | number | NSN | officer | TO |
| Less than carload | LCL | NATO stock num- | | United States pharma- | |
| Less than truck- | | ber | NSN | copoeia | USP |
| load | LTL | Net weight | NET | United States ship | USS |
| Manufactured | MFD | | WT | United States Navy | |
| Mark | MK | Officer | OFF | ship | USNS |
| Mildew resistant | | Packed | PKD | Vehicle | VE |
| treatment | MRT | | | Weapons system | |
| | | | | pouch | WSP |

Supersedes page 15 of 3 January 1978.

15

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-05-30 13:26:22 UTC

MIL-STD-129H
1 July 1980

4.1.1 Abbreviation of corporate name of contractor. Where corporate name of contractor will require two or more lines, an abbreviation of the name which can be identified with the contractor will be permitted.

4.2 Markings and marking material.

4.2.1 Advertising matter and container marking. Unless otherwise specified herein or in the contract or order, advertising matter and container markings not interfering with the clarity or positioning of required markings on container will be permitted. Required markings will be of a different color than advertising matter if markings cover part of advertising.

4.2.2 Marking material. All marking material shall be as specified herein or an alternate approved by the cognizant activity (see 3.6).

4.2.2.1 Waterproofing materials for protective coatings. Spar varnish or a clear acrylic coating compound for protecting and waterproofing markings shall conform to TT-V-121 or MIL-C-17504, respectively. Label adhesives or cement shall conform to MMM-A-105, MMM-A-178, or MMM-A-179, respectively. Transparent tape shall conform to PPP-T-60, PPP-T-70 or L-T-90.

4.2.2.2 Stencil-marking material.

4.2.2.2.1 Stencil ink. Stencil ink for marking shall conform to TT-I-1795 unless otherwise specified in ammuntion packaging drawings.

4.2.2.2.2 Lacquer, paint, enamel, and gasoline soluble paint. Lacquer, paint and enamel for marking shall conform to TT-L-20, MIL-P-52108, and TT-E-489, respectively. Gasoline soluble paint for marking unboxed and uncrated equipment where applied directly to the item shall conform to MIL-P-13983. Ammunition packaging drawings specifying other finishes take precedence over the above requirements.

4.2.2.3 Obliterating lacquer, enamel or paint. Obliterating lacquer shall conform to TT-L-40. Lusterless enamel shall conform to TT-E-515, and shall be sand color 30277 of FED-STD-595. Obliterating paint shall conform to MIL-P-52108. A quick drying opaque lacquer, enamel, or paint, approximating the color of the container, may be used for obliterating marking, when approved by the cognizant activity.

4.2.3 Labels, paper. Unless otherwise authorized by the cognizant activity (see 3.6) labels shall be made of sized white paper stock having a minimum basis weight of 20 pounds and shall have a smooth finish.

4.2.3.1 Labels, pressure-sensitive, water-resistant. Labels shall be of a water-resistant grade of paper, film, fabric or plastic, flat-back, coated on one side with pressure-sensitive adhesive. The texture of material shall be such as to permit flexibility. Labels shall have a finish capable of withstanding normal handling during shipment and storage. Labels shall be suitable for printing or writing on with ink without feathering or spreading.

Supersedes page 16 of 3 January 1978.

16

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY (036409100001) - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

4.2.3.2 Adhesive, pressure-sensitive, for labels. The adhesive shall be a pressure-sensitive permanent type. It shall be water-insoluble, homogeneous, and shall be coated in a smooth layer on one side of the label. The adhesive shall require no solvent, heat, or other preparation prior to application. Adhesive shall be of a type that will adhere to metal, plastic, or fiberboard surfaces under high or low temperatures.

4.2.4 Tags. Unless otherwise specified, cloth and paper tags shall conform to the requirements of UU-T-81. Metal shipping tags shall be corrosion resistant. Aluminum foil adhesive backed plates, plastic and plastic laminated plates, authorized for use by the cognizant activity, may be used when durability is required and costs will not exceed that of metal tags.

4.2.5 Water-resistant envelopes. Water-resistant envelopes for packing lists and Material Release/Receipt Documents shall conform to PPP-E-540.

4.2.6 Envelope protectors. Envelope protectors shall conform to PPP-P-700.

4.3 Method of marking and size of markings.

4.3.1 Method of marking interior packs, shipping containers, and loose or unpacked items. Marking shall be accomplished by use of labels, stamping, stenciling, printing, or tagging. Lithographing, silk-screening, photo marking, embossing, decals, transfers, barcoding, laser marking or other similar processes may be used when specified herein or upon approval of the cognizant agency (see 3.6). Hand lettering may be used for marking serial numbers, yardage marking of textiles, piece number, total pieces, weight and cube, provided all other requirements of this standard are met for legibility and marking material. Identification marking for ammunition shall be limited to stamping, stenciling, printing, silk-screening, or embossing unless other methods are specifically authorized.

4.3.1.1 Conditions of surfaces to be marked. All surfaces to be marked shall be clean, dry and entirely free of contaminants, except as permitted in 5.1.4.8.8.2. Any marks not applicable to the shipment contemplated, except those permitted by 4.2.1, shall be removed by covering with obliterating lacquer, enamel, or paint (see 4.2.2.3). When shipping containers are consolidated into container vans for shipment to an ultimate consignee, obliteration of address labels shall not be required by consolidation activities (see 5.2.1.3.11). Contract data markings shall not be obliterated when original unopened packs are re-addressed for shipment by DOD shipping element, unless they interfere with other required markings.

4.3.1.2 Legibility, color, and durability of markings. All markings shall be clear and legible and not less than the size specified (see 4.3.2). Markings shall be nonfading and durable. Unless otherwise specified, color of all markings shall be black, except when applied to surfaces on which black is not legible, then the color used shall provide a definite contrast. For example, yellow or white lettering shall be applied over lusterless, olive-drab coloring.

Supersedes Page 17 of 1 November 1978.

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:28:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120872 4 ■

MIL-STD-129H
1 July 1980

4.3.1.3 <u>Use of labels</u>. Labels are permitted on all levels of military pack-aging except as otherwise specified herein. Labels shall be used for domestic address and oversea address marking (see 5.2 and 5.2.1.2, figs 19, 20, and 22). Labels are not applicable to bundles of lumber (see 5.2.1.3.12.1 and 5.2.1.3.12.2.1). Labels are permitted for marking identification and contract data on interior containers. Labels for applying identification and contract markings are permitted on shipping containers of fiberboard, plastic, or metal unless otherwise specified. Pressure-sensitive labels (see 4.2.3.1, 4.2.3.2) may be used on containers other than wood.

4.3.1.4 <u>Stenciling</u>. Stenciling may be accomplished by brushing, rolling or spraying a sharply cut stencil with materials specified in 4.2.2.2.1 and 4.2.2.2.2, as applicable.

4.3.1.5 <u>Printing</u>. Required markings may be printed directly on containers at time of manufacture. Such markings may be applied on all interior and exterior containers (see 4.3.1). Self-inked, porous stencils, impressed by typewriter or data processing machine, may be used.

4.3.1.6 <u>Lithographing, embossing, roller coating or stamping</u>. When lithographic, embossing or roller coating of markings is authorized, commercial enamels, lacquers or inks in the color specified shall be used. When stamping is specified, commercial waterproof and petroleum resistant inks, in the color specified, offering the greatest durability on exposure to field service shall be used.

4.3.1.7 <u>Tags</u>. A metal, cloth, plastic, or paper shipping tag, bearing the required markings, shall be used when specified herein or whenever the container or unpacked item is such that it is impracticable to stencil mark thereon or imprac-ticable to use a label. Paper tags shall conform to type B of UU-T-81. Tags shall be attached with wire or twine. Wire shall not be smaller than 23 gage (0.0258-in diameter) tag wire or other suitable corrosion-resistant metal fastener. When rusting of wire could affect or damage the item to which the tag is attached, then twine shall be used for attaching tags. Marking on cloth or paper tags shall be printed or typed with waterproof ink. Markings on metal tags shall be accomplished with dies or punches. Markings on plastic tags shall be accomplished by use of stamping, stenciling, printing, perforating, embossing, or, when specified, by lithographing, silk-screening, photo marking, decals, transfers or other similar processes. Types of material for plastic tags shall meet the requirements of L-P-387. Method of securing plastic tags shall be similar to that of securing cloth, paper or metal tags. As an alternate to twine or wire, attachment methods may be adhesion, cemented, sewed, clip, staple, tack, tape, or nail.

Supersedes page 18 of 1 November 1978.

18

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120873 6 ■

MIL-STD-129H
1 July 1980

4.3.1.8 Labels.

4.3.1.8.1 For shipping containers, interior packs, paper wrapped rolls, unpacked items. When labels are used, the required markings shall be printed, stamped, typed, or reproduced. Letters must not smear or blur.

4.3.1.8.1.1 Affixing and securing of paper labels (except vehicles and related equipment). Labels other than pressure-sensitive shall be securely affixed in place with water-resistant label adhesive as specified in 4.2.2.1. Adhesive shall be placed on the complete underside of the label. For an alternate method, see 4.3.1.8.1.4. When pressure-sensitive labels are used, the adhesive used during label manufacture shall be as specified in 4.2.3.2.

4.3.1.8.1.2 Protective coating of labels. Labels for level A exterior packs (except vehicles or related items) shall be waterproofed by coating the entire outer surface of the label with waterproof lacquer, varnish, clear acrylic coating compound or label adhesive. Transparent tape (see 4.2.2.1) is authorized for use on level A exterior packs, vehicles, and related items (see 5.2.1.3.7.2 and 5.2.1.3.9). Labels for packs other than exterior level A require no protective coating. Labels applied to structural steel products require overcoating protection.

4.3.1.8.1.3 Interior pack markings. Markings may be applied by any means as specified in 4.3.1. Markings shall be of a size which permits ready identification commensurate to the size of the packs (see 4.3.2). Size of labels shall not exceed the marking surface area of any one side of the unit container. When clear (untinted) plastic containers are used for unit protection, the labels may be inserted or affixed inside the container if the label will not affect or be affected by the method of preservation and will not obscure more than 50 percent of the surface of the container.

4.3.1.8.1.4 Alternate method of securing labels. An alternate method of affixing and protecting labels on fiberboard containers, metal containers, polyethylene, rubber products, and vehicles, and related equipment for level A is through the use of PPP-T-60, type III, class 2, or PPP-T-70 pressure-sensitive tape over the entire surface of the label. For level B and C packs and for parcel post, pressure-sensitive tape conforming to L-T-90, type II, class A may be used as an alternate to PPP-T-60 and PPP-T-70 tapes.

4.3.2 Size, marking for identification, special and address markings of interior and exterior containers.

4.3.2.1 Size of lettering. Lettering for all markings shall be capital letters of equal height, as specified herein, so as to be clearly legible and proportional to the available space of the container. Letter size on ammunition packaging shall be in accordance with the provisions of this standard unless otherwise specified on applicable ammunition packaging documentation. Ammunition lot marking will be in the largest practical size lettering and shall be underlined.

Supersedes page 19 of 1 November 1978.

19

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A MCCLOSKEY (038409100001) - PEGGYINCA@ME.COM,
Not for Resale,2020-08-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120874 8 ■■

MIL-STD-129H
1 July 1980

4.3.2.1.1  <u>Identification and special markings</u>.  Stenciled lettering for identification and special markings shall be no less than three-eighths of an inch nor more than 1 inch in height.  The size lettering may be reduced to one-fourth of an inch in height when the total area, or the available space, of the panel to be marked is not sufficient for the larger size lettering.  Lettering on ammunition packages may be larger than one inch in height when so specified on ammunition packaging documents.

4.3.2.1.2  <u>Stencil address markings</u>.  Stencil markings shall be as authorized in 5.2 or as otherwise specified herein.

4.3.2.1.3  <u>Tags and labels</u>.  Address and identification markings on plastic, cloth, paper tags, or paper labels shall not be less than 0.095 of an inch (approximately three thirty-seconds of an inch); on metal tags, not less than three-sixteenths of an inch.

Supersedes page 20 of 3 January 1978.

20

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120875 T ■■

5.    DETAILED REQUIREMENTS

5.1  Interior and exterior identification and contract data markings.

5.1.1  Unit and intermediate packs and unpacked items (see 3.25 and 3.68). The following identification marking shall appear on unit and intermediate packs and unpacked items in the order listed (fig 1). (The words "national stock number," "item description," "quantity," and "unit of issue" shall not be made a part of the markings.) See 5.6 for ammunition markings.

a.  NSN/NATO stock number (see 3.36 and 3.36.3). When no NSN/NATO stock number is available, the applicable Federal Supply Classification (FSC), if known, shall be shown. In addition, the manufacturer's reference/part number (MFR/PN) shall be used and space shall be left blank immediately above the number for subsequent placement of the NSN/NATO stock number. The words "MFR/PN" shall be used to identify this information. When the MFR/PN is used, the Federal Supply Code for Manufacturers (FSCM) appropriate to the part number shall precede the part number on the same line. The letters "FSCM" shall be used to identify the code indicated. (The FSCM is cross-referenced to manufacturers' names and addresses in Cataloging Handbooks H4 and H4-2.)

b.  Manufacturers' part number. When specifically required by a contract or order, the MFR/PN and FSCM (see a above) shall be applied in addition to the NSN/NATO stock numbers and shall be located directly below the NSN/NATO stock number.

c.  Item description (see 3.26).

d.  Quantity and unit of issue (see 3.51 and 3.67). When the unit of issue is nondefinitive (see 3.67.1), the quantitative expression for unit packs (see 3.67.2) shall be added after the quantity and unit of issue, i.e., 1 RO (150 ft), or as otherwise specified.

e.  Contract number (delivery order number, when specified) or purchase order number (see 3.10).

f.  Level of protection (see 3.28) and date, i.e., A 12/77, indicates level A preservation applied December 1977. Date preservation was accomplished may be excluded when shelf-life markings are applied.



FIGURE 1.  Unit and intermediate container identification markings.

Supersedes page 21 of 1 November 1978.

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [058409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120876 1 ■■

MIL-STD-129H
1 July 1980

5.1.2 Exterior container identification markings. The required markings shall be placed so as not to be obscured by cleats and strapping. Arrangement of markings shall be as described and illustrated herein. One end and the top and bottom of containers shall always be free of any markings, unless otherwise specified. Marking materials and size of markings shall comply with 4.2 and 4.3. See 5.6 for ammunition markings.

5.1.2.1 Identification markings. Identification markings shall be composed of the following information. (The words "national stock number," "item description," "quantity," and "unit of issue" shall not be made a part of the marking.)

a.  NSN/NATO stock number (see 5.1.1a).
b.  MFR/PN (see 5.1.1b).
c.  Item description (see 3.26).
d.  Quantity, unit of issue (see 3.51 and 3.67).
e.  Levels of protection (see 3.28) and date such as A/B - 1/78, i.e., to indicate level A preservation, level B packing, month and year of the earliest pack date. (Date packing accomplished may be excluded when shelf-life marking is applied (see 5.4.1).)
f.  Gross weight and cube (see 3.22, 3.12, 5.1.2.4 and 5.1.2.5).
g.  Proper shipping names for hazardous items only (see 3.50).

When shipping hazardous materials, the proper shipping name and precautionary labels shall be in accordance with 49 CFR Parts 107-179. The proper shipping names shall be distinct and apart from the item description.

5.1.2.2 Omission of marking on outside shipping container of selected sensitive, controlled, and pilferable items. On shipments of clothing and textile items consigned to Headquarters, Support Activity, Taipei, Republic of China, and to Air Force and Navy oversea consignees, and all shipments of selected sensitive and controlled items (i.e., small arms (weapons), controlled substances (narcotics and drugs), and precious metals) and selected pilferable items (i.e., maps, watches, jewelry, cameras, radios/TVs and other similar valuable or pilferable items), the stock number, MFR/PN, nomenclature, and serial number, when applicable to a specific item, shall be omitted or obliterated from all outside shipping containers, regardless of mode of shipment. (NSN, printed on computer prepared parcel post labels, is permitted for parcel post shipments to Air Force and Navy oversea consignees.) Marking required for identification (DOD Identification Code (DODIC), stock number, nomenclature and lot number) of ammunition or explosives and the proper shipping name and precautionary marking and labels prescribed by DOT regulations shall not be omitted from the outside of shipping containers.

Supersedes page 22 of 3 January 1978.

22

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120877 3 ■

5.1.2.3 <u>Marking for assorted item</u>.

5.1.2.3.1 <u>Related items</u>. When an assortment of related items which cannot be identified under one stock number is packed in a shipping container, the gross weight, cube and special markings shall be applied, plus a brief description of the contents in lieu of the identification data. For example: repair parts for pump, centrifugal, 2-inch disc, gas engine Jaeger 2-APS-1, 55GPM, Ser 12345. Kit or set components shall be suitably segregated and identified within the unit pack by part number and/or national stock number.

5.1.2.3.2 <u>Unrelated items</u>. When containers of unrelated items are consolidated into a shipping container, the word "MULTIPACK" shall be applied to the shipping container plus level of packing, date, gross weight, and cube in lieu of the identification marking required by subparagraphs a, b, c and d of 5.1.2.1. Example of markings is:

Multipack
A/12/77
WT 100 – CU 4

5.1.2.4 <u>Marking of gross weight</u>. The capital letters "WT" shall precede gross weight numerals. All weights shall be numerically indicated and shall be expressed in pounds to the nearest pound.

5.1.2.5 <u>Cube</u>. The letters "CU" shall precede the cube (cubic displacement) numerals. The cube shall be the cubic displacement of the shipping container, bundle, or secured lift, calculated from the overall length, width, and height dimensions, and shall be shown in cubic feet expressed decimally to the nearest one-tenth of a cubic foot. Irregular, cylindrical, or round items shall be considered as rectangular solids. Inches expressed as decimals of a foot for calculation purposes shall be as follows:

| | | | | | |
|---|---|---|---|---|---|
| 1 inch | -------- | 0.08 | 7 inches | -------- | .58 |
| 2 inches | ------ | .17 | 8 inches | -------- | .67 |
| 3 inches | ------ | .25 | 9 inches | -------- | .75 |
| 4 inches | ------ | .33 | 10 inches | -------- | .83 |
| 5 inches | ------ | .42 | 11 inches | -------- | .92 |
| 6 inches | -------- | .50 | 12 inches | -------- | 1.00 |

5.1.3 <u>Exterior container contract data marking</u>. Contract data marking shall be composed of the following information:

a. Contract number (delivery order number, when specified) or purchase order number (see 3.10) or modification for change order number, when applicable, and lot number, when applicable.
b. Name and address (including zip code) of prime contractor (see 3.35). When the supplies are shipped from a subcontractor, the name and address of the prime contractor only shall be used.

Supersedes page 23 of 3 January 1978.

23

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number W2226533
Sold to MARGARET A. MCCLOSKEY [03840910000] - PEGGYINCA@ME.COM,
Not for Resale 2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120878 5 ■

MIL-STD-129H
1 July 1980

   c.  For clothing and textile items, the following markings are required: Shipment number, name and address of manufacturer if other than prime contractor, zip code, and container number consecutively numbered from each shipping point for duration of contract.

     NOTE:  When more than one contract is applicable to a multipack container, sub-item a is not required on the exterior container, but shall be applied to each individual container within the multipack.

5.1.4  Positioning of exterior container identification and contract data markings.

   5.1.4.1  Boxes and crates under 10 cubic feet.  Identification markings shall be applied in the left, upper two-thirds of the side of the container (fig 2). Contract data marking shall be placed below the identification marking.  Identification and contract data shall be stenciled or printed directly on the container or, when applied to fiberboard, plastic or metal containers, may be shown on a printed, reproduced, or typed label affixed as specified in 4.3.1.8.1.1. Shipments made by military installations may have contract data omitted only if it interferes with the placement of other markings, or when materiel is repacked.



Figure 2.  Exterior container identification and contract data markings (containers under 10 cubic feet).

   5.1.4.2  Boxes and crates 10 cubic feet and over.  In addition to the requirements of paragraph 5.1.4.1, identification markings are required on one end of containers 10 cubic feet and over.  The markings shall be applied on the upper two-thirds of the container.  An alternate method for marking unsheathed crates is by using marking boards (fig 3) constructed of 1/4-inch plywood conforming to NN-P-530, PS-1 (CD sheet with exterior glues).  See 5.6 for ammunition markings.

Supersedes page 24 of 3 January 1978.

24

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-08-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120879 7 ■

MIL-STD-129H
3 January 1978



FIGURE 3. Alternate method of marking unsheathed crates using marking boards.

5.1.4.3 <u>Bales</u>. Identification markings shall be stenciled on the upper 2/3 of the side of the bale having the largest marking surface area (fig 4). Size of stencil lettering shall be not less than 3/4 inch. Contract data markings shall be placed below the identification markings. When stenciling is not appropriate, labels or tags shall be used. Bales with a presewn end and a wire-tied ear on the opposite end shall have the NSN, quantity, and unit of issue applied on the presewn end. When both ends have wire-tied ears, no identification markings shall be applied on the end.



FIGURE 4. Exterior container identification and contract data markings (bales).

5.1.4.4 <u>Cloth covered bundles</u>. Identification markings shall be stenciled on the upper 2/3 and as close to the left side as possible (fig 5). Contract data shall be placed below the identification marking. Prior to stenciling, the marking area of the bundle shall be given a smooth coating of sand colored lacquer, enamel, or paint.

Reprinted without change.

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [035409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-08-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120880 3 ■

MIL-STD-129H
1 July 1980



Figure 5. **Exterior container identification and contract data markings
(cloth covered bundles)**.

5.1.4.5 **Paper shipping sacks, bags, and textile/laminated textile bags**.
Identification markings shall be printed or stenciled on that side of the sack or bag
that does not bear the sack manufacturer's certificate of compliance. Beginning
seven inches from the top of the sack, or bag, and in separate lines spaced
one-half inch apart, the following identification data shall appear in the order listed:

   a. NSN (see 3.36)
   b. Item Description (see 3.26)
   c. Level and date of pack (see 3.28 and 3.16)
   d. Net weight and cube (see 3.37 and 3.12)
   e. Number and weight of primary bags or sacks (as applicable)

Size lettering shall be a minimum of three-eighths of an inch to a maximum of one
inch, equal height (fig 6). Date of pack may be shown with the contract data
and is not required when the item is known to be for resale. Contract data markings
shall begin 12 inches from the bottom of the sack. If the textile bag material is such
that identification and contract data are not legible when stenciled, the information
shall be printed on a tag or label. If the top of the bag has ears, the tag shall
be securely affixed to one of the ears. Commodities already packed in commercially
printed sacks or bags shall have the required markings stenciled in letters of
three-eighths of an inch to one inch, equal height, centered on one face of the sack
or bag. When the printing area is too small to permit compliance with specified
requirements, the spacing of the printing may be altered proportionately. Lines
may be consolidated when space permits.

**Supersedes page 26 of 3 January 1978.**

26

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-08-38 13:28:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120881 5 ■

MIL-STD-129H
1 July 1980



Figure 6. **Exterior container identification and contract data markings for sacks and bags (stenciling or tagging).**

**5.1.4.6 Barrels, drums and other cylindrical containers.** Identification markings shall be stenciled or printed on the upper one-third of filled pails, barrels, kegs, drums, and reusable metal containers (fig 7). Contract data shall be shown on the upper one-third of the same side or diametrically opposite that of the identification markings when space is not available. In addition, on 50- and 55-gallon barrels or drums from which heads are not removed, identification data (less weight and cube), contract data, and shelf-life marking (when required) shall be shown on the head. Lusterless olive drab colored containers shall be marked with yellow or white lettering. Labels or tags may be used when the container is too small to allow any other specified method of marking. Unless otherwise specified, pressure-sensitive labels may be used on metal drums and cylindrical containers. No markings shall be placed in the space six inches below and above the apex of the bulge of barrels not equipped with rolling rings. Labels or tags shall not be used for identification of metal drums or cylindrical containers of ammunition.



Figure 7. **Exterior container identification and contract data markings (cylindrical containers).**

**Supersedes page 27 of 3 January 1978.**

27

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120882 7 ■■

MIL-STD-129H
1 July 1980

**5.1.4.7** <u>Empty barrels, drums, and cylindrical containers</u>. Identification and contract data markings shall be applied on the top by securely attaching tags or pressure-sensitive labels (fig 8).



8110-00-001-0001
DRUM, METAL, 55 GL
1 EA
A 12/77
WT 50  CU 9

DLA400-77-P-1021 LOT NO 5
JONES CONTAINER CO
NEW YORK, NY 10003

Figure 8. <u>Exterior container identification and contract data markings
(empty cylindrical containers)</u>.

**5.1.4.8** <u>Miscellaneous packs and unpacked items</u>.

**5.1.4.8.1** <u>Small containers</u>. Identification markings and contract data markings shall be applied by stenciling on the left upper two-thirds of the container (fig 9) or labeling (see 4.3.1.3). See 5.6 for ammunition markings.



6305-00-175-0175
WASHER
2000 EA
A/B  12/77
WT 115  CU 1.0

DAAG25-77-P-0050  LOT NO 5
S & B IRON WORKS
TRENTON, NJ 08638

Figure 9. <u>Exterior container identification and contract data
markings (small containers)</u>.

**5.1.4.8.2** <u>Rods, shafts, bars, etc</u>. Identification markings and contract data markings shall be applied on two tags securely attached to the article. One of the tags shall be bound to the item with burlap or other suitable covering with each end of the cover securely fastened (fig 10).

Supersedes page 28 of 3 January 1978.

28

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number W2226533
Sold to:MARGARET A  MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale 2020-06-30 13:26:22 UTC



FIGURE 10. Identification and contract data markings (rods, shafts, bars).

5.1.4.8.3 Reels or spools of cable and wire. Identification markings and contract data markings shall be stenciled on the side of the reel or spool. When the area does not permit stenciling, the markings may be applied by using a label (fig 11).



FIGURE 11. Identification and contract data markings (spool and reels).

5.1.4.8.4 Coils of wire. Identification markings and contract data markings shall be applied on two tags securely attached to the coil (fig 12).



FIGURE 12. Identification and contract data markings (coils of wire).

29

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H
3 January 1978

5.1.4.8.5 **Paper and cloth wrapped rolls.** Identification markings and
contract data markings shall be applied by stenciling, printing, or labeling.
Prior to stenciling cloth wrapped rolls, the marking area shall be given a smooth
coating of sand colored lacquer, enamel or paint. One end of wrapped rolls
shall contain markings consisting of NSN, quantity and unit issue (fig 13).



FIGURE 13. **Identification and contract data markings (wrapped rolls).**

5.1.4.8.6 **Unpacked major equipment (except unpacked vehicles).**
Identification markings and contract data markings shall be stenciled on a marking
panel which shall be applied to the most suitable location of the item. An
alternate method of applying the markings is through use of a label applied
directly on the equipment surface with PPP-T-60, type III, class 2, or PPP-T-70
pressure-sensitive tape (fig 14). The tape shall be placed over the label and
extend a minimum of $\frac{1}{2}$ inch from all edges of the label.



FIGURE 14. **Identification and contract data markings (unpacked equipment).**

30

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

Case 5:25-cv-01852-JMG    Document 1    Filed 04/10/25    Page 298 of 440

5.1.4.8.7 Palletized unit loads. Individual containers comprising the palletized load shall be marked with the identification markings required in 5.1.2.1 and contract data required in 5.1.3. The palletized load shall be built on the pallet so that the markings on the individual containers do not show on two adjacent sides of the unit load. See 5.6.1.3 for ammunition unit load instructions.

 a. For palletized loads with smooth surfaces, the identification markings shall be stenciled on two surfaces comprising the palletized load, with markings extending from one container to another (fig 15). Contract markings shall be applied on one surface.

 b. When the palletized load does not provide a smooth marking surface, (i.e., wood containers with cleats and pallet loads with wood frames or when an individual container is placed on its side or end), the marking shall be applied on a weather-resistant fiberboard panel (PPP-F-320 V2s) (fig 15). As an alternate to use of fiberboard panels, palletized loads comprised of containers with wood cleats, pallet loads with wood frames, or pallet loads of unpacked items may have the markings applied through use of labels or tags.

 c. Gross weight for palletized containerized unit loads shall include the weight of the pallet or container base. Stencil markings on palletized loads shall not be less than three-fourths of an inch in height.

5.1.4.8.8 Wood products. Identification and contract data markings are not required for domestic and overseas shipments. The identification markings shall only consist of the NSN. If an NSN is not available, the item description as cited in the contract (e.g., door, wood, exterior) shall be used. Contract data markings shall only consist of the contract number or purchase order number and shall be located below the identification data. The markings shall be applied by stenciling the area most suitable for the purpose.

5.1.4.8.8.1 Bundled wood products. When identification and contract data are to be applied by stenciling, the markings shall be applied on the side of the bundle. If the area does not permit stenciling, two or more identification tags, securely attached to the bundle, may be used (fig 16).

5.1.4.8.8.2 Loose pieces, poles, piles, and ties. Identification and contract data markings shall be applied by stenciling or tagging (fig 17). The marking shall be applied on only 10 percent of the total pieces to be shipped. For materiel that is preservative treated with oil solutions (e.g., poles, ties, etc.), stenciling shall be accomplished with TT-P-38 aluminum leaf paint. Tags shall be of weather-resistant material. Metal tags or plastic tags may be used when authorized by the cognizant activity.

Supersedes page 31 of 3 January 1978.

31

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-08-30 13:26:22 UTC

Case 5:25-cv-01852-JMG    Document 1    Filed 04/10/25    Page 299 of 440

MIL-STD-129H
3 January 1978



FIGURE 15.  <u>Identification and contract data markings</u>
<u>(palletized loads)</u>.

Reprinted without change.

32

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYIMCA@ME.COM,
Not for Resale,2020-05-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120887 6 ■■



FIGURE 16.  Identification and contract data markings for bundled wood products.



FIGURE 17.  Identification and contract data markings for loose lumber, poles, ties.

5.1.4.8.8.3  Miscellaneous wood products in containers (doors, windows, molding and wedges).  Identification and contract data shall be applied by stenciling or tagging one side of the box (fig 18).

Reprinted without change.

33

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [058409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:28:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120868 8 ■

MIL-STD-129H
1 July 1980



> 5520-00-280-8859
> DOOR
> 2 EA
> A/A 12/77
> WT 40   CU 9.2
>
> DLA 721-77-C-1111
> POCONO LUMBER CO
> MT POCONO, PA 18344

FIGURE 18.  Identification and contract data markings for
miscellaneous packs.

5.1.4.9 Requirement for additional marking of NSN and item description
on exterior containers shipped overseas.  These markings shall be applied
only when specifically required by the applicable military department and when
specified in the contract.  Refer to appendix C.

5.2 Domestic and oversea address marking.  Address markings shall be
applied to shipping containers by means of labels or tags.  When the use of
labels will interfere with or obscure other required markings on shipping
containers, tags shall be used.  Contractors have the option of applying the
address markings by means of stenciling or silk screening, provided procure-
ment costs are not increased  (see 4.3.1 and 4.3.1.5).  See 5.6.2 for
additional instructions regarding ammunition address marking.

5.2.1 Domestic and oversea shipment address (except parcel post).
Transportation priority (TP) 1 or 2 shall be identified by colored borders
(approx. one-fourth of an inch wide) and colored TP numeral preprinted in
the TP block of the DD Forms 1387 and 1387-1.  As an alternate, only the
colored TP numeral may be applied in the TP block of the DD Form 1387 and
1387-1.  Minimum size of the TP numeral shall be one inch.  No color identifi-
cation is authorized for TP 3.  The following colors shall be used.

  a.  TP 1:  Red
  b.  TP 2:  Blue

When DD Form 1387 or 1387-1 is not available at a vendor's plant and the time
required to obtain it would preclude meeting the RDD on a TP 1 or 2 shipment,
any available label or tag of the same size may be used, provided the data content
is the same as the DD Form 1387 or 1387-1, and the red or blue borders as
appropriate are applied.  On oversea shipments, prior approval is required
from the contracting officer.  Shipments to be moved under TP 3 shall be marked

Supersedes page 34 of 1 November 1978.

34

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to MARGARET A  MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:28:22 UTC

on the plain DD Form 1387 or 1387-1 (fig 19). As an alternate for TP 3 domestic shipments, military shipping activities may use the computer generated label or a plain tag; contractors may use any type of label or tag readily available at time of shipment (fig 20). Labels are not applicable to bundles of lumber but may be used on miscellaneous packs of wood products. Marking and marking material shall be as specified in paragraph 4.2. Tags shall be as specified in 4.3.1.7. Labels shall be marked, secured, and protected in accordance with applicable paragraphs under 4.3.1.8. Size of marking shall be in accordance with paragraphs 4.3.2.

5.2.1.1 <u>Domestic shipment address</u>. The domestic address shall be composed as follows:

a. "TCN..." The TCN shall be shown with a space between each of the data elements, e.g., A25TBB 7130 0010 XAX.

b. RDD or expedited handling code (see 5.4.23) project code (when applicable), and transportation priority number, prefixed as appropriate by "RDD...," "PROJ...," "TP..." Clear project names shall also be shown when required by appendix B13 of DOD 4140.17M (MILSTRIP) and when provided by the service concerned. The project name shall be separate and distinct from the address marking, but shall appear on the same side as the address marking.

c. FROM: Name and address of the consignor (coded and in-the-clear).

d. TO: Name and address of the consignee (coded and in-the-clear).

e. Piece number, total pieces, weight, and cube (piece number, total piece number not required on full carload and truckload shipments of homogeneous items to a CONUS activity).

NOTE: Paragraphs a, b, and e above do not apply to shipments moving in support of Government contractors where the shipment is accomplished by commercial or GBL from, to, or between contractors' plants. This also applies to shipments from contractors' plants which do not enter DTS (see 3.16) such as first destination shipments from contractors' plants to military depots for stock or storage where the complete movement is via commercial transportation through government bill of lading; shipments of personnel property; or annual resupply projects. The coded data in c above are not required on contractor shipments. In-the-clear data in c above are not required on contractor shipments of small arms to Air Force consignees.

35

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-08-30 13:28:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120890 6 ■

**MIL-STD-129H**
**3 January 1978**



**FIGURE 19. DD Form 1387 (Military Shipment Label)**
**and DD Form 1387-1 (Military Shipping Tag) for domestic shipments.**

5.2.1.1.1 Parcel post. The domestic shipment parcel post address (fig 21) shall be composed as follows. Except for precautionary labels, packing list or other markings required by regulation or statute, no other markings need appear on an outer wrap or container providing it is a supplemental container used for shipping purposes only and the inclosed container has the required identification markings. If a USPS mail pouch is used as the outer container for mailing of more than one package as a direct pouch to the addressee (as in Weapons System pouch), each package in the pouch must have an indicia label attached thereto.

a. Consignor.
b. Requisition number, supplemented by the suffix, partial and split
   shipment codes.

36

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A. MCCLOSKEY [053409100001] - PEGGY:NCA@ME.COM,
Not for Resale,2020-06-30 13:28:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120891 8 ■■

MIL-STD-129H
3 January 1978

   c. Required delivery date (when specified) and project code (when
      applicable) (see 3.49 and 3.46).

   d. Consignee.

   e. Mark for (when specified).

   f. Applicable service/agency indicia code.



TCN W25G1R 9140 0121 XXX
RDD 177 PROJ GCS TP 3
FROM:  W25G1W TOBYHANNA ARMY DEPOT, PA  18466

TO:  W25G1R LETTERKENNY ARMY DEPOT, PA  17201
1/1 WT 200 CU 9.6

FROM: NOVO METAL CO.
MOSCOW, PA  18444

TO: TRANSPORTATION OFFICER
W31G12 ANNISTON ARMY DEPOT
BYNUM, ALABAMA  36202

FIGURE 20.  Transportation priority 3 alternate military and
commercial shipment label.

FB2030
TINKER AFB OK  73145

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE $300

POSTAGE AND FEES PAID
DEPARTMENT OF THE AIR FORCE

DoD-318

TOP OF PRIORITY       OR/OUT
SOS       128       1       1

FB2300 2094 0052
FB2300
Wright-Patterson AFB OH 45433

PROJECT PACER SAMPLE

DATE MAILED

0 4 MAY 1977

FIGURE 21.  Domestic shipment parcel post address label.

37

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120892 T ■■

MIL-STD-129H
3 January 1978

5.2.1.1.2 <u>Less than carload (LCL) and less than truckload (LTL)</u>. The domestic address shall be required on all shipping containers or palletized unit loads, and unpacked items for LCL and LTL lots.

5.2.1.1.3 <u>Full carload and full truckloads</u>. Domestic address is not required on shipping containers, palletized unit loads, unpacked items, and bulk items (such as cement, wood products, etc.) and for empty kegs or drums (new or used) shipped in full carloads or full truckloads moving from a single consignor to a single CONUS consignee.

5.2.1.2 <u>Oversea shipment address</u>. The oversea address (fig 22) shall be composed as follows:

a. TCN. The TCN shall be shown with a space between each of the data elements, e.g., AT 6667 7130 0010 XAX.

b. RDD or expedited handling code (see 5.4.23). (Not required for export surface shipments of lumber and allied products.)

c. Project code, when specified. (Clear project names are not required but may be shown at the option of the service/agency concerned.) When shown, the project name shall be separate and distinct from the address marking, but shall appear on the same side as the address marking.

d. Consignor.* (For contractor shipments, the activity address code of the contract administration office followed by the actual shipper shown in-the-clear.) (Not required for export surface shipments of lumber and allied products.)

e. Transportation priority.

f. POE/APOE.* (Not required for export surface shipments of lumber and allied products.)

g. POD/APOD.*

h. Consignee.*

i. Piece number. (Not required for shipments of a single commodity in standard pack containers/packaging, or export shipments of lumber and allied products (i.e., plywood, poles, pilings, ties, and other related wood products); or export shipments of unfabricated steel mill products.)

j. Total pieces. (Not required for export shipments of (1) lumber and allied products, or (2) unfabricated steel mill products.)

k. Weight (each piece). (Not required for export shipments of (1) lumber and allied products, or (2) unfabricated steel mill products.)

l. Cube (each piece). (Not required for export shipments of (1) lumber and allied products, or (2) unfabricated steel mill products.)

*Data elements with an asterisk (*) shall be shown coded and "in-the-clear."

38

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [008409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120893 1 ■

MIL-STD-129H
1 November 1978





FIGURE 22.  DD Form 1387 (Military Shipment Label) and
DD Form 1387-1 (Military Shipping Tag) for oversea shipments.

5.2.1.2.1 Foreign Military Sales (FMS) shipments to freight forwarders.
The address markings for FMS cargo shipped through a freight forwarder shall
be composed as follows (fig 23).

   a.   TCN, RDD, project code, and transportation priority.
   b.   FROM:  Name and address of consignor in-the-clear (coded when
        applicable).
   c.   TO:  Name and address of freight forwarder in-the-clear.


Reprinted without change.

39

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to MARGARET A MCCLOSKEY [036409180001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120894 3 ■

MIL-STD-129H
1 July 1980

   d.  Ultimate consignee/mark for (coded and in-the-clear) FMS case
       number.
   e.  Piece number, total pieces, weight, and cube.



FIGURE 23.  **FMS address marking.**

   **5.2.1.2.1.1 FMS case designator.** On all FMS shipments, the sales case
designator provided by the requisition or other appropriate document shall
appear as the last line of the oversea address. The designator shall be preceded
with words "FMS Case No., e.g., FMS Case No. ABD." When the oversea address
is not applicable, the FMS Case No. shall be the last line of the freight forwarder
address.

   **5.2.1.2.2 Parcel post shipments (except FMS to freight forwarder).**
Army Post Office/Air Post Office (APO) and Fleet Post Office (FPO), parcel post
shipment address (fig 24) shall be composed as follows. Except for precautionary
labels, packing list or other markings required by regulation or statute, no
other markings need appear on an outer wrap or container provided it is a
supplemental container used for shipping purposes only and the inclosed container
has the required identification markings. If a USPS mail pouch is used as the
outer container for mailing of more than one pack as a direct pouch to the addressee
(as in a weapon pouch system), each pack in the pouch must have an indicia
label attached thereto.

**Supersedes page 40 of 1 November 1978.**

40

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:28:22 UTC

MIL-STD-129H
3 January 1978

a. Consignor.
b. Consignee.
c. Requisition number supplemented by the suffix, partial shipment, and split shipment codes.
d. RDD and project code (when specified).



FIGURE 24.  Oversea address parcel post label.

5.2.1.2.3 FMS parcel post (to freight forwarders). FMS parcel post shipment address (fig 25) shall be composed as follows:

a. Consignor.
b. Mark for (coded only).
c. Requisition number supplemented by the suffix, partial shipment, and split shipment codes.
d. RDD and project code (when specified).
e. FMS case number.
f. Freight forwarder.



FIGURE 25.  FMS parcel post shipment address.

41

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY (03840910001) - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120896 7 ■

MIL-STD-129H
3 January 1978

5.2.1.3 <u>Location of address marking</u>. The domestic and oversea shipment address shall be applied on the identification marked side of the container. In the event a container is too small to accommodate the address label on the identification marked side, it shall be applied on the side opposite that of the identification marking.

5.2.1.3.1 <u>Boxes and crates</u>. The domestic and oversea address shall be applied to the lower 2/3 of the container (fig 26).



FIGURE 26. <u>Domestic and oversea address markings for boxes and crates</u>.

5.2.1.3.2 <u>Boxes (parcel post)</u>. The domestic and oversea address shall be applied to the lower 2/3 of the side of the container (fig 27).



FIGURE 27. <u>Domestic and oversea parcel post address markings</u>.

5.2.1.3.3 <u>Bales</u>.

5.2.1.3.3.1 <u>Domestic shipments</u>. The domestic address shall be affixed to the wire-tied ear of bales, or to the marked side when no ear is present (fig 28).

42

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [030409100001] - PEGGYINDA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC



**FIGURE 28.** <u>Domestic address marking tag for bales</u>.

5.2.1.3.3.2 <u>Oversea shipments</u>. The oversea address shall be applied to the lower 2/3 of the side (fig 29) or the wire-tied ear of the bale.



**FIGURE 29.** <u>Oversea address marking for bales</u>.

5.2.1.3.4 <u>Cloth covered bundles</u>.

5.2.1.3.4.1 <u>Domestic shipments</u>. The domestic address shall be affixed to the wire-tied or sewn ear of the bundle (fig 30).



**FIGURE 30.** <u>Domestic address marking tag for bundles</u>.

43

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

**MIL-STD-129H**
**3 January 1978**

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120894 0 ■

**5.2.1.3.4.2 Oversea shipments.** The oversea address shall be applied to the lower 2/3 of the top panel (fig 31) or to the wire-tied ear.



FIGURE 31. **Oversea address marking for bundles.**

**5.2.1.3.5 Sacks and bags of paper, textile and laminated textile.** The domestic and oversea address shall be marked on a label or tag. When a label is used, it shall be applied between the identification and contract data. If the bag is closed by stitching, a tag may be fastened to the bag by stitching at the same time closure is made. If the top of the bag has ears, the tag shall be securely affixed to one of the ears (fig 32).



FIGURE 32. **Domestic and oversea address markings for bags and sacks.**

**5.2.1.3.6 Cylindrical containers (including empty containers).** For containers having a capacity of 5 gallons or less, the domestic and oversea address shall be marked on a label or tag (fig 33). For containers having a capacity of 6 gallons or more, the address shall be placed in the middle 1/3 of containers equipped with rolling rings. Barrels not equipped with rolling rings shall have the address

44

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [03840910000I] - PEGGYINCA@ME.COM
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120899 2 ■

MIL-STD-129H
1 November 1978

placed not less than 6 inches above the bulge of barrels to avoid rubbing off or blurring of the label. When authorized by the cognizant activity, pressure-sensitive labels may be used on metal containers.



FIGURE 33. <u>Domestic and oversea address markings for cylindrical containers</u>.

5.2.1.3.7 <u>Unpacked vehicles</u>.

5.2.1.3.7.1 <u>Domestic shipments</u>. Domestic address, weight, and cube markings are not required on driveaway, truckaway, railaway, towaway shipments destined to CONUS activities.

5.2.1.3.7.2 <u>Oversea shipments</u>. Figure 34 illustrates the markings (specification, preservation, weight and cube, and address markings) that shall be applied on address labels. Address marking of vehicles for oversea unit movement shall be in accordance with applicable regulations of the Military Department involved. The oversea address shall be placed on the rear or right side near the rear of the vehicle. The address label shall be applied to a marking panel composed of either ¼-inch plywood (NN-P-530, PS1) (C-D sheet with exterior glue) ½-inch lumber, or 1/8-inch hardboard (masonite or equal). An alternate method of applying the label is by placing it directly on the vehicle surface with PPP-T-60, type III, class 2 or PPP-T-70 pressure-sensitive tape. The tape shall be placed over the label and extend a minimum of ½ inch from the edge of the label. When possible, the marking shall be positioned on the vehicle at a height of not more than 6 feet or less than 4 feet. When the above locations are not practical, the best alternate location shall be selected.

Reprinted without change.

45

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:28:22 UTC

MIL-STD-129H
1 July 1980

 

FIGURE 34.  Oversea address marking for vehicles.

**5.2.1.3.8  Palletized unit loads.**  Provided that a smooth surface is available, the domestic and oversea address shall be applied to the lower one-third of the identification marked surface of the palletized load (fig 35).  If the palletized load does not provide a smooth surface (i.e., wood containers with cleats, or pallet loads with wood frames), shipping activities shall have the option of applying the label on a fiberboard panel (PPP-F-320, V2s), or on a tag placed on any suitable space of an identification marked surface of the load.

 

FIGURE 35.  Domestic and oversea address for palletized loads.

Supersedes page 46 of 3 January 1978.

46

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A  MCCLOSKEY [058409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:28:22 UTC

Case 5:25-cv-01852-JMG    Document 1    Filed 04/10/25    Page 314 of 440

5.2.1.3.9 <u>Unpacked major equipment</u>. The domestic address label shall be applied to a marking panel (A), or as an alternate may be applied directly on the equipment surface (B), with PPP-T-60, type III, class 2 or PPP-T-70 pressure-sensitive tape. The tape shall be placed over the label and extend a minimum of one-half inch from the edge of the label (fig 36).



FIGURE 36. <u>Domestic address marking for major equipment.</u>

5.2.1.3.10 <u>Miscellaneous packs</u>. The domestic and oversea addresses for loose or unpacked items, rods, shafting, bars (does not include unfabricated ferrous (steel mill) and nonferrous products) reels, spools and coils of cable and wire, and paper and cloth wrapped rolls shall be applied as specified (fig 37).



FIGURE 37. <u>Domestic and oversea address markings for miscellaneous packs.</u>

Supersedes page 47 of 3 January 1978.

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A MCCLOSKEY {03840810001} - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120902 9 ■

MIL-STD-129H
3 January 1978

5.2.1.3.11 <u>SEAVAN/MILVAN</u>. The oversea address for SEAVANs/MILVANs shall be address marked with a DD Form 1387-1 attached to the seal, or at the rear of the SEAVAN/MILVAN (fig 38). Shipping containers, palletized unit loads and unpacked items consolidated into a full SEAVAN/MILVAN load by the origin shipper for delivery as a unit to the ultimate consignee do not require address marking. Consolidation activities receiving shipments for consolidation into SEAVANs/MILVANs are not required to obliterate address labels applied by the origin shipper.



FIGURE 38. <u>Oversea address marking for SEAVAN/MILVAN</u>.

5.2.1.3.12 <u>Wood products</u>.

5.2.1.3.12.1 <u>Domestic shipments</u>. When wood products are shipped LCL (see 5.2.1.1.2) or on a single conveyance to more than one consignee, the domestic address shall be stenciled on each unit or, when strapped units are not required, on 10 percent of the total pieces shipped. See 5.2.1 for data to be used in the address marking (fig 39). DD Form 1387 labels and DD Form 1387-1 tags are not applicable, but may be used on miscellaneous packs of wood products as cited in 5.2.1.3.12.2.3.



FIGURE 39. <u>Domestic address marking for wood products</u>.

Reprinted without change.

48

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [03840910000 1] - PEGGY.NCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ▆ 9999911 0120903 0 ▆

5.2.1.3.12.2 Oversea shipments.

5.2.1.3.12.2.1 Bundles. The oversea address for bundles of lumber shall be stenciled on the side, below the identification marking (fig 40). Lettering for markings shall not be less than 3/8 inch and not more than 1 inch in height.



FIGURE 40. Oversea address marking for bundles of lumber.

5.2.1.3.12.2.2 Loose pieces, poles, ties. The oversea address shall be applied on the side. When the materiel is preservative treated, the marking shall be stenciled with aluminum leaf paint. The marking shall be applied on only 10 percent of the total pieces to be shipped (fig 41). Contents of address markings shall be in accordance with 5.2.1.2.



FIGURE 41. Oversea address marking for loose pieces, poles and ties.

49

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120904 2 ■

MIL-STD-129H
3 January 1978

5.2.1.3.12.2.3 Miscellaneous packs. The oversea address for doors, windows, molding, wedges, etc., shall be provided on each pack by labeling or stenciling (fig 42). Contents of address marking shall be in accordance with 5.2.1.2.



FIGURE 42. Oversea address marking for miscellaneous packs of lumber products.

5.2.1.3.13 Steel products (unfabricated). Surface shipments of unfabricated steel mill products shall be address marked as specified herein. Address marking for unpackaged steel is required on only 10 percent of the pieces. Address marking shall be labeling, stenciling, or tags.

5.3 Subsistence markings.

5.3.1 Unit and intermediate container identification markings. The identification markings on unit and intermediate packs of subsistence shall be in accordance with applicable commodity specifications.

5.3.2 Exterior container identification and contract data markings (other than sacks).

5.3.2.1 Nonperishable subsistence. The following identification and contract data markings shall be stenciled or printed on containers, except when otherwise specified in the contract or purchase order (see 5.1.4.5 for marking of sacks):

    a. NSN (see 3.34). Not required when the item is for resale, unless specifically required by the order.
    b. Item description (see 3.24) and brand name (when applicable).
    c. Quantity, size and unit (when applicable) and date packed, i.e., 24-2 LB JARS 4/78 (see 3.48, 3.15). When the item is for resale only, the month and year of the earliest package date are required.

50

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120905 4 ■■

MIL-STD-129H
3 January 1978

d. Gross weight and cube (see 3.20, 3.11). Gross weight and cube shall
be used on shipments to supply points and ports if the shipments are
not palletized/containerized, but may be omitted on shipments to
domestic consuming installations.

e. Contract or purchase order number (see 3.9), and lot number (when
specified or required) (see 3.28). The contractor shall code or other-
wise distinctively mark by embossing, stamping, printing, or stencil-
ing on each primary and/or shipping container, each lot of supplies
offered for acceptance as such by the Government, so as to identify
that lot from any other lot produced by the contractor.

f. Name and address of contractor (see 3.33).

The markings shall be applied on one end panel (fig 43). If required markings
exceed the area on the end panel, the remaining lines shall be placed on the
upper 2/3 of the right side panel. When shipments of nonperishable subsistence
are for domestic consumption or assembly into rations, or if for resale or export,
and the subsistence was purchased in commercial containers, the identification
and contract data shown in the commercial printing may be retained and the
additional required markings added. If advertising matter on the container
prevents application of the required markings, the manufacturer shall obliterate
the advertisement in accordance with 4.2.2.3 or use a label large enough on
which to apply the markings.



FIGURE 43.  Identification and contract data markings (nonperishable
subsistence).

5.3.2.2 Perishable subsistence. The following identification and contract
data markings shall be stenciled or printed on containers, except when other-
wise specified in the contract or purchase order. The standard markings for
perishable subsistence shall not apply to purchase of fresh fruits and vegetables.
Markings on shipping containers for fresh fruits and vegetables shall be as
specified in the contract or purchase order.

51

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY (936409100001) - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120906 6 ■■

MIL-STD-129H
3 January 1978

   a. NSN (see 3.34). The NSN shall be shown on perishable (specification) meats, poultry, seafood, dairy products, frozen fruits and vegetables, which have NSNs assigned and when a stock number is assigned.

   b. Item description (see 3.24) and grade or brand. For items purchased by brand name, grade may be omitted; however, the brand name shall be shown.

   c. Total net weight and count, as applicable (see 3.35) and date packed (month, day and year) (see 3.14). On those items where the specification designates types, classes, etc., according to number of days subsequent to date of slaughter, or processing or both, day shall be the date of manufacture.

   d. Gross weight and cube (see 3.20, 3.11). Gross weight and cube shall be used on shipments to supply points and ports if the shipments are not palletized/containerized, but may be omitted on shipments to domestic consuming installations.

   e. Contract or purchase order number (see 3.9) and lot number when specified or required (see 3.28). The contractor shall code or otherwise distinctively mark by embossing, stamping, printing or stenciling on each primary and/or shipping container each lot of supplies offered for acceptance as such by the Government so as to identify that lot from any other lot produced by the contractor.

   f. Name and address of contractor (see 3.33).

The markings shall be applied on one end panel (fig 44). If the required markings exceed the area on the end panel, the remaining lines shall be placed on the upper 2/3 of the right side panel. Lines may be consolidated when space permits. When shipments of perishable subsistence are for domestic consumption; resale or export, and the subsistence was purchased in commercial containers, the identification and contract data shown in the commercial printing may be retained and the additional required markings added. If advertising matter on the container prevents application of the required markings, the manufacturer shall obliterate the advertisement in accordance with 4.2.2.3 or use a label large enough on which to apply the markings.



FIGURE 44. Identification and contract data markings (perishable subsistence).

52

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A  MCCLOSKEY [03840910000I] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H
3 January 1978

**5.3.2.2.1** Precautionary marking. For items required to be frozen or refrigerated, the markings KEEP FROZEN - (0° OR BELOW) OR KEEP REFRIGERATED (temperature range as applicable) shall be applied to the top of each shipping container in letters 1 inch high (fig 44).

**5.3.2.3** Nonperishable and perishable subsistence palletized unit loads. The following identification and contract data markings shall be stenciled or printed on the palletized unit load:

a. NSN (see 3.34).
b. Item description (see 3.24).
c. Quantity, size, and unit (see 3.48 and 3.64), level of protection (see 3.26) type of pack, i.e., 42 cases of 24 cans A/B TPD-2.
d. Gross weight (see 3.20) and cube (see 3.11).
e. Date packed (see 3.15).
f. Inspection/test date (see 3.22).
g. Contract or purchase order number (see 3.9) and lot number (see 3.28).
h. Name and address of contractor (see 3.33).

**5.3.3** Domestic and oversea address markings.

**5.3.3.1** Domestic address. The domestic address for nonperishable subsistence shall be as specified by the cognizant activity and shall be composed as shown in 5.2.1.1a through d (figs 32, 33, 35, and 45) and applied to the lower 2/3 container end.



FIGURE 45. Domestic address marking for boxes of subsistence.

**5.3.3.2** Oversea address. The oversea address for shipments of subsistence shall be applied to the lower 2/3 of the container end (fig 46) and shall be as follows:

a. Shipments of nonperishable subsistence from contractors' plants or depots shall be in accordance with 5.2.1.2.

53

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-05-30 13:29:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120908 T ■

**MIL-STD-129H**
**3 January 1978**

   b.  All nonperishable subsistence to Air Force consignees in Turkey:  Each crate, piece, case or other individual container, including those on palletized loads, shall be marked in accordance with 5.2.1.2.

   c.  All perishable subsistence to Air Force consignees in Turkey:  Each crate, piece, case or other individual container, including those on palletized loads shall be address marked with no less than the minimum address marking shown in paragraph e below.

   d.  Fresh fruits and vegetables and carcass meats shipped loose to consignees other than shown in c above, e.g., crate, piece, case or other individual container--no address marking is required, unless otherwise cited in the contract or order.

   e.  For all other perishable subsistence shipments:

| | |
|---|---|
| 1st line: | TCN. |
| 2d line:<br>(if specified) | Project, when specified. |
| 3rd line:<br>(2d line, if no project) | POD (coded and in-the-clear). |
| 4th line:<br>(3d line, if no project) | Oversea consignee in-the-clear. |

   f.  Except for the address marking stipulated in c and d above, application of the address marking to shipping containers within a TCN shipment unit is relaxed as follows:

When more than 25 loose containers, boxes, crates, etc., for each TCN line are shipped, a minimum of 10 percent of the shipping containers of perishable subsistence items shall be address marked as specified in e above.



FIGURE 46.  Oversea address marking for subsistence.

   5.3.4  Armed Forces symbol for subsistence.  All shipping containers packed with nonperishable subsistence, and perishable subsistence, except containers packed with fresh fruits and vegetables, shall bear a solid black crescent symbol

54

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-1294 NOTICE 2 PA ■■ 9999911 0120909 1 ■■

MIL-STD-129H
3 January 1978

conforming to the design and dimension shown in figure 47. The symbol shall be located to the right of the identification marking on all shipping containers. Shipping containers are not required to bear the subsistence label when it is shown that the item is for resale.



FIGURE 47. Crescent symbol for subsistence items.

5.4 Interior and exterior container special markings. Hazardous materials and supply type labels are listed in appendix D and shall be applied as required.

5.4.1 Shelf-life markings. There are two types of shelf life (see 3.57) and when specified in contracts, purchase orders or other documents, the type of shelf life shall be shown below the item identification data on unit, intermediate and exterior packs or unpacked items. Items assigned a shelf-life code 0 (non-deteriorative) shall not require shelf-life markings. The shelf-life markings shall include the following (fig 48) (see notes 1 thru 5):

a. For type I shelf-life item:
    DATE (MANUFACTURED[1] CURED[2] ASSEMBLED[3] _____ ) (Apply one as applicable)
    EXPIRES OR EXPIRATION DATE[4] _____ .
b. For type II shelf-life item:
    DATE (MANUFACTURED[1] CURED[2] ASSEMBLED[3] _____ ) (Apply one as applicable)
    INSPECTION/TEST DATE[5]



FIGURE 48. Type II shelf-life marking.

55

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120910 8 ■■

MIL-STD-129H
3 January 1978

[1]For all items required to be marked with the date of manufacture, the date shall be applied in accordance with figure 48. For type I medical items having an expiration date, the date of manufacture will not be shown. When two or more unit packs of identical items bear different dates of manufacture, the earliest date shall be shown on the shipping container.

[2]For all rubber (or synthetic elastomers) items required to be marked with cure date, the marking shall be applied using the calendar quarter and year, i.e., 2Q 78. When two or more unit packs of identical items bear different cure dates, the earliest date shall be shown on the shipping container.

[3]For all items required to be marked with the date of assembly, the date shall be applied in accordance with figure 48. When more than one shelf-life item is packed as an assembly, the expiration date of the item with the earliest expiration date shall be shown and applied in accordance with figure 48.

[4]The expiration date is only required for type I shelf-life items such as drugs, biologicals and cure dated items. For drugs and biologicals (potency dated materials) the expiration date shall be marked in accordance with PPP-C-186. Cure dated items shall have the expiration date shown by quarter and calendar year, i.e., 1Q 78, except for nonmedical elastomeric products.

[5]For type II shelf-life items, the manufacturer shall apply an inspection/test date. The date shall be shown by month and calendar year, i.e., 12/77 (fig 48). This indicates to DOD elements the date on which shelf life shall expire (unless extended as a result of inspection/test by DOD storage activities). The manufacturer shall provide space for additional inspection/test dates. This space shall be used by DOD elements when the initial date is lined out and subsequent inspection/test dates are applied (fig 48). When two or more unit packs bear different inspection/test dates, only the earliest date shall be shown on the shipping container. For drugs and biologicals the expiration date shall be shown in lieu of the date of manufacture. The inspection/test date shall be left blank for drugs and biologicals.

5.4.2 <u>Arrows</u>. Where consideration of the safety of the contents of unit and intermediate packs, and exterior containers necessitates that the containers be stacked with the top surface up, two sides of rectangular container and two equidistant points on the circumference of a cylinder container shall be marked with the word "UP" with an arrow toward the top of the container (fig 49). The length of the arrow shall not be less than 1 inch and the stem not less than ¼ inch in width and size shall be proportioned to the available space. Arrows shall be employed only to indicate, or supplement the words "UP" or "TOP". These markings shall not be used indiscriminately and are to be affixed only when it is essential. The word "UP" may be marked above the arrow head, below the stem, or on the stem. American National Standards Institute (ANSI) markings are acceptable.

56

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: V2226503
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGY:NCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120911 T ■

MIL-STD-129H
3 January 1978



**FIGURE 49.  Arrow markings.**

5.4.3 <u>Method II marking</u>.  All method II unit, intermediate and exterior packs
will bear a precautionary label on the identification marked side (fig 50).  On unit
and intermediate packs the method II marking may be applied by stamping.  Method II
marking may be printed on the barrier at the time the bag is fabricated, providing the
specified color scheme is observed.  On exterior containers a copy of the label may
be printed or stenciled on the container using waterproof red ink.  When space is
not available, the words "METHOD II PACKAGE--DO NOT OPEN UNTIL READY FOR
USE" in as large letters as possible shall be printed or stenciled adjacent to the
identification markings.



**FIGURE 50.  Method II marking.**

5.4.4 <u>Fragile Items</u>.  Unit and intermediate packs, and exterior containers,
containing delicate or fragile articles, shall be marked by means of a fragile
label, stenciling or stamping (fig 51).  When space permits, the fragile symbol
shall be placed on the identification marked side and either end of a rectangu-
lar container and two equally spaced areas on the circumference of cylindrical
containers.  Containers imprinted with a precautionary marking such as GLASS--
DO NOT DROP OR THROW or GLASS--HANDLE WITH CARE or a similar pre-
cautionary marking shall not require fragile labels.  A fragile label shall not be
required when rough handling tests confirm that the container and its cushioning
systems protect the item from dynamic environments such as shock and vibration
encountered during shipment and handling.  The size of fragile markings shall
be either 2½, 4, or 6 inch square ungummed white stock conforming to the require-
ments of 4.2.3 and shall be nonfading and durable.  Labels for exterior containers

57

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:28:22 UTC

MIL-STD-129H
3 January 1978

shall be secured and waterproofed as specified in 4.3.1.8.1.1 and 4.3.1.8.1.2.
However, when vinyl or plastic coated labels are used, further protective coating
is not required. For vendor shipments only, when the prescribed fragile
label is not available at time of shipment, a vendor fragile label may be used,
providing it denotes the word "FRAGILE" and the size is commensurate with
the size of the container. ANSI markings are authorized.



FIGURE 51. Fragile marking.

5.4.5 Engineering or technical order changes or modifications. Unit,
intermediate and exterior packs containing materiel furnished for a modification
work order (see 3.32) shall be marked on the identification marked side with
modification work order number preceded by "MWO." When the procuring
activity has specified a particular modification by the technical order number
and date of issue, such markings including the change or modifications shall
be included on the shipping container as specified by the cognizant activity.
The marking shall be located in the lower right-hand corner (fig 52).



FIGURE 52. Modification work order marking on shipping container.

5.4.6 Serial number. An item assigned a serial number (see 3.53) shall
have the number applied to the unit and exterior pack preceded by the words
"SERIAL NO." The marking shall be shown directly below the identification
marking (fig 53) except when packed in accordance with 5.4.9.1. When unit

58

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY (038409100001) - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120913 3 ■

MIL-STD-129H
1 July 1980

packs bearing consecutive serial numbers are packed in intermediate or exterior
containers, only the first and last number of the series shall be shown.  If serial
numbers are not in sequence, each number shall be listed.  Serial numbers
assigned by the manufacturer solely for the purpose of indicating the quantity
produced shall not be shown.



FIGURE 53.  Serial number markings on unit and intermediate/exterior
containers.

5.4.7  Lot, control, or batch numbers.  Lot, control, or batch numbers on
unit, intermediate and exterior packs (see 3.30) shall be preceded by the proper
designation, e.g., Lot No. 5, and shall be shown adjacent to the contract number
(fig 54).  Ammunition lot numbers shall be in the largest practical lettering and
shall be underlined.  Contract numbers shall not be shown when ammunition lot
numbers are applied.



FIGURE 54.  Lot, control or batch number markings.

5.4.8  Export permit number.  For export shipments of narcotics to
countries under the International Logistics Program, the export permit number
shall be shown on the outside of the shipping container.  The export permit
number shall be located adjacent to the address markings (fig 55).

Supersedes page 59 of 3 January 1978.

59

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120914 5 ■■

MIL-STD-129H
3 January 1978



FIGURE 55. Export permit number markings.

5.4.9 Set or assembly marking. When a set or assembly is placed in two or more containers, all containers of component parts shall be shipped together. Each shipping container shall bear, in addition to its own number within the set, the total number of containers making up the set, and the number of the set within each shipment. Set or assembly markings shall be placed on the surfaces containing the identification marking and located in the lower right-hand corner. A 2-inch black disc shall be placed above these numbers on each container. For surfaces on which black is not legible, i.e., olive drab containers, a yellow or white disc shall be applied.

5.4.9.1 Set or assembly (component parts of disassembled items with serial numbers). Component parts of disassembled items shall have the serial number of the item on each shipping container comprising the applicable set. The serial number of the machine shall be shown immediately below the fractional number which identifies the individual container and the total number of containers comprising the set (fig 56).



FIGURE 56. Set or assembly markings with components of disassemblies having serial numbers.

Reprinted without change.

60

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228513
Sold to:MARGARET A. MCCLOSKEY [0384091000001] - PEGGY:INCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120915 7 ■

**5.4.9.2 Set or assembly (component parts of disassembled items without serial numbers).** When an item which does not have a serial number is disassembled for shipment, a date (month, day, and year) followed by a capital letter to identify a set or assembly shall be shown on the shipping containers in lieu of a serial number. Each set shall bear a different letter (fig 57).



FIGURE 57. Set or assembly markings without serial numbers.

**5.4.9.3 Single stock numbered sets.** When the contents of a single stock numbered item are packed in two or more shipping containers or stored together as a set, in addition to the marking of 5.4.9, the stock number shown on each shipping container shall be that of the complete set, and shall be prefixed with "Part of" (shown as P/O). Component shall be shown directly under the set nomenclature (fig 58).



FIGURE 58. Single stock numbered set markings.

**5.4.10 Warranty markings.** When specified in a contract that an item is being procured with a warranty agreement, unit, intermediate and shipping containers shall be marked to indicate the time period of the warranty and the expiration date. If the warranty period starts from the time material is shipped to storage or user elements, the marking shall be applied as shown in figure 59. If the warranty period starts from the time an item is put into use, containers shall be marked accordingly. The warranty marking shall be applied by labeling, tagging, or printing and shall be located below the identification data (not applicable for clothing and textile items).

61

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-08-30 13:28:22 UTC

MIL-STD-129H
3 January 1978

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120916 9 ■



FIGURE 59. Warranty markings.

5.4.11 Supply class identification marking labels. The use of supply class identification color marking labels shall be on an optional basis and used only when specified by a Military Department and when specified in the contract. The marking requirements are contained in appendix A of this standard.

5.4.12 Outside dimensions. Outside dimensions shall be shown on all shipping containers, bundles, or secured lifts, having any single dimension of 72 inches or over. Outside dimensions shall be shown in the order of length, width, and height, and shall appear in addition to the cube. Dimensions shall be shown in inches to the nearest inch and located below identification data--L 133 W 31 H 29.

5.4.13 Marking of Agency for International Development (AID) shipments. (Office of Public Safety and Disaster Relief.) When specified by the requisitioning or procuring activity, Office of Public Safety and Disaster Relief shipments (including subsistence commodities) to recipient foreign governments and international organizations, whether shipped from CONUS, oversea stocks or offshore procurement sources, shall be identified with the handclasp emblem applied on each side of a container (fig 60). (Bulk shipments of items such as coal, grain and oil; loose unpacked items such as ingots, bars, pipe, sheets, plates and girders shall not be marked with the handclasp emblem.) The handclasp emblem shall also be applied on two areas of bundled items and on each side of the hood or cab of vehicles. The emblem shall be applied as a label, paper tag, or printed directly on the container. The label size shall be 2 3/8 by 3 1/8 inches, 5 by 6 9/16 inches, 8 1/2 inches by 11 3/16 inches and 11 by 14 1/2 inches. The largest possible emblem consistent with available marking space shall be used. The tag size shall be 6 1/4 by 3 1/8 inches.



FIGURE 60. AID handclasp emblem.

62

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ▮ 9999911 0120917 0 ▮

MIL-STD-129H
3 January 1978

**5.4.14** <u>Restrictive markings</u>. Classified materiel and internal containers shall be appropriately marked, tagged, or labeled to reflect quantity, identity, security classification, condition, technical order compliance (TOC) status, and reinspection date, as applicable. Elements of data that are classified and any markings that identify the shipment as classified, will not be placed on the exterior shipping container (see 5.5.1.5.2).

**5.4.15** <u>Valuable and security items</u>. When such items as certain drugs, narcotics, maps, precious metals, currency, watches, jewelry, cameras, and similar valuables are shipped, the marking shall be as specified by the cognizant activity concerned or as required by regulation or statute. Alcohol and/or alcoholic beverages are to be documented and marked in accordance with US Treasury Department regulations.

**5.4.16** <u>Technical data marking</u>. Technical data marking, when required, shall be shown in accordance with the instructions, specifications, and drawings for such markings as supplied by the cognizant activity concerned.

**5.4.17** <u>Structural markings</u>. When prescribed by the cognizant activity, structural markings such as the following shall appear on shipping containers.

a. INSPECTION DOOR.
b. REMOVE TOP FIRST.
c. TO OPEN TOP: REMOVE SCREWS.
d. REUSABLE CONTAINER.

The markings shall be located on or near the structure described. Containers designated as reusable shall include sufficient structural marking to provide instructions for opening and unpacking without damage to the container, packing materials and contents. Containers packed with major assemblies, components, and test equipment for use in connection therewith shall be marked with the words "FRONT OR OPEN SIDE" as appropriate in order to permit unpacking without waste of time.

**5.4.18** <u>Equipment which includes battery (other than self-propelled equipment)</u>. When equipment includes a battery, the type of battery shall be plainly marked in large letters directly under the item description as follows: Battery, Storage (Volts), (Dry Charged or Wet Charged or Moist Uncharged) (fig 61). (Applicable data to be entered by contractor.)

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to MARGARET A. MCCLOSKEY (033409100001) - PEGGYINCA@ME.COM,
Not for Resale,2020-08-30 13:28:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120918 2 ■

MIL-STD-129H
3 January 1978



FIGURE 61. <u>Marking of equipment that includes battery</u>.

5.4.19 <u>Expedited handling</u>. Requisitions and contracts identified as expedited handling shipments shall be identified by a "not operationally ready for supply (NORS)" code shown in the required delivery date block of the address label or tag. The applicable code is 999, or the letter E or N which may be followed by the RDD expressed in the number of days from the requisition date. In addition to appearing on the address label or tag, NORS condition 999 shipments shall be marked with two 999 labels on each container (fig 62). For NORS condition other than 999, containers shall be marked with two NORS labels (fig 62). One label shall be placed adjacent to the address marking and one shall be placed on the opposite side.



FIGURE 62. <u>Expedite handling shipment label</u>.

5.4.20 <u>Materiel condition markings</u>. Materiel condition tags or labels shall be used whenever materiel may become mixed during storage or shipment within or between installations, or where physical evidence is necessary for materiel control, to prevent duplicate inspections, or both. Implementation of this requirement by the respective departments and agencies will afford specific guidance concerning use and application. The following forms are authorized for use in indicating the condition(s) of materiel and identification of the individual article or the contents of the package, bundle, or container of any type to which they are

64

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

Case 5:25-cv-01852-JMG    Document 1    Filed 04/10/25    Page 332 of 440

MIL-STD-129H
3 January 1978

securely attached. Condition codes are defined in Military Standard Requisition-ing and Issue Procedures (MILSTRIP) (DOD 4140.17-M) and departmental imple-mentation thereto. These forms are not for indiscriminate use on serviceable materiel that presents no problem in storage and transfer.

5.4.20.1 Serviceable Tag (DD Form 1574) and Serviceable Label (DD Form 1574-1). Except as otherwise specified in paragraph 5.4.20 materiel that is service-able (issuable w/o qualification, issuable with qualification, or priority issue) shall be conspicuously marked with a serviceable materiel condition tag or label. Tag/label shall have yellow margins and letters (match Pantone Matching System (PMS) 116).

5.4.20.2 Unserviceable (Reparable) Tag (DD Form 1577-2) and Unserviceable (Reparable) Label (DD Form 1577-3). Materiel that is unserviceable (limited re-storation, or incomplete) shall be conspicuously marked with an unserviceable (re-parable) materiel condition tag or label. Tag/label shall have green margins and letters (match PMS 355).

5.4.20.3 Unserviceable (Condemned) Tag (DD Form 1577) and Unserviceable (Condemned) Label (DD Form 1577-1). Materiel that is unserviceable (condemned) shall be conspicuously marked with an unserviceable (condemned) materiel condition tag or label. Tag/label shall have red margins and letters (match PMS 186).

5.4.20.4 Suspended Tag (DD Form 1575) and Suspended Label (DD Form 1575-1). Materiel that is suspended (stocks awaiting classification, returns awaiting classification, or stocks held pending negotiation or litigation) shall be conspicuously marked with a suspended materiel condition tag or label. Tag/label shall have brown margins and letters (match PMS 470).

5.4.20.5 Test/Modification Tag (DD Form 1576) and Test/Modification Label (DD Form 1576-1). Serviceable materiel which requires test, alteration, modifica-tion, conversion, or disassembly prior to issue shall be conspicuously marked with a test modification materiel condition tag or label. Tag/label shall have blue margins and letters (match PMS 279).

5.4.21 Magnetized materials suitable for shipment via aircraft. Boxes, packages, and items containing magnetized material, determined to be suitable for shipment by military aircraft in conformance with MIL-S-4473, shall be marked in accordance with AFR 71-4/TM 38-250/NAVSUP PUB 505/MCO P4030.19/DLAM 4145.3. Magnetized materials suitable for shipment by commercial air shall be marked in conformance with Official Air Transport Restricted Articles Tariff No. 6-D, CAB No. 82 and CFR-49.

65

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A  MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H
3 January 1978

5.4.22 <u>Magnetized materials not suitable for shipment via military aircraft</u>.
Boxes, packages, and items containing magnetized material, determined to be
not suitable for shipment by military aircraft in conformance with MIL-S-4473,
shall be conspicuously marked on two opposite sides with a red caution label
having white lettering (fig 63). Labels shall be 5 by 4 inches or 10 by 8 inches
in size depending upon container size. When the marking area is limited, the
size of the label may be reduced to a size commensurate with the available space
on the container. Labels shall be red, matching color chip 21105 of Federal Standard
595, with white letters.



FIGURE 63. <u>Magnetic equipment caution label for materiel not suitable
for air shipment</u>.

5.4.23 <u>Magnetic tape with data</u>. Magnetic tape with data shall be labeled
conspicuously on interior and exterior containers (fig 64).



FIGURE 64. <u>Magnetic tape label</u>.

5.4.24 <u>Center of balance and sling or lifting points</u>. A 1 inch wide vertical
line 3 inches long locating center of balance shall be extended up from the bottom
edge of both sides of containers over 10 feet in length or those which are unbalanced.
This line shall be identified by stenciling or printing in 1-inch letters the words
"CENTER OF BALANCE" immediately above or alongside the line (fig 65). On unbc

66

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [008409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-05-30 13 26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120921 2 ■■

MIL-STD-129H
3 January 1978

equipment, the location of designated sling or lift points shall be marked in white. On vehicles which are painted white, yellow, or other light colors, the marking shall be black and the words "LIFT HERE" with arrow pointing to the lifting eyes shall be placed immediately above or alongside the lifting eyes (fig 66). For marking unboxed equipment and vehicles, the paint shall be gasoline soluble as specified in 4.2.2.2.2. If stencil ink is used, it shall conform to TT-I-1795. When space does not permit, size of arrow and lettering may be reduced accordingly.



FIGURE 65.  Center of balance marking.



FIGURE 66.  Lift point markings.

5.4.25 Load bearing areas and lift points. When shipping containers and contents are subject to damage caused by bending and twisting from uneven container stresses or strains, load bearing areas and lift points shall be marked on the exterior of the container. The words "LOAD BEARING AREA" shall be marked on the opposite panels of the container directly over the load bearing areas. The words "FORKLIFT AREA" shall be placed directly over the forklift truck entry points of the skid and rubbing strip construction (fig 67).

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A  MCCLOSKEY [084091000001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120922 4 ■

MIL-STD-129H
3 January 1978



FIGURE 67.  Load bearing area--lift point markings.

**5.4.26 Legend "USE NO HOOKS".** When specified herein, the legend "USE NO HOOKS" in letters not less than 1½ inches in height shall be stenciled on both sides of shipping containers in which the contents are susceptible to damage by use of hooks. In addition, a hook symbol with a superimposed X sufficiently heavy to convey the intended prohibitory use of the hook shall be placed directly above the legend (fig 68).



FIGURE 68.  "USE NO HOOKS" precautionary marking.

**5.4.27 Special handling.** Marking such as TOP, UP, THIS SIDE UP, GLASS, KEEP DRY, PERISHABLE, KEEP FROZEN, or other special handling instructions of a similar nature shall appear on shipping containers as applicable (fig 69). However, such markings shall not interfere with nor obscure other markings on shipping containers.



FIGURE 69.  Special handling marking.

68

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038408100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

Case 5:25-cv-01852-JMG    Document 1    Filed 04/10/25    Page 336 of 440

MIL-STD-129H
3 January 1978

**5.4.28** <u>Frozen Medical Material Shipments (DD Form 1502)</u>. Shipping containers packed with perishable medical freezer items (constant temperature must be maintained below $32^O$ F.) shall have a completed PERISHABLE--KEEP FROZEN label (DD Form 1502) applied to the address side of each container (fig 70). The applicable icing and time data are to be inserted on the labels at time of shipment. In addition, "ARROW" and "FRAGILE" markings shall be applied to containers of frozen medical items. A completed DD Form 1387-2 (Special Handling Data/Certification) is required and shall be applied to the address side of the container when shipment via military air transportation is scheduled (see 5.4.33.2).



FIGURE 70. <u>Frozen medical material markings</u>.

**5.4.29** <u>Chilled Medical Material Shipments (DD Form 1502-1)</u>. Shipping containers packed with perishable medical refrigerated items (constant temperatures must be maintained between $35^O$ and $46^O$ F.) shall have a completed PERISHABLE KEEP CHILLED label (DD Form 1502-1) applied to the address side of each container (fig 71). The applicable icing and time data are to be inserted on the labels at time of shipment. In addition, "ARROW" and "FRAGILE" markings shall be applied to containers of chilled medical items. A completed DD Form 1387-2 is required and shall be applied to the address side of the container when shipment via military air transportation is scheduled (see 5.4.33.2).



FIGURE 71. <u>Chilled medical material markings</u>.

**Reprinted without change.**

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COI
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120924 8 ■

MIL-STD-129H
1 July 1980

5.4.30 <u>Limited Unrefrigerated Medical Material Shipments (DD Form 1502-2)</u>. Containers packed with perishable medical items out of refrigeration (when receipt of shipment by consignee is assured within a specified number of days) shall have a completed PERISHABLE label (DD Form 1502-2) applied to the address side (fig 72). The data applicable to time of removal from refrigeration shall be inserted on the label at time of shipment. In addition, "ARROW" and "FRAGILE" markings shall be applied to containers of perishable medical items. A completed DD Form 1387-2 is required and shall be applied to the address side of the container when shipment via military air transportation is scheduled (see 5.4.33.2).



FIGURE 72.  <u>Limited unrefrigerated medical material markings</u>.

5.4.31 <u>Security service</u>. Shipments identified as classified or sensitive cargo, or items requiring special surveillance during transit shall be provided a signature security service. When required by the applicable carrier's tariff, each exterior container shall be labeled or tagged to indicate the service requested (fig 73). When shipped by military aircraft, shipper shall prepare a DD Form 1387-2 and note in the handling instruction block, "Signature Service Required," in compliance with DOD 4500.32-R.



FIGURE 73.  <u>Security service markings</u>.

5.4.32 <u>Project code markings</u>. When specified in contracts and by instructions of the appropriate cognizant activity (see 3.6) that project code labels are required on exterior containers, the project code shown in the requisition or procurement document, in addition to appearing in the address, shall also be shown on a white

<u>Supersedes page 70 of 3 January 1978.</u>

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226553
Sold to:MARGARET A MCCLOSKEY [0384091000001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H
1 July 1980

label having a black bordered disc superimposed thereon (fig 74). In the event more than one project code is required, both project codes can be applied on one label. Label sizes shall be 3 x 3 or 9 x 9 inches and the disc shall measure 2 or 6 inches in diameter respectively with proportional black lettering. When a tag is prescribed for marking of the project code, a label or separate tag shall not be required. The project code may be printed or stenciled on containers which are too small to accommodate the smallest project code labels. When markings are applied by tags, the project code shall be stenciled or printed on the identification tag adjacent to the identification data. Application of the marking shall be as follows:

    a. Rectangular containers, consolidation containers and palletized loads--
       Two discs, one on each side.

    b. CONEX containers--One disc on each marking board.

    c. Cylindrical container--Two discs equally spaced on the circumference.

    d. Irregularly shaped containers and loose or unpacked items--Stenciled or printed on the identification marked side of a tag.

    e. Vehicles, or other major unpacked items, i.e., Industrial Plant Equipment (IPE)--One disc on the marking board. As an alternate method, a disc may be applied directly on a vehicle by the use of PPP-T-60, type III, class 2, or PPP-T-70 pressure-sensitive tape. The tape shall be placed over the label and extend a minimum of one-half inch from all edges of the label.

    f. Parcel post--One disc adjacent to the address marking.

    g. MILVANs/SEAVANs--Shall not be marked; however, the containers or items comprising the van load shall be marked as specified herein.



FIGURE 74. Project code marking.

    5.4.33 Precautionary marking DOT regulations for marking and labeling. Explosives and other hazardous materials shall be marked and labeled in accordance with the requirements of the 49 CFR, Parts 171-179, to satisfy all mode requirements en route from source to destination. Military design containers shall be marked with the drawing number or military specification number (including revision) under which the container was manufactured. When shipment by military airlift is directed, the requirements of AFR 71-4/TM 38-250/NAVSUP Pub 505 (REV)/MCO P4030.19D/DLAM 4145.3 shall apply. Labels required for explosives and other hazardous materials are listed in appendix D of this standard. The label shall be placed on the same side of the container as the identification markings unless it would obscure other markings, or is otherwise specified.

Supersedes page 71 of 3 January 1978.

71

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A MCCLOSKEY [0384091000001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H
1 July 1980

5.4.33.1.1 <u>Proper shipping name</u>. The proper shipping name shall be marked on the outside of each shipping container in accordance with 5.1.2.1g, reference 49 CFR 172.101 (Land, Sea and Air), and chapter 4 of AFR 71-4/TM 38-250/NAVSUP PUB 505(REV)/MCO P4030.19D/DLAM 4145.3 (Military Air).

5.4.33.1.2 <u>Air shipments</u>. Marking and labeling requirements for shipment of hazardous materials by air are specified in 49 CFR 171-175. DOT labels are compatible with IATA requirements.

5.4.33.1.3 <u>Other precautionary and statutes marking</u>. Markings required for any purpose by statute or regulation such as 21 CFR, Food and Drug Administration, Department of Health, Education and Welfare, Part 1, 29 CFR, Labor, Public Law 91-596, Occupational Safety and Health Act and regulations issued under their authority shall neither obscure nor be obscured by other markings.

5.4.33.2 <u>DD Form 1387-2 (Special Handling Data/Certification)</u>. All shipments scheduled for transportation by military aircraft (including LOGAIR and QUICKTRANS) containing hazardous material, biologicals, classified materiel, and any other materiel requiring special handling shall be labeled with a DD Form 1387-2 (fig 75). Detailed instructions for the required copies and preparation of DD Form 1387-2 labels shall be as specified in the joint military publication AFR 71-4/DLAM 4145.3/TM 38-250/NAVSUP PUB 505/MCO P4030.19. For other than Air Force, MIL-HDBK-758 may also be used as a guide in preparing the DD Form 1387-2. (Requirements in the AFR will take precedence over the MIL-HDBK and this standard.) The form will be located on the same side as the address marking and shall be applied as specified in paragraphs 4.3.1.8.1.1 and 4.3.1.8.1.2.



FIGURE 75. <u>Special Handling Data/Certification--DD Form 1387-2</u>.

5.4.34 <u>Flash/Boiling point marking</u>. Unit and intermediate packs and shipping containers packed with flammable and combustible liquids with a flash point below 200° F. shall be marked with the flash point of material. In addition, if the flash point is less than 73° F., the boiling point will also be marked. Flash point and boiling point markings shall be expressed in degrees Fahrenheit and shall be

Supersedes page 72 of 1 November 1978.

72

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to: MARGARET A. MCCLOSKEY [0384091000001] - PEGGYINCA@ME.COM,
Not for Resale, 2020-06-30 13:25:22 UTC

Case 5:25-cv-01852-JMG    Document 1    Filed 04/10/25    Page 340 of 440

MIL-STD-129H
1 July 1980

applied on the identification marked side by means of labeling, printing, stamp-
ing, or stenciling (fig 76). Size of lettering shall not be less than one-half inch.
Flash point shall be determined by using the testing methods prescribed in
section 173.115(d) of 49 CFR.



FIGURE 76. Flash point marking.

5.4.35 Hazardous chemicals and materials. All unit and intermediate packs
of hazardous chemicals and materials (including aerosol propellants) shall have
affixed thereto the applicable warning labels in accordance with the applicable
laws, statutes, regulations, or ordinances. Such laws include the Federal Food,
Drug, and Cosmetic Act and similar State and municipal legislation, the Federal
Insecticide, Fungicide, and Rodenticide Act. In addition, interior, unit and
intermediate packs including unit containers that serve as shipping containers
such as pails and drums shall be marked with the applicable precautionary informa-
tion in accordance with the American National Standard for Labeling of Hazardous
Industrial Chemicals (ANSI Z129.1-1976).

5.4.35.1 Specific hazards: Asbestos. Unit and intermediate packs, including
containers that serve as shipping containers of asbestos and products containing
asbestos shall be marked: "Caution, Contains Asbestos Fibers. Avoid Creating Dust.
Breathing Asbestos Dust May Cause Serious Bodily Harm."



FIGURE 77. OSHA compliance label for asbestos.

Supersedes page 73 of 1 November 1878.

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226553
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:28:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120928 5 ■

MIL-STD-129H
1 July 1980

**5.4.35.2 Specific Hazards: Polychlorinated Biphenyls (PCBs).** Unit and intermediate packs, including containers that serve as shipping containers of waste PCB, should have a PCB label (fig 77a) affixed as required by the US Environmental Protection Agency.



FIGURE 77a. **PCB label for shipping containers**

**5.4.36 Radioactive material.** Interior containers packed with radioactive material shall be labeled in accordance with applicable DOT regulations, section 20.203(f)(2) of 10 CFR, part 20. MIL-HDBK-600 may be used as a guide for identification, marking, labeling, storage, and transportation. Exterior containers of radioactive materials requiring labeling (fig 77b) must be labeled on two opposite sides of the package. (sec 172.406(e)(1), 49 CFR).



FIGUREC 77b. **Radioactive material marking on exterior containers**.

New page.

73a

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A  MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ▇ 9999911 0120929 ? ▇

MIL-STD-129H
1 July 1980

**THIS PAGE INTENTIONALLY LEFT BLANK**

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A  MCCLOSKEY [0384091000001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

Case 5:25-cv-01852-JMG    Document 1    Filed 04/10/25    Page 343 of 440

MIL-STD-129H
1 July 1980

5.4.37 <u>Sensitive electronic items</u>. Unit, intermediate and exterior packs containing electronic devices (or various other electronic items, either alone or as part of assemblies) susceptible to damage from strong electrostatic, electromagnetic, magnetic or radioactive fields shall be marked as follows:

a. <u>Unit packs</u>. Unit packs will be marked with a sensitive electronic device symbol and the statement "Do Not Open Except at Approved Field Force Protective Work Station." Minimum size of the impression shall be one-third of an inch measured vertically (fig 78). This symbol shall be printed in black or in the same color as the identification marking (if other than black). When available marking space permits, the sensitive electronic device caution label (fig 79) may be used.



FIGURE 78. <u>Sensitive electronic device symbol</u>.

b. <u>Intermediate and exterior packs</u>. Intermediate and exterior packs shall be marked with a yellow caution label having black lettering (fig 79). A 2- by 2-inch label shall be placed on one side of each intermediate container. Two 4- by 4-inch (minimum size) labels shall be placed on each exterior container--one on the identification marking side (or surface) and one on the opposite side of each shipping container exceeding one-half cubic foot. Smaller shipping containers shall be marked in the same manner except that labels as small as a 2- by 2-inch size may be used.



CAUTION

SENSITIVE ELECTRONIC DEVICES

DO NOT SHIP OR STORE NEAR STRONG
ELECTROSTATIC, ELECTROMAGNETIC
MAGNETIC OR RADIOACTIVE FIELDS

FIGURE 79. <u>Sensitive electronic device caution label</u>.

5.5 <u>Packing lists and DD Form 1348-1 (DOD Single Line Item Release/ Receipt Document)</u>.

5.5.1 <u>Packing list</u>. Each set, kit, or assembly having unlike stock numbered items but identified by a single stock number shall have a packing list securely attached to the end or side of the container. In addition, each set, kit or assembly comprising a palletized-unitized load or consolidation container shall have a packing list attached to the exterior surface of each container. For exception to the use of exterior packing list, see 5.5.1.5.

Supersedes page 74 of 1 November 1978.

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A MCCLOSKEY [0384091000001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

5.5.1.1 <u>Single stock numbered assembled sets</u>. Sets consisting of two or more exterior shipping containers consisting of unlike stock numbered items, packed in more than one shipping container, require a packing list for each container. The packing list shall be attached to the exterior of each container. A master packing list shall be prepared for the set and a copy attached to the No. 1 container.

5.5.1.2 <u>DD Form 250 (Materiel Inspection and Receiving Report)</u>. The DD Form 250 should be used as a packing list for contractor shipments and shall be applied to exterior containers as applicable, in accordance with 5.5.2. Packing list copies shall be in addition to the copies required for standard distribution in the Defense Acquisition Regulation (DAR) and shall be marked "Packing List."

5.5.1.3 <u>DD Form 1155 (Order for Supplies and Equipment)</u>. DD Form 1155 shall be attached to the commercial packing list used by the vendor on FMS Fast Pay Contracts and shall be applied to exterior containers as applicable, in accordance with 5.5.2.

5.5.1.4 <u>DD Form 1750 (Packing List)</u>. DD Form 1750 shall be used for shipments generated by DOD activities. As an alternate to the DD Form 1750, activities with facilities to program for computer output of packing lists from Basic Issue Item (BII) cards furnished by commodity managers may use these listings as a packing list for single stock numbered sets, kits, or assemblies. The contents of the listing shall be so organized as to be readily understood and shall not include information that has no bearing on the items or to the receiving activity. A DD Form 1149 (Requisition Invoice Shipping Document), DD Form 1342 (DOD Property Record), or instruction sheets which list loose parts may be used as a packing list for Industrial Plant Equipment shipments provided the forms are marked to the effect that they constitute a packing list.

5.5.1.5 <u>Exception to the use of exterior packing lists</u>. Exterior packing lists are required on all contractor and DOD shipments with the following exceptions:

5.5.1.5.1 <u>Exceptions to use of packing lists</u>. No packing list is required for individual containers having like items or single item packs when the contents are listed on a label attached to the boxes, lithographed, or printed on the boxes (fig 80) or when a manufacturer's parts list is provided.



FIGURE 80. <u>Single stock numbered item consisting of other than stock numbered items in a single container.</u>

Supersedes page 75 of 3 January 1978.

75

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-08-30 13:28:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120932 7 ■

MIL-STD-129H
1 July 1980

   5.5.1.5.2 Classified shipments. Shipments of classified materiel shall not have packing lists affixed to the outside of the container. Markings indicating the classified nature of the materiel, its security classification, and the manufacturer's name if it will identify the classified nature of the shipment shall not appear on the exterior of the container.

   5.5.1.5.3 Concealed/omitted identification. When identification markings have been omitted from shipping containers of selected sensitive, controlled, and pilferable items (see 5.1.2.2), packing lists shall be placed inside the containers.

   5.5.1.5.4 Clothing and textile items. On shipments of clothing and textile items consigned to Headquarters Support Activity, Taipei, Republic of China, to Air Force and Navy oversea consignees (including grant aid and foreign military sales shipments), and to the Port of Djarkarta, Indonesia, regardless of mode of shipment, packing lists shall be placed inside the containers.

   5.5.1.6 Application of packing lists. Exterior packing lists shall be sealed in a water-resistant envelope conforming to PPP-E-540, class 1. (Style 4 envelopes are not authorized on wooden containers.) They shall be secured to the exterior of the palletized load or containers in the most protected location by taping with transparent L-T-90, type II, class A, PPP-T-60 or PPP-T-70 pressure-sensitive tape or contained in waterproof envelopes (style 4) with pressure-sensitive adhesive backing applied to containers other than wood. On wood containers, tacks or staples shall be used. Packing list for registered parcel post shall be attached in accordance with 5.5.2.4. For oversea shipments, except parcel post, unless otherwise specified, the waterproof envelope shall be further protected with a packing list protector (see 4.2.6) securely attached to the palletized-unitized load or container. When tacks or staples are used, they shall not be driven into the envelope in such a manner as to fasten or bind the packing list, nor shall they be of such length as to penetrate the container. See 5.6.4 for ammunition packing lists.

   5.5.1.7 Alternate application of packing lists. An alternate method of applying packing lists to fiberboard cartons and metal or plastic containers is by placing a glassine sheet of paper over the folded packing list, then applying transparent L-T-90, PPP-T-60 or PPP-T-70 tape over the top. Tape should extend one-half inch from all edges of the packing list. Glassine paper shall have the words "Packing List Enclosed" printed on the face (fig 81).



TRANSPARENT TAPE
GLASSINE PAPER
PACKING LIST

FIGURE 81. Packing list application.

Supersedes page 76 of 1 November 1978.

76

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H
1 November 1978

5.5.2 DOD Single Line Item Release/Receipt Document (DD Form 1348-1, DD 1348-1A).

5.5.2.1 Shipment units of single line items. Two copies of the DD Form 1348-1/ 1348-1A shall be attached to the materiel in the No. 1 shipping container. One copy shall be inclosed in a PPP-E-540, class 4, water-resistant envelope and attached in a protected location on the shipping container (fig 83). (Style 4 envelopes are not authorized on wooden containers.) When the storage container is used as the shipping container, the two copies normally placed inside the container shall be inclosed with the copy attached to the No. 1 container. For oversea shipments unless otherwise specified, the class 4, weather-resistant envelope shall be further protected with PPP-P-700 envelope protector (see 4.2.6). The words Material/Release Receipt Documents shall be marked on the outside of the protector (fig 82).

5.5.2.2 Shipment units of multiple line items. Two copies of the DD Form 1348-1/1348-1A shall be placed in a PPP-E-540, class 4, water-resistant envelope (see 4.2.5) and in such a manner that the NSN will be visible. The bag shall be attached to the package applicable to each requisition by means of 1 inch L-T-90, type 2, grade A, or PPP-T-42, pressure-sensitive tape. One copy applicable to each requisition shall be placed in a PPP-E-540, class 4, water-resistant envelope and attached in a protected location on each of the multiple containers. (Style 4 envelopes are not authorized on wooden containers.) For oversea shipments, unless otherwise specified, the PPP-E-540 envelope shall be further protected with a PPP-P-700 envelope protector with the words Material Release/Receipt Documents marked on the outside of the protector (fig 82). When a polyethylene bag is employed to group single items for packing, the same bag shall contain the DD Form 1348-1/1348-1A folded in such a manner as to provide the identification and requisition information.

5.5.2.3 DD Form 1348-1 for FMS shipments. Two copies of the DD Form 1348-1 applicable to each item shall be placed inside the container. One copy of the DD Form 1348-1A applicable to each item shall be placed in a PPP-E-540, class 4, weather-resistant envelope and attached to the outside of the container (fig 82). (Style 4 envelopes are not authorized on wooden containers.) One copy will be furnished to the country's designated recipient for shipment status. When the storage container is used as the shipping container, the two copies normally placed inside the container shall be inclosed with the copy attached to the outside of the container. On consolidation shipments, the two copies shall be placed in polyethylene bag and attached to the shipment pack applying to each individual requisition by means of 1 inch L-T-90 or PPP-T-42 pressure-sensitive tape. A second set of DD Forms 1348-1A shall be distributed in accordance with DOD 4140.17M.

Supersedes page 77 of 3 January 1978

77

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [008409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 12:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120934 0 ■

MIL-STD-129H
3 January 1978



FIGURE 82. DD Form 1348-1, Materiel Release/Receipt Document.

5.5.2.4 Alternate method of attaching papers accompanying shipment to fiberboard boxes. DD Form 1348-1 may be attached to fiberboard boxes in the following manner: Prior to sealing the box, the papers are placed in a water-resistant envelope. The envelope is placed under the flaps of the box so that the open end/flap of the envelope extends down the end of the box under the closure tape. The words "PAPERS HERE" in letters 1/2 inch high shall be placed on the tape directly over the envelope containing the papers. This method of attachment is required for registered parcel post shipments.

5.5.2.5 Alternate method of attaching papers to small parcel shipments. When the small parcel shrink film system is used for accompanying items, two copies of the DD Form 1348-1/1348-1A shall be attached to the materiel. The third copy for all items shall be grouped and placed beneath the film under the address label. For single items, three copies of the DD Form 1348-1/1348-1A shall be placed under the shrink film in such a manner as to be read.

Reprinted without change.

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A  MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H
1 July 1980

5.6 <u>Ammunition markings.</u>

5.6.1    <u>Interior and exterior container identification markings.</u>

5.6.1.1 <u>Unit and intermediate container identification markings.</u> The following identification markings shall appear on unit and intermediate packs and unpacked items. (The words "national stock number," "item description," "quantity," and "unit of issue" shall not be made a part of the markings.)

    a.  NSN/NATO stock number (see 3.36 and 3.36.3). When no NSN/NATO stock number is available, a Management Control Number or manufacturer's reference/part number (MFR/PN) shall be used.

    b.  Department of Defense Identification Code (DODIC) (see 3.18). The DODIC shall be placed on the same line as the NSN/NATO stock number.

    c.  Item description (see 3.26).

    d.  Quantity and unit of issue (see 3.51 and 3.67).

    e.  Lot number, when assigned.

    f.  Serial number, when assigned.

5.6.1.2 <u>Exterior container identification markings.</u> In addition to the identification markings required by 5.6.1.1, exterior container identification markings shall also include gross weight, proper shipping name and any special cautionary marking required by 49 CFR for the commodity described by that proper shipping name. Proper shipping name and any cautionary marking shall be placed on top of the container unless otherwise specified by 49 CFR. DODIC and lot number shall also be placed on both ends of the exterior container, unless otherwise specified (fig 83). Marking boards and pressure sensitive labels shall not be used unless specifically authorized. Empty ammunition containers shall have identification markings obliterated prior to shipment or "Empty" labels used in accordance with 49 CFR 173.29, unless otherwise directed by the shipping authority.



FIGURE 83    Identification markings for exterior ammunition containers.

**New page.**

78a

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY (038409100001) - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:28:22 UTC

MIL-STD-129H
1 July 1980

5.6.1.3 <u>Palletized unit loads</u>. Ammunition unit load identification marking shall include NSN, DODIC, lot number, quantity by lot (if the unit load has more than one lot) or total quantity (if the unit load has only one lot), item description, gross weight, and DOT proper shipping name. Identification marking shall be applied as follows:

a.  Unit loads of box-packed ammunition require the addition of only that identification marking which is not visible on the boxes. The additional marking is normally limited to quantity and partial nomenclature (i.e., 30 cartridges, 100 grenades, etc.), gross weight of the unit load, and any applicable mixed lot identification. Unless otherwise specified in the unitization drawing, unit loads of box-packed ammunition shall have one or more boxes turned to present a blank surface for marking (fig 84). Boxes which must have all nose ends pointed in the same direction (such as some rockets) shall not be turned. Marking shall be applied as described in 4.2. Letter size need not exceed one-eighth inch except for stencil marking which must be at least three-eighths of an inch. When the unit load is configured in such a way that box tops are turned inward on the load, the top layer of boxes shall be turned top out to permit the DOT proper shipping name to be visible. When it is not practical to turn the entire top layer, two diagonal corner boxes on the top layer shall be turned to expose the proper shipping name. Marker boards shall not be used.



IDENTIFICATION
MARKINGS

FIGURE 84. <u>Identification markings for pallet loads of ammunition</u>.

b.  Unit loads of separate loading projectiles require the addition of only that identification marking which is not visible on the projectiles. This additional marking is normally limited to quantity, nomenclature, gross weight, and mixed lot identification (including quantity per lot). Marking may be applied directly to the pallet load by stenciling, embossing, stamping, or printing. Tags may be used when the marking cannot be applied directly to the pallet load. The location and content of identification marking shall be specified on ammunition packaging and marking drawings for separate loading projectiles. Marker boards shall not be used.

New page.

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ▮▮ 9999911 0120937 6 ▮▮

MIL-STD-129H
1 July 1980

c.  Unit loads of cylindrical containers, such as propelling charges,
    may be marked with either labels or tags.  Marking content shall
    be as specified above for box-packed ammunition.  Marking shall
    be applied diagonally opposite near the ends of the upper layer
    (fig 85).  Containers shall be positioned so the proper shipping
    name is visible on at least one of the containers on each side of
    the load.  Marker boards shall not be used.



FIGURE 85.  Identification markings for pallet load of cylindrical
            ammunition containers.

d.  Each unit load containing empty, filler, and/or light containers
    shall have a weather-resistant placard or tag applied to one end and
    one side of the load.  The placard or tag shall be marked in one-eighth
    inch or larger letters (three-eighths inch minimum for stenciling) to
    identify the quantity of empty containers and/or the quantity and
    content of light containers.

e.  Unit loads of ammunition comprised of more than one lot shall be
    marked with the appropriate lot numbers in order to maintain lot
    integrity.  In addition, the lot number and quantity of each lot in
    unit loads of mixed lots shall be listed on a plain white label or
    tag, as applicable, and placed adjacent to the other identification
    markings.  The maximum label or tag size shall be 4 by 6 inches
    and the lettering shall be not less than one-quarter of an inch in
    height.

New page.                              78c

Copyright Naval Publications and Form Center.
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [038406100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120938 8 ■■

MIL-STD-129H
1 July 1980

5.6.2 <u>Domestic and overseas address marking</u>.

5.6.2.1 <u>Domestic and overseas shipment address</u>. Piece number, total pieces, weight, and cube are not required as part of the domestic or overseas address on surface shipments of ammunition.

5.6.2.2 <u>Palletized loads of ammunition</u>. Unless otherwise specified in the unitization drawing, space for overseas address marking for ammunition shall be provided by positioning the box(es) to present a smooth unmarked surface suitable for the application of address marking. A unit load which does not present a suitable surface, such as a pallet load of projectiles, shall be addressed by the use of a tag (DD Form 1378-1). One hundred percent markings are required on all pallet loads for overseas shipment.

5.6.2.3 <u>Full carload and full truckload shipments</u>. Full carload and full truckload shipments of ammunition to OCONUS activities shall require not less than 100 percent address marking. International logistics (IL) shipments and shipments to US Army Forces in the Panama Canal Zone require 100 percent address marking. Full carload and truckload shipments to CONUS activities do not require address marking.

5.6.3   <u>Interior and exterior container special markings</u>.

5.6.3.1 <u>Special orientation marking</u>. Ammunition packages requiring a special orientation under certain conditions shall be marked in a manner which will alert the shipper/storer to the applicable restrictions. An example would be marking "nose end" on packaged rockets or white phosphorous filled munitions.

5.6.3.2 <u>Light box/light load marking</u>. A light box/container (less than full box/container) shall be identified by painting the entire box orange (conforming to color chip 32246 of FED-STD-595) and marking the words, "LIGHT BOX," on the top and at least one side of the box. Empty boxes in unit loads of ammunition shall be painted orange (conforming to color chip 32246 of FED-STD-595) and the word, "EMPTY," marked on both ends, the top, and at least one side of the box. It is permissible to neatly mask existing marking when painting containers in order to avoid remarking. Unit loads containing empty or light boxes will be placarded with a 4- by 6-inch weather resistant placard containing the words, "LIGHT LOAD." The placard shall be of a contrasting color (see 5.6.1.3).

5.6.3.3 <u>Temperatures</u>. When temperature control is required for storage or when firing temperature limits apply, the temperature limits shall be inclosed in a square (or squares) with the words, "Storage Temperature Limits" or "Firing Temperature Limits," (or both, when applicable). The temperature shall be indicated by a figure followed by the letter C (Celsius) or F (Fahrenheit), as appropriate.

New page.

78d

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [03840910000] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■■ 9999911 0120939 T ■■

5.6.3.4 <u>Foreign country requirements</u>. Marking and labeling requirements imposed by foreign governments shall be observed as prescribed by the service directing the shipment. Foreign country labeling requirements for military explosives are met by applying the applicable label(s) (or labeled tags) on the exterior of each of the four sides of the unit load. Labels shall not be applied directly to the ammunition end item.

5.6.4 <u>Packing lists</u>. When packing lists are required for shipments of ammunition, the packing list shall be placed inside the shipping container.

5.6.5 <u>Previous ammunition marking requirements</u>. Marking of new production, and of existing stocks when remarking is required for maintenance or renovation purposes, shall be in accordance with applicable ammunition packing and marking drawings. These drawings shall incorporate the marking requirements of this standard. Remarking of current stocks merely to comply with this standard is not required. If a marking drawing does not exist for an item, then this standard shall be used.

5.6.6 <u>Precedence</u>. In the event of conflict between the requirements of this standard and those of product specifications, item technical publications, or drawings, the order of precedence shall be:

a. The requirements of the drawings.

b. The requirements of item technical publications.

c. The requirements of product specification.

d. The requirements of this standard.

New page.          78e

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A MCCLOSKEY [638409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120940 6 ■

MIL-STD-129H
3 January 1978

Custodians:                                          Preparing activity:
    Army - SM
    Navy - SA                                            Army - SM
    Air Force - 16
Defense Logistics Agency - DH                        Project:  PACK 0554

Review activities:
    Army - EL, GL, AL, AR , AT, ME, AV, MD, EA
    Navy - YD, MC, SH, AS, OS, MS, EC, CG
    Air Force - 11, 43, 45, 69, 99
    DLA - CT, CS, DM, ES, GS, IS, PS
    Federal - GSA

User activities:
    DSA - IP, SS
    Army - MI, MT

Review and user information is current as of the date of this document.  For future
coordination of changes to this document, draft circulation should be based on the
information in the current Federal Supply Classification Listing of DOD Documents.

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:28:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120941 8 ■

MIL-STD-129H
3 January 1978

Appendix A

SUPPLY CLASS MARKING REQUIREMENTS
(Ref. para 5.4.13)

10.  SCOPE.  The application of color marking as specified herein shall be on an optional basis and shall be used only when specified by a Military Department for movement of supplies to oversea units which are the responsibility of the Department.

20.  SUPPLY CLASS LABELS.  When specified by a Military Department, all DOD elements involved in the shipment of supplies shall color code shipping containers to supply class identity using the appropriate color marking labels (fig 83).  The supply class shall be printed with black ink on paper which most nearly approximates the color chip specified in 70 of this appendix.  Supply class labels required for procurement purposes shall be furnished by the procuring activity.  Labels shall be applied to containers/equipment with water-resistant label adhesive as specified in 4.3.1.8.1.1 and coated in accordance with 4.3.1.8.1.2 of this standard.  When the label is affixed to a tag, the tag shall conform to the requirements of specification UU-T-81.  In addition to the supply class label, the subclass, when applicable, shall be stenciled in 1 inch black letters or applied by label directly below each supply class label as illustrated in figure 83.  When tags are used, the subclass will be stenciled or labeled to the right of the supply class label on the tag.

30.  COLOR MARKING.  In addition to color marking labels, containers of medical supplies shall be color marked on two diagonally opposite top corners with a solid triangle on each top, side and end of each corner.  Each triangle shall be of the same size, but the size may vary from 3 to 8 inches in height and shall be proportionate to the size of the container.  The color shall be maroon conforming to the color specified in 70 of this appendix.  CONEX transporters filled with medical supplies shall have 12 inch corner colors applied to all four top corners.

40.  SIZE.  Color marking labels shall be either 3 x 3 or 9 x 9 inches.  The larger size shall be used whenever the size of the marking surface permits.

50.  EXCEPTIONS TO THE USE OF COLOR MARKING LABELS.  Color marking labels specified in this appendix are not required for major unpacked items such as vehicles, artillery, boats, subsistence, petroleum products, explosives and other dangerous articles subject to the provisions of AFR 71-4/TM 38-250/NAVSUP PUB 505 (REV)/ MCO P4030.19D/DSAM 4145.3.

60.  SUPPLY CLASS AND SUBCLASS IDENTIFICATION.  To determine the appropriate color marking label to be applied and the appropriate subclass to apply under the class label, the supply class and subclass shall be identified by any one of the following methods:

80

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [03840510000I] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:28:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120942 T ■

MIL-STD-129H
1 July 1980

THIS PAGE INTENTIONALLY LEFT BLANK

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to:MARGARET A MCCLOSKEY [036409100001] - FEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120943 1 ■

60.1. Knowledge of the class and subclass being shipped.

60.2. Card column 67 of the Item Data Record of the Army Master Data File identifies the class of supply and card column 68 identifies the supply subclass.

60.3. Printed in-the-clear on the bottom border of the DD Form 1348-1.

60.4. As specified in contract or purchase order.

70. SUPPLY CLASS COLORS.  Background colors which most nearly conform to the following color numbers of FED STD 595 shall be used:

| Color | FED STD 595: |
|-------|--------------|
| Blue | 15180 |
| Brown | 10091 |
| Green | 14115 |
| Maroon | 10049 |
| Orange | 12246 |
| Purple | 17100 |
| Red | 11136 |
| Yellow | 13538 |

80. LOCATION OF COLOR MARKING LABELS.

80.1. Rectangular shipping containers.  Four color marking labels shall be applied, one on each side, one end, and top, except as noted in 90 of this appendix (fig 86).

80.2. Cylindrical containers (barrels and drums).  One color marking label shall be applied on the top and three color marking symbol labels shall be equally spaced around the circumference (fig 86).

80.3. Irregularly shaped containers (bag, bales, etc.).  Two color marking labels shall be applied, one on each side of a tag.  The tag shall be affixed in accordance with 4.3.1.7 of this standard (fig 86).

80.4. Loose unpacked items.  Loose unpacked items shall be marked with color marking labels except as noted in 50 of this appendix.  Two color marking labels shall be applied, one on each side of a tag.  The tag shall be affixed in accordance with 4.3.1.7 of this standard.

80.5. Parcel post containers.  One color marking label shall be applied to the address marked side.

Supersedes page 81 of 3 January 1978.

81

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY, [035409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 10:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120944 3 ■

MIL-STD-129H
1 July 1980

90.  PALLETIZED LOADS, CONSOLIDATION CONTAINERS AND CONEX.  When the
contents are of a single class, one color marking label shall be applied to
each side, one end, and top of each palletized load, and consolidation container.
On CONEX one color marking label shall be applied to each marking board.  When
the contents are mixed supply classes, the palletized load, consolidation container
or CONEX shall not be marked.  However, each of the interior containers shall
be marked with a color marking label to indicate the supply class (fig 86) with-
in that container.  MILVANs or SEAVANs shall not be marked; however, the
contents shall be color marked as specified in this appendix.



FIGURE 86.  Supply class color labels.

Supersedes page 82 of 3 January 1978.

82

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A  MCCLOSKEY (038409100001) - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120945 5 ■

Appendix B

SHELF-LIFE CODES

TABLE I.  Wholesale level suppliers.

| Shelf-life period | Type I | | Type II |
|---|---|---|---|
| Nondeteriorative -------------- | 0 | ---------------------- | 0 |
| 1 month ---------------------- | A | | |
| 2 months --------------------- | B | | |
| 3 months --------------------- | C | ---------------------- | 1 |
| 4 months --------------------- | D | | |
| 5 months --------------------- | E | | |
| 6 months --------------------- | F | ---------------------- | 2 |
| 9 months --------------------- | G | ---------------------- | 3 |
| 12 months -------------------- | H | ---------------------- | 4 |
| 15 months -------------------- | J | | |
| 18 months -------------------- | K | ---------------------- | 5 |
| 21 months -------------------- | L | | |
| 24 months -------------------- | M | ---------------------- | 6 |
| 27 months -------------------- | N | | |
| 30 months -------------------- | P | | |
| 36 months -------------------- | Q | ---------------------- | 7 |
| 48 months -------------------- | R | ---------------------- | 8 |
| 60 months -------------------- | S | ---------------------- | 9 |

NOTE:  Military essential and medical items with shelf life greater
than 60 months assigned shelf-life code X.

TABLE II.  Application of condition code changes to shelf-life items.

| Shelf-life condition code | Definition |
|---|---|
| A -------------------------- | Shelf life remaining is more than 6 months. |
| B -------------------------- | Shelf life remaining is from 3 to 6 months. |
| C -------------------------- | Shelf life remaining is less than 3 months. |

TABLE III.  Applicability of condition codes for medical materiel.

| Condition code | Expiration dating period | Unexpired dating period (months remaining) |
|---|---|---|
| A -------------------------- | 18 months or more ----------- | over 9 months. |
| A -------------------------- | 12 to 17 months ------------- | over 7 months. |
| A -------------------------- | 6 to 11 months ------------- | over 3 months. |
| B -------------------------- | 18 months or more ----------- | 3 to 9 months. |
| B -------------------------- | 12 to 17 months ------------- | 3 to 7 months. |
| B -------------------------- | 6 to 11 months ------------- | 2 to 3 months. |
| C -------------------------- | 18 months or more ----------- | under 3 months. |
| C -------------------------- | 12 to 17 months ------------- | under 3 months. |
| C -------------------------- | 6 to 11 months ------------- | under 2 months. |

Supersedes page 83 of 1 November 1978.

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-08-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120946 7 ■

MIL-STD-129H
1 July 1980

## Appendix C

### ADDITIONAL NSN AND ITEM DESCRIPTION MARKINGS ON EXTERIOR CONTAINERS SHIPPED OVERSEAS
(Ref. para 5.1.4.9)

10. SCOPE. Additional NSN and item description markings will be applied to exterior containers only when specifically required by a Military Department for movement to oversea units which are the responsibility of that department.

20. LOCATION OF MARKINGS. In addition to the location of identification markings specified herein, the NSN and item description shall be added, as required, to provide markings on three surface areas of a container, except as indicated in 20.4 below (fig 87). Specific locations are:

20.1. Boxes, crates and pallet loads--both sides and one end (fig 87).

20.2 Horizontal metal reusable cylindrical containers--both sides and one end.

20.3 Irregularly shaped containers (bales, bags, etc.)--two sides or conspicuous locations.

20.4 Bundles, barrels, kegs, drums, and upright metal cylindrical reusable containers--two areas on the side (180° from one another).

NOTE: Identification markings required herein (see 5.1.2.1), address markings (see 5.2.1.2), and Supply Class marking requirements (app A), when required, shall have priority on marking space available. In those instances where space prohibits stenciling the NSN and item description on the specified surfaces, they shall be added to the top or the unmarked end. Surfaces of containers already marked with the identification data need not be remarked; however, the NSN and item description shall be applied to the additional surfaces.

30. EXCEPTIONS TO THE REQUIREMENT FOR ADDITIONAL APPLICATION OF THE NSN AND ITEM DESCRIPTION ARE:

30.1. Parcel post containers.

30.2. Loose, unpacked or other self-identifying items where item identification is placed on labels and tags.

30.3. Security or sensitive items requiring concealment of identification.

30.4. Contents of palletized unit loads, multipacks or consolidation containers.

Supersedes page 84 of 3 January 1978.

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [008409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-08-30 13:29:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120947 9 ■

MIL-STD-129H
3 January 1978

30.5. Containers of frozen, chilled or limited unrefrigerated medical shipments.

30.6. Perishable subsistence including shipments of fresh fruits and vegetables.

30.7. As determined by the cognizant military service.

40. SIZE OF LETTERS AND NUMERALS.

40.1. Identification markings (see 5.1.2.1) shall be 1 inch high whenever space permits. When space does not permit 1-inch stenciling, the size of the markings shall be in accordance with Table I.

TABLE I. Size of letters and numerals.

| Available marking surface | Stencil size |
|---|---|
| Height less than 5"; length 6" minimum | 1/4" |
| Height 5" to 9"; length 15" minimum | 1/2" |
| Height 9" to 12"; length 16" minimum | 3/4" NSN<br>1/2" other markings |
| Height 12" to 15" or more; length 18" minimum | 1" |

NOTE: The size of stencil used is dependent on both the height and the width of the container surface. If there is a conflict between two stencil sizes, the smaller size shall be used, e.g., 7"H x 12"L, stencil size will be $\frac{1}{4}$" rather than $\frac{1}{2}$" or 4"H x 16"L, stencil size used would be $\frac{1}{4}$" rather than $\frac{3}{4}$".

40.2. Additional markings specified in 20 above shall be proportionate to the available space with a minimum of 1 inch and a maximum of 1-3/4 inch height. However, when space does not permit the use of 1-inch letters and numerals, the largest size possible shall be used.

40.3. When specific size stencil markings of 1 inch or more are prescribed herein for selected commodities (see 5.2.1.3.5), those requirements shall apply.

50. PREPARATION OF CONTAINER SURFACES. The container surfaces in the area to which the identification markings are to be applied shall be coated with obliterating (sand color) lacquer or paint as specified in 4.2.2.3, prior to stenciling the markings on the following types of containers:

50.1. Wood containers that are weathered or discolored to the extent that color contrast is ineffective.

**Reprinted without change.**

85

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [938409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H
1 July 1980

50.2. Fiberboard and wood containers with old markings which are illegible
or not required.

50.3. Wood containers whose available surface area does not permit the use of
letters or numerals larger than one-half inch for identification markings.

60. APPLICATION OF MARKINGS. Application of markings and required marking
materials shall be as specified in 4.2.

70. OVERCOATING (WEATHERPROOFING) MARKINGS. All identification markings
stenciled on wood containers shall be overcoated with spar varnish or clear acrylic
coating compound as specified in 4.2.2.1.



FIGURE 87. Location of identification markings.

Supersedes page 86 of 3 January 1978.

86

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2225533
Sold to:MARGARET A  MCCLOSKEY [038400100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H
3 January 1978

## Appendix D

### HAZARDOUS MATERIAL LABELS[1]
### AND SUPPLY-TYPE LABELS

| Standard Form | United Nations Class | Title (DOT Classifications) | NSN |
|---|---|---|---|
| 400 | 1 | Explosive A | 7540-00-118-0032 |
| 401 | 1 | Explosive B | 7540-00-118-0083 |
| 402 | 1 | Explosive C | 7540-00-118-0113 |
| 403 | 2 | Non-Flammable Gas | 7540-00-118-0156 |
| 404 | 2 | Flammable Gas | 7540-00-118-0231 |
| 405 | 3 | Flammable Liquid | 7540-00-118-0237 |
| 406 | 4 | Flammable Solid | 7540-00-118-0872 |
| 407 | 5 | Oxidizer | 7540-00-118-0340 |
| 408 | 5 | Organic Peroxide | 7540-00-118-0343 |
| 409 | 2 or 6 | Poison Gas (Poison A) | 7540-00-118-0367 |
| 410 | 6 | Poison (Poison B) | 7540-00-118-0535 |
| 411 | 6 | Irritant (Irritating material) | 7540-00-118-0565 |
| 412 | 6 | Irritant (w/skull) (Import and Export) | 7540-00-118-0575 |
| 413 | 7 | Radioactive I (materials) | 7540-00-118-0583 |

---

[1]Sizes of labels are 4 x 4 inches except SF 417 which is 6 x 6 inches.

Reprinted without change.

87

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A MCCLOSKEY [034409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120950 9 ■

MIL-STD-129H
1 July 1980

### Appendix D--Continued

| Standard Form | United Nations Class | Title (DOT Classifications) | NSN |
|---|---|---|---|
| 414 | 7 | Radioactive II (material) | 7540-00-118-0609 |
| 415 | 7 | Radioactive III (material) | 7540-00-118-0610 |
| 416 | 8 | Corrosive (material) | 7540-00-118-0611 |
| 417 | – | Empty | 7540-00-118-0613 |
| 418 | 4 | Spontaneously Combustible (material) | 7540-00-118-0614 |
| 419 | 4 | Dangerous When Wet (Water Reactive Material) | 7540-00-118-0660 |
| *420 | – | Etiologic Agents Biomedical Material For Domestic Shipments | 7540-00-149-0575 |
| 421 | – | Cargo Aircraft Only | 7540-01-021-7389 |
| 422 | – | Magnetized Material | 7540-01-021-7387 |
| 423 | – | Blasting Agent | 7540-01-074-7028 |

*NOTE: For import and export shipments use class B Poison Label.

### SUPPLY-TYPE LABELS

| Optional Form | Title | Size | NSN |
|---|---|---|---|
| 70 | Fragile | 2$\frac{1}{4}$" x 2$\frac{1}{4}$" | 7540-00-139-4728 |
| 71 | Fragile | 4" x 4" | 7540-00-139-4733 |
| 72 | Fragile | 6" x 6" | 7540-00-139-4734 |
| 73 | Method II Package | 2$\frac{1}{4}$" x 1" | 7540-00-139-4738 |
| 74 | Method II Package | 6" x 2$\frac{1}{4}$" | 7540-00-139-4752 |

Supersedes page 88 of 1 November 1978.

✦U.S. GOVERNMENT PRINTING OFFICE: 1980—603-121/3035

88

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2228533
Sold to MARGARET A MCCLOSKEY [038409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

MIL-STD-129H NOTICE 2 PA ■ 9999911 0120951 0 ■

MIL-STD-129H
3 January 1978

## Appendix D--Continued

| Optional Form | Title | Size | NSN |
|---|---|---|---|
| 77 | Caution-Unscrew This Bung Slowly | 5" x 3" | 7540-00-139-4761 |
| 78 | Caution-Magnetic Equipment (50 ft) | 5" x 4" | 7540-00-139-4773 |
| 79 | Caution-Magnetic Equipment (50 ft) | 10" x 8" | 7540-00-139-4784 |
| 80 | 999 | 2" x 2" | 7540-00-139-4831 |
| 81 | 999 | 4" x 4" | 7540-00-139-4832 |
| 82 | 999 | 8" x 8" | 7540-00-139-4833 |
| 83 | NORS | 3 x 1 1/2" | 7540-00-139-4834 |
| 84 | NORS | 3" x 5" | 7540-00-139-4835 |
| 85 | Fragile-Magnetic Tape | 4 3/4" x 4" | 7540-00-133-4312 |

Copyright Naval Publications and Form Center
Provided by IHS
No reproduction or networking permitted without license from IHS

Order Number: W2226533
Sold to:MARGARET A. MCCLOSKEY [033409100001] - PEGGYINCA@ME.COM,
Not for Resale,2020-06-30 13:26:22 UTC

**EXHIBIT J**

MIL-P-17303C(NAVY)
14 October 1955
SUPERSEDING
MIL-P-17303B(NAVY)
9 March 1953

## MILITARY SPECIFICATION

### PACKING MATERIALS,

### PLASTIC METALLIC AND PLASTIC NONMETALLIC

All interested Bureaus of the Department of the Navy have concurred in the use of this specification.

1.1 **Scope.** - This specification covers plastic metallic packings for rotary and reciprocating pumps handling steam, water, gas and oil; and plastic nonmetallic packings for high and low pressure valve stem and reciprocating rod saturated and superheated stem service for machinery on Naval vessels.

1.2 **Classification.** - The packing shall be of the following classes and types, as specified (see 6.1):

Class I - Plastic metallic, lead base:
Type A - Bulk form, symbol 1431.
Type B - Coil form, with or without cotton jacket, symbol 1433.
Type C - Coil form, metal foil jacket, symbol 1434.
Type D - Coil form, braided metal jacket, symbol 1432.
Type E - Coil form, with or without cotton jacket, (gasoline service), symbol 1437.

Class II - Plastic nonmetallic:
Type B - Coil form, cotton jacket, symbol 1106.
Type C - Coil form, asbestos and nickel-copper wire jacket, symbol 1108.
Type D - Coil form, with or without cotton jacket, (gasoline service), symbol 1109.
Type E - Coil form, asbestos and nickel-chromium-iron alloy wire jacket, symbol 1111.

Class III - Plastic metallic, copper base:
Type B - Coil form, cotton jacket, symbol 1439.

FED. SUP. CLASS
5330

GPO—O—NAV—36

01851

MIL-P-1730SC(NAVY)

## 2. APPLICABLE DOCUMENTS

2.1 The following specifications and standards, of the issue in effect on date of invitation for bids, form a part of this specification:

### SPECIFICATIONS

#### FEDERAL
NN-B-591 - Boxes, Fiberboard, Wood-Cleated (for Domestic Shipment).
NN-B-621 - Boxes, Wood, Nailed and Lock-Corner.
LLL-B-631 - Boxes, Fiber, Corrugated (for Domestic Shipment).
LLL-B-636 - Boxes, Fiber, Solid (for Domestic Shipment).
PPP-B-566 - Boxes, Folding, Paperboard.
PPP-B-601 - Boxes, Wood, Cleated-Plywood.
PPP-B-676 - Boxes, Set-up, Paperboard.

#### MILITARY
JAN-P-103 - Packaging and Packing for Overseas Shipment - Boxes,
　　　　　　　Wood Cleated; Solid Fiberboard.
JAN-P-106 - Packaging and Packing for Overseas Shipment - Boxes,
　　　　　　　Wood, Nailed.
JAN-P-108 - Packaging and Packing for Overseas Shipment - Boxes,
　　　　　　　Fiberboard (V-Board and W-Board), Exterior and
　　　　　　　Interior.
MIL-L-10547 - Liners, Case, Waterproof.

#### NAVY DEPARTMENT
General Specifications for Inspection of Material.

### STANDARDS

#### MILITARY
MIL-STD-129 - Marking for Shipment and Storage.

(Copies of specifications, standards, drawings, and publications required by contractors in connection with specific procurement functions should be obtained from the procuring agency or as directed by the contracting officer.)

2.2 Other publications. - The following documents form a part of this specification. Unless otherwise indicated, the issue in effect on date of invitation for bids shall apply.

### AMERICAN SOCIETY FOR TESTING MATERIALS STANDARD
D471-46T - Methods of Tests for Rubber Products.

(Application for copies should be addressed to the American Society for Testing Materials, 1916 Race Street, Philadelphia 3, Pa.)

2

01852

MIL-P-17305C(d.

## CONSOLIDATED CLASSIFICATION COMMITTEE
Consolidated Freight Classification Rules.

(Application for copies should be addressed to the Consolidated Classification Committee, 202 Chicago Union Station, Chicago 6, Ill.)

## 3. REQUIREMENTS

3.1 Qualification.- Packing material furnished under this specification shall be a product which has been tested and has passed the qualification tests specified in section 4 (see 6.2).

3.2 Composition and construction.- The composition and construction shall conform to that of the sample submitted for qualification (see 4.2).

3.3 Size.- Packing shall be furnished in the sizes specified (see 6.1).

3.4 Binder.- The different components of type A and the core of types B, C, D, and E shall be thoroughly mixed with a binder suitable for the temperature conditions for which the packing is required and shall be so held together by the binder as to prevent separation of the various parts.

3.5 Graphite.- Graphite, when used for lubrication, shall be a pure lubricating graphite.

3.6 Flexibility.- The packing shall be sufficiently flexible to be readily formed into coils to fit a rod of the diameter shown in table I (see 4.6.2).

Table I - Size of coils.

| Size of packing Inches | Rod diameter Inches |
|---|---|
| 1/8 to 1/4 | 2 |
| 5/16 to 5/8 | 3 |
| 11/16 to 13/16 | 4 |
| 7/8 and 1 | 8 |
| 1-1/8 | 9 |
| 1-1/4 | 10 |

3

MIL-P-17303C(NAVY)

3.7 Simulated performance.- The packaging under initial conditions and during the progress of the simulated service tests specified in 4.5.3 shall respond readily to gland adjustment for the control of leakages from the stuffing box. The packing shall be in satisfactory condition upon completion of the tests.

3.8 Class I, plastic metallic, lead base.- The metal used for lead base packing shall not melt nor disintegrate at or below a temperature of 550° F. (see 4.5.4).

3.8.1 Type A, symbol 1431.- The packing shall be in bulk form.

3.8.2 Type B, symbol 1433.- The packing shall be continuous strips of approximately uniform cross section, partially compressed to prevent disintegration during application. It may be enclosed in a latticed cotton thread or knit cotton covering or may be furnished without a covering.

3.8.3 Type C, symbol 1434.- The packing shall be continuous strips of uniform cross section, completely enclosed in a metal covering consisting of not less than two ribbons. The metal ribbon shall be not less than 0.0023 inch thick.

3.8.4 Type D, symbol 1432.- The packing shall be continuous strips of uniform cross section, extruded into a braided wire jacket. The jacket shall be of copper wire not more than 0.008 inch in diameter.

3.8.5 Type E, symbol 1437.- The packing shall be continuous strips of approximately uniform cross section, partially compressed to prevent disintegration during application. It may be enclosed in a latticed cotton thread or knit cotton covering or may be furnished without a covering.

3.9 Class II, plastic nonmetallic.-

3.9.1 Type B, symbol 1108.- The packing shall be continuous strips of approximately uniform cross section, partially compressed to prevent disintegration during application, and enclosed in a latticed cotton thread or knit cotton covering.

3.9.2 Type C, symbol 1108.- The packing shall be continuous strips of uniform cross section, completely enclosed in a braided jacket composed of asbestos and nickel-copper wire. The packing shall contain two corrosion inhibitors.

3.9.2.1 Corrosion resistance.- Symbol 1108 packing shall not corrode 13 percent chrome steel valve stem when tested as specified in 4.5.5.

4

MIL-P-17303C(NAVY)

3.9.3 Type D, symbol 1109.- The packing shall be continuous strips of approximately uniform cross section partially compressed to prevent disintegration during application. It may be enclosed in a latticed cotton thread or knit cotton covering or may be furnished without a covering.

3.9.4 Type E, symbol 1111.- The packing shall be continuous strips of uniform cross section, completely enclosed in a braided jacket composed of asbestos and nickel-chromium-iron alloy wire. The core of the packing shall contain not more than 20 percent, by weight, of corrosion inhibitor.

3.9.4.1 Pressure and temperature tests.- When the packing is installed in a stuffing box and tested as specified in 4.5.6, there shall be no leakage from the stuffing. The packing and the valve stem shall be in satisfactory condition upon conclusion of the tests.

3.9.4.2 Corrosion resistance.- Symbol 1111 packing shall not corrode 13 percent chrome steel valve stem when tested as specified in 4.5.5.

3.10 Class III, plastic metallic, copper base.- The metal for class III packing shall not melt nor disintegrate at or below a temperature of 1200° F. (see 4.5.4).

3.10.1 Type B, symbol 1439.- The packing shall be in continuous strips of approximately uniform cross section, partially compressed to prevent disintegration during application, and enclosed in a latticed cotton thread or knit cotton covering.

3.11 Workmanship.- The workmanship shall be first class in every respect.

4. QUALITY ASSURANCE PROVISIONS

4.1 Inspection procedures.- For Naval purchases, the general inspection procedures shall be in accordance with General Specifications for Inspection of Material.

4.2 Qualification tests at a Government laboratory.- Qualification tests shall be conducted at a Government laboratory designated by the Bureau of Ships. These tests shall consist of the tests specified in 4.5.

4.3 Sampling.-

4.3.1 Lot.- For purpose of sampling, a lot shall consist of all packing of one class, type, and size produced in one plant under essentially the same conditions and offered for delivery at one time.

5

01855

MIL-P-17303C(NAVY)

4.3.2 <u>Sampling procedure for lot acceptance inspection.</u> - For the inspection specified in 4.4.1.1, the Government inspector shall select representative lengths of packing from each lot in accordance with table II.

Table II – Sampling procedure for lot
acceptance inspection.

| Number of lengths of packing in the lot | Number of sample lengths to be selected |
|---|---|
| 8 or under | 2 |
| 9 to 15 | 3 |
| 16 to 25 | 5 |
| 26 to 40 | 7 |
| Over 40 | 10 |

4.3.3 <u>Sampling procedure for lot acceptance tests.</u> - For the test specified in 4.4.1.2 the Government inspector shall take a 36-inch sample from each sample length of finished packing selected in accordance with table II.

4.3.4 <u>Sampling procedure for production check tests.</u> - From the first lot of packing of each class and type offered for delivery under a contract or order, the Government inspector shall select from each of two lengths of packing a 36-inch sample for the purpose of the production check tests specified in 4.4.2. Thenceforth, two such sample pieces of packing shall be selected from one of every 10 lots which have passed inspection and test at the place of manufacture.

4.4 <u>Inspection and tests.</u> -

4.4.1 <u>Lot acceptance inspection and tests at place of manufacture.</u> -

4.4.1.1 <u>Inspection.</u> - Each of the samples selected in accordance with 4.3.2 shall be subjected by the Government inspector to surface inspection for workmanship and dimensions. Minor surface defects not affecting the serviceability of the packing shall not be cause for rejection.

4.4.1.2 <u>Tests.</u> - The samples selected in accordance with 4.3.3 shall be subjected to the tests specified in 4.5.2 and 4.5.4.

6

01856

MIL-P-17303C(NAVY)

4.4.1.3 Action in case of failure. - If any one of the samples tested is found to be not in conformance with this specification, the lot which it represents shall be rejected. A rejected lot may be resubmitted for Government inspection only after the manufacturer, after being informed of the reasons for rejection, has so reworked the entire lot as to remove or correct all nonconforming material.

4.4.2 Production check tests at a Government laboratory. - The samples selected in accordance with 4.3.4 shall be subjected to the tests specified in 4.5.2 and 4.5.4. If found not to conform as to construction with that given qualification, the sample need not be subjected to other tests before reporting the lot as unsatisfactory.

4.4.2.1 Place of tests. - Unless otherwise specified in the contract or order, production check tests shall be conducted at the Naval Engineering Experiment Station, Annapolis, Md.

4.4.2.2 Action in case of failure. - Acceptance of the first lot offered for delivery under a contract or order shall be withheld until a satisfactory report is received on the production check test sample. Thenceforth, except as hereinafter specified, acceptance and rejection of lots shall normally be on the basis of the sampling and inspection specified in 4.3.2, 4.3.3, and 4.4.1 and acceptance shall not be withheld pending receipt of test reports on production check test samples. However, upon receipt of an unsatisfactory test report on a production check test sample, the Government inspector shall select additional samples from every subsequent lot offered for delivery. The samples so selected shall be submitted to Naval Engineering Experiment Station, Annapolis, Md., and shall there be subjected to test or tests wherein failure was observed. Lots shall then be accepted only upon receipt of a satisfactory test report on the samples so selected. Additional testing shall be discontinued and lot acceptance returned to the normal basis when three successive lots have been accepted.

4.5 Test procedures. -

4.5.1 Chemical analysis. - Chemical analysis shall be made using standardized procedures.

4.5.2 Flexibility. - Packing shall be coiled by hand around a rod of a diameter as shown in table I (see 3.6). Only sufficient packing to make one complete turn around the rod shall be used.

4.5.3 Simulated performance. - Performance tests shall be made under simulated operating conditions in a machine designed for the purpose.

7

01857

MIL-P-17303C(NAVY)

4.5.3.1 Type C, symbol 1108, and type B, symbol 1439. - The packing shall be tested for the following service:

Valve stem service at 600 pounds per square inch (p. s. i.) and 750° F. Test shall be concluded after 3500 hours of operation.

4.5.3.2 Type D, symbol 1432. - The packing shall be tested for the following service:

Reciprocating rod service steam at 300 p. s. i. and 720° F., and a rod speed of 170 feet per minute. The test shall be concluded after 1,500 hours operation.

4.5.3.3 Type A, symbol 1431, symbol 1106 and type B, symbol 1433. - The packing shall be tested for the following services:

Reciprocating rod service with saturated steam at 300 p. s. i. and a rod speed of 100 feet per minute. Test shall be concluded after 3000 hours of operation.
Rotary rod service with feed water at 100 p. s. i. gage and 250° F., and a rod speed of 4,000 feet per minute. The test shall be concluded after 3,000 hours of operation.

4.5.3.4 Type C, symbol 1434. - The packing shall be tested for the following services:

Rotary rod service with feed water at 100 p. s. i. gage and 250° F., and a rod speed of 4000 feet per minute. Test shall be concluded after 3,000 hours of operation.

4.5.3.5 Rotary rod service. - During the rotary rod service tests specified in 4.5.3.3 and 4.5.3.4 in order to simulate conditions occasionally encountered in the service, the packing shall be subjected to cycles of sudden changes in pressure from 100 p. s. i. to 10 p. s. i. twice daily. The lower pressure shall be maintained for approximately 30 seconds and then suddenly raised to 100 p. s. i.

4.5.3.6 Type E, symbol 1437, and type D, symbol 1109. - The packing shall be tested for rotary rod service with a sequence of fluids at 50 p. s. i. gage and a rod speed of 1,375 feet per minute. The sequence of the fluids shall be as follows:

(a) Aromatic fuel (reference fuel No. 2 in accordance with A. S. T. M. D471-46T) for 200 hours.
(b) Alkylate fuel (115/145 base stock) for 200 hours.
(c) Sea water for 200 hours.
(d) Aromatic fuel (reference fuel No. 2 in accordance with A. S. T. M. D471-46T) for 200 hours.

8

01858

MIL-P-17303C(NAVY)

4.5.3.7 Type E, symbol 1111.- The packing shall be tested for the following service:

Valve stem service with steam at 600 p.s.i. and 750°F. During test there shall be a protracted series of simulated valve openings and closings. Tests shall be concluded after 2,000 hours of operation.

4.5.4 Heat resistance.- Specimens cut from each sample of packing shall be subjected for 2 hours to the temperature in 3.8 and 3.10.

4.5.5 Corrosion resistance, type C, symbol 1108 and type E, symbol 1111.- The packing shall be installed in the stuffing box of 1-inch size, 600 p.s.i. valve, equipped with a 13 percent chrome steel valve stem. The packing gland shall be adjusted to allow slight leakage under 300 p.s.i. valve test water. The condition shall be maintained for 24 hours to insure the wetting of the packing. The valve shall then be drained and stored at ambient temperature. The valve stem shall be inspected after 6 and 12 months of storage.

4.5.6 Pressure and temperature.- The packing shall be installed in the stuffing box of 1-inch size, 1500 series valve, equipped with a 13 percent chrome steel valve stem, and subjected successively to the following conditions:

(a) Superheated steam at 600 p.s.i. gage and 750°F. for twenty-four hours.
(b) Air pressure of 2000 p.s.i. gage.
(c) Temperature of 1100°F. for six hours.
(d) Air pressure of 2000 p.s.i. gage.

5. PREPARATION FOR DELIVERY

5.1 Preservation and packaging.-

5.1.1 For domestic shipment - immediate use.- Packing material shall be packaged in accordance with manufacturer's commercial practice.

5.1.2 For domestic shipment involving storage and overseas shipment.- Unless otherwise specified in the contract or order, packing material shall be wound on spools or coiled and packaged in folding cartons, set-up boxes, corrugated or solid fiberboard boxes conforming to Specification PPP-B-566, PPP-B-676, LLL-B-631 or LLL-B-636, respectively.

9

01859

MIL-P-17303C(NAVY)

5.2 Packing.-

5.2.1 For domestic shipment - immediate use.- The packing material shall be packed to insure carrier acceptance and safe delivery to destination at the lowest applicable rate. Containers shall comply with the Consolidated Freight Classification Rules or other regulations applicable to the mode of transportation.

5.2.2 For domestic shipment and storage. - The packing material, packaged as specified in 5.1.2, shall be packed in snug-fitting wood cleated fiberboard, cleated plywood, nailed wood, corrugated or solid fiberboard boxes conforming to Specification NN-B-591, PPP-B-601 (overseas type), NN-B-621, LLL-B-631, or LLL-B-636, respectively. Fiberboard boxes shall conform to the special requirements of the applicable box specification. Closure of the shipping container shall conform to the applicable container specification. The gross weight of wood boxes shall not exceed 200 pounds, and fiberboard boxes shall not exceed 90 pounds.

5.2.3 For overseas shipment. - The packing material, packaged as specified in 5.1.2, shall be packed in snug-fitting wood cleated fiberboard, wood cleated plywood, nailed wood, or fiberboard boxes conforming to Specification JAN-P-103, PPP-B-601 (overseas type), JAN-P-106, or JAN-P-108, respectively. Boxes shall be lined with a sealed waterproof caseliner conforming to type I, grade B, class 2 of Specification MIL-L-10547. Shipping containers shall be closed and strapped in accordance with the appendix of the applicable container specification. The gross weight of wood boxes shall not exceed 200 pounds, and fiberboard boxes shall not exceed 70 pounds.

5.3 Marking.- In addition to any special marking required by the contract or order, unit packages and intermediate and exterior shipping containers shall be marked in accordance with Standard MIL-STD-129.

6. NOTES

6.1 Ordering data.- Procurement documents should specify the following:

    (a) Title, number, and date of this specification.
    (b) Class, type, and size required (see 1.2 and 3.3).
    (c) Whether domestic or overseas shipment will be required; if domestic, the type required (see 5.1 and 5.2).

10

01860

MIL-P-17J3C(NAVY)

6.2 In the procurement of products requiring qualification, the right is reserved to reject bids on products that have not been subjected to the required tests and found satisfactory for inclusion on the Military Qualified Products List. The attention of suppliers is called to this requirement, and manufacturers are urged to communicate with the Bureau of Ships, Navy Department, Washington 25, D. C., and arrange to have the products that they propose to offer to the Army, the Navy, or Air Force, tested for qualification in order that they may be eligible to be awarded contracts or orders for the products covered by this specification. Information pertaining to qualification of products covered by this specification may be obtained from the Chief of Bureau of Ships, Department of the Navy, Washington 25, D. C.

6.3 The packaging, packing, and marking specified herein apply only to direct shipment to the Government and are not intended to apply to contracts or orders between the manufacturer and the prime contractor.

Patent notice. - When Government drawings, specifications, or other data are used for any purpose other than in connection with a definitely related Government procurement operation, the United States Government thereby incurs no responsibility nor any obligation whatsoever; and the fact that the Government may have formulated, furnished, or in any way supplied the said drawings, specifications, or other data is not to be regarded by implication or otherwise as in any manner licensing the holder or any other person or corporation, or conveying any rights or permission to manufacture, use, or sell any patented invention that may in any way be related thereto.

Custodian:
    Navy-Bureau of Ships
Other interest:
    Navy-Or

11

01861

## DOCUMENT CERTIFICATION

I, Thomas F. McCaffery, do swear under the penalties of perjury that the documents (141-262 pages and initialed) in Volume II of the binder entitled, "Dana Corporation, General Information, Gasket-Related QPLs" are to the best of my knowledge and belief, true and accurate copies of original U.S. Government documents.

Thomas F. McCaffery

I, MARISA A. TRASATTI , a commissioned Notary Public in and for the County of HARFORD , State of MD , do certify that Thomas F. McCaffery appeared before me on this date in the City of Baltimore, State of Maryland and that I took his oath aforesaid.

SEAL

Date: 5/30/03

My commission expires: 8/29/06

# EXHIBIT K

MIL-P-15385(SHIPS)
15 August 1951
SUPERSEDING
Navy 33P25c
2 January 1943

345
R6

8·7·7·51

MILITARY SPECIFICATION

PACKING, METALLIC AND NONMETALLIC, PLASTIC

(All interested bureaus of the Navy Department have concurred in the use of this specification for purchase.)

1. SCOPE

1.1 Scope. - This specification covers plastic metallic packings for rotary and reciprocating pumps handling steam, water, gas and oil; and plastic nonmetallic packings for high and low pressure valve stem and reciprocating rod saturated and superheated steam service for machinery on Naval vessels.

1.2 Classification. - Plastic packing shall be of the following classes and types, as specified (see 6.1):

Class I - Plastic metallic, lead base:
    Type A - Bulk form, symbol 1431.
    Type B - Coil form, with or without cotton jacket, symbol 1433.
    Type C - Coil form, metal foil jacket, symbol 1434.
    Type D - Coil form, braided metal jacket, symbol 1432.
Class II - Plastic nonmetallic:
    Type B - Coil form, cotton jacket, symbol 1106.
    Type C - Coil form, asbestos and wire jacket, symbol 1108.
Class III - Plastic metallic, copper base:
    Type B - Coil form, cotton jacket, symbol 1439.

2. APPLICABLE SPECIFICATIONS, STANDARDS, DRAWINGS, AND PUBLICATIONS

2.1 The following specifications, standards, drawings, and publications, of the issue in effect on date of invitation for bids, form a part of this specification:

SPECIFICATIONS

FEDERAL
    NN-B-591 - Boxes; Wood-Cleated-Fiberboard.
    NN-B-601 - Boxes; Wood-Cleated-Plywood, for Domestic Shipment.
    NN-B-621 - Boxes; Wood, Nailed and Lock-Corner.
    NN-B-631 - Boxes; Wood, Wirebound, for Domestic Shipment.
    LLL-B-631 - Boxes; Fiber, Corrugated (for Domestic Shipment).
    LLL-B-636 - Boxes; Fiber, Solid (for Domestic Shipment).

MILITARY
    JAN-P-105 - Packaging and Packing for Overseas Shipment - Boxes, Wood, Cleated, Plywood.
    JAN-P-106 - Packaging and Packing for Overseas Shipment - Boxes, Wood, Nailed.
    JAN-B-107 - Boxes, Wood, Wirebound (Overseas Type).
    JAN-P-108 - Packaging and Packing for Overseas Shipment - Boxes, Fiberboard (V-Board and W-Board), Exterior and Interior.

MIL-P-15385(SHIPS)

MILITARY (cont'd.)
JAN-P-125 - Packaging and Packing for Overseas Shipment - Barrier-Materials,
Waterproof, Flexible.
JAN-P-138 - Packaging and Packing for Overseas Shipment - Boxes, Wood,
Fiberboard-Lined.
JAN-P-140 - Packaging and Packing for Overseas Shipment - Adhesive,
Water-Resistant, Case Liner.

NAVY DEPARTMENT
General Specifications for Inspection of Material.

PUBLICATIONS

BUREAU OF SUPPLIES AND ACCOUNTS
Navy Shipment Marking Handbook.

(Copies of specifications,  standards and drawings  required by contractors in connection with
specific procurement functions should be obtained from the procuring agency or as directed by the
contracting officer.)

3.  REQUIREMENTS

3.1  Qualification. -  Plastic packing furnished under this specification shall be a product which has
been tested and has passed the qualification tests specified in section 4 (see 6.2).

3.2  Composition and construction. -  The composition and construction shall conform to that of the
sample submitted for qualification (see 4.4.1.2).

3.3  Size. -  Packing shall be furnished in the sizes specified (see 6.1).

3.4  Binder. -  The different components of type A, and of the core of types B, C and D, shall be
thoroughly mixed with a binder suitable for the temperature conditions for which the packing is required;
and shall be so held together by the binder as to prevent separation of the various parts.

3.5  Asbestos fiber. -  The asbestos fiber shall contain not less than 12 percent, by weight, of
chemically combined water (see 4.5.2).

3.6  Graphite. -  Graphite, when used for lubrication, shall contain not less than 90 percent, by
weight, of graphitic carbon (see 4.5.3).

3.7  Flexibility. -  The packing shall be sufficiently flexible to be readily formed into coils to fit a
rod of the diameter shown in table I (see 4.5.4).

Table I - Size of coils.

| Size of packing | Rod diameter |
|---|---|
| Inches | Inches |
| 1/8 to 7/16 inclusive | 1 |
| 1/2 and 5/8 | 2 |
| 11/16 to 13/16 inclusive | 4 |
| 7/8 and 1 | 8 |
| 1-1/8 | 9 |
| 1-1/4 | 10 |

2

UNCLASSIFIED
Authority NND974382

MIL-P-15385(SHIPS)

3.8 Simulated performance. - The packings under initial conditions and during the progress of the simulated service tests specified in 4.5.5 shall respond readily to gland adjustment for the control of leakages from the stuffing box. The packing shall be in satisfactory condition upon completion of the test.

3.9 Class I, plastic metallic, lead base. - The metal used for lead base packings shall not melt or disintegrate at or below a temperature of 550° F. (see 4.5.6).

3.9.1 Type A, symbol 1431. - The packings shall be furnished in bulk form.

3.9.2 Type B, symbol 1433. - The packings shall be furnished in continuous strips of approximately uniform cross section, partially compressed to prevent disintegration during application. It may be enclosed in a latticed cotton thread or knit cotton covering or may be furnished without a covering.

3.9.3 Type C, symbol 1434. - The packings shall be furnished in continuous strips of uniform cross section, completely enclosed in a metal covering consisting of not less than two ribbons on sizes up to 3/8 inch and three ribbons on larger sizes. The metal ribbon shall be 0.0025 $\pm$ 0.0002 inch thick.

3.9.4 Type D, symbol 1432. - The packings shall be furnished in continuous strips of uniform cross section, extruded into a braided wire jacket. The jacket shall be of copper wire not more than 0.008 inch in diameter.

3.10 Class II, plastic nonmetallic. -

3.10.1 Type B, symbol 1106. - The packings shall be furnished in continuous strips of approximately uniform cross section, partially compressed to prevent disintegration during application, and enclosed in a latticed cotton thread or knit cotton covering.

3.10.2 Type C, symbol 1108. - The packings shall be furnished in continuous strips of uniform cross section, completely enclosed in a braided jacket composed of asbestos and nickel-copper wire.

3.10.2.1 Corrosion resistance. - Symbol 1108 packing shall not corrode 13 percent chrome steel valve stem when tested as specified in 4.5.7.

3.11 Class III, plastic metallic, copper base. - The metal for class III packings shall not melt nor disintegrate at or below a temperature of 1200° F. (see 4.5.6).

3.11.1 Type B, symbol 1439. - The packings shall be furnished in continuous strips of approximately uniform cross section, partially compressed to prevent disintegration during application, and enclosed in a latticed cotton thread or knit cotton covering.

3.12 Workmanship. - The workmanship shall be first class in every respect.

4. SAMPLING, INSPECTION, AND TEST PROCEDURES

4.1 Inspection procedures. - For Naval purchases, the general inspection procedures shall be in accordance with General Specifications for Inspection of Material.

4.2 Qualification tests at a Government laboratory. - Qualification tests shall be conducted at a Government laboratory designated by the Bureau of Ships. These tests shall consist of the tests specified in 4.5.

4.3 Sampling. -

4.3.1 Lot. - For purposes of sampling, a lot shall consist of all finished packing of one class and type produced in one plant under essentially the same conditions and offered for delivery at one time.

3

MIL-P-15385(SHIPS)

4.3.2 <u>Sampling procedure for lot acceptance inspection.</u> - For the inspection specified in 4.4.1.1, the Government inspector shall select representative lengths of packing from each lot in accordance with table II. When the order calls for more than one size, samples shall be selected from the smallest and from the largest sizes.

Table II - Sampling procedure for lot acceptance inspection.

| Number of lengths of packing in the lot | Number of sample lengths to be selected |
|---|---|
| 8 or under | 2 |
| 9 to 15 | 3 |
| 16 to 25 | 5 |
| 26 to 40 | 7 |
| Over 40 | 10 |

4.3.3 <u>Sampling procedure for lot acceptance tests.</u> - For the test specified in 4.4.1.2 the Government inspector shall take a 36 inch sample from each sample length of finished packing selected in accordance with table II. When the order calls for more than one size, samples shall be selected from the smallest and from the largest sizes.

4.3.4 <u>Sampling procedure for production check tests.</u> - From the first lot of packing of each class and type offered for delivery under a contract or order, the Government inspector shall select from each of two lengths of packing a 36 inch sample for the purpose of the production check tests specified in 4.4.2. Thenceforth, two such sample pieces of packing shall be selected from one of every 10 lots which have passed inspection and test at the place of manufacture.

4.4. <u>Inspection and tests.</u> -

4.4.1 <u>Lot acceptance inspection and tests (at place of manufacture).</u> -

4.4.1.1 <u>Inspection.</u> - Each of the samples selected in accordance with 4.3.2 shall be subjected by the Government inspector to surface inspection for workmanship and dimensions. Minor surface defects not affecting the serviceability of the packing shall not be cause for rejection.

4.4.1.2 <u>Tests.</u> - The samples selected in accordance with 4.3.3 shall be subjected to those tests which will establish the identity of the inspection sample with that given qualification and to the tests specified in 4.5.4 and 4.5.6.

4.4.1.3 <u>Action in case of failure.</u> - If any one of the samples tested is found to be not in conformance with the specification, the lot which it represents shall be rejected. A rejected lot may be resubmitted for Government inspection only after the manufacturer, after being informed of the reasons for rejectance, has so reworked the entire lot as to remove or correct all nonconforming material.

4.4.2 <u>Production check tests (at a Government laboratory).</u> - The samples selected in accordance with 4.3.4 shall be subjected to the tests specified in 4.5.2, 4.5.3, 4.5.4 and 4.5.6. If found not to conform as to construction with that given qualification, the sample need not be subjected to other tests before reporting the lot as unsatisfactory.

4.4.2.1 <u>Place of tests.</u> - Unless otherwise specified, production check tests shall be conducted at the Naval Engineering Experiment Station, Annapolis, Md.

4

MIL-P-15385(SHIPS)

4.4.2.2 Action in case of failure. - Acceptance of the first lot offered for delivery under a contract or order shall be withheld until a satisfactory report is received on the production check test sample. Thenceforth, except as hereinafter specified, acceptance and rejection of lots shall normally be on the basis of the sampling and inspection specified in 4.3.2, 4.3.3 and 4.4.1 and acceptance shall not be withheld pending receipt of test reports on production check test samples. However, upon receipt of an unsatisfactory test report on a production check test sample, the Government inspector shall select additional samples from every subsequent lot offered for delivery. The samples so selected shall be submitted to Naval Engineering Experiment Station, Annapolis, Md., and shall there be subjected to test or tests wherein failure was observed. Lots shall then be accepted only upon receipt of a satisfactory test report on the samples so selected. Additional testing shall be discontinued and lot acceptance returned to the normal basis when three successive lots have been accepted.

4.5 Test procedures. -

4.5.1 Chemical analysis. - Chemical analysis shall be made using standardized procedures.

4.5.2 Chemically combined water. - Place a known weight of approximately 1 gm. of the dried material in a platinum crucible and ignite in an electric furnace at 800° to 810°C. for 1 hour. The ignited weight of the asbestos, divided by the original weight of the sample and multiplied by 100, will give the percentage of ignited asbestos in the packing. The percentage of ignited asbestos plus the percentage of cotton, subtracted from 100, will give the percentage of chemically combined water in the asbestos fiber.

4.5.3 Graphite carbon, by combustion method - preliminary treatment. - Place a sample weighing from 0.200 to 0.300 gm. in a small Erlenmeyer flask, add about 25 m$\ell$ of ether, cork loosely, and allow to stand for about 1/2 hour, shaking at intervals. The mixture shall be filtered onto asbestos in a Gooch crucible, which asbestos previously has been washed with hydrochloric acid and ignited. The residue on the filter shall be washed with alcohol and next with distilled water. The residue then shall be washed with hot (1:1) hydrochloric acid to remove any carbonates that might be present and then with hot distilled water until free of chlorides. The filter and the residue then shall be transferred to a porcelain or platinum boat and dried on the hot plate. The boat containing the residue shall be transferred to the tube of a combustion furnace and burned at 800° to 850°C. in a stream of oxygen gas, and the $CO_2$ which forms collected in a potash bulb with a 30 percent KOH solution. The combustion tube shall contain some fused lead chromate to retain any sulphur that may be present.

4.5.4 Flexibility. - Packing shall be coiled by hand around a rod of a diameter as shown in table I (see 3.7). Only sufficient packing to make one complete turn around the rod shall be used.

4.5.5 Simulated performance. - Performance tests shall be made under simulated operating conditions in a machine designed for the purpose.

4.5.5.1 Type C, symbol 1108, and type B, symbol 1439. - The packings shall be tested for the following service:

Valve stem service at 600 pounds per square inch and 750°F. Test shall be concluded after 3500 hours of operation.

4.5.5.2 Type D, symbol 1432. - The packing shall be tested for the following service:

Reciprocating rod service with steam at 300 pounds per square inch and 720°F., and a rod speed of 170 feet per minute. The test shall be concluded after 1500 hours operation.

5

UNCLASSIFIED
Authority NND 924382

MIL-P-15385(SHIPS)

4.5.5.3  Type A, symbol 1431, type B, symbol 1106 and type B, symbol 1433. - The packings shall be tested for the following services:

Reciprocating rod service with saturated steam at 300 pounds per square inch and a rod speed of 100 feet per minute.  Test shall be included after 3000 hours of operation.
Rotary rod service with feed water at 100 pounds per square inch gage and 250°F., and a rod speed of 4,000 feet per minute.  The test shall be concluded after 3000 hours of operation.

4.5.5.4  Type C, symbol 1434. - The packing shall be tested for the following services:

Rotary rod service with feed water at 100 pounds per square inch gage and 250°F., and a rod speed of 4,000 feet per minute.  Test shall be concluded after 3000 hours of operation.

4.5.5.5  Rotary rod service. - During the rotary rod service tests specified in 4.5.5.3 and 4.5.5.4 in order to simulate conditions occasionally encountered in the service, twice daily the packing shall be subjected to cycles of sudden changes in pressure from 100 p.s.i. to 10 p.s.i. The lower pressure shall be maintained for approximately 30 seconds and then suddenly raised to 100 p.s.i.

4.5.6  Heat resistance. - Specimens cut from each sample of packing shall be subjected for 2 hours to the temperature specified in 3.9 and 3.11.

4.5.7  Corrosion resistance, symbol 1108 packing. - The packing shall be installed in the stuffing box of 1-inch size, 600 p.s.i. valve, equipped with a 13 percent chrome steel valve stem.  The packing gland shall be adjusted to allow slight leakage under 300 p.s.i. boiler feed water.  The condition shall be maintained for 24 hours to insure the wetting of the packing.  The valve shall then be drained and stored at ambient temperature.  The valve stem shall be inspected after 6 and 12 months of storage.

5.  PREPARATION FOR DELIVERY

5.1  Packaging. - Commercial packages are acceptable under this specification.

5.2  Packing. -

5.2.1  For domestic shipment. - The subject commodity packaged as specified in 5.1, shall be packed in substantial commercial containers of the type, size, and kind commonly used for the purpose, so constructed as to insure acceptance and safe delivery by common or other carriers, at the lowest rate, to the point of delivery.  When wood-cleated-fiberboard boxes, wood-cleated-plywood boxes, nailed wood boxes, wire-bound wood boxes, corrugated fiber boxes, or solid fiber boxes are used, they shall conform to Specifications NN-B-591, NN-B-601, NN-B-621, NN-B-631, LLL-B-631 and LLL-B-636, respectively.  The gross weight of wood boxes shall not exceed approximately 200 pounds; of fiberboard boxes, approximately 70 pounds.

5.2.2  For overseas shipment. - The subject commodity packaged as specified in 5.1, shall be packed in cleated-plywood boxes, nailed wood boxes, wire-bound boxes, fiberboard boxes, or fiberlined wood boxes conforming to Specifications JAN-P-105, JAN-P-106, JAN-B-107, JAN-P-108, and JAN-P-138, respectively.  Shipping containers shall be lined with a sealed waterproof bag made from material conforming to Specification JAN-P-125.  The seams and closures shall be sealed with water-resistant adhesive conforming to Specification JAN-P-140.  The gross weight of wood boxes shall not exceed approximately 200 pounds; of fiberboard boxes, approximately 70 pounds.

5.3  Marking. - In addition to any special marking required by the contract or order, marking of interior packages and shipping containers shall be in accordance with the Navy Shipment Marking Handbook.

DECLASSIFIED
Authority NND 974382

MIL-P-15385(SHIPS)

6. NOTES

6.1 Ordering data. - Procurement documents should specify the following:

(a) Title, number, and date of this specification.
(b) Class, type and size required (see 1.2 and 3.3).
(c) Whether domestic or overseas shipment is required (see 5.2.1 and 5.2.2).

6.2 In the procurement of products requiring qualification the right is reserved to reject bids on products that have not been subjected to the required tests and found satisfactory for inclusion on the Military Qualified Products List.  The attention of suppliers is called to this requirement, and manufacturers are urged to communicate with the Bureau of Ships, Navy Department, Washington 25, D.C., and arrange to have the products that they propose to offer to the Army, the Navy or the Air Force, tested for qualification in order that they may be eligible to be awarded contracts or orders for the products covered by this specification.  Information pertaining to qualification of products covered by this specification may be obtained from the Chief of the Bureau of Ships, Navy Department, Washington 25, D.C.

Notice. - When Government drawings, specifications, or other data are used for any purpose other than in connection with a definitely related Government procurement operation, the United States Government thereby incurs no responsibility nor any obligation whatsoever; and the fact that the Government may have formulated, furnished, or in any way supplied the said drawings, specifications, or other data is not to be regarded by implication or otherwise as in any manner licensing the holder or any other person or corporation, or conveying any rights or permission to manufacture, use, or sell any patented invention that may in any way be related thereto.

Interest:
  Bureaus - ShOrSY

7

# EXHIBIT L

REPRODUCED AT THE NATIONAL ARCHIVES

N20.6².
33P25c
**33P25c**

JAN. 2,
1943
———
SUPERSEDING
33P25b
Oct. 1, 1941

NAVY DEPARTMENT SPECIFICATION

# PACKING, METALLIC AND NONMETALLIC, PLASTIC

## A. APPLICABLE SPECIFICATIONS.

A–1. Navy Department General Specifications for Inspection of Material, of the issue in effect on date of invitation for bids, forms a part of this specification, and bidders and contractors should provide themselves with the necessary copies.

## B. CLASSES AND TYPES.

B–1. Metallic and nonmetallic plastic packing covered by this specification shall be supplied in the following classes and types, as specified in the contract or order (see par. H–2):

Class I—Plastic metallic, lead base:

Type A—Bulk form, symbol 1431.
Type B—Coil form, cotton jacket, symbol 1433.
Type C—Coil form, metal foil jacket, symbol 1434.
Type D—Coil form, braided metal jacket, symbol 1432.

Class II—Plastic nonmetallic:

Type B—Coil form, cotton jacket, symbol 1106.
Type C—Coil form, asbestos and wire jacket, symbol 1108.
Type D—Coil form, metal braided jacket, symbol 1107.

Class III—Plastic metallic, copper base:

Type B—Coil form, cotton jacket, symbol 1439.

## C. MATERIAL AND WORKMANSHIP.

C–1. See sections D and E.

## D. GENERAL REQUIREMENTS.

D–1. *Construction.*—The different components of the core of plastic packing shall be thoroughly mixed and so held together by the binder as to prevent separation of the various parts.

D–2. *Asbestos fiber.*—The asbestos fiber shall contain not less than 12 percent, by weight, of water of hydration.

D–3. *Graphite.*—Graphite, when used for lubrication, shall contain not less than 90 percent, by weight, of graphitic carbon.

D–4. *Binder.*—The binder shall be a material suitable for the temperature conditions for which the packing is required.

D–5. *Coils.*—The packing shall be sufficiently flexible to be readily formed into coils to fit a rod of the diameter shown in Table I.

497428—42

REPRODUCED AT THE NATIONAL ARCHIVES

TABLE I.—Size of coils

| Size of packing | Rod diameter | Size of packing | Rod diameter |
|---|---|---|---|
| *Inches* | *Inches* | *Inches* | *Inches* |
| Up to ½, inclusive | | 1 | 8 |
| ⅝ | 4 | 1¼ | 9 |
| ¾ | 5 | 1½ | 10 |
| ⅞ | 6 | | |

**E. DETAIL REQUIREMENTS.**

E-1. *Composition.*—The composition shall conform to that of the sample submitted for type or brand approval test (see par. E-3a.).

E-2. *Acceptable work values.*—To be acceptable a brand of packing shall obtain a work value not less than that specified below:

| Symbol: | Work value |
|---|---|
| 1431 | 1,000 |
| 1433 | 900 |
| 1434 | 500 |
| 1432 | 250 |
| 1106 | 2,000 |
| 1107 | 500 |

E-3. *Class I.*—

E-3a. *Metal.*—The metal shall not melt nor disintegrate at a temperature below 550° F. It shall be of one or more of the following forms: Finely ground, small pellets, small strands, or small shreds.

E-3b. *Type A.*—This type shall be furnished in bulk form.

E-3c. *Type B.*—This type shall be furnished in continuous strips of approximately uniform cross section, partially compressed to prevent disintegration during application, and enclosed in a latticed cotton thread or knit cotton covering.

E-3d. *Type C.*—This type shall be furnished in continuous strips of uniform cross section, completely enclosed in a metal covering consisting of not less than two wraps on sizes up to ⅜ inch and three wraps on larger sizes. The metal ribbon shall be 0.0042 inch thick.

E-3e. *Type D.*—This type shall be furnished in continuous strips of uniform cross section, extruded into a braided wire jacket. The jacket shall be of copper wire not more than 0.008 inch in diameter.

E-4. *Class II.*—

E-4a. *Type A.*—This type shall be furnished in continuous strips of approximately uniform cross section, partially compressed to prevent disintegration during application, and enclosed in a latticed cotton thread or knit cotton covering.

E-4b. *Type C.*—This type shall be furnished in continuous strips of uniform cross section, completely enclosed in a braided jacket composed of asbestos and nickel-copper wire.

E-4c. *Type D.*—This type shall be furnished in continuous strips of uniform cross section, extruded into a braided wire jacket. The jacket shall be of copper wire not more than 0.008 inch in diameter.

[33F23c]

E-5. *Class III.*—

E-5a. *Metal.*—The metal shall not melt nor disintegrate at a temperature below 1200° F. It shall be of one or more of the following forms: Finely ground, small pellets, small strands, or small shreds, or in continuous strips, of

E-5b. This packing shall be furnished in continuous strips, of approximately uniform cross section, partially compressed to prevent disintegration during application, and enclosed in a latticed cotton thread or knit cotton covering.

**F. METHODS OF SAMPLING, INSPECTION, AND TESTS.**

F-1. *Sampling.*—Samples of sufficient length to make the coil test shall be selected from each lot offered for delivery. When the order calls for more than one size, one sample shall be selected from the smallest and one from the largest size.

F-2. *Inspection tests.*—The following tests shall be conducted by the Naval inspector at place of manufacture:

F-2a. *Coil test.*—The coil test shall be made by hand. Packing shall be coiled around a rod of a diameter as shown in table I (see par. D-5). Only sufficient packing to make two complete turns around the rod, and 4 inches at each end for handgrips, shall be used.

F-2b. *Heat test.*—A small specimen shall be cut from each sample and subjected for 2 hours to the temperature specified in paragraph E-3a.

F-3. *Tests.*—

F-3a. *Type or brand approval tests.*—Tests for approval of type or brand shall be made under simulated operating conditions in a machine designed for the purpose. The test conditions specified below shall apply.

F-3a. (1). Symbol 1106 shall be tested on reciprocating service with saturated steam at 300 pounds per square inch and a rod speed of 100 feet per minute; rotary service with feed water at 100 pounds per square inch and a rod speed of 4,000 feet per minute; and on valve stem service with steam at 600 pounds per square inch and 750° F.

F-3a. (2). Symbol 1107 shall be tested on reciprocating rod service with steam at 300 pounds per square inch and 750° F, and a rod speed of 170 feet per minute; and on valve stem service with steam at 600 pounds per square inch and 750° F.

F-3a. (3). Symbols 1108 and 1439 shall be tested on valve stem service at 600 pounds per square inch and 750° F.

F-3a. (4). Symbol 1432 shall be tested on reciprocating rod service with steam at 300 pounds per square inch and 720° F, and a rod speed of 170 feet per minute; and on valve stem service with steam at 600 pounds per square inch and 720° F.

F-3a. (5). Symbols 1431 and 1433 shall be tested on reciprocating rod service with saturated steam at 300 pounds per square inch and a rod speed of 170 feet per minute; on rotary service with feed water at 100 pounds per square inch gage and 200° F, and a rod speed of 4,000 feet per minute; and on valve stem service with saturated steam at 600 pounds per square inch.

F-3a. (6). Symbol 1434 shall be tested on rotary rod service with feed water at 100 pounds per square inch gage and 200° F, and a rod speed

[33F26d]

of 4,000 feet per minute; and on valve stem service with saturated steam at 600 pounds per square inch.

F–3b. *Work value.*—Upon completion of the tests for approval of type or brand, a work value shall be calculated for the test of each service except valve stem, in the manner specified below, for all symbols except 1108 and 1439:

$$\text{Work value} = \frac{1}{(a/b)}, \text{ in which}$$

$a$ = the total quantity of packing required for two packing boxes during the endurance test.

$b$ = the total number of hours of service during the endurance test.

NOTE.—When two or more services are involved, the work value shall be the average of all the work values.

F–3c. *Water of hydration.*—Place a known weight of approximately 1 gm. of the dried material in a platinum crucible and ignite in an electric furnace at cherry-red heat or over a blast lamp to constant weight. The ignited weight of the asbestos, divided by the original weight of the sample and multiplied by 100, will give the percentage of ignited asbestos in the packing. The percentage of ignited asbestos plus the percentage of carbonates subtracted from 100, will give the percentage of water of hydration in the asbestos.

F–3d. *Graphite carbon, by combustion method—preliminary treatment.*—Place a sample weighing from 0.200 to 0.300 gm. in a small Erlenmeyer flask, add about 25 ml. of ether, cork loosely, and allow to stand for ½ hour, shaking at intervals. The mixture shall be filtered onto asbestos in a Gooch crucible, which asbestos previously has been washed with hydrochloric acid and ignited. The residue on the filter shall be washed with alcohol and next with distilled water. The residue then shall be washed with hot (1:1) hydrochloric acid to remove any carbonates that might be present and then with hot distilled water until free of chlorides. The filter and the residue then shall be transferred to a porcelain or platinum boat and dried on the hot plate. The boat containing the residue shall be transferred to the tube of a combustion furnace and burned in a stream of oxygen gas, and the $CO_2$ which forms collected in a potash bulb with a 30 percent KOH solution. The combustion tube shall contain some fused lead chromate to retain any sulphur that may be present.

## G. PACKAGING, PACKING, AND MARKING FOR SHIPMENT.

G–1. *Packaging.*—Unless otherwise specified, commercial packages are acceptable under this specification.

G–2. *Packing.*—Unless otherwise specified, the subject commodity shall be packed in substantial wooden boxes, so constructed as to insure safe delivery by common or other carrier to the point of delivery at the lowest transportation rate. The net weight of a single container shall not be in excess of approximately 300 pounds.

[33P25c]

G–3. *Marking.*—

G–3a. *Packages.*—Unless otherwise specified, packages shall be marked with the name of the material, the class, type, size, symbol number, and quantity contained therein, as defined by the contract or order under which shipment is made, and the name of the manufacturer.

G–3b. *Shipping containers.*—Unless otherwise specified, shipping containers shall be marked with the name of the material, the class, type, size, symbol number, and quantity contained therein, as defined by the contract or order under which shipment is made, the name of the contractor, the number of the contract or order, and the gross weight.

## H. NOTES.

H–1. Requests, requisitions, schedules, and contracts or orders must contain the title of the specification, the number, and date.

H–2. Requests, requisitions, schedules, and contracts or orders should specify the class, type, size, and symbol number of packing desired.

H–3. When specified in requisitions and schedules, award of contract for the subject commodity will be made to the bidder whose packing shows the lowest cost per hour of service, evaluated by the following formula:

$$\text{Service cost per hour} = \frac{\text{Total cost to the Government}}{\text{Work value}}$$

H–4. The right is reserved to reject any bids on makes of plastic metallic and nonmetallic packing which have not been subjected to the required tests and found satisfactory. The attention of the manufacturers is called to this requirement, and they are urged to forward samples of the plastic metallic and nonmetallic packing which they propose to offer to the Navy in the future in order that tests may be made. Information with reference to the expense involved and as to where the samples should be sent will be supplied upon application to the Bureau of Supplies and Accounts. It is to be understood that the manufacturers shall pay all transportation charges to and from the point where tests are made. In the case of failure of the sample or samples submitted to prove satisfactory, consideration will be given to the requests of the manufacturers for additional tests only after it has been clearly shown that changes have been made in the product with reference to design, method of manufacture, etc., which the bureau considers sufficient to warrant conducting additional tests.

H–5. Copies of Navy Department specifications may be obtained upon application to the Bureau of Supplies and Accounts, Navy Department, Washington, D. C., except that Naval activities should make application to the Commandant, Navy Yard, New York, N. Y. When requesting, refer to specification by both title and number.

SnOSY,

[33P25c]

# EXHIBIT M

# SUPERSEDED



QPL-17303-25
19 March 1969
SUPERSEDING
QPL-17303-24
15 February 1966

FSC 5330

## QUALIFIED PRODUCTS LIST
### OF
## PRODUCTS QUALIFIED UNDER MILITARY SPECIFICATION
#### MIL-P-17303

##### PACKING MATERIALS, PLASTIC METALLIC AND PLASTIC NONMETALLIC

This list has been prepared for use by or for the Government in the procurement of products covered by the subject specification and such listing of a product is not intended to and does not connote indorsement of the product by the Department of Defense. All products listed herein have been qualified under the requirements for the product as specified in the latest effective issue of the applicable specification. This list is subject to change without notice; revision or accordance of this list will be issued as necessary. The listing of a product does not release the supplier from compliance with the specification requirements. Use of the information shown hereon for advertising or publicity purposes is expressly forbidden.

The activity responsible for this Qualified Products List is Naval Ship Engineering Center

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| **Class 1** | | | |
| Type A | Allpax | EES 3226 5/18/28 and 1/15/30 | The Allpax Co., Inc. 160 Jefferson Ave. Mamaroneck, N. Y. Plant: Same address |
| Type B | Allpax No. 1 | EES 9834-B 2/5/41 | The Allpax Co., Inc. 160 Jefferson Ave. Mamaroneck, N. Y. Plant: Same address |
| Type B | Anchor Style 808C, Type 5 | EES 1BDT458 | The Anchor Packing Co. 401 N. Broad St. Philadelphia 8, Pa. (Distributor) Raybestos-Manhattan, Inc. Plant: Manheim, Pa. (Manufacturer) |
| Type B | John Crane Superseal No. 1 | EES 5001-F 5/17/38 and EES B-942 8/10/38 | Crane Packing Co. 6400 Oakton St. Morton Grove, Ill. Plant: Same address |
| Type B | Dura Plastic B-77 | EES 1ADT436 6/9/52 | Durametallic Corp. 2104 Factory Street Kalamazoo 24F, Michigan Plant: Same address |
| Type B | Garlock Style 909 | EES 010073 | Garlock, Inc. Palmyra, N. Y. Plant: Same address |
| Type B | Palmetto #1500 | EES C-1849 3/8/47 | Greene, Tweed and Company North Wales, Pa. Plant: Same address |
| Type B | J.M. C-610 | EES 610365B | Johns-Manville Sales Corp. 22 E. 40th Street New York 16, N. Y. Plants: Manville, N.J. Waukegan, Illinois |
| Type B | R/M 1840-B | EES 1BDT458 9/24/52 | Raybestos-Manhattan Inc., Packing Division Manheim, Pa. Plant: Same address |
| Type B | Sea Ro-Nek Seal, Style 501 Sea Ro No. 301 | EES B-7-E 6/5/41 EES C-522 & BUSHIPS ltr. JJ33(1) (336) 3/1/44 | Sea-Ro Packing Co., Inc. 133 Wood-Ridge Street Wood-Ridge, New Jersey 07075 Plant: Same address |

1 of 3

QPL-17303



| Government Designation | Manufacturer's Designation | Test or Qualification Reference | Manufacturer's Name and Address |
|---|---|---|---|
| **Class I** | | | |
| Type C | Style 858 | EES 1KA140001 10/2/52 | The Anchor Packing Co. 401 North Broad Street Philadelphia 8, Pa. (Distributor) Raybestos-Manhattan, Inc. Plant: Manheim, Pa. (Manufacturer) |
| Type C | John Crane, Style 150 | EES 3907 10/31/31 | Crane Packing Co. 6400 Oakton St. Morton Grove, Ill. Plant: Same address |
| Type C | Garlock Style 8890 | EES 010074 | Garlock, Inc. Palmyra, N. Y. Plant: Same address |
| Type C | R/M 905-A | EES 1KA140001 10/2/52 | Raybestos-Manhattan Inc., Packing Division Manheim, Pa. Plant: Same address |
| Type C | Sea Ro Style 2501 | EES C-803 3/5/47 | Sea-Ro Packing Co., Inc. 133 Wood-Ridge Street Wood-Ridge, New Jersey 07075 Plant: Same address |
| Type D | John Crane, Style 250 | EES C-522 4/19/45 | Crane Packing Co. 6400 Oakton St. Morton Grove, Ill. Plant: Same address |
| Type E | J.M. Style #610 | EES 1P(4)066749 10/23/52 | Johns-Manville Sales Corp. 22 East 40th Street New York 16, N. Y. Plants: Manville, N. J. Waukegan, Illinois |
| Type F | John Crane Super Seal #1 | EES 5001-F 5/17/38 & EES-B-942 and dtd. 8/25/65 | Crane Packing Company 6400 Oakton Street Morton Grove, Illinois Plant: Same address |
| **Class II** | | | |
| Type C | Ankorite Style 804 | EES 610033A | Anchor Packing Co. 401 North Broad St. Philadelphia, Pa. (Distributor) Raybestos-Manhattan, Inc. Plant: Manheim, Pa. (Manufacturer) |
| Type C | John Crane Style No. 6 AM CR | EES 010033A | Crane Packing Company 6400 Oakton St. Morton Grove, Ill. Plant: Same address |
| Type C | Garlock Style 5855 | EES 010073 | Garlock, Incorporated Palmyra, N. Y. Plant: Same address |
| Type C 1/4 inch and over | MX-4686 | EES 610579 | Johns-Manville Sales Corp. 22 E. 40th Street New York 16, N. Y. Plants: Manville, N. J. Waukegan, Illinois |
| Type C | R/M Style LS8842 | EES 610033A | Raybestos-Manhattan Inc. Packing Division Manheim, Pa. Plant: Same address |

00618



QPL-17303

| Government Designation | Manufacturer's Designation | Test or Qualification Reference | Manufacturer's Name and Address |
|---|---|---|---|
| **Class II**<br>Type C | Sea-Ro Style 303 | EES 1A066749 9/29/50 | Sea-Ro Packing Co., Inc.<br>133 Wood-Ridge Street<br>Wood-Ridge, New Jersey 07075<br>Plant: Same address |
| Type D | Style 820-NJ | EES 1F(4) 066749<br>10/23/52 | The Anchor Packing Co.<br>401 North Broad Street<br>Philadelphia 8, Pa.<br>(Distributor)<br>Raybestos-Manhattan, Inc.<br>Plant: Manheim, Pa.<br>(Manufacturer) |
| Type D | "Style #1845" | EES 1P(4)066749 10/23/52 | Raybestos-Manhattan Inc.<br>Packing Division<br>Manheim, Pa.<br>Plant: Same address |
| **Class II**<br>Type E | Style No. 809 | EES 010033 | The Anchor Packing Co.<br>401 North Broad Street<br>Philadelphia 8, Pa.<br>(Distributor)<br>Raybestos-Manhattan, Inc.<br>Plant: Manheim, Pa.<br>(Manufacturer) |
| Type E | John Crane Style 1871 | EES 010033 | Crane Packing Co.<br>6400 Oakton St.<br>Morton Grove, Ill.<br>Plant: Same address |
| Type E | Garlock Style 5901 | EES 010033D | Garlock, Inc.<br>Palmyra, N.Y.<br>Plant: Same address |
| Type E | J.M. Style #397 | EES 610579 | Johns-Manville Sales Corp.<br>22 E. 40th Street<br>New York 16, N. Y.<br>Plants: Manville, N. J.<br>Waukegan, Illinois |
| Type E | R/M 325 | EES 010033 | Raybestos-Manhattan, Inc.<br>Packing Division<br>Manheim, Pa. 17545<br>Plant: Same address |
| Type F | Anchor Style 858-CRB | EES 610423 | The Anchor Packing Co.<br>401 N. Broad Street<br>Philadelphia 8, Pa.<br>(Distributor)<br>Raybestos-Manhattan, Inc.<br>Plant: Manheim, Pa.<br>(Manufacturer) |
| **Class III**<br>Type B | Sea Ro Style 503 | EES B-7 5/5/47 | Sea-Ro Packing Co., Inc.<br>133 Wood-Ridge Street<br>Wood-Ridge, New Jersey 07075<br>Plant: Same address |

3 of 3

# EXHIBIT N





Civil Docket Report

A $5 Convenience fee will be added to the transaction at checkout.

## Case Description

| | |
|---|---|
| **Case ID:** | 230402099 |
| **Case Caption:** | PAPPAGALLO ETAL VS REDCO CORP., F/K/A CRANE COMPAN |
| **Filing Date:** | Friday , April 21st, 2023 |
| **Court:** | MASS TORT |
| **Location:** | CITY HALL |
| **Jury:** | JURY |
| **Case Type:** | MASS TORT - ASBESTOS |
| **Status:** | ASSIGNED TO LITIGATION GROUP |

## Related Cases

*No related cases were found.*

## Case Event Schedule

| Event | Date/Time | Room | Location | Judge |
|---|---|---|---|---|
| LITIGATION GROUP | JULY 2025 | CITY HALL | COURTROOM 602 | *unassigned* |

## Case motions

| Motion | Assign/Date | Control No | Date/Received | Judge |
|---|---|---|---|---|
| MOTION FOR SUMMARY JUDGMENT | *pending* | 25032126 | 11-MAR-2025 | MASS TORT-ASBESTOS JUDGE |

## Case Parties

| Seq # | | Assoc | Expn Date | Type | Name |
|---|---|---|---|---|---|

| 1 | | | ATTORNEY FOR PLAINTIFF | COBURN, CASEY R |
|---|---|---|---|---|
| **Address:** | TWO PENN CENTER<br>1500 JFK BLVD.<br>SUITE 404<br>PHILADELPHIA PA 19102<br>(215)546-8200<br>ccoburn@nasscancelliere.com | **Aliases:** | *none* | |

| 2 | 1 | | PLAINTIFF | PAPPAGALLO, IGNATIUS |
|---|---|---|---|---|
| **Address:** | 5 INDEPENDENCE WAY<br>HAZLET NJ 07730 | **Aliases:** | EXECUTOR OF THE ESTATE OF RALPH PAPPAGALLO AKA PAPPAGALLO, RAFFAELE | |

| 3 | 89 | | DEFENDANT | DAP INC KNA LA MIRADA PRODUCTS COMPANY |
|---|---|---|---|---|
| **Address:** | 2400 BOSTON STREET, SUITE 200<br>BALTIMORE MD 21224 | **Aliases:** | *none* | |

| 4 | 51 | | DEFENDANT | DREVER COMPANY |
|---|---|---|---|---|
| **Address:** | C/O CT CORPORATION SYSTEMS<br>600 N. 2ND STREET, SUITE 401<br>HARRISBURG PA 17101 | **Aliases:** | *none* | |

| 5 | 74 | | DEFENDANT | FLOWSERVE AS SII BYRON JACKSON PUMP COMPANY |
|---|---|---|---|---|
| **Address:** | 5215 N. O'CONNOR BOULEVARD<br>SUITE 2300<br>IRVING TX 75039 | **Aliases:** | *none* | |

| 6 | 76 | | DEFENDANT | FLOWSERVE AS SUCCESSOR TO DURCO PUMPS |
|---|---|---|---|---|

| Address: | 5215 N. O'CONNOR BOULEVARD SUITE 2300 IRVING TX 75039 | Aliases: | *none* | |
|---|---|---|---|---|
| | | | | |

| 7 | 76 | | DEFENDANT | FLOWSERVE AS SII DURIRON |
|---|---|---|---|---|
| Address: | 5215 N. O'CONNOR BOULEVARD SUITE 2300 IRVING TX 75039 | Aliases: | *none* | |
| | | | | |

| 8 | 82 | | DEFENDANT | FLOWSERVE US INC SOLELY AS SII EDWARD VOGT |
|---|---|---|---|---|
| Address: | 5215 N. O'CONNOR BOULEVARD SUITE 2300 IRVNG TX 75039 | Aliases: | VALVE COMPANY VOGT VALVE COMPANY VOGT VALVE COMPANY | |
| | | | | |

| 9 | 76 | | DEFENDANT | FLOWSERVE CORPORATION I/A/A/SII |
|---|---|---|---|---|
| Address: | CT CORP. 1999 BRYAN STREET, SUITE 900 DALLAS TX 75201 | Aliases: | IDP PUMPS FKA INGERSOLL DRESSER PUMPS | |
| | | | | |

| 10 | | | DEFENDANT | FLOWSERVE US INC SOLELY AS SII |
|---|---|---|---|---|
| Address: | 5215 N. O'CONNOR BOULEVARD SUITE 2300 IRVING TX 75039 | Aliases: | NORDSTROM VALVES INC | |
| | | | | |

| 11 | 72 | | DEFENDANT | FMC CORPORATION |
|---|---|---|---|---|
| Address: | CT CORPORATION SYSTEM 600 N. 2ND STREET, SUITE 401 HARRISBURG PA 17101 | Aliases: | *none* | |
| | | | | |

| 12 | 79 | | DEFENDANT | FOSECO INC |
|---|---|---|---|---|
| **Address:** | CT CORPORATION SYSTEM<br>600 N. 2ND STREET, SUITE 401<br>HARRISBURG PA 17101 | **Aliases:** | *none* | |

| 13 | 1 | | PLAINTIFF | PAGGAGALLO, ANNA |
|---|---|---|---|---|
| **Address:** | 5 INDEPENDENCE WAY<br>HAZLET NJ 07730 | **Aliases:** | *none* | |

| 14 | 68 | | DEFENDANT | FOSTER WHEELER LLC |
|---|---|---|---|---|
| **Address:** | UNITED AGENT GROUP, INC.<br>3411 SILVERSIDE ROAD<br>TATNALL BUILDING, #104<br>WILMINGTON DE 19810 | **Aliases:** | *none* | |

| 15 | 52 | | DEFENDANT | GENERAL ELECTRIC COMPANY |
|---|---|---|---|---|
| **Address:** | C/O C.T. CORPORATION SYSTEMS<br>600 N. 2ND STREET, SUITE 401<br>HARRISBURG PA 17101 | **Aliases:** | *none* | |

| 16 | 56 | | DEFENDANT | GENUINE PARTS COMPANY |
|---|---|---|---|---|
| **Address:** | C/O CT CORPORATION SYSTEMS<br>600 N. 2ND STREET, SUITE 401<br>HARRISBURG PA 17101 | **Aliases:** | *none* | |

| 17 | 71 | | DEFENDANT | ITT LLC AS SII GODWIN PUMPS OF AMERICA INC |
|---|---|---|---|---|
| **Address:** | C/O C.T. CORPORATION SYSTEMS<br>600 N. 2ND STREET, SUITE 401<br>HARRISBURG PA 17101 | **Aliases:** | *none* | |

| 18 | 71 | | DEFENDANT | GOULDS PUMPS INC NKA GOULDS PUMPS LLC |
|---|---|---|---|---|
| **Address:** | C/O C.T. CORPORATION SYSTEMS 600 N. 2ND STREET, SUITE 401 HARRISBURG PA 17101 | **Aliases:** | *none* | |

| 19 | 70 | | DEFENDANT | GREENE TWEED NC LLC |
|---|---|---|---|---|
| **Address:** | 201 S TYRON, SUITE 950 CHARLOTTE NC 28202 | **Aliases:** | *none* | |

| 20 | 71 | | DEFENDANT | GRINNELL LLC FKA GRINNELL CORPORATION |
|---|---|---|---|---|
| **Address:** | C/O C.T. CORPORATION SYSTEMS 600 N. 2ND STREET, SUITE 401 HARRISBURG PA 17101 | **Aliases:** | *none* | |

| 21 | 64 | | DEFENDANT | HAJOCA CORPORATION |
|---|---|---|---|---|
| **Address:** | CORPORATION SERVICE COMPANY 2595 INTERSTATE DRIVE, #103 HARRISBURG PA 17110 | **Aliases:** | *none* | |

| 22 | 91 | | DEFENDANT | HONEYWELL INTERNATIONAL INC AS SII |
|---|---|---|---|---|
| **Address:** | CORPORATION SERVICE COMPANY 2595 INTERSTATE DRIVE, #103 HARRISBURG PA 17110 | **Aliases:** | ALLIED SIGNAL INC AS SII BENDIX CORPORATION | |

| 23 | 53 | | DEFENDANT | IMO INDUSTRIES INC I/A/A/SII |
|---|---|---|---|---|

| Address: | C/O CORPORATION SYSTEMS<br>600 N. 2ND STREET, SUITE 401<br>HARRISBURG PA 17101 | Aliases: | DELAVAL STEAM TURBINE COMPANY |
|---|---|---|---|
| | | | |
| 24 | 67 | DEFENDANT | REDCO CORPORATION FKA CRANE COMPANY |
| Address: | THE CORPORATION TRUST COMPANY<br>CORPORATION TRUST CENTER<br>1209 ORANGE STREET<br>WILMINGTON DE 19801 | Aliases: | *none* |
| | | | |
| 25 | 71 | DEFENDANT | ITT CORPORATION |
| Address: | C/O CT CORPORATION SYSTEM<br>600 N. 2ND STREET, SUITE 401<br>HARRISBURG PA 17101 | Aliases: | *none* |
| | | | |
| 26 | 71 | DEFENDANT | ITT LLC FKA ITT CORPORATION AND BELL & GOSSETT COMPANY |
| Address: | C/O CT CORPORATION SYSTEMS<br>600 N. 2ND STREET, SUITE 401<br>HARRISBURG PA 17101 | Aliases: | *none* |
| | | | |
| 27 | 54 | DEFENDANT | J A SEXAUER MANUFACTURING COMPANY |
| Address: | C/O CSC<br>251 LITTLE FALLS DRIVE<br>WILMINGTON DE 19808 | Aliases: | *none* |
| | | | |
| 28 | 68 | DEFENDANT | JH FRANCE REFRACTORIES |
| Address: | C/O THE CORPORATION TRUST CO<br>CORPORATION TRUST CENTER | Aliases: | *none* |

| | 1209 ORANGE STREET<br>WILMINGTON DE 19801 | | | |
| --- | --- | --- | --- | --- |

| 29 | 83 | | DEFENDANT | JOHN CRANE INC FKA CRANE PACKING COMPANY |
| --- | --- | --- | --- | --- |
| **Address:** | CT CORPORATION<br>600 N. 2ND STREET, SUITE 401<br>HARRISBURG PA 17101 | **Aliases:** | *none* | |

| 30 | 79 | | DEFENDANT | KEELER/DORR-OLIVER BOILER COMPANY |
| --- | --- | --- | --- | --- |
| **Address:** | C/O JOHN G. GAUL, ESQUIRE<br>THREE LOGAN SQUARE<br>1717 ARCH STREET, SUITE 3710<br>PHILADELPHIA PA 19103 | **Aliases:** | *none* | |

| 31 | 92 | | DEFENDANT | GROVE US LLC AS SURVIVOR OF THE MERGER WITH MANITOWOC |
| --- | --- | --- | --- | --- |
| **Address:** | CORPORATION SERVICE COMPANY<br>2704 COMMERCE DRIVE, SUITE B<br>HARRISBURG PA 17110 | **Aliases:** | CRANES LLC | |

| 32 | 77 | | DEFENDANT | METROPOLITAN LIFE INSURANCE COMPANY |
| --- | --- | --- | --- | --- |
| **Address:** | 200 PARK AVENUE<br>NEW YORK NY 10166 | **Aliases:** | *none* | |

| 33 | | | DEFENDANT | MILWAUKEE VALVE COMPANY |
| --- | --- | --- | --- | --- |
| **Address:** | 16550 WEST STRATTON DRIVE<br>NEW BERLIN WI 53151 | **Aliases:** | *none* | |

| 34 | 73 | | DEFENDANT | JOY GLOBAL SURFACE MINING INC FKA |
|---|---|---|---|---|
| **Address:** | THE CORPORATION TRUST COMPANY CORPORATION TRUST CENTER 1209 ORANGE STREET WILMINGTON DE 19801 | **Aliases:** | P & H MINING EQUIPMENT INC | |

| 35 | 63 | | DEFENDANT | 3M COMPANY |
|---|---|---|---|---|
| **Address:** | 3M CORPORATE HEADQUARTERS 3M CENTER ST. PAUL MN 55144 | **Aliases:** | *none* | |

| 36 | | | DEFENDANT | P&H MINING EQUIPMENT INC FKA |
|---|---|---|---|---|
| **Address:** | THE CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON DE 19801 | **Aliases:** | HARNISCHFEGER CORPORATION | |

| 37 | 62 | | DEFENDANT | PARKER HANNIFIN CORPORATION |
|---|---|---|---|---|
| **Address:** | THE CORPORATION TRUST COMPANY 1209 ORANGE STREET WILMINGTON DE 19801 | **Aliases:** | *none* | |

| 38 | 74 | | DEFENDANT | STERLING FLUID SYSTEMS (USA) |
|---|---|---|---|---|
| **Address:** | 2005 DR. MARTIN LUTHER KING ST INDIANAPOLIS IN 46202 | **Aliases:** | *none* | |

| 39 | | | DEFENDANT | SUNOCO INC |
|---|---|---|---|---|
| **Address:** | 3801 WEST CHESTER PIKE NEWTOWN SQUARE PA 19073 | **Aliases:** | *none* | |

| 40 | 58 | | DEFENDANT | UNION CARBIDE CORPORATION |
|---|---|---|---|---|
| **Address:** | C/O C.T. CORPORATION SYSTEMS 600 N. 2ND STREET, SUITE 401 HARRISBURG PA 17101 | **Aliases:** | *none* | |

| 41 | 66 | | DEFENDANT | WARREN PUMPS LLC |
|---|---|---|---|---|
| **Address:** | CT CORPORATION 1209 ORANGE STREET WILMINGTON DE 19801 | **Aliases:** | *none* | |

| 42 | 91 | | DEFENDANT | MARLEY-WYLAIN COMPANY FKA WEIL MCLAIN COMPANY |
|---|---|---|---|---|
| **Address:** | 500 BLAINE STREET MICHIGAN CITY IN 46360 | **Aliases:** | *none* | |

| 43 | 52 | | DEFENDANT | VIACOMCBS INC FKA CBS CORPORATION |
|---|---|---|---|---|
| **Address:** | 20 STANWIX STREET PITTSBURGH PA 15222 | **Aliases:** | A DELAWARE CORPORATION F/K/A VIACOM INC CBS CORPORATION A SBM PA CORPORATION FKA WESTINGHOUSE ELECTRIC CORPORATION | |

| 44 | 62 | | DEFENDANT | ZURN INDUSTRIES INC |
|---|---|---|---|---|
| **Address:** | 1801 PITTSBURGH AVENUE ERIE PA 16502 | **Aliases:** | *none* | |

| 45 | 86 | | DEFENDANT | AMDURA LLC FKA AMDURA CORPORATION INDIVIDUALLY AND AS |
|---|---|---|---|---|

| Address: | C/O C.T. CORPORATION<br>1209 ORANGE STREET<br>WILMINGTON DE 19801 | Aliases: | AMERICAN HOIST & DERRICK COMPANY SII |
|---|---|---|---|

| 46 | 65 | | DEFENDANT | ANCHOR DARLING VALVE COMPANY |
|---|---|---|---|---|
| Address: | C/O TROY CHUTE<br>34407 DUPONT BLVD., SUITE 6<br>FRANKFORD DE 19945 | Aliases: | *none* | |

| 47 | 88 | | DEFENDANT | AIR AND LIQUID SYSTEMS<br>CORPORATION AS SBM |
|---|---|---|---|---|
| Address: | C/O CORPORATION SERVICE CO.<br>2595 INTERSTATE DRIVE, #103<br>HARRISBURG PA 17110 | Aliases: | BUFFALO PUMPS INC | |

| 48 | 71 | | DEFENDANT | CARRIER CORPORATION |
|---|---|---|---|---|
| Address: | CORPORATE CREATIONS NETWORK<br>1001 STATE STREET, #1400<br>ERIE PA 16501 | Aliases: | *none* | |

| 49 | 71 | | DEFENDANT | CLEAVER BROOKS INC |
|---|---|---|---|---|
| Address: | 11270 W. PARK PLACE, 4TH FLOOR<br>MILWAUKEE WI 53224 | Aliases: | *none* | |

| 50 | | 01-DEC-<br>2023 | TEAM LEADER | FLETMAN, ABBE F |
|---|---|---|---|---|
| Address: | 606 CITY HALL<br>PHILADELPHIA PA 19107 | Aliases: | *none* | |

| 51 | | | ATTORNEY FOR DEFENDANT | REILLY, MOLLY C |
|---|---|---|---|---|
| **Address:** | REILLY MCDEVITT THE WIDENER BUILDING 1 S PENN SQ SUITE 410 PHILADELPHIA PA 19107 (215)972-5200 mreilly@rmh-law.com | **Aliases:** | *none* | |

| 52 | | | ATTORNEY FOR DEFENDANT | MCSHEA, JOHN P |
|---|---|---|---|---|
| **Address:** | MC SHEA LAW FIRM 1500 MARKET STREET SUITE 3350 EAST PHILADELPHIA PA 19102 (215)599-0800 courtfilings@mcshealawfirm.com | **Aliases:** | *none* | |

| 53 | | | ATTORNEY FOR DEFENDANT | FONTAK, JOSEPH IRA |
|---|---|---|---|---|
| **Address:** | LEADER BERKON COLAO SILVERSTEI 1515 MARKET ST SUITE 1200 PHILADELPHIA PA 19102 (215)755-0455 jfontak@leaderberkon.com | **Aliases:** | *none* | |

| 54 | | | ATTORNEY FOR DEFENDANT | RAU, TIMOTHY D |
|---|---|---|---|---|
| **Address:** | 1650 ARCH STREET SUITE 2110 PHILADELPHIA PA 19103 (215)351-5817 trau@dmclaw.com | **Aliases:** | *none* | |

| 55 | | 23-MAY-2024 | ATTORNEY FOR DEFENDANT | BUSCH, CHRISTINE P |
|---|---|---|---|---|
| **Address:** | 2000 MARKET STREET SUITE 2300 PHILADELPHIA PA 19103 (215)575-2600 CPBusch@MDWCG.com | **Aliases:** | *none* | |

| 56 | | | ATTORNEY FOR DEFENDANT | FOX, STEPHANIE A |
|---|---|---|---|---|
| **Address:** | 1201 N MARKET ST SUITE 1100 WILMINGTON DE 19801 (302)472-1739 saf@maronmarvel.com | **Aliases:** | *none* | |

| 57 | 56 | | ATTORNEY FOR DEFENDANT | DORCUS, NATASHA L |
|---|---|---|---|---|
| **Address:** | 1717 ARCH STREET SUITE 3710 PHILADELPHIA PA 19103 (215)231-7100 NDorcus@maronmarvel.com | **Aliases:** | *none* | |

| 58 | | | ATTORNEY FOR DEFENDANT | JASONS, CATHERINE N |
|---|---|---|---|---|
| **Address:** | KELLEY JASONS MCGOWAN SPINELLI & HANNA LLP 1818 MARKET ST SUITE 3205 PHILADELPHIA PA 19103 (215)854-0658 cjasons@kjmsh.com | **Aliases:** | *none* | |

| 59 | | 21-MAR-2024 | ATTORNEY FOR DEFENDANT | PETTIT, JEFFREY L |
|---|---|---|---|---|
| **Address:** | 1617 JOHN F KENNEDY BLVD<br>SUITE 1500<br>PHILADELPHIA PA 19103<br>(215)557-2900<br>jpettit@mdmc-law.com | **Aliases:** | *none* | |

| 60 | 59 | 21-MAR-2024 | ATTORNEY FOR DEFENDANT | KUENY III, BERNARD E |
|---|---|---|---|---|
| **Address:** | MCELROY, DEUTSCH, MULVANEY & C<br>1617 JFK BOULEVARD<br>SUITE 1500<br>PHILADELPHIA PA 19103<br>(215)557-2900<br>bkueny@mdmc-law.com | **Aliases:** | *none* | |

| 61 | | 27-DEC-2023 | ATTORNEY FOR DEFENDANT | NEESON, PETER J |
|---|---|---|---|---|
| **Address:** | CENTRE SQUARE WEST<br>1500 MARKET STREET<br>19TH FLOOR<br>PHILADELPHIA PA 19102<br>(215)575-4320<br>toxictortefs@rawle.com | **Aliases:** | *none* | |

| 62 | | | ATTORNEY FOR DEFENDANT | RYAN JR JR, DANIEL J |
|---|---|---|---|---|
| **Address:** | MARSHALL DENNEHEY WARNER<br>COLEMAN & GOGGIN<br>2000 MARKET ST., SUITE 2300<br>PHILADELPHIA PA 19103 | **Aliases:** | *none* | |

| | | | |
|---|---|---|---|
| | (215)575-2600<br>DJRYAN@MDWCG.COM | | |

| | | | |
|---|---|---|---|
| 63 | | ATTORNEY FOR DEFENDANT | DISIPIO, BASIL A |
| **Address:** | LAVIN CEDRONE GRAVER BOYD &<br>190 N INDEPENDENCE MALL W<br>6TH & RACE ST SUITE 500<br>PHILADELPHIA PA 19106<br>(215)627-0303<br>BDiSipio@Lavin-Law.com | **Aliases:** | *none* |

| | | | |
|---|---|---|---|
| 64 | | ATTORNEY FOR DEFENDANT | GONZALES, CHRISTINA A |
| **Address:** | MARSHALL DENNEHEY, P.C.<br>2000 MARKET STREET<br>SUITE 2300<br>PHILADELPHIA PA 19103<br>(215)575-2820<br>CAGonzales@MDWCG.com | **Aliases:** | *none* |

| | | | |
|---|---|---|---|
| 65 | | ATTORNEY FOR DEFENDANT | MCMEEKIN II, JOHN C |
| **Address:** | RAWLE & HENDERSON<br>CENTRE SQUARE WEST<br>1500 MARKET STREET, 19TH FLOOR<br>PHILADELPHIA PA 19102<br>(215)575-4200<br>toxictortefs@rawle.com | **Aliases:** | *none* |

| | | | |
|---|---|---|---|
| 66 | | ATTORNEY FOR DEFENDANT | SCHEETS, JOSHUA D |

| Address: | 2000 MARKET STREET<br>23RD FLOOR<br>PHILADELPHIA PA 19104<br>(215)575-2751<br>jdscheets@mdwcg.com | Aliases: | *none* |
|---|---|---|---|

| 67 | | | ATTORNEY FOR DEFENDANT | BRUCH JR., G DANIEL |
|---|---|---|---|---|
| Address: | SWARTZ CAMPBELL LLC<br>TWO COMMERCE SQUARE<br>2001 MARKET STREET, SUITE 2815<br>PHILADELPHIA PA 19103<br>(215)299-4312<br>gdbruch@swartzcampbell.com | Aliases: | *none* | |

| 68 | | | ATTORNEY FOR DEFENDANT | REILLY, VINCENT F |
|---|---|---|---|---|
| Address: | REILLY, MCDEVITT & HENRICH<br>THE WIDENER BUILDING<br>ONE SOUTH PENN SQUARE,STE 410<br>PHILADELPHIA PA 19107<br>(215)972-5200<br>mjdoyle@rjm-law.com | Aliases: | *none* | |

| 69 | 68 | | ATTORNEY FOR DEFENDANT | JACKSON, DAMIAN SEAN |
|---|---|---|---|---|
| Address: | 1 SOUTH PENN SQUARE<br>STE. 410<br>PHILADELPHIA PA 19107<br>(215)972-5200<br>djackson@rmh-law.com | Aliases: | *none* | |

| 70 | | | ATTORNEY FOR DEFENDANT | DAVID, WEINBERG C |
|---|---|---|---|---|
| **Address:** | 1600 MARKET STREET, SUITE 2000<br>1600 MARKET STREET, SUITE 200<br>PHILADELPHIA PA 19103<br>(215)564-4141<br>efile.pccp@wlbdeflaw.com | **Aliases:** | *none* | |

| 71 | | | ATTORNEY FOR DEFENDANT | RANKIN, HILLARY C |
|---|---|---|---|---|
| **Address:** | ONE OXFORD CENTRE<br>THIRTY SECOND FLOOR<br>PITTSBURGH PA 15219<br>(412)560-7471<br>hillary.rankin@morganlewis.com | **Aliases:** | *none* | |

| 72 | | | ATTORNEY FOR DEFENDANT | REBER, W MATTHEW |
|---|---|---|---|---|
| **Address:** | KELLEY JASONS MCGOWAN SPINELLI<br>1818 MARKET ST<br>SUITE 3205<br>PHILADELPHIA PA 19103<br>(215)854-0658<br>mreber@kjmsh.com | **Aliases:** | *none* | |

| 73 | | | ATTORNEY FOR DEFENDANT | DEPFER, JOAN P |
|---|---|---|---|---|
| **Address:** | 2000 MARKET STREET<br>23RD FLOOR<br>PHILADELPHIA PA 19103<br>(215)575-2600<br>jpdepfer@mdwcg.com | **Aliases:** | *none* | |

| 74 | | | ATTORNEY FOR DEFENDANT | CONNOR, TIMOTHY C |
|---|---|---|---|---|
| **Address:** | 1650 MARKET STREET<br>SUITE 3600<br>PHILADELPHIA PA 19103<br>(215)972-8015<br>tconnor@smsm.com | **Aliases:** | *none* | |

| 75 | 68 | | ATTORNEY FOR DEFENDANT | VALINIS, SUSAN M |
|---|---|---|---|---|
| **Address:** | REILLY MCDEVITT & HENRICH<br>ONE S PENN SQ<br>SUITE 410<br>PHILADELPHIA PA 19107<br>(215)972-5200<br>svalinis@rmh-law.com | **Aliases:** | *none* | |

| 76 | | | ATTORNEY FOR DEFENDANT | MCDEVITT HAGAN, TRACEY |
|---|---|---|---|---|
| **Address:** | REILLY MCDEVITT PC<br>WIDENER BLDG SUITE 410<br>ONE S PENN SQ<br>PHILADELPHIA PA 19107<br>(215)972-5200<br>tmcdevitt@rmh-law.com | **Aliases:** | *none* | |

| 77 | 76 | | ATTORNEY FOR DEFENDANT | SINGER, STEWART R |
|---|---|---|---|---|
| **Address:** | SALMON, RICCHEZZA, SINGER & TU<br>1601 MARKET ST., SUITE 2500<br>PHILADELPHIA PA 19103<br>(215)606-6600<br>ssinger@srstlaw.com | **Aliases:** | *none* | |

| 78 | 76 | | ATTORNEY FOR DEFENDANT | REILLY, JOSEPH PATRICK |
|---|---|---|---|---|
| **Address:** | REILLY MCDEVITT & HENRICH<br>ONE SOUTH PENN SQ<br>SUITE 410<br>PHILADELPHIA PA 19107<br>(215)972-5200<br>jreilly@rmh-law.com | **Aliases:** | *none* | |

| 79 | | | ATTORNEY FOR DEFENDANT | MCGARRITY, JENNIFER A |
|---|---|---|---|---|
| **Address:** | MARON MARVEL BRADLEY ANDERSON<br>1717 ARCH ST<br>SUITE 3710<br>PHILADELPHIA PA 19103<br>(215)231-7100<br>jmcgarrity@maronmarvel.com | **Aliases:** | *none* | |

| 80 | 79 | | ATTORNEY FOR DEFENDANT | LAPWORTH, KIMBERLY A |
|---|---|---|---|---|
| **Address:** | 1717 ARCH STREET<br>SUITE 3710<br>PHILADELPHIA PA 19103<br>(215)231-7100<br>KLapworth@maronmarvel.com | **Aliases:** | *none* | |

| 81 | 79 | | ATTORNEY FOR DEFENDANT | KADISH ESQ, ERIC J |
|---|---|---|---|---|
| **Address:** | THREE LOGAN SQUARE<br>1717 ARCH STREET<br>SUITE 3710<br>PHILADELPHIA PA 19103 | **Aliases:** | *none* | |

| 82 | | | ATTORNEY FOR DEFENDANT | LEVINTHAL, BERNARD L |
|---|---|---|---|---|
| **Address:** | ONE BALA PLAZA<br>231 SAINT ASAPHS ROAD<br>SUITE 622<br>BALA CYNWYD PA 19004-1403<br>(215)979-8200<br>blevinthal@goldfeinlaw.com | **Aliases:** | *none* | |

| 83 | | | ATTORNEY FOR DEFENDANT | TURNER, TIFFANY F |
|---|---|---|---|---|
| **Address:** | DICKIE, McCAMEY & CHILCOTE<br>1650 ARCH ST. SUITE 2110<br>PHILADELPHIA PA 19103<br>(215)925-2289<br>turnert@dmclaw.com | **Aliases:** | *none* | |

| 84 | 83 | | ATTORNEY FOR DEFENDANT | SMITH, WILLIAM J |
|---|---|---|---|---|
| **Address:** | DICKIE MCCAMEY & CHILCOTE<br>1650 ARCH STREET<br>SUITE 2110<br>PHILADELPHIA PA 19103<br>(215)925-2289<br>wsmith@dmclaw.com | **Aliases:** | *none* | |

| 85 | 83 | | ATTORNEY FOR DEFENDANT | ADAMS, WILLIAM R |
|---|---|---|---|---|
| **Address:** | DICKIE MCCAMEY & CHILCOTE PC<br>222 DELAWARE AVENUE | **Aliases:** | *none* | |

| | | | |
|---|---|---|---|
| SUITE 1040<br>WILMINGTON DE 19801<br>(302)428-6133<br>wadams@dmclaw.com | | | |

| 86 | | ATTORNEY FOR<br>DEFENDANT | HADDEN ESQ, JAMES P |
|---|---|---|---|
| **Address:** THREE LOGAN SQUARE<br>1717 ARCH STREET<br>SUITE 3710<br>PHILADELPHIA PA 19103<br>(215)231-7100<br>jph@maronmarvel.com | **Aliases:** *none* | | |

| 87 | 86 | ATTORNEY FOR<br>DEFENDANT | SKINNER, MARK J |
|---|---|---|---|
| **Address:** MARON MARVEL BRADLEY BRADLEY<br>1717 ARCH STREET, SUITE 3710<br>PHILADELPHIA PA 19103<br>(215)231-7105<br>mskinner@maronmarvel.com | **Aliases:** *none* | | |

| 88 | | ATTORNEY FOR<br>DEFENDANT | HOWARTH, JOHN S |
|---|---|---|---|
| **Address:** 1818 MARKET STREET<br>SUITE 3100<br>PHILADELPHIA PA 19103<br>(215)564-4141<br>EFile.PCCP@wlbdeflaw.com | **Aliases:** *none* | | |

| 89 | | ATTORNEY FOR<br>DEFENDANT | BLOCK, MICHAEL J |
|---|---|---|---|

| Address: | WILBRAHAM, LAWLER & BUBA<br>1600 MARKET STREET<br>SUITE 2000<br>PHILADELPHIA PA 19103<br>(215)972-2850<br>mjb@wlbdeflaw.com | Aliases: | *none* |
|---|---|---|---|

| 90 | | TEAM LEADER | ROBERTS, JOSHUA |
|---|---|---|---|
| Address: | 538 CITY HALL<br>PHILADELPHIA PA 19107 | Aliases: | *none* |

| 91 | | ATTORNEY FOR DEFENDANT | BURKE, LAUREN E |
|---|---|---|---|
| Address: | 1801 PENNSYLVANIA AVENUE, NW<br>SUITE 1000<br>WASHINGTON DC 20006<br>(202)378-2364<br>PAservice@huschblackwell.com | Aliases: | *none* |

| 92 | | ATTORNEY FOR DEFENDANT | BRANNIGAN, PATRICK MICHAEL |
|---|---|---|---|
| Address: | 222 DELAWARE AVENUE SUITE 700<br>WILMINGTON DE 19801<br>(302)574-7400<br>PBRANNIGAN@ECKERTSEAMANS.COM | Aliases: | *none* |

| 93 | 92 | ATTORNEY FOR DEFENDANT | SEWARD, PAUL S |
|---|---|---|---|
| Address: | 222 DELAWARE AVE., 7TH FLOOR<br>WILMINGTON DE 19801<br>(302)657-2100<br>Pseward@eckertseamans.com | Aliases: | *none* |

## Docket Entries

| Filing Date/Time | Docket Type | Filing Party | Disposition Amount |
|---|---|---|---|
| 21-APR-2023 09:30 AM | ACTIVE CASE | | |
| **Docket Entry:** | E-Filing Number: 2304041712 | | |
| | | | |
| 21-APR-2023 09:30 AM | COMMENCEMENT OF CIVIL ACTION | COBURN, CASEY R | |
| **Documents:** | Final Cover | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 21-APR-2023 09:30 AM | COMPLAINT FILED NOTICE GIVEN | COBURN, CASEY R | |
| **Documents:** | Ralph Pappagallo Complaint FINAL.pdf | | |
| **Docket Entry:** | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 FILED. | | |
| | | | |
| 21-APR-2023 09:30 AM | WAITING FOR LISTING MASS TORT | COBURN, CASEY R | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 21-APR-2023 09:30 AM | CASE MANAGEMENT ORDER ISSUED | COBURN, CASEY R | |

| Documents: | Asbestos |
|---|---|
| **Docket Entry:** | IN RE: ASBESTOS LITIGATION-OCTOBER TERM 1986, NO. 0001 MASTER CASE MANAGEMENT ORDER FOR ASBESTOS-RELATED PERSONAL INJURY CLAIMS - It is the goal of this Court to secure the just, expeditious and cost-effective determination of each personal injury case involving exposure to asbestos or asbestos-containing products pending or hereafter filed in the Court of Common Pleas of Philadelphia County to eliminate duplication of effort, prevent unnecessary paperwork and promote judicial economy. In order to achieve these objectives, this 1st day of December, 2010, the Court enters the following Case Management Order for personal injury cases involving exposure to asbestos or asbestos-containing products. This Case Management Order supersedes all prior Case Management Orders entered in the Asbestos Litigation and shall apply to all cases currently pending and hereafter filed in this Court. I. PLEADINGS A. Short Form Complaints A Short Form Complaint shall be filed and served in every case in accordance with the Pennsylvania Rules of Civil Procedure. Plaintiffs may incorporate by reference the Master Long Form Complaints filed on the above-captioned docket. The Short Form Complaint shall contain the information required by Philadelphia Civil Rule *1019.1(B), to the extent consistent with the Pennsylvania Rules of Civil Procedure. A Short Form Complaint that contains premises liability claims shall include the name and address of each work site in which the plaintiff alleges exposure to asbestos and the dates during which the plaintiff or the decedent worked at each such work site. B. Preliminary Objections In response to each Short Form Complaint, the defendant may file preliminary objections, if deemed appropriate, in accordance with the Pennsylvania Rules of Civil Procedure and Philadelphia Civil Rule *1028. The preliminary objections shall be filed in letter brief format rather than motion package format. Its caption must specify "Asbestos Litigation" and name opposing counsel. Facts, issues and pertinent case law should be included. Each motion must include a proposed order. C. Answers to Complaints Defendant's answers to complaints are governed by Rule 1041.1 of the Pennsylvania Rules of Civil Procedure. II. GIFFEAR DOCKET Cases that do not state a valid claim pursuant to Giffear v. Johns-Manville Corp., 632 A.2d 880 (Pa.Super. 1993), aff'd sub nom. Simmons v. Pacor, Inc., 674 A.2d 232 (Pa.1996), shall be placed on an inactive docket. To reactivate a case which has been discontinued pursuant to Giffear, a Motion to Reactivate must be filed and include all necessary medical reports supporting said motion. The motion shall be filed in letter brief format consistent with the Mass Tort Motion procedures. III. DISCOVERY The following deadlines shall apply for the completion of discovery and the exchange of expert reports: 180 Days prior to jury selection- Plaintiffs shall serve answers to Defendants' Master Interrogatories and Requests for Production Directed to Plaintiffs, including information relating to Bankruptcy Trust Filings. Plaintiffs shall forward the identification of all health care providers along with addresses to defense counsel and RecordTrak. Plaintiffs shall forward HIPAA compliant authorizations signed by plaintiffs to RecordTrak. 120 days prior to jury selection- Plaintiffs shall serve medical, economic and liability expert reports. Plaintiffs shall produce to lead defense counsel all diagnostic materials in the possession of plaintiffs or their counsel and all diagnostic material reviewed by plaintiffs' experts. This includes, but is not limited to, x-rays, CT scans, pathology and cytology. Plaintiffs shall serve product identification witness lists identifying the defendants the witnesses are expected to identify. 100 days prior to jury selection-- Completion of plaintiffs' depositions. 90 days prior to jury selection-- Completion of all co-worker depositions. 45 days prior to jury selection-- Defendants shall serve medical and economic expert reports. 10 days prior to jury selection--Defendants shall serve expert liability reports. IV. STIPULATIONS OF DISMISSAL 1. If a plaintiff has agreed to stipulate to the dismissal of a defendant, the defendant (hereinafter the "Stipulated Defendant") shall prepare a Stipulation of Dismissal. 2. The Stipulated Defendant shall circulate the Stipulation of Dismissal to all |

defense counsel by letter, stating that any party has ten (10) days from the date of the letter to object to the dismissal of the Stipulated Defendant. 3. If a party objects to the dismissal of the Stipulated Defendant, the objecting party shall notify the Stipulated Defendant in writing of the basis for the objection. 4. If, after the expiration of the ten (10) day period, no objections are received by the Stipulated Defendant, the Stipulation of Dismissal may be electronically filed with the Court as unopposed. 5. The package electronically filed with the Court shall include the signed Stipulation of Dismissal and a cover letter stating no objections have been raised within the ten (10) day period. 6. Service of the Court-approved Stipulation of Dismissal shall be effectuated via the Court's electronic filing system on all parties of record. V. MOTION PRACTICE AND PROCEDURE All summary judgment motions shall be filed in accordance with the Revised Asbestos Summary Judgment Motion Procedures, a copy of which is attached hereto. In addition, to prevent the filing of unnecessary motions, five (5) days prior to the deadline for filing summary judgment motions (or 85 days prior to jury selection) Plaintiffs' counsel are to serve upon all parties to a case, a 'Dismissal Letter' indicating all defendants which Plaintiff will voluntarily dismiss from that case. All other motions, including motions for forum non conveniens, motions to amend complaints, motions to compel, motions to enforce settlements, etc., shall be filed in accordance with the Revised Mass Tort Motion Procedures, a copy of which is attached hereto. VI. TRIAL SCHEDULING The dates for all scheduled trials will be published each Monday in The Legal Intelligencer. VII. DEADLINES FOR CASES THAT MOVE TO NEW TRIAL GROUPS If any case is moved, with the consent of the Court, from its original trial group to a later trial group, all discovery and motions deadlines for the later group will apply. Any summary judgment motions filed prior to moving the case will be considered moot and must be re-filed in accordance with the deadlines for the group to which the case has been moved, except for cases where the motion deadline for the new group has already passed at the time the case is moved. For those cases, motions will remain open and need not be re-filed. Those motions remaining open shall be decided by the Coordinating Judge in accordance with the deadlines for the new group. VIII. CALL OF THE LIST A brief call of the asbestos list will be conducted every Monday at 11:00 a.m. The Court will conduct general asbestos business and call those cases listed for trial for the following month. Knowledgeable representatives of each party involved in the next month's scheduled trials shall attend. A meeting of the Asbestos Kitchen Cabinet will be conducted on the first Monday of each month, following the call of the list. IX. SANCTIONS Failure to comply with any deadlines set forth in the Case Management Order may result in the imposition of appropriate sanctions, including dismissal. ...BY THE COURT: ABBE F. FLETMAN, J., TEAM LEADER, COMPLEX LITIGATION CENTER

| 25-APR-2023 12:32 AM | NOTICE GIVEN | | |
| --- | --- | --- | --- |
| **Docket Entry:** | OF MASTER CASE MANAGEMENT ORDER ISSUED. | | |

| 01-MAY-2023 12:58 PM | ATTEMPTED SERVICE - NOT FOUND | | |
| --- | --- | --- | --- |

| Documents: | 196919.18_AFFIDAVIT_4BAF0513-F55D-0842-9C63-596FCCB17E68.pdf | | |
|---|---|---|---|
| **Docket Entry:** | SUNOCO INC NOT FOUND ON 04/27/2023. | | |

| | | | |
|---|---|---|---|
| 01-MAY-2023 02:08 PM | ENTRY OF APPEARANCE | REILLY, MOLLY C | |
| Documents: | Pappagallo, Est. of Ralph Entry.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF MOLLY C REILLY FILED. (FILED ON BEHALF OF DREVER COMPANY) | | |

| | | | |
|---|---|---|---|
| 02-MAY-2023 03:15 PM | ENTRY OF APPEARANCE | MCSHEA, JOHN P | |
| Documents: | Pappagallo - GE EOA (00209992xD3162).PDF | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF JOHN P MCSHEA FILED. (FILED ON BEHALF OF GENERAL ELECTRIC COMPANY) | | |

| | | | |
|---|---|---|---|
| 03-MAY-2023 09:33 AM | SHORT FORM ANSWER FILED | FONTAK, JOSEPH IRA | |
| Documents: | Pappagallo - Entry of Appearance and Answer to Complaint.pdf | | |
| **Docket Entry:** | SHORT FORM ANSWER WITH ALL AFFIRMATIVE DEFENSES IN ACCORDANCE WITH 1041.1 FILED. (FILED ON BEHALF OF IMO INDUSTRIES INC I/A/A/SII) ENTRY OF APPEARANCE FILED ON BEHALF OF IMO INDUSTRIES INC I/A/A/SII. | | |

| | | | |
|---|---|---|---|
| 03-MAY-2023 11:24 AM | ENTRY OF APPEARANCE | RAU, TIMOTHY D | |
| Documents: | Entry -Pappagallo.PDF | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF TIMOTHY D RAU FILED. (FILED ON BEHALF OF JA SEXAUER MANUFACTURING COMPANY) | | |

| 03-MAY-2023 02:30 PM | ENTRY OF APPEARANCE | BUSCH, CHRISTINE P | |
|---|---|---|---|
| **Documents:** | [Pappagallo - Grove EOA.pdf](#) | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF CHRISTINE P BUSCH FILED. (FILED ON BEHALF OF GROVE US LLC AS SURVIVOR OF THE MERGER WITH MANITOWOC) | | |
| | | | |
| 05-MAY-2023 02:40 PM | ENTRY OF APPEARANCE | FOX, STEPHANIE A | |
| **Documents:** | [Pappagallo, Ralph - Entry and Answer for GPC.pdf](#) | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF NATASHA L DORCUS ,STEPHANIE A FOX FILED AND SHORT FORM ANSWER . (FILED ON BEHALF OF GENUINE PARTS COMPANY) | | |
| | | | |
| 08-MAY-2023 08:59 AM | ANSWER TO COMPLAINT FILED | JASONS, CATHERINE N | |
| **Documents:** | [Pappagallo, Ralph UNC EA.pdf](#) | | |
| **Docket Entry:** | SHORT FORM ANSWER TO PLAINTIFF'S COMPLAINT FILED. (FILED ON BEHALF OF UNION CARBIDE CORPORATION) ENTRY OF APPEARANCE FILED ON BEHALF OF UNION CARBIDE CORPORATION. | | |
| | | | |
| 08-MAY-2023 11:10 AM | AFFIDAVIT OF SERVICE FILED | | |
| **Documents:** | [196919.20_AFFIDAVIT_2B31C968-9CA1-B445-8EC8-8058081E8FA3.pdf](#) | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON VIACOMCBS INC FKA CBS CORPORATION BY SHERIFF SERVICE ALLEGHENY ON 04/28/2023 FILED. | | |
| | | | |
| 08-MAY-2023 12:44 PM | AFFIDAVIT OF SERVICE FILED | | |

| Documents: | [196919.01.pdf](196919.01.pdf) | | |
|---|---|---|---|
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON AIR AND LIQUID SYSTEMS CORPORATION AS SBM BY SHERIFF SERVICE DAUPHIN ON 04/28/2023 FILED. | | |
| | | | |
| 08-MAY-2023 12:47 PM | AFFIDAVIT OF SERVICE FILED | | |
| Documents: | [196919.03.pdf](196919.03.pdf) | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON DREVER COMPANY BY SHERIFF SERVICE DAUPHIN ON 05/02/2023 FILED. | | |
| | | | |
| 08-MAY-2023 12:49 PM | AFFIDAVIT OF SERVICE FILED | | |
| Documents: | [196919.04.pdf](196919.04.pdf) | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON FMC CORPORATION BY SHERIFF SERVICE DAUPHIN ON 05/02/2023 FILED. | | |
| | | | |
| 08-MAY-2023 12:58 PM | AFFIDAVIT OF SERVICE FILED | | |
| Documents: | [196919.05.pdf](196919.05.pdf) | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON FOSECO INC BY SHERIFF SERVICE DAUPHIN ON 05/02/2023 FILED. | | |
| | | | |
| 08-MAY-2023 01:15 PM | AFFIDAVIT OF SERVICE FILED | | |
| Documents: | [196919.06.pdf](196919.06.pdf) | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON GENERAL ELECTRIC COMPANY BY SHERIFF SERVICE DAUPHIN ON | | |

| | 05/02/2023 FILED. | | |
|---|---|---|---|

| 08-MAY-2023 01:18 PM | AFFIDAVIT OF SERVICE FILED | | |
|---|---|---|---|
| **Documents:** | [196919.07.pdf](196919.07.pdf) | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON GENUINE PARTS COMPANY BY SHERIFF SERVICE DAUPHIN ON 05/02/2023 FILED. | | |

| 08-MAY-2023 01:21 PM | AFFIDAVIT OF SERVICE FILED | | |
|---|---|---|---|
| **Documents:** | [196919.08.pdf](196919.08.pdf) | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON ITT LLC AS SII GODWIN PUMPS OF AMERICA INC BY SHERIFF SERVICE DAUPHIN ON 05/02/2023 FILED. | | |

| 08-MAY-2023 01:23 PM | AFFIDAVIT OF SERVICE FILED | | |
|---|---|---|---|
| **Documents:** | [196919.09.pdf](196919.09.pdf) | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON GOULDS PUMPS INC NKA GOULDS PUMPS LLC BY SHERIFF SERVICE DAUPHIN ON 05/02/2023 FILED. | | |

| 08-MAY-2023 01:33 PM | AFFIDAVIT OF SERVICE FILED | | |
|---|---|---|---|
| **Documents:** | [196919.10.pdf](196919.10.pdf) | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON GRINNELL LLC FKA GRINNELL CORPORATION BY SHERIFF SERVICE DAUPHIN ON 05/02/2023 FILED. | | |

| 08-MAY-2023<br>01:38 PM | AFFIDAVIT OF SERVICE FILED | | |
|---|---|---|---|
| **Documents:** | 196919.11.pdf | | |
| **Docket Entry** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON HAJOCA CORPORATION BY SHERIFF SERVICE DAUPHIN ON 04/28/2023 FILED. | | |

| 08-MAY-2023<br>01:45 PM | AFFIDAVIT OF SERVICE FILED | | |
|---|---|---|---|
| **Documents:** | 196919.12.pdf | | |
| **Docket Entry** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON HONEYWELL INTERNATIONAL INC AS SII BY SHERIFF SERVICE DAUPHIN ON 04/28/2023 FILED. | | |

| 08-MAY-2023<br>01:57 PM | AFFIDAVIT OF SERVICE FILED | | |
|---|---|---|---|
| **Documents:** | 196919.14.pdf | | |
| **Docket Entry** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON ITT CORPORATION BY SHERIFF SERVICE DAUPHIN ON 05/02/2023 FILED. | | |

| 08-MAY-2023<br>02:00 PM | AFFIDAVIT OF SERVICE FILED | | |
|---|---|---|---|
| **Documents:** | 196919.15.pdf | | |
| **Docket Entry** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON ITT LLC FKA ITT CORPORATION AND BELL & GOSSETT COMPANY BY SHERIFF SERVICE DAUPHIN ON 05/02/2023 FILED. | | |

| 08-MAY-2023 02:08 PM | ENTRY OF APPEARANCE | PETTIT, JEFFREY L | |
|---|---|---|---|
| **Documents:** | [MWC- Pappagallo, Ignatius EOA-SFA (5-8-23) .pdf](MWC- Pappagallo, Ignatius EOA-SFA (5-8-23) .pdf) | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF BERNARD E KUENY III AND JEFFREY L PETTIT FILED. (FILED ON BEHALF OF MARLEY-WYLAIN COMPANY FKA WEIL MCLAIN COMPANY) | | |

| 08-MAY-2023 02:10 PM | ANSWER TO COMPLAINT FILED | PETTIT, JEFFREY L | |
|---|---|---|---|
| **Documents:** | [MWC- Pappagallo, Ignatius EOA-SFA (5-8-23) .pdf](MWC- Pappagallo, Ignatius EOA-SFA (5-8-23) .pdf) | | |
| **Docket Entry:** | ANSWER TO PLAINTIFF'S COMPLAINT FILED. (FILED ON BEHALF OF MARLEY-WYLAIN COMPANY FKA WEIL MCLAIN COMPANY) | | |

| 08-MAY-2023 02:12 PM | AFFIDAVIT OF SERVICE FILED | | |
|---|---|---|---|
| **Documents:** | [196919,16.pdf](196919,16.pdf) | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON JOHN CRANE INC FKA CRANE PACKING COMPANY BY SHERIFF SERVICE DAUPHIN ON 05/02/2023 FILED. | | |

| 08-MAY-2023 02:16 PM | AFFIDAVIT OF SERVICE FILED | | |
|---|---|---|---|
| **Documents:** | [196919,13.pdf](196919,13.pdf) | | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON IMO INDUSTRIES INC I/A/A/SII BY SHERIFF SERVICE DAUPHIN ON 05/02/2023 FILED. | | |

| 08-MAY-2023 02:19 PM | AFFIDAVIT OF SERVICE FILED | | |
|---|---|---|---|

| Documents: | [196919.17.pdf](196919.17.pdf) | | |
|---|---|---|---|
| Docket Entry: | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON GROVE US LLC AS SURVIVOR OF THE MERGER WITH MANITOWOC BY SHERIFF SERVICE DAUPHIN ON 04/28/2023 FILED. | | |

| 08-MAY-2023 02:24 PM | AFFIDAVIT OF SERVICE FILED | | |
|---|---|---|---|
| Documents: | [196919.19.pdf](196919.19.pdf) | | |
| Docket Entry: | AFFIDAVIT OF SERVICE OF CIVIL ACTION COMPLAINT-ASBESTOS,MASTER CASE MANAGEMENT ORDER FORM,CIVIL COVER SHEET UPON UNION CARBIDE CORPORATION BY SHERIFF SERVICE DAUPHIN ON 05/02/2023 FILED. | | |

| 08-MAY-2023 03:01 PM | ANSWER TO COMPLAINT FILED | NEESON, PETER J | |
|---|---|---|---|
| Documents: | [Pappagallo Honeywell International Inc, EOA and Answer to Plaintiffs_Complaint.pdf](#) | | |
| Docket Entry: | ANSWER TO PLAINTIFF'S COMPLAINT FILED. (FILED ON BEHALF OF HONEYWELL INTERNATIONAL INC AS SII) ENTRY OF APPEARANCE FILED ON BEHALF OF HONEYWELL INTERNATIONAL INC AS SII. | | |

| 08-MAY-2023 03:45 PM | ENTRY OF APPEARANCE | RYAN JR JR, DANIEL J | |
|---|---|---|---|
| Documents: | [Pappagallo - EOA Parker Hannifin Corporation.pdf](#) | | |
| Docket Entry: | ENTRY OF APPEARANCE OF DANIEL J RYAN JR FILED. (FILED ON BEHALF OF PARKER HANNIFIN CORPORATION) | | |

| 09-MAY-2023 09:05 AM | ENTRY OF APPEARANCE | DISIPIO, BASIL A | |
|---|---|---|---|
| Documents: | [Pappagallo - EOA for 3M Company.pdf](#)<br>[Pappagallo - DJT for 3M Company.pdf](#) | | |

| Docket Entry: | ENTRY OF APPEARANCE OF BASIL A DISIPIO FILED. (FILED ON BEHALF OF 3M COMPANY) | | |
|---|---|---|---|
| | | | |
| 09-MAY-2023 09:05 AM | JURY TRIAL PERFECTED | DISIPIO, BASIL A | |
| Docket Entry: | 12 JURORS REQUESTED. | | |
| | | | |
| 09-MAY-2023 10:44 AM | ENTRY OF APPEARANCE | GONZALES, CHRISTINA A | |
| Documents: | Pappagallo Hajoca EOA and Answer PCCP.PDF | | |
| Docket Entry: | ENTRY OF APPEARANCE AND SHORT FORM ANSWER OF CHRISTINA A GONZALES FILED. (FILED ON BEHALF OF HAJOCA CORPORATION) | | |
| | | | |
| 09-MAY-2023 10:44 AM | JURY TRIAL PERFECTED | GONZALES, CHRISTINA A | |
| Docket Entry: | 12 JURORS REQUESTED. | | |
| | | | |
| 11-MAY-2023 12:02 PM | ENTRY OF APPEARANCE | MCMEEKIN II, JOHN C | |
| Documents: | Pappagallo Anchor Darling Valve Company Entry of Appearance.pdf | | |
| Docket Entry: | ENTRY OF APPEARANCE OF JOHN C MCMEEKIN AND SHORT FORM ANSWER FILED. (FILED ON BEHALF OF ANCHOR DARLING VALVE COMPANY) | | |
| | | | |
| 11-MAY-2023 12:02 PM | JURY TRIAL PERFECTED | MCMEEKIN II, JOHN C | |
| Docket Entry: | 12 JURORS REQUESTED. | | |

| 11-MAY-2023 02:32 PM | ENTRY OF APPEARANCE | SCHEETS, JOSHUA D | |
|---|---|---|---|
| **Documents:** | Pappagallo - Warren Pumps EOA.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF JOSHUA D SCHEETS FILED. (FILED ON BEHALF OF WARREN PUMPS LLC) | | |
| | | | |
| 12-MAY-2023 11:15 AM | ENTRY OF APPEARANCE | BRUCH JR., G DANIEL | |
| **Documents:** | Entry (Pappagallo).pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF G DANIEL BRUCH FILED. (FILED ON BEHALF OF REDCO CORPORATION FKA CRANE COMPANY) | | |
| | | | |
| 12-MAY-2023 11:26 AM | SHORT FORM ANSWER FILED | REILLY, VINCENT F | |
| **Documents:** | Pappagallo, Est. of Ralph Answer.pdf | | |
| **Docket Entry:** | SHORT FORM ANSWER WITH ALL AFFIRMATIVE DEFENSES IN ACCORDANCE WITH 1041.1 FILED. (FILED ON BEHALF OF JH FRANCE REFRACTORIES) ENTRY OF APPEARANCE FILED ON BEHALF OF JH FRANCE REFRACTORIES. | | |
| | | | |
| 12-MAY-2023 11:49 AM | ENTRY OF APPEARANCE | JACKSON, DAMIAN SEAN | |
| **Documents:** | Pappagallo, Est. of Ralph DSJ Entry.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF DAMIAN SEAN JACKSON FILED. (FILED ON BEHALF OF JH FRANCE REFRACTORIES) | | |
| | | | |
| 12-MAY-2023 12:13 PM | ENTRY OF APPEARANCE | DAVID, WEINBERG C | |

| Documents: | Pappagallo v Grtwpa 05.12.2023.pdf | | |
| --- | --- | --- | --- |
| **Docket Entry:** | ENTRY OF APPEARANCE OF WEINBERG C DAVID FILED. (FILED ON BEHALF OF GREENE TWEED NC LLC) | | |
| | | | |
| 15-MAY-2023 10:45 AM | SHORT FORM ANSWER FILED | RANKIN, HILLARY C | |
| Documents: | Pappagallo_Carrier EOA.pdf | | |
| **Docket Entry:** | SHORT FORM ANSWER WITH ALL AFFIRMATIVE DEFENSES IN ACCORDANCE WITH 1041.1 FILED. (FILED ON BEHALF OF CARRIER CORPORATION) ENTRY OF APPEARANCE FILED ON BEHALF OF CARRIER CORPORATION. | | |
| | | | |
| 15-MAY-2023 10:48 AM | SHORT FORM ANSWER FILED | RANKIN, HILLARY C | |
| Documents: | Pappagallo_Cleaver Brooks EOA.pdf | | |
| **Docket Entry:** | SHORT FORM ANSWER WITH ALL AFFIRMATIVE DEFENSES IN ACCORDANCE WITH 1041.1 FILED. (FILED ON BEHALF OF CLEAVER BROOKS INC) ENTRY OF APPEARANCE FILED ON BEHALF OF CLEAVER BROOKS INC. | | |
| | | | |
| 15-MAY-2023 10:51 AM | SHORT FORM ANSWER FILED | RANKIN, HILLARY C | |
| Documents: | Pappagallo_Goulds EOA.pdf | | |
| **Docket Entry:** | SHORT FORM ANSWER WITH ALL AFFIRMATIVE DEFENSES IN ACCORDANCE WITH 1041.1 FILED. (FILED ON BEHALF OF GOULDS PUMPS INC NKA GOULDS PUMPS LLC) ENTRY OF APPEARANCE FILED ON BEHALF OF GOULDS PUMPS INC NKA GOULDS PUMPS LLC. | | |
| | | | |
| 15-MAY-2023 10:54 AM | SHORT FORM ANSWER FILED | RANKIN, HILLARY C | |
| Documents: | Pappagallo_Grinnell EOA.pdf | | |

| Docket Entry: | SHORT FORM ANSWER WITH ALL AFFIRMATIVE DEFENSES IN ACCORDANCE WITH 1041.1 FILED. (FILED ON BEHALF OF GRINNELL LLC FKA GRINNELL CORPORATION) ENTRY OF APPEARANCE FILED ON BEHALF OF GRINNELL LLC FKA GRINNELL CORPORATION. | | |
|---|---|---|---|
| | | | |
| 15-MAY-2023 10:57 AM | SHORT FORM ANSWER FILED | RANKIN, HILLARY C | |
| Documents: | Pappagallo_ITT EOA.pdf | | |
| Docket Entry: | SHORT FORM ANSWER WITH ALL AFFIRMATIVE DEFENSES IN ACCORDANCE WITH 1041.1 FILED. (FILED ON BEHALF OF ITT LLC FKA ITT CORPORATION AND BELL & GOSSETT COMPANY, ITT CORPORATION AND ITT LLC AS SII GODWIN PUMPS OF AMERICA INC) ENTRY OF APPEARANCE FILED ON BEHALF OF ITT LLC FKA ITT CORPORATION AND BELL & GOSSETT COMPANY, ITT CORPORATION AND ITT LLC AS SII GODWIN PUMPS OF AMERICA INC. | | |
| | | | |
| 15-MAY-2023 12:45 PM | ANSWER TO COMPLAINT FILED | REBER, W MATTHEW | |
| Documents: | Pappagallo, Ralph - EOA (FMC).pdf | | |
| Docket Entry: | ANSWER TO PLAINTIFF'S COMPLAINT FILED. (FILED ON BEHALF OF FMC CORPORATION) ENTRY OF APPEARANCE FILED ON BEHALF OF FMC CORPORATION. | | |
| | | | |
| 15-MAY-2023 02:38 PM | ENTRY OF APPEARANCE | DEPFER, JOAN P | |
| Documents: | Pappagallo - EOA.JGSM.pdf | | |
| Docket Entry: | ENTRY OF APPEARANCE OF JOAN P DEPFER FILED. (FILED ON BEHALF OF JOY GLOBAL SURFACE MINING INC FKA) | | |
| | | | |
| 16-MAY-2023 12:25 PM | ENTRY OF APPEARANCE | CONNOR, TIMOTHY C | |
| Documents: | Pappagallo Ralph BWIP EOA.pdf | | |

| Docket Entry: | ENTRY OF APPEARANCE OF TIMOTHY C CONNOR AND SHORT FORM ANSWER FILED. (FILED ON BEHALF OF FLOWSERVE AS SII BYRON JACKSON PUMP COMPANY) | | |
|---|---|---|---|
| | | | |
| 16-MAY-2023 01:47 PM | ANSWER TO COMPLAINT FILED | REBER, W MATTHEW | |
| Documents: | Pappagallo, Ralph - EOA (SFS).pdf | | |
| Docket Entry: | ANSWER TO PLAINTIFF'S COMPLAINT FILED. (FILED ON BEHALF OF STERLING FLUID SYSTEMS (USA)) ENTRY OF APPEARANCE FILED ON BEHALF OF STERLING FLUID SYSTEMS (USA). | | |
| | | | |
| 16-MAY-2023 02:18 PM | ENTRY OF APPEARANCE | REILLY, VINCENT F | |
| Documents: | Pappagallo, Est. of Ralph Entry.pdf | | |
| Docket Entry: | ENTRY OF APPEARANCE OF SUSAN M VALINIS AND VINCENT F REILLY FILED. (FILED ON BEHALF OF FOSTER WHEELER LLC) | | |
| | | | |
| 16-MAY-2023 02:25 PM | SHORT FORM ANSWER FILED | MCDEVITT HAGAN, TRACEY | |
| Documents: | EOA and Answer_Pappagallo, Est. of Ralph.pdf | | |
| Docket Entry: | SHORT FORM ANSWER WITH ALL AFFIRMATIVE DEFENSES IN ACCORDANCE WITH 1041.1 FILED. (FILED ON BEHALF OF FLOWSERVE CORPORATION I/A/A/SII) ENTRY OF APPEARANCE FILED ON BEHALF OF FLOWSERVE CORPORATION I/A/A/SII. | | |
| | | | |
| 17-MAY-2023 08:51 AM | ENTRY OF APPEARANCE | SINGER, STEWART R | |
| Documents: | 00459084.PDF | | |
| Docket Entry: | ENTRY OF APPEARANCE OF STEWART R SINGER FILED. (FILED ON BEHALF OF METROPOLITAN LIFE INSURANCE COMPANY) | | |

| 17-MAY-2023 03:24 PM | ENTRY OF APPEARANCE | REILLY, JOSEPH PATRICK | |
|---|---|---|---|
| Documents: | EOA_Pappagallo, Est. of Ralph.pdf | | |
| Docket Entry: | ENTRY OF APPEARANCE OF JOSEPH PATRICK REILLY FILED. (FILED ON BEHALF OF FLOWSERVE CORPORATION I/A/A/SII) | | |
| | | | |
| 18-MAY-2023 02:12 PM | ENTRY OF APPEARANCE | RYAN JR JR, DANIEL J | |
| Documents: | Pappagallo - EOA Zurn Industries LLC.pdf | | |
| Docket Entry: | ENTRY OF APPEARANCE OF DANIEL J RYAN JR FILED. (FILED ON BEHALF OF ZURN INDUSTRIES INC) | | |
| | | | |
| 18-MAY-2023 02:33 PM | ANSWER TO COMPLAINT FILED | DISIPIO, BASIL A | |
| Documents: | Pappagallo - 3M Answer with NM and NMCC.pdf | | |
| Docket Entry: | ANSWER WITH NEW MATTER AND CROSSCLAIM TO PLAINTIFF'S COMPLAINT FILED. (FILED ON BEHALF OF 3M COMPANY) | | |
| | | | |
| 18-MAY-2023 02:43 PM | ENTRY OF APPEARANCE | MCSHEA, JOHN P | |
| Documents: | PG EOA - Pappagallo (00210560xD3162).PDF | | |
| Docket Entry: | ENTRY OF APPEARANCE AND SHORT FORM ANSWER OF JOHN P MCSHEA FILED. (FILED ON BEHALF OF VIACOMCBS INC FKA CBS CORPORATION) | | |
| | | | |
| 18-MAY-2023 03:11 PM | ENTRY OF APPEARANCE | MCGARRITY, JENNIFER A | |
| Documents: | Pappagallo, Ralph - PCCP EOA for KDO.pdf | | |

| | | | |
|---|---|---|---|
| **Docket Entry:** | ENTRY OF APPEARANCE OF JENNIFER A MCGARRITY, KIMBERLY A LAPWORTH AND ERIC J KADISH FILED. (FILED ON BEHALF OF KEELER/DORR-OLIVER BOILER COMPANY) | | |
| | | | |
| 19-MAY-2023 03:06 PM | ANSWER TO COMPLAINT FILED | LEVINTHAL, BERNARD L | |
| **Documents:** | 2023.05.19 Flowserve ATC - Pappagallo.pdf | | |
| **Docket Entry:** | ANSWER TO PLAINTIFF'S COMPLAINT FILED. (FILED ON BEHALF OF FLOWSERVE US INC SOLELY AS SII EDWARD VOGT) ENTRY OF APPEARANCE FILED ON BEHALF OF FLOWSERVE US INC SOLELY AS SII EDWARD VOGT. | | |
| | | | |
| 19-MAY-2023 04:50 PM | ENTRY OF APPEARANCE | MCGARRITY, JENNIFER A | |
| **Documents:** | Pappagallo Ralph - Foseco PCCP EOA (W1668035).PDF | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF JENNIFER A MCGARRITY AND KIMBERLY A LAPWORTH FILED. (FILED ON BEHALF OF FOSECO INC) | | |
| | | | |
| 31-MAY-2023 01:07 PM | ENTRY OF APPEARANCE | TURNER, TIFFANY F | |
| **Documents:** | Pappagallo JCI EOA.pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF WILLIAM R ADAMS, WILLIAM J SMITH AND TIFFANY F TURNER FILED. (FILED ON BEHALF OF JOHN CRANE INC FKA CRANE PACKING COMPANY) | | |
| | | | |
| 08-JUN-2023 10:28 AM | ENTRY OF APPEARANCE | HADDEN ESQ, JAMES P | |
| **Documents:** | Pappagallo, Ralph - PCCP EOA for Amdura (W1676532).pdf | | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF MARK J SKINNER AND JAMES P HADDEN FILED. (FILED ON BEHALF OF AMDURA LLC FKA AMDURA CORPORATION INDIVIDUALLY AND AS) ANSWER TO COMPLAINT FILED | | |

| 14-JUL-2023 11:34 AM | ENTRY OF APPEARANCE | HOWARTH, JOHN S | |
|---|---|---|---|
| Documents: | Pappagallo, Ralph v ALSC entry and ans.pdf | | |
| Docket Entry: | ENTRY OF APPEARANCE OF JOHN S HOWARTH AND SHORT FORM ANSWER FILED. (FILED ON BEHALF OF AIR AND LIQUID SYSTEMS CORPORATION AS SBM) | | |
| | | | |
| 18-JUL-2023 12:46 PM | AFFIDAVIT OF SERVICE FILED | | |
| Documents: | 196919.02.pdf | | |
| Docket Entry: | AFFIDAVIT OF SERVICE OF PLAINTIFF'S COMPLAINT UPON CARRIER CORPORATION BY PERSONAL SERVICE ON 05/03/2023 FILED. | | |
| | | | |
| 18-JUL-2023 12:49 PM | AFFIDAVIT OF SERVICE FILED | | |
| Documents: | 196919.21.pdf | | |
| Docket Entry: | AFFIDAVIT OF SERVICE OF PLAINTIFF'S COMPLAINT UPON ZURN INDUSTRIES INC BY PERSONAL SERVICE ON 05/08/2023 FILED. | | |
| | | | |
| 08-AUG-2023 01:00 PM | ENTRY OF APPEARANCE | BLOCK, MICHAEL J | |
| Documents: | PAPPAGALLO v DAP EOA.pdf | | |
| Docket Entry: | ENTRY OF APPEARANCE OF MICHAEL J BLOCK FILED. (FILED ON BEHALF OF DAP INC KNA LA MIRADA PRODUCTS COMPANY) | | |
| | | | |
| 27-DEC-2023 12:31 PM | WITHDRAWAL/ENTRY OF APPEARANCE | BURKE, LAUREN E | |
| Documents: | HON - Pappagallo, Raffaele - WD and EOA.pdf | | |

| Docket Entry: | WITHDRAWAL OF APPEARANCE OF PETER J NEESON AND ENTRY OF APPEARANCE OF LAUREN E BURKE AND LAUREN E BURKE FILED. (FILED ON BEHALF OF HONEYWELL INTERNATIONAL INC AS SII) | | |
|---|---|---|---|
| | | | |
| 08-FEB-2024 12:44 PM | PRAECIPE TO REINSTATE CMPLT | COBURN, CASEY R | |
| Documents: | Praecipe to Reinstate Complaint.pdf<br>Ralph Pappagallo Complaint (FILED).pdf | | |
| Docket Entry: | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 REINSTATED. (FILED ON BEHALF OF ANNA PAGGAGALLO AND IGNATIUS PAPPAGALLO) | | |
| | | | |
| 27-FEB-2024 12:28 PM | ATTEMPTED SERVICE - NOT FOUND | | |
| Documents: | 205180.01_AFFIDAVIT_F690A044-8E0F-2D4E-95EF-F9216153913A.pdf | | |
| Docket Entry: | SUNOCO INC NOT FOUND ON 02/22/2024. | | |
| | | | |
| 20-MAR-2024 11:53 AM | WITHDRAWAL/ENTRY OF APPEARANCE | BURKE, LAUREN E | |
| Documents: | MWC - Pappagallo, Raffaele - WD and EOA (PCCP).pdf | | |
| Docket Entry: | WITHDRAWAL OF APPEARANCE OF BERNARD E KUENY III AND JEFFREY L PETTIT AND ENTRY OF APPEARANCE OF LAUREN E BURKE FILED. (FILED ON BEHALF OF MARLEY-WYLAIN COMPANY FKA WEIL MCLAIN COMPANY) | | |
| | | | |
| 22-MAY-2024 03:45 PM | WITHDRAWAL/ENTRY OF APPEARANCE | BRANNIGAN, PATRICK MICHAEL | |
| Documents: | GROVE MTC (PA) PAPPAGALLO - EOA and WITHDRAWAL - FINAL.pdf | | |
| Docket Entry: | WITHDRAWAL OF APPEARANCE OF CHRISTINE P BUSCH AND ENTRY OF APPEARANCE OF PAUL S SEWARD, PATRICK MICHAEL BRANNIGAN AND PATRICK MICHAEL BRANNIGAN FILED. (FILED ON BEHALF OF GROVE US LLC AS SURVIVOR OF THE MERGER WITH MANITOWOC) | | |

| 09-AUG-2024 09:48 AM | LISTED FOR TRIAL | | |
|---|---|---|---|
| **Docket Entry:** | *none.* | | |

| 05-DEC-2024 01:19 PM | WAITING TO LIST FOR TRIAL | | |
|---|---|---|---|
| **Docket Entry:** | *none.* | | |

| 05-DEC-2024 01:37 PM | ASSIGNED TO LITIGATION GROUP | | |
|---|---|---|---|
| **Docket Entry:** | PROPOSED JURY SELECTION 5/30/25 | | |

| 19-FEB-2025 08:58 AM | WAITING FOR LISTING MASS TORT | | |
|---|---|---|---|
| **Docket Entry:** | *none.* | | |

| 19-FEB-2025 09:02 AM | ASSIGNED TO LITIGATION GROUP | | |
|---|---|---|---|
| **Docket Entry:** | *none.* | | |

| 11-MAR-2025 11:17 AM | MOTION FOR SUMMARY JUDGMENT | REBER, W MATTHEW | |
|---|---|---|---|
| **Documents:** | Pappagallo v. FMC MSJ NO ID.pdf<br>Motion CoverSheet Form | | |

| Docket Entry: | 26-25032126 RESPONSE DATE 03/28/2025. REPLY DATE: 4/02/2025. (FILED ON BEHALF OF FMC CORPORATION) | | |
| --- | --- | --- | --- |
| | | | |
| 11-MAR-2025 11:20 AM | MOTION FOR SUMMARY JUDGMENT | REBER, W MATTHEW | |
| Documents: | Pappagallo v. SFS MSJ NO ID.pdf<br>Motion CoverSheet Form | | |
| Docket Entry: | 27-25032127 RESPONSE DATE 03/28/2025. REPLY DATE 04/02/2025. (FILED ON BEHALF OF STERLING FLUID SYSTEMS (USA)) | | |
| | | | |
| 13-MAR-2025 08:35 AM | MOTION/PETITION/STIP WITHDRAWN | REBER, W MATTHEW | |
| Documents: | Pappagallo, Ralph - Praecipe to Withdrawal MSJ (SFS).pdf | | |
| Docket Entry: | 27-25032127 PRAECIPE TO WITHDRAW MOTION FOR SUMMARY JUDGMENT FILED. (FILED ON BEHALF OF STERLING FLUID SYSTEMS (USA)) | | |

▶ Case Description    ▶ Related Cases    ▶ Event Schedule    ▶ Case Parties    ▶ Docket Entries

[ E-Filing System ]    [ Search Home ]

# EXHIBIT O

DICKIE, McCAMEY & CHILCOTE                   Attorneys for Defendant,
By: William R. Adams, Esquire                John Crane Inc.
I.D.# 73534
By:  Tiffany F. Turner, Esquire
I.D.# 62832
By:  William J. Smith, Esquire
I.D.# 66161
1650 Arch Street, Suite 2110
Philadelphia, PA 19103
(215) 925-2289

| | | |
|---|---|---|
| IGNATIUS PAPPAGALLO, Executor of | : | COURT OF COMMON PLEAS |
| The Estate of RALPH PAPPAGALLO a/k/a | : | PHILADELPHIA COUNTY |
| RAFFAELE PAPPAGALLO and ANNA | : | TRIAL DIVISION |
| PAPPAGALLO, in her own right | : | CIVIL ACTION |
| Plaintiffs | : | |
| vs. | : | APRIL TERM, 2023 |
| | : | NO.: 2099 |
| JOHN CRANE INC., et al. | : | |
| Defendants | : | ASBESTOS DIVISION |

### NOTICE OF FILING NOTICE OF REMOVAL

TO THE PROTHONOTARY AND PLAINTIFFS BY AND THROUGH THEIR ATTORNEYS OF
RECORD, CASEY COBURN (NASS CANCELLIERE):

PLEASE TAKE NOTICE that on April 10, 2025, Defendant John Crane Inc. filed a

Notice of Removal with the United States District Court for the Eastern District of

Pennsylvania to remove the above-captioned action from the Court of Common Pleas of

Philadelphia County, Pennsylvania, to the United States District Court for the Eastern

District of Pennsylvania.

A copy of the Notice of Removal is attached hereto as "Exhibit A" and is hereby filed

with the Prothonotary of the Court of Common Pleas of Philadelphia County, Pennsylvania,

to effect removal of the above-captioned action pursuant to 28 U.S.C. §§ 1442(a)(1) and

1446.

DICKIE, McCAMEY & CHILCOTE

By:_____*Tiffany Turner*_____

Tiffany F. Turner, Esquire
Attorney for Defendant, John Crane Inc.

## CERTIFICATE OF SERVICE

Tiffany F. Turner, Esquire hereby certifies that a copy of the foregoing pleading will be served on Plaintiffs' counsel as well as counsel for Defendants via civil e-filing <u>April 10, 2025</u>

DICKIE, McCAMEY & CHILCOTE

By: _Tiffany Turner_____
Tiffany F. Turner, Esquire
Attorney for Defendant, John Crane Inc.